JOSEPH J. BABICH, ESQ. / SBN: 096290
jbabich@dbbwc.com
SEAN D. WISMAN ESQ. / SBN: 296420
swisman@dbbwc.com
**DREYER BABICH BUCCOLA WOOD CAMPORA, LLP**
20 Bicentennial Circle
Sacramento, CA 95826
Telephone:  (916) 379-3500
Facsimile:  (916) 379-3599
DBBWC-ESERVICE@dbbwc.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL J. HALL and JEANNETTE HALL, | Case No.: 2:20-cv-01789-TLN-DMC |
| Plaintiffs, | **DECLARATION OF SEAN D. WISMAN IN SUPPORT OF OPPOSITION TO DEFENDANT CITY OF WEED'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| CITY OF WEED, JOHN GALE, and DOES 1 through 10, inclusive, | Date:       January 11, 2024 |
| Defendants. | Time:       2:00 p.m. |
| | Dept.:      Courtroom 2, 15th Floor |

I, Sean D. Wisman, declare as follows:

1.      I am an attorney licensed to practice and practicing law in the State of California.  I am an associate attorney with the law firm of Dreyer Babich Buccola Wood Campora, LLP, attorneys of record for Plaintiffs PAUL J. HALL and JEANNETTE LEWIN. I have personally worked on this case and am familiar with the facts, evidence, and issues stated herein and if called to testify hereto, I could and would competently so testify.

2.      I have personal knowledge of the statements made in this declaration and could competently testify to them if called as a witness.

3.      Attached as "**Exhibit A**" is a true and correct copy of the relevant portions of the deposition transcript of Plaintiff PAUL J. HALL in this matter.

///

---

-1-

**Declaration of Sean Wisman in Support of Opposition to**
**Defendant City of Weed's Motion for Summary Judgment**

4.      Attached as "**Exhibit B**" is a true and correct copy of the relevant portions of the deposition transcript of Plaintiff JEANNETTE LEWIN in this matter.

5.      Attached as "**Exhibit C**" is a true and correct copy of the relevant portions of the deposition transcript of Defendant JOHN GALE in this matter.

6.      Attached as "**Exhibit D**" is a true and correct copy of the relevant portions of the deposition transcript of Justin Mayberry in this matter.

7.      Attached as "**Exhibit E**" is a true and correct copy of the relevant portions of the deposition transcript of Martin Nicholas in this matter.

8.      I have personally reviewed the Body Worn Camera video (BWC) maintained by Defendant CITY OF WEED and taken from the Body Worn Camera of Defendant JOHN GALE of his interaction with Plaintiff PAUL J. HALL on October 12, 2019, which was submitted by Defendant CITY OF WEED as Exhibit F to the Declaration of Justin Mayberry in Support of Defendant CITY OF WEED's Motion for Summary Judgment (Doc. 38-4) and in Defendant CITY OF WEED's Request to File Documents Under Seal In Support Of Motion For Summary Judgment, filed with this Court on November 1, 2023 (Doc. 37), and which has been filed under seal with the Court. All citations to times and timeframes in said video are based upon my personal viewing of said video.

9.      Attached as "**Exhibit F**" is a true and correct copy of the relevant portions of the deposition transcript of Tim Green in this matter.

10.     Attached as "**Exhibit G**" is a true and correct copy of the relevant portions of the Administrative Interview of Officer John Gale, which was produced by the Siskiyou County District Attorney's Office in response to a subpoena issued in this case. Pursuant to the Affidavit of Custodian of Records signed by Custodian of Records Rachel Parks, which is found on the last page of "**Exhibit G**," this writing was made in the regular course of a business; this writing was made at or near the time of the act, condition, or event; the custodian or other qualified witness testified by declaration to the writing's identity and the mode of its preparation; and the sources of information and method and time of preparation are such as to indicate the writing's trustworthiness. To conserve resources, the entirety of the records subpoenaed from the Siskiyou County District Attorney's Office are not included in

///

---

**Declaration of Sean Wisman in Support of Opposition to**
**Defendant City of Weed's Motion for Summary Judgment**

Exhibit H, but rather, only the introductory pages, the relevant pages of the Administrative Interview of John Gale, and the Declaration of Custodian of Records.

11.     Attached as "**Exhibit H**" is a true and correct copy of the relevant portions of the transcript taken from the video taken from the Body Worn Camera (BWC) of Defendant JOHN GALE, portions of which were attached as Exhibit D to the Declaration of J. Scott Smith in Support of Defendant City of Weed's Motion for Summary Judgment. This is being offered to assist the Court in following along with the video.

I declare under penalty of perjury and the law of the State of California and the United States of America that the foregoing is true and correct.

Executed this 15th day of November, 2023, at Sacramento, California.

_____ */s/ Sean D. Wisman* _____

SEAN D. WISMAN

**Declaration of Sean Wisman in Support of Opposition to**
**Defendant City of Weed's Motion for Summary Judgment**

# EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

PAUL J. HALL and JEANNETTE )
HALL, )
 )
        Plaintiffs, )
 )  Case No.
        vs. )  2:20-cv-01789-TLN-DMC
 )
CITY OF Weed, JOHN GALE, and )
DOES 1 through 10, inclusive, )
 )
        Defendants. )
_____)

--oOo--

VIDEOTAPED DEPOSITION

OF

PAUL J. HALL

--oOo--

Friday, June 2, 2023

--oOo--

**CERTIFIED TRANSCRIPT**

23-164
Stenographically Reported By:
JULIE C. ROZELL, CSR 14107



D&B DEPOSITION REPORTERS

601 University Avenue, Suite 148, Sacramento, CA 95825 | (916) 649-1060 | rose@dbreporters.com

1                     UNITED STATES DISTRICT COURT

2                     EASTERN DISTRICT OF CALIFORNIA

3                             --oOo--

4    PAUL J. HALL and JEANNETTE        )
     HALL,                             )
5                                      )
                   Plaintiffs,         )
6                                      )   Case No.
                   vs.                 )   2:20-cv-01789-TLN-DMC
7                                      )
     CITY OF Weed, JOHN GALE, and      )
8    DOES 1 through 10, inclusive,     )
                                       )
9                  Defendants.         )
     _____)

10

11

12                            --oOo--

13                   VIDEOTAPED DEPOSITION

14                            OF

15                       PAUL J. HALL

16                            --oOo--

17                   Friday, June 2, 2023

18                            --oOo--

19

20                     CERTIFIED
                       TRANSCRIPT
21

22

23

24   23-164
     Stenographically Reported By:
25   JULIE C. ROZELL, CSR 14107



1                        APPEARANCES

2

3   For the Plaintiffs:

4           DREYER BABICH BUCCOLA WOOD CAMPORA, LLP
            BY:  JOSEPH J. BABICH, ESQ.
5           20 Bicentennial Circle
            Sacramento, California  95826-2802
6           916.379.3500
            jbabich@dbwc.com
7

8   For the Defendant CITY OF Weed:

9           ANGELO, KILDAY & KILDUFF, LLP
            BY:  BRUCE A. KILDAY, ESQ.
10          601 University Avenue, Suite 150
            Sacramento, California  95825
11          916.564.6100
            bkilday@akk-law.com
12

13  For the Defendant JOHN GALE:

14          ALLEN GLAESSNER HAZELWOOD WERTH
            BY:  DALE L. ALLEN, JR., ESQ.
15          (APPEARING REMOTELY VIA ZOOM VIDEOCONFERENCE)
            180 Montgomery Street, Suite 1200
16          San Francisco, California  94104
            414.697.2000
17          dallen@aghwlaw.com

18

19  Also Present:

20          Tiffany Foisy, videographer
            Valley Legal Video
21

22                          --oOo--
23

24

25



1                    INDEX OF EXAMINATION

2                                                     Page

3   By Mr. Kilday                                       6

4

5

6                      ---oOo---

7

8   Deponent's Signature page                         164

9   Deponent's Changes or Corrections                 165

10  Reporter's Certificate                            166

11  Deponent's Review letter                          167

12  Disposition of Original Transcript letter         168

13

14                     ---oOo---

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXHIBITS

2

3   (No exhibits were marked for identification.)

4

5                    ---oOo---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          BE IT REMEMBERED that on Friday, the

2    2nd day of June, 2023, commencing at the hour of

3    10:03 a.m. thereof, at the offices of Dreyer Babich

4    Buccola Wood Campora, LLP, 20 Bicentennial Circle,

5    Sacramento, California, before me, JULIE C. ROZELL, a

6    Certified Shorthand Reporter of the State of California,

7    the following proceedings took place as hereinafter set

8    forth.

9                        ---oOo---

10          THE VIDEOGRAPHER:  We are on the record at          10:02

11    10:03.  The date is June 2nd, 2023.  We are located at

12    20 Bicentennial Circle, Sacramento, California.

13          We are here in the matter of Hall versus City

14    of Weed.  This is the deposition of Paul J. Hall.

15          The court reporter is Julie Rozell with D&B          10:03

16    Deposition Reporters.

17          My name is Tiffany Foisy, the videographer

18    with Valley Legal Video.

19          Would all counsel please identify themselves

20    and whom they represent.                                   10:03

21          MR. BABICH:  Joseph Babich for plaintiffs.

22          MR. KILDAY:  I'm Bruce Kilday of Angelo,

23    Kilday & Kilduff for the City of Weed.

24          MR. ALLEN:  And Dale Allen on behalf of Eric

25    Gale -- I'm sorry -- John Gale.                            10:03



1   that it was necessary to have you go through that

2   evaluation -- that was what was bothering you?

3       A.    No.  I think I -- I had already acknowledged

4   the day before that -- and came to a pretty good

5   agreement that I was -- that I needed mental health      01:49

6   help.  That -- the day before -- I mean, the day before,

7   I decided that.

8           The -- the portion I did not want to go

9   through was the portion of Officer Gale coming in

10  through the door and handcuffing me and -- and then      01:49

11  taking me out was -- that was -- that was where I --

12  that's -- I didn't -- it's -- it's -- it was hard enough

13  to accept the fact that I needed help, but then -- them

14  to be here, you know, then -- and it's embarrassing.

15  It's a thing -- you know, we have shame because of these  01:49

16  things.  And then for them to take me out in cuffs, it

17  was like it -- I don't -- I didn't like the idea of it.

18      Q.    Well, forgive me for being really direct, but

19  if there was some degree of shame involved in being led

20  out of that situation in handcuffs, if that were to       01:50

21  occur -- to occur, what about the shame that you would

22  feel if you had actually ignited yourself and been

23  seriously injured or killed?  Would there be any shame

24  attached to that?

25      A.    I never intended on lighting myself.  That was   01:50

1   never an option.

2        Q.     It was never an option?

3        A.     No.

4        Q.     The lighter was a working lighter, wasn't it?

5        A.     I assume.                                          01:50

6        Q.     You had no reason to believe that the lighter

7   was a dud, meaning would not work.  You believed it was

8   a working lighter?

9        A.     Nor did I attempt to flick it, to test it,

10  because I knew that flicking it and testing it would     01:50

11  light -- would light myself on fire.  I didn't -- I

12  never intended on lighting myself on fire.

13       Q.     But isn't it true that you told Officer Gale a

14  number of times that "I'm going to light us both up"?

15       A.     I don't recall ever saying that.              01:51

16       Q.     And then he kept talking to you, and you said

17  at some point, "I will.  You know I will."  Do you

18  remember saying that?

19       A.     I don't.

20       Q.     Do you remember telling him, "Only death will  01:51

21  stop me"?

22       A.     I don't remember saying that.

23       Q.     Do you remember saying that "Only death will

24  stop me" twice?

25       A.     I don't remember saying that.                 01:51

1      Q.    You told Officer Gale when he did -- let's go

2  back a step.

3         You were told that the police were coming.

4  Did you know that it was going to be Gale that arrived?

5      A.    No.                             01:51

6      Q.    You just knew it was going to be some police

7  officer --

8      A.    Uh-huh.

9      Q.    -- correct?

10     A.    Yeah, that's correct.           01:51

11     Q.    And it turns out it was Officer Gale; correct?

12     A.    Correct.

13     Q.    Did you recognize him at that time on

14  October 12th as being the guy who had come on the noise

15  complaint a few days earlier?          01:51

16     A.    Sure.  Yes.

17     Q.    And do you remember that Officer Gale tried to

18  talk to you?

19     A.    When did he try to talk to me?

20     Q.    On the morning -- or on the day of    01:52

21  October 12th when you were there with the gasoline and

22  the lighter.

23     A.    I don't remember conversing with Officer Gale.

24     Q.    Do you have any recollection of him trying to

25  talk to you?                          01:52

1       A.    I remember him trying to grab the lighter out

2   of my hand, and I was kind of like just -- like, just

3   holding it up higher, and I was basically -- because I

4   knew he couldn't reach it.  So I just held it up.

5       Q.    How would you describe Officer Gale in terms    01:52

6   of his physical stature?

7       A.    He was small -- a smaller man.

8       Q.    How would -- how tall would you estimate him

9   to be?

10      A.    5-5, maybe.                                     01:52

11      Q.    And how tall were you?

12      A.    6-1.

13      Q.    And how much would you estimate he weighs?

14      A.    130 pounds.

15      Q.    And how much did you weigh at the time?         01:52

16      A.    185, probably.

17      Q.    So when you held the lighter up in the air and

18  he was trying to get it, he couldn't -- he couldn't

19  reach anywhere near the lighter in your hand; correct?

20      A.    No.                                             01:53

21      Q.    Is that correct?

22      A.    I would say he was close -- getting close to

23  grabbing it, yeah.  I mean, it -- I just was just kind

24  of shielding myself.  I was just, like, twisting my

25  body, I remember, and -- and then that's -- that's about  01:53

1   all I remember of that part of it.

2           I remember -- I remember talking to him, and

3   he -- he was across the room, and -- but it's all --

4   it's all bits and pieces.

5       Q.   Did you understand that he was trying to take          01:53

6   the lighter away from you so that it would not be

7   possible for you to ignite the gasoline?

8       A.   I looked at it as that he was trying to take

9   the lighter away from me so he could arrest me.  That's

10  what I was -- my fear was being arrested at that point,       01:54

11  because -- and at that point, I didn't think that I had

12  done anything that warranted an arrest, and -- and I

13  don't -- like I said, my fear was going out of there in

14  handcuffs and the -- the embarrassment that it would

15  cause my family and everything else that went along with      01:54

16  that.

17      Q.   But you just told me a few moments ago that

18  you had decided on the previous day that what you needed

19  was mental health assistance; correct?

20      A.   That's correct.                                       01:54

21      Q.   And isn't it correct that if you had gone out

22  with Officer Gale, you would have eventually had mental

23  health assistance?

24      A.   Sure.  Possibly; possibly not.  The -- what I

25  did know -- that I would be an embarrassment to my            01:55

1  family, and it would be embarrassing to go out of there

2  in -- over -- and like I said before, in my eyes, that I

3  hadn't committed a crime yet.  I mean, there's

4  nothing --

5      Q.    And so the fear of being taken out in          01:55

6  handcuffs, the belief that you had not committed a crime

7  was enough to make you resist the officer trying to take

8  a lighter away from you while you were standing there

9  soaked in gasoline.  Is that accurate?

10     A.    That's the best I can remember, yeah.          01:56

11     Q.    Before the officer arrived, you said that your

12 son Devin had confronted you and that Devin saw you with

13 the gasoline and could smell the gasoline on you and saw

14 you with the lighter in your hand.  But Devin called

15 your bluff; correct?                                     01:56

16     A.    Uh-huh.

17     Q.    Is that right?

18     A.    That is correct.

19     Q.    Now, you had also said that you wanted to get

20 the family to talk to you, and that was the reason that  01:56

21 you had gone down to that middle floor, because you knew

22 they had to leave and that they would see you as they

23 left to go take your son someplace; correct?

24     A.    That is correct.

25     Q.    Once Devin saw you and called your bluff,      01:56

1    hadn't your point -- hadn't your objective of making

2    them see you in that situation been achieved?

3         A.    Yes and -- and no.  I mean, the -- by the time

4    it was -- it was -- by the time it was -- the -- I was

5    told the cops were on their way -- or the cops were          01:57

6    here, at that point, it was just try to flee, you know,

7    try to -- try to get out the -- out the back door.

8    That's where -- I ran towards the back door.

9         Q.    But you didn't go out the back door, did you?

10        A.    Because I couldn't.                                01:57

11        Q.    Why couldn't you?

12        A.    Because I had screwed it shut the night

13   before, like a dummy.  I had used -- because the back

14   door wouldn't lock, and I'd screw it so that it -- it's

15   just a prevention from anybody getting in.  And I busted      01:57

16   down one part of the door and climbed through it, and I

17   got to the back porch, and then I realized that I had

18   locked it off, and I couldn't get out.

19             MR. BABICH:  Bruce, I know you're leading up

20   to the moment, but what do you think about a break?          01:58

21             MR. KILDAY:  If you want, sure.

22             MR. BABICH:  Okay.

23             THE VIDEOGRAPHER:  Off the record at 1:58.

24             (A brief recess was taken.)

25             THE VIDEOGRAPHER:  Back on the record at 2:16.      02:15

1       A.    I -- I don't recall.

2       Q.    Are you aware that Officer Gale was

3   continuously trying to demand that you give him the

4   lighter or put the lighter down?

5       A.    I don't remember Officer Gale -- having a          02:29

6   conversation with Officer Gale, period -- the

7   conversation.  So I don't know the interactions that --

8   that we had.  I don't -- the only thing I remember is

9   the physical part of it, when he physically tried to

10  grab something from me.  And that's the only thing I can    02:29

11  remember.

12      Q.    When he physically tried to grab something

13  from you, do you have a recollection of his -- having

14  his hands on your hand?

15      A.    I don't.                                           02:30

16      Q.    Or do you just remember holding it above him?

17      A.    I just remember holding it above him.

18      Q.    What I was -- all this was leading up to my

19  asking whether you ever put any kind of a condition on

20  relinquishing the lighter?                                  02:30

21      A.    Not that I'm aware of.

22      Q.    Did you see him remove his Taser from its

23  holster?

24      A.    I don't recall him -- him doing that.

25      Q.    Do you have any recollection of him holding        02:30

1    the Taser?

2        A.    I remember, "Taser, Taser, Taser."

3        Q.    And what do you mean by that?

4        A.    Those are the words I remember him saying.

5    And I remember trying to decipher what was -- what that          02:30

6    really meant.  I didn't really -- I couldn't put it in

7    my -- in context, what it was -- the outcome would be.

8        Q.    Do you have any recollection of hearing a

9    countdown, a verbal countdown?

10       A.    No.                                                     02:31

11       Q.    Do you have any knowledge of what happened to

12   the lighter that had been in your hand?

13       A.    No, I don't.

14       Q.    Do you know if the lighter was still in your

15   hand when you went outside?                                       02:31

16       A.    Don't have a clue.

17       Q.    Do you know if the lighter was ever found

18   inside the building?

19       A.    I don't know.

20       Q.    After you heard the words, "Taser, Taser,               02:31

21   Taser," what, if anything, do you remember?

22       A.    Officer Gale smiling at me, and me being

23   tased.

24       Q.    Okay.  What do you mean when you say that he

25   was smiling at you?                                               02:32

1        A.      He smiled at me.

2        Q.      Did you have -- did you interpret that to mean

3    something?

4        A.      I -- it's the first thought that I had

5    whenever I woke up out of my coma, and -- and it's the          02:32

6    thought of many nightmares.   Many times I've woken up

7    with that thought.   And I don't -- I don't know how to

8    interpret it.   I just know that that's -- that's what

9    happened.

10       Q.      Have you seen Officer Gale at any time since        02:33

11   that incident?

12       A.      I have.

13       Q.      When have you seen him?

14       A.      I seen him -- he continued working for quite

15   some time after -- that year afterwards.                        02:33

16       Q.      And you saw him when he was on -- on duty

17   working?

18       A.      And off duty.

19       Q.      Where did you see him off duty?

20       A.      Just driving -- driving -- driving around.          02:33

21       Q.      Did you ever have any contact with him?

22       A.      No.

23       Q.      Did you ever attempt -- attempt to communicate

24   with him?

25       A.      No.                                                 02:33

1   of how serious you were, serious enough to have doused

2   yourself with gasoline and hold a lighter.

3        MR. BABICH:  Well, before you answer that,

4   it's compound.

5        MR. KILDAY:  Certainly.                          02:53

6        MR. BABICH:  And it calls for speculation of

7   what's in Devin's mind.

8        And that's the most technical objection you've

9   heard all day.

10        MR. KILDAY:  It might be the only objection    02:53

11   I've heard all day.

12   BY MR. KILDAY:

13   Q.    So let me just ask it this way.

14        Once Devin called your bluff, why did you not

15   drop the lighter?                                    02:53

16   A.    From what I recall is that, at that point, I

17   was -- I recall them saying that the cops were here, and

18   I don't even know that -- why -- I just ran.  I remember

19   just wanting to get out of there.

20        And I don't remember even the lighter being a   02:54

21   factor at the point whenever I decided to get up and

22   run.  It was -- that was an afterthought, really, at

23   that point.  You know, it just wasn't -- I remember

24   being told that the cops were here, and my only

25   objective was to -- to get -- to get out.            02:54

1      Q.    To your knowledge, did your wife, Jeannette,

2  see you at any point when you were standing there doused

3  with gasoline holding the lighter?

4      A.    I don't recall.  I don't.

5      Q.    All right.  I have no further questions.          02:55

6      A.    Okay.

7            MR. KILDAY:  Joe?

8            MR. BABICH:  No questions.

9            MR. KILDAY:  Dale?

10           MR. ALLEN:  No questions.                          02:55

11           MR. KILDAY:  Okay.

12           THE VIDEOGRAPHER:  Okay.  This concludes the

13  deposition of Paul J. Hall.  We are off the record at

14  2:55.

15           THE REPORTER:  Mr. Allen, will you be ordering     02:55

16  an electronic copy of the transcript from today?

17           MR. ALLEN:  Yes, please.  And if it wasn't

18  asked for -- did you take yesterday's depo?

19           THE REPORTER:  I did.

20           MR. ALLEN:  I don't know if my associate asked     02:55

21  for an electronic copy, but I'd like it from yesterday

22  as well.

23           THE REPORTER:  And, Mr. Babich?

24           MR. BABICH:  Yes, please.

25           (The proceedings concluded at 2:55 p.m.)

1                    SIGNATURE PAGE

2

3    Please be advised that I have read the

4    foregoing deposition, pages 1 through 163,

5    inclusive.  I hereby state that there are:

6

7    (Check one) _____  no corrections

8                _____  corrections per

9                             attached

10

11   Signed under penalty of perjury.

12   _____
     PAUL J. HALL
13

14   _____
     Date
15
                     --oOo--
16

17

18

19

20

21

22

23

24

25

```
 1              DEPONENT'S CHANGES OR CORRECTIONS

 2    Instructions:  If you are adding to your testimony,
      print the exact words you want to add.  If you are
 3    deleting from your testimony, print the exact words you
      want to delete.  Specify with "Add" or "Delete" and sign
 4    this form.

 5    Deposition of:   PAUL J. HALL
      Held on:         June 2, 2023
 6    Job No.:         23-164
      Case Title:      Hall vs. City of Weed, et al.

 7
      I, PAUL J. HALL, have the following changes and/or
 8    corrections to make to my deposition:

 9    PAGE     LINE      CHANGE/ADD/DELETE

10    _____   _____    _____

11    _____   _____    _____

12    _____   _____    _____

13    _____   _____    _____

14    _____   _____    _____

15    _____   _____    _____

16    _____   _____    _____

17    _____   _____    _____

18    _____   _____    _____

19    _____   _____    _____

20    _____   _____    _____

21    _____   _____    _____

22    _____   _____    _____

23    _____   _____    _____

24    DEPONENT'S SIGNATURE: _____

25    DATE: _____
```

1                    REPORTER'S CERTIFICATE

2  State of California              )
                                    ) ss.
3  County of Sacramento             )

4          I, JULIE C. ROZELL, a Certified Shorthand

5  Reporter of the State of California, duly authorized to

6  administer oaths, do hereby certify:

7          That I am a disinterested person herein; that

8  the witness, PAUL J. HALL, named in the foregoing

9  deposition, was by me duly sworn to testify the truth,

10 the whole truth, and nothing but the truth; that the

11 deposition was reported in shorthand by me, JULIE C.

12 ROZELL, a Certified Shorthand Reporter of the State of

13 California, and thereafter transcribed using

14 computer-aided transcription and is a true and correct

15 record of the testimony so given.

16          ( X ) Reading and signing was requested

17          (   ) Reading and signing was waived

18          (   ) Reading and signing was not requested

19          IN WITNESS WHEREOF, I hereby certify this

20 transcript at my office in the County of Sacramento,

21 State of California, this June 13, 2023.

22

23          _____
           JULIE C. ROZELL, CSR NO. 14107
24          Certified Shorthand Reporter of
           the State of California

25


D&B DEPOSITION REPORTERS
(916) 649-1060 | rose@dbreporters.com

# EXHIBIT B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

PAUL J. HALL and JEANNETTE          )
HALL,                               )
                                    )
            Plaintiffs,             )
                                    )  Case No.
            vs.                     )  2:20-cv-01789-TLN-DMC
                                    )
CITY OF WEED, JOHN GALE, and        )
DOES 1 through 10, inclusive,       )
                                    )
            Defendants.             )
_____)



--oOo--

VIDEOTAPED DEPOSITION

OF

JEANNETTE LEWIN

--oOo--

Thursday, June 1, 2023

--oOo--

CERTIFIED
TRANSCRIPT




23-163
Stenographically Reported By:
JULIE C. ROZELL, CSR 14107



601 University Avenue, Suite 148, Sacramento, CA 95825 | (916) 649-1060 | rose@dbreporters.com

1                  UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF CALIFORNIA

3                          --oOo--

4   PAUL J. HALL and JEANNETTE      )
    HALL,                           )
5                                   )
              Plaintiffs,           )
6                                   )   Case No.
              vs.                   )   2:20-cv-01789-TLN-DMC
7                                   )
    CITY OF WEED, JOHN GALE, and    )
8   DOES 1 through 10, inclusive,   )
                                    )
9              Defendants.          )
    _____)

10

11

12                        --oOo--

13                VIDEOTAPED DEPOSITION

14                          OF

15                  JEANNETTE LEWIN

16                        --oOo--

17              Thursday, June 1, 2023

18                        --oOo--

19                    CERTIFIED
                      TRANSCRIPT
20

21

22

23

24   23-163
     Stenographically Reported By:
25   JULIE C. ROZELL, CSR 14107

1                          APPEARANCES

2

3   For the Plaintiffs:

4          DREYER BABICH BUCCOLA WOOD CAMPORA, LLP
           BY:  JOSEPH J. BABICH, ESQ.
5          20 Bicentennial Circle
           Sacramento, California  95826-2802
6          916.379.3500
           jbabich@dbwc.com

7

8   For the Defendant CITY OF WEED:

9          ANGELO, KILDAY & KILDUFF, LLP
           BY:  BRUCE A. KILDAY, ESQ.
10         601 University Avenue, Suite 150
           Sacramento, California  95825
11         916.564.6100
           bkilday@akk-law.com

12

13  For the Defendant JOHN GALE:

14         ALLEN GLAESSNER HAZELWOOD WERTH
           BY:  WILLIAM A. ASPINWALL, ESQ.
15         (APPEARING REMOTELY VIA ZOOM VIDEOCONFERENCE)
           180 Montgomery Street, Suite 1200
16         San Francisco, California  94104
           414.697.2000
17         waspinwall@aghwlaw.com

18

19  Also Present:

20         Bob Fennessy, videographer
           Valley Legal Video

21

22                          --oOo--

23

24

25



1                    INDEX OF EXAMINATION

2                                                    Page

3   By Mr. Kilday                                    6

4   By Mr. Aspinwall                                 138

5   By Mr. Kilday                                    143

6

7                       ---oOo---

8

9   Deponent's Signature page                        145

10   Deponent's Changes or Corrections               146

11   Reporter's Certificate                          147

12   Deponent's Review letter                        148

13   Disposition of Original Transcript letter       149

14

15                       ---oOo---

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXHIBITS

2

3    (No exhibits were marked for identification.)

4

5                      ---oOo---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           BE IT REMEMBERED that on Thursday, the

2  1st day of June, 2023, commencing at the hour of

3  10:09 a.m. thereof, at the offices of Dreyer Babich

4  Buccola Wood Campora, LLP, 20 Bicentennial Circle,

5  Sacramento, California, before me, JULIE C. ROZELL, a

6  Certified Shorthand Reporter of the State of California,

7  the following proceedings took place as hereinafter set

8  forth.

9                     ---oOo---

10           THE VIDEOGRAPHER:  Hello.  My name is Bob          10:08

11  Fennessy, and I'll be video recording this deposition

12  today.  I'm here on behalf of Valley Legal Video,

13  Sacramento.

14           The date is June 1st, 2023.  The time is

15  10:09.  We're located at 20 Bicentennial Circle,          10:09

16  Sacramento.

17           We're here in the matter of Hall versus City

18  of Weed.  This is the deposition of Jeannette Hall.

19           The attorney taking the deposition is Bruce

20  Kilday.  The court reporter is Julie Rozell of D&B        10:09

21  Deposition Reporters.

22           The attorneys will now introduce themselves.

23           MR. BABICH:  Joseph Babich for the plaintiffs.

24           MR. KILDAY:  I'm Bruce Kilday for the City of

25  Weed.                                                      10:09



1          A.     About 10 miles.

2          Q.     Is Mount Shasta on Highway 5?

3          A.     Yes.

4          Q.     In the -- in this ten-year period before

5    October of 2019, did PJ have any kind of a mental or          12:40

6    emotional breakdown?

7          A.     What do you mean by that?

8          Q.     Well, did he have anything like -- that

9    involved a particular incident?  Not a general condition

10   but a particular incident.  For example, did he ever          12:41

11   talk about suicide?

12         A.     No.

13         Q.     Do you know if anybody in his family ever

14   talked about suicide?

15         A.     Not that I can recall.                            12:41

16         Q.     Now, the October 12th, 2019, incident involved

17   him threatening to commit suicide, didn't it?

18         A.     Yes.

19         Q.     And just in a nutshell, he poured gasoline on

20   himself, held a lighter in his hand, and threatened to        12:42

21   flick the lighter; is that correct?

22         A.     He did not threaten to -- to flick the

23   lighter.  He had it in his hand.

24         Q.     Okay.  All right.  Had he ever done anything

25   remotely like that in the ten years before?                   12:42

1        A.    No.

2        Q.    Do you know of anybody -- any friends of the

3    family who have committed suicide?

4        A.    No.

5        Q.    Did you ever threaten to commit suicide?        12:42

6        A.    No.

7        Q.    Was PJ ever hospitalized because of any

8    emotional issue in the ten years before this incident?

9        A.    No.

10       Q.    Has PJ ever been treated under Section 5150?    12:43

11   Are you familiar with that section?

12       A.    I'm familiar with that, yes.

13       Q.    Has he ever been treated as a result of that

14   section?

15       A.    No.                                             12:43

16       Q.    Has he ever -- and treated might be the wrong

17   word.

18             Has he ever been examined or cared for as a

19   result of that section being used?

20       A.    No.                                             12:43

21       Q.    I've been told that there was a call to the

22   police department in July of 2014 -- so this is five

23   years before the incident -- in which PJ had threatened

24   to hang himself.

25             Do you have any recollection of that?           12:44

1    Q.    That was mentioned by Chief Mayberry when he
2  was deposed in this case.
3    A.    I don't have any recollection of that.
4    Q.    Okay.  Did PJ ever express any kind of
5  attitude or feelings about the police in general before      12:49
6  this incident?
7    A.    No.
8    Q.    Did he have any friends who were police
9  officers?
10   A.    What do you mean by that?                              12:49
11   Q.    Well, any -- any people that he'd grown up
12 with or neighbors or people that he'd become friendly
13 with in town who happened to be police officers or
14 sheriff's officers?
15   A.    I mean, he knew some of the police officers in      12:49
16 Weed, but I'm not sure if they were, like -- if they
17 grew up together --
18   Q.    Okay.
19   A.    -- because I didn't grow up there; so --
20   Q.    But they didn't come -- family friends?          12:49
21   A.    Right.
22   Q.    Okay.  Did PJ ever -- PJ ever talk about
23 having police officers shoot him?  Did he ever talk
24 about creating a situation where a police officer would
25 end up shooting him?                                          12:50

1     A.     Not that I recall.

2     Q.     Did he say anything remotely like that?

3     A.     Not that I can recall.  I'm not sure on that.

4     Q.     Have you ever heard from somebody else that PJ

5  told another person something about an idea of having            12:50

6  police shoot him?

7     A.     I'm not -- I'm not recalling any of that.

8     Q.     All right.  I'm going to move to the time

9  around the incident itself, and I understand that the

10 incident was on October 12th, 2019.                              12:51

11            Do you agree with that?

12    A.     Yes.

13    Q.     Do you remember what day of the week that was?

14    A.     I believe it was a Wednesday.

15    Q.     Okay.  And can you describe for me PJ's             12:51

16 attitude, demeanor, his behavior in the month or so

17 before that?  So from mid-September through

18 October 12th, was there anything unusual about him

19 regarding work?

20    A.     No.                                                 12:51

21    Q.     Was there anything unusual about his use of

22 drugs -- of methamphetamine?

23    A.     Can you say that again?

24    Q.     Was he -- was there anything unusual -- let me

25 ask it a different way.                                        12:51

1      A.   We woke up.  I believe that I made the kids

2   some breakfast, and PJ came up to have another

3   conversation.  He was upset with the conversation that

4   we had the night before, wanted to talk some more.  He

5   didn't seem like he was any better than the night          01:02

6   before.  He seemed a little worse.

7      Q.   Did he seem work -- excuse me.

8           Did -- did PJ drink alcoholic beverages around

9   that time in -- in 2019?

10     A.   Periodically.                                       01:03

11     Q.   And you said that he was upset that -- that

12  morning -- upset about the conversation you'd had the

13  night before; correct?

14     A.   Yes.

15     Q.   And could you tell if he had had anything of      01:03

16  an alcoholic nature to drink at the time you were

17  observing him being more upset?

18     A.   He told me that he had drank some -- some

19  alcohol.

20     Q.   Okay.  What time of day was this?                  01:03

21     A.   Oh, I don't even recall.  Maybe 10:00 --

22  between 10:00 and noon.

23     Q.   Okay.  Did he say what he had or how much he

24  had?

25     A.   He just said he had a beer, I believe.             01:03

1     A.    I tried to tell him -- ask him what he was

2  doing and to open the door, and he wouldn't unlock it.

3  That's when I panicked and ran up the stairs, down some

4  stairs, and to the back to go through a little window to

5  try to get in and do what I could to --                    01:10

6     Q.    And did you have any communication -- verbal,

7  telephonic, any other kind -- with him during that --

8  those motions?

9     A.    Just trying to yell through him -- through the

10  door.                                                       01:11

11     Q.    Did he say anything to you?

12     A.    He just looked at me and said that -- that

13  this was my fault.

14     Q.    When you say he said, "This was my fault," are

15  you saying that he was saying, "It was Jeannette's         01:11

16  fault," or, "It was PJ's fault"?

17     A.    My fault.

18     Q.    So he was saying, "It was Jeannette's

19  fault" -- your fault?

20     A.    Yes.                                               01:11

21     Q.    Did he say what he was going to do?

22     A.    No, not that I recall.

23     Q.    Did -- did your observation of him with a gas

24  container next to him make you think that he was going

25  to attempt to commit suicide?                              01:12

```
 1        A.    Not commit suicide, but a cry for help.

 2        Q.    What would be the difference, in your mind,

 3   between an attempt at suicide, with a man having a can

 4   of gas there, and a cry for help?

 5        A.    Because PJ wouldn't have lit himself on fire.      01:12

 6   He's afraid of fire.

 7        Q.    How do you know he's afraid of fire?

 8        A.    The years of us being together, he could never

 9   start a fire.  Like, a fireplace or -- he was always

10   afraid of getting -- getting burned.                          01:12

11        Q.    So what did you do after you went through the

12   building in the manner you described?

13        A.    I unlocked the door so my son could come in to

14   help try to, you know --

15        Q.    And that was your older son, Dominic?              01:13

16        A.    That's my older son, Devin.

17        Q.    Devin.  Okay.

18              And so you communicated with him and had him

19   come downstairs?

20        A.    Yes.                                               01:13

21        Q.    Then what happened?

22        A.    After I got into the room, I unlocked the door

23   to have Devin come in, had him call -- he was already on

24   the phone with Weed PD to see if we can get an officer

25   to come help at least calm the -- you know, ask for help    01:13
```

1       A.    He had -- I had seen his hand clenched, but I

2  couldn't -- I couldn't see the lighter itself, no.

3       Q.    Did you later realize that there was a

4  lighter?

5       A.    Yes.                                          01:15

6       Q.    At that moment, how many people were in -- or

7  in the immediate vicinity of the building at 180 Main

8  Street?

9       A.    It was me and my son --

10      Q.    Okay.                                          01:15

11      A.    -- Devin.

12      Q.    And PJ?

13      A.    And PJ.

14           I need to take just a quick bathroom break.

15           MR. KILDAY:  Can we go off the record for a    01:16

16  moment.

17           THE VIDEOGRAPHER:  The time is 1:16.  Off the

18  record.

19           (A brief recess was taken.)

20           THE VIDEOGRAPHER:  The time is 1:24.  Back on   01:24

21  the record.

22  BY MR. KILDAY:

23      Q.    Ms. Lewin, are you ready to go?

24      A.    Yes.

25      Q.    Okay.  I think we were talking about the fact  01:24

1    A.    I assumed it was.

2    Q.    In the call to the police, did your son say

3  anything about PJ threatening to ignite himself in any

4  other -- in any kind of language, any kinds of words?

5    A.    Not that I recall, because I was also on the          01:27

6  phone with his parents.

7    Q.    Okay.  And what were you telling his parents?

8    A.    Asking if -- I called his mother to ask if we

9  could get her husband to come down to help.

10    Q.    And was he available?  "He," meaning her          01:27

11  husband, PJ's father?

12    A.    He wasn't home at the time, no.  I think he

13  was golfing, but I'm not positive.

14    Q.    Do you know if there was a fire extinguisher

15  in the building?                                                01:28

16    A.    Yes, I did have one.

17    Q.    Where?

18    A.    I had one upstairs.

19    Q.    Did you go get it?

20    A.    After PJ was outside, I did.                          01:28

21    Q.    Okay.  Did you instruct either of your sons or

22  anybody else to go upstairs to get it?

23    A.    No.  It was in a panic.  Did not even think

24  about that until after the fact.

25    Q.    So your son called the police; you called PJ's      01:28

```
 1        Q.    When Officer Gale arrived on the date of the

 2   incident, did you recognize him from a couple days

 3   previous when he responded on the noise complaint?

 4        A.    Yes.

 5        Q.    When Officer Gale arrived on the date of the     01:31

 6   incident, what did you tell him?

 7        A.    I was on the phone with PJ's mom, and he asked

 8   where he was, and I said, "In the back room."

 9        Q.    And when you say "back room," does that refer

10   to a room that is close to the street or farther away     01:31

11   from the street?

12        A.    Farther away from the street.

13        Q.    And did you see what, if anything, Officer

14   Gale did after getting that information?

15        A.    I just saw him run to the back, and there was   01:32

16   a door closed, and I remember him -- there was, like, an

17   opening -- like, a cutout opening on the door, and I

18   seen -- because the door was locked, and Officer Gale

19   jumped -- like, climbed through the -- the door to get

20   into the back room.                                        01:32

21        Q.    So he climbed through the opening in the door,

22   because the door was locked --

23        A.    Right.

24        Q.    -- in order to get through the door to the

25   room where PJ was?                                         01:32
```

1     A.    Yeah.  If you -- so here's (indicating) --
2  there's a -- a room, and then the door, and then he just
3  jumped in.  Because the room's not very big.  It's maybe
4  a little wider than this table.
5     Q.    So would you say it's 6 feet wide?                01:32
6     A.    Yeah.
7     Q.    So could you tell if PJ was saying anything to
8  you or your son or the officer at that time?
9     A.    All I heard was, "Go be with your loved ones.
10 Life is too short," or something to that effect.           01:33
11    Q.    And was it your understanding he was saying
12 that to the officer?
13    A.    I just heard PJ saying that.  I'm not sure if
14 he was saying that to the officer or if he was just
15 saying that just in general.  I was outside on the         01:33
16 street.
17    Q.    If PJ was talking about "going with your loved
18 ones," would you agree that you and your sons and his
19 parents were PJ's loved ones?
20    A.    Yes.                                              01:33
21    Q.    From your position on the street --
22          And that's on Main Street; correct?
23    A.    Correct.
24    Q.    -- could you see into the room in which PJ was
25 located?                                                   01:34

1   about hearing Officer Gale talk about a lighter and

2   asking -- commanding PJ to give him the lighter; is that

3   correct?

4        A.    I wouldn't say it was demanding.  I kind of

5   vaguely remember him saying, "Hand me the lighter," or          01:35

6   something to that effect, but I'm -- like I said, I'm

7   not positive.  I was also on the phone with PJ's mom at

8   that time.

9        Q.    And with regard to Officer Gale saying

10  something about, "Hand me the lighter," words to that          01:36

11  effect, do you know if he said that repeatedly?

12       A.    Not that I know of.  I don't recall.

13       Q.    Do you -- from what you're saying, you could

14  not observe if Officer Gale tried to physically take the

15  lighter away from PJ; is that correct?                          01:36

16       A.    That is correct.

17       Q.    Could you hear -- or based on what you did

18  hear, could you tell whether or not Officer Gale tried

19  to physically take the lighter away from PJ?

20       A.    I cannot tell you that.                              01:36

21       Q.    Did you hear PJ tell Officer Gale something to

22  the effect of, "Go be safe"?

23       A.    I don't recall that.  All I recall is him

24  saying, "Be" -- "Go with your loved ones."  That's what

25  I recall him saying.                                            01:37

1      Q.    And you remember -- you do remember him

2   saying, "Be with your loved ones"?

3      A.    That's -- yes.

4      Q.    Did you overhear PJ say something to the

5   effect of, "Only death will stop me"?          01:37

6      A.    I do not recall that at all, no.

7      Q.    Would you be surprised to learn that PJ said,

8   "Only death will stop me"?

9      A.    Yeah.  I'm pretty shocked on that one.

10            (Discussion off the record.)          01:38

11            THE VIDEOGRAPHER:  1:38.  Off the record.

12            (Discussion off the record.)

13            THE VIDEOGRAPHER:  1:38.  Back on the record.

14   BY MR. KILDAY:

15      Q.    Did you hear PJ say anything to the effect of,     01:38

16   "You're going to have to kill me, or I'm going up"?

17      A.    I did not.

18      Q.    Would it surprise you to learn that he did say

19   that?

20      A.    Yes.          01:39

21      Q.    Do you know where your son Devin was at the

22   time Officer Gale was inside the building with PJ?

23      A.    Yes.  He was in the -- I call it a makeshift

24   kitchen, just the room before you go into the back deck

25   area where the incident happened.          01:39

1      Q.     So Devin would be near where PJ and Officer

2   Gale were but one room removed?

3      A.     Yeah.  Well -- so say here's the

4   (indicating) -- the room that my son was in, and then

5   there's a wall -- a door, and then that's where the --                01:40

6   the incident happened.

7      Q.     Okay.  So between your son and the -- and the

8   room in which it happened, there was a wall and a door;

9   correct?

10      A.     Correct.                                                     01:40

11      Q.     Do you know if that door was opened or closed

12   at the time Officer Gale and PJ were in the room

13   together?

14      A.     I'm assuming that it was still closed, because

15   Officer Gale had to jump through the window -- or the --              01:40

16   the cutout in the door.

17      Q.     Okay.  So that door that was closed is the one

18   that had the cutout through which Officer Gale climbed

19   to get closer to PJ; correct?

20      A.     Yes.                                                         01:40

21      Q.     From your position on Main Street, did you say

22   anything to PJ during all of this?

23      A.     I did not talk to PJ during this, no.

24      Q.     Other than Officer Gale, do you know of

25   anybody else who spoke with PJ during this?                           01:40

1      A.     Not spoke.  I -- let me backtrack there.

2             I'm not sure if my nephew said anything to PJ

3   at that time when he showed up and ran to the back.

4      Q.     And your -- that's your nephew Spencer --

5      A.     Yes.                                            01:41

6      Q.     -- Bobbie's son?

7      A.     Yes.

8      Q.     Is that right?

9      A.     Yes.

10     Q.     And where did Spencer go upon his arrival?    01:41

11     A.     He ran straight to where they were at.

12     Q.     So would he have been right next to Devin?

13     A.     I believe he went -- tried to get further.

14     Q.     So he was closer than Devin was to the room

15  where PJ and Officer Gale were?                          01:41

16     A.     Yes.

17     Q.     Did you hear anything that Devin said to

18  either Officer Gale or to PJ?

19     A.     I did not.

20     Q.     Did you hear anything that Spencer said to   01:42

21  either PJ or Officer Gale?

22     A.     No.

23     Q.     Do you know if either one of them said

24  anything?

25     A.     I -- I have -- I don't know.                   01:42

1    Q.    Did you hear any reference to a Taser?

2    A.    Only after my nephew yelled, "He tased him."

3    Q.    Okay.  But nothing before that?

4    A.    Nothing before that; I did not.

5    Q.    Did you hear Officer Gale threatening to use a        01:42

6    Taser unless PJ gave him the lighter?

7    A.    I did not.

8    Q.    Did you hear anybody say, "Don't use the

9    Taser," or say anything about choosing not to use the

10   Taser?                                                        01:43

11   A.    No.

12   Q.    So the situation is that you're outside on

13   Main Street, PJ and Officer Gale are inside, Devin and

14   Spencer are inside but at least one room away with

15   Spencer being a little closer than Devin; correct?           01:43

16   A.    Correct.

17   Q.    And you could hear parts of what was being

18   said between PJ and Officer Gale; correct?

19   A.    Just what I stated earlier with the -- "Be

20   with your loved ones"; that's all I heard.  That's all I     01:43

21   heard.

22   Q.    Did you hear Officer Gale say -- did you hear

23   anything that Officer Gale said?

24   A.    No.

25         MR. BABICH:  Bruce, was that question in          01:44

1        A.      My nephew saying, "He tased him," and PJ

2   coming running out of the house.

3        Q.      Did you hear any sounds or noises?

4        A.      Just that my nephew said, "He tased him."

5   Well, he didn't say it in those exact words.  He said,        01:50

6   "He effing tased him," and PJ come running out in a ball

7   of flame, taking off his shirt.  And then my nephew and

8   my son running out trying to get PJ to roll on the

9   ground to get the fire off -- out.  And then I ran

10  upstairs to grab the fire extinguisher.  And by the time      01:51

11  I came back downstairs, PJ was already on the ground,

12  and they had -- had him out, and the -- my nephew had

13  the -- the fire department or the ambulance -- I'm not

14  sure which one it was -- to try to get PJ to calm

15  down --                                                       01:51

16       Q.      So by the time -- so you saw PJ run out.  Then

17  you went upstairs to get the fire extinguisher --

18       A.      Yes.

19       Q.      -- and you came down with the fire

20  extinguisher, but by the time you returned, there were        01:51

21  already emergency personnel there starting to -- to

22  treat PJ.  Is that accurate?

23       A.      Not -- they were -- one of them was a -- a

24  volunteer EMT, I believe, and he was walking down the

25  street when it happened.  And then the neighbor across        01:51

1   the street, her husband was there.  She owns a hair

2   salon, and he happened to be there, and he -- from what

3   I remember is he -- he came and helped also.  And there

4   was a couple other people there, but I'm not sure who

5   they -- who they were.                                          01:52

6       Q.    Did you see a fire engine or an ambulance at

7   that time?

8       A.    I believe there was one.  There was a bunch of

9   people around PJ at that point --

10      Q.    Okay.                                                 01:52

11      A.    -- pouring -- trying to pour water on him and

12  trying to get him to --

13      Q.    I didn't mean to cut you off.

14      A.    That's okay.

15      Q.    At the time you came down -- so you saw Devin,       01:52

16  and you saw Spencer, and you saw PJ; correct?

17      A.    Yes.

18      Q.    Did you see Officer Gale?

19      A.    Yes, I did.

20      Q.    Where was he?                                         01:52

21      A.    Trying to restrain PJ.

22      Q.    Can you describe that, please?

23      A.    PJ was on his back, and Officer Gale was on

24  top of him, trying to hold him down, and PJ was trying

25  to push him off, and they were both yelling at each          01:53

1   other.

2        Q.     Okay.  What do you remember the yelling to be?

3        A.     I remember PJ saying that he -- he did it and

4   that -- and I heard Officer Gale say, "Why'd you

5   light" -- "Why'd you" -- "Why'd you do it, PJ?"          01:53

6        Q.     Did you hear anything else that PJ said?

7        A.     He was just screaming.

8        Q.     Did you hear anything else that Officer Gale

9   said?

10       A.     I don't recall.                               01:53

11       Q.     At any point did you hear anybody yell at

12  Gale?

13       A.     Yes.

14       Q.     What did you hear?

15       A.     I'm not -- I think it was my nephew was       01:54

16  saying, "Why'd you do it" -- "Why'd you tase him?  Why'd

17  you tase him?"

18       Q.     And did you hear a response?

19       A.     I did not.

20       Q.     Did you hear anybody else saying anything?    01:54

21       A.     There was a bunch of people talking, but I --

22  I can't recall what they were saying.

23       Q.     All right.  Did you hear PJ say anything about

24  wanting to harm Officer Gale?

25       A.     I don't recall.                               01:54

```
1            MR. BABICH:  Yeah, let's take a break.

2            THE VIDEOGRAPHER:  2:16.  Off the record.

3            (A brief recess was taken.)

4            THE VIDEOGRAPHER:  2:25.  Back on the record.

5            MR. KILDAY:  Okay.  It's been about ten          02:25

6    minutes.  I've looked at my notes, and I don't think I

7    have any more questions for you.  So I'll turn it over

8    to Mr. Gale's counsel and see if he has anything he

9    wants to discuss.

10                      EXAMINATION                          02:25

11   BY MR. ASPINWALL:

12       Q.    Yeah, I'll just ask a couple questions.

13            And I just want to bring your attention back

14   to the date of the incident.  And I want to ask you

15   where you were when Officer Gale first arrived on the   02:25

16   scene.

17       A.    I was outside on the sidewalk in front of my

18   place.

19       Q.    So you saw Officer Gale arrive; correct?

20       A.    My back was turned when he pulled up, but when 02:25

21   I turned around, I seen him, yes.

22       Q.    You saw that he arrived in a police car?

23       A.    Yes.

24       Q.    What was the first thing that Officer Gale

25   said after he got out of his police car and approached  02:26
```

1    you?

2        A.    I believe he said, "Where's he at?"

3        Q.    What did you say?

4        A.    I said, "In the back room" -- or I said,

5    "Inside" -- either "Inside" or "In the back room."          02:26

6        Q.    And when you say, "Where is he at?" I assume

7    you're talking about PJ; correct?

8        A.    Correct.

9        Q.    After you told Officer Gale where PJ was, what

10   was the next thing that Officer Gale said?                   02:26

11       A.    I don't recall him saying anything.

12       Q.    What was the next thing that Officer Gale did?

13       A.    Ran towards the back room where PJ was at.

14       Q.    Did you have to show him where the back room

15   was?                                                         02:26

16       A.    I kind of pointed and said, "That way,"

17   (indicating), like, forward to the only -- it was, like,

18   a straight like to where PJ was at.

19       Q.    Did you or anybody else accompany Officer Gale

20   toward the back room as he began to approach PJ?             02:27

21       A.    I did not follow Officer Gale, and I believe

22   my son was already in the storefront.  I'm not sure if

23   he was in the makeshift kitchen or in the storefront

24   area -- in the room before where PJ was at.

25       Q.    Earlier you testified that two days prior to      02:27

1    memories.

2        Q.    Okay.  And is that the only reason that he has

3    not moved back in?

4        A.    Yeah, he cannot be at that -- he -- he can

5    barely be out the front of the house when he --          02:33

6        Q.    Have you and PJ considered moving to a

7    different location so -- a location that does not have

8    that bad association that 180 Main Street does?

9        A.    We have not talked about it.

10            MR. KILDAY:  Okay.  That's all I've got.          02:33

11    Thank you.

12            THE WITNESS:  Thank you.

13            THE VIDEOGRAPHER:  The time is 2:33.  Off the

14    record.

15            THE REPORTER:  For the transcript today, do we

16    need this any faster than normal or standard timing?

17            MR. KILDAY:  Standard timing should be fine.

18            THE REPORTER:  Okay.

19            And would you like to order a copy?

20            MR. BABICH:  Yeah, just digitally.              02:34

21            THE REPORTER:  And, Mr. Aspinwall, would you

22    like to order a copy?

23            MR. ASPINWALL:  Yes.  Standard time.

24            (The proceedings concluded at 2:34 p.m.)

25

1                    SIGNATURE PAGE

2

3    Please be advised that I have read the

4    foregoing deposition, pages 1 through 144,

5    inclusive.   I hereby state that there are:

6

7    (Check one) _____  no corrections

8                _____  corrections per

9                            attached

10

11   Signed under penalty of perjury.

12   _____
     JEANNETTE LEWIN
13

14   _____
     Date
15
                     --oOo--
16

17

18

19

20

21

22

23

24

25

1                    DEPONENT'S CHANGES OR CORRECTIONS

2      Instructions:  If you are adding to your testimony,
       print the exact words you want to add.  If you are
3      deleting from your testimony, print the exact words you
       want to delete.  Specify with "Add" or "Delete" and sign
4      this form.

5      Deposition of:  JEANNETTE LEWIN
       Held on:        June 1, 2023
6      Job No.:        23-163
       Case Title:     Hall vs. City of Weed, et al.

7
       I, JEANNETTE LEWIN, have the following changes and/or
8      corrections to make to my deposition:

9      PAGE      LINE      CHANGE/ADD/DELETE

10     _____    _____    _____

11     _____    _____    _____

12     _____    _____    _____

13     _____    _____    _____

14     _____    _____    _____

15     _____    _____    _____

16     _____    _____    _____

17     _____    _____    _____

18     _____    _____    _____

19     _____    _____    _____

20     _____    _____    _____

21     _____    _____    _____

22     _____    _____    _____

23     _____    _____    _____

24     DEPONENT'S SIGNATURE: _____

25     DATE: _____

```
1              REPORTER'S CERTIFICATE

2   State of California          )
                                 ) ss.
3   County of Sacramento         )

4           I, JULIE C. ROZELL, a Certified Shorthand

5   Reporter of the State of California, duly authorized to

6   administer oaths, do hereby certify:

7           That I am a disinterested person herein; that

8   the witness, JEANNETTE LEWIN, named in the foregoing

9   deposition, was by me duly sworn to testify the truth,

10  the whole truth, and nothing but the truth; that the

11  deposition was reported in shorthand by me, JULIE C.

12  ROZELL, a Certified Shorthand Reporter of the State of

13  California, and thereafter transcribed using

14  computer-aided transcription and is a true and correct

15  record of the testimony so given.

16          ( X ) Reading and signing was requested

17          (   ) Reading and signing was waived

18          (   ) Reading and signing was not requested

19          IN WITNESS WHEREOF, I hereby certify this

20  transcript at my office in the County of Sacramento,

21  State of California, this June 12, 2023.

22

23          _____
            JULIE C. ROZELL, CSR NO. 14107
24          Certified Shorthand Reporter of
            the State of California

25
```

# EXHIBIT C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

---oOo---

PAUL J. HALL, and JEANNETTE
HALL,

              Plaintiffs,

vs.                  CASE NO. 2:20-CV-01789-TLN-DMC

CITY OF WEED, JOHN GALE, and
DOES 1 through 10, inclusive,

_____ ___ ____ Defendants.   /

Videoconference Deposition of

**JOHN GALE**

Monday, February 6, 2023

NOTICING ATTORNEY:  JOSEPH J. BABICH
REPORTER:  LYNNE M. NISSON, CSR 7317

```
1                      REMOTE APPEARANCES

2

3    For the Plaintiffs:

4         DREYER BABICH BUCCOLA WOOD CAMPORA, LLP
          BY:  JOSEPH J. BABICH, ESQ.
5         20 Bicentennial Circle
          Sacramento, California  95826
6         916-379-3500
          jbabich@dbbwc.com
7

8    For the Defendant City of Weed:

9         ANGELO, KILDAY & KILDUFF, LLP
          BY:  BRUCE A. KILDAY, ESQ.
10        601 University Avenue, Suite 150
          Sacramento, California  95825
11        916-564-6100
          bkilday@akk-law.com
12

13   For the Defendant John Gale:

14        ALLEN, GLASSNER, HAZELWOOD & WERTH, LLP
          BY:  DALE L. ALLEN, JR., ESQ.
15        180 Montgomery Street, Suite 1200
          San Francisco, California  94104
16        415-697-2000
          dallen@aghwlaw.com
17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF EXAMINATIONS

 2                                              PAGE

 3    EXAMINATION BY MR. BABICH                    6

 4

 5                      ---oOo---

 6

 7

 8                    INDEX OF EXHIBITS

 9

10    PAGE        DEPOSITION

11

12    1           Policy 300 Use of Force;
                  City000564-571
13                (8 pages)...........................pre

14    2           Policy 308 Control Devices and
                  Techniques; City000572-576
15                (5 pages)...........................pre

16    3           Policy 309 Conducted Energy Device;
                  City000577-582
17                (6 pages)...........................pre

18    4           Policy 340 Standards of Conduct;
                  City000589-595
19                (7 pages)...........................pre

20    5           Policy 466 Crisis Intervention
                  Incidents; City000583-587
21                (5 pages)...........................pre

22    6           TASER Handheld CEW Warnings,
                  Instructions, and Information:
23                Law Enforcement; City000378
                  (1 page)............................pre
24

25
```

```
1                    INDEX OF EXHIBITS (cont.)

2

3     PAGE  DEPOSITION

4

5     7           TASER Axon Academy TASER Training
                  Power Point
6                 (6 pages).............................pre

7     8           Axon TASER 7 CEW User Application
                  Form, Annual Recertification;
8                 City000380, 381, 542
                  (3 pages).............................pre
9
      9           CAD Incident Report 191012004;
10                City000001-3
                  (3 pages).............................pre
11
      10          report dated 11/04/2019, Re:  Officer
12                Gale IA, Allegations and Findings
                  (Paul Hall); City000350-357
13                (8 pages).............................pre

14    11          Yreka Police Department 11/12/19
                  Use of Force Review Board Findings;
15                City000348-349
                  (2 pages).............................pre
16
      12          letter dated 11/19/2019 to John Gale
17                from Justin Mayberry, re: Administrative
                  Review of Incident; City000588
18                (1 page).............................pre

19
      13          letter dated December 9, 2019 to
20                Justin Mayberry from Shawn Jole;
                  City000228
21                (1 page).............................pre

22    14          Video clip............................post
                  (retained by Mr. Babich)
23
      15          Video clip............................post
24                (retained by Mr. Babich)

25                        ---oOo---
```

```
  1                          ---oOo---

  2            BE IT REMEMBERED that on Monday, February

  3    6, 2023, at the hour of 10:06 a.m., of said day,

  4    with all participants appearing remotely via

  5    videoconference, before me, Lynne M. Nisson, a

  6    Certified Shorthand Reporter, State of California,

  7    appeared JOHN GALE, who was examined as a witness in

  8    said cause.

  9                          ---oOo---

 10                      PROCEEDINGS

 11            THE REPORTER:  Good morning.  This is the         05:02:02

 12    deposition of John Gale.  Today's date is February       05:02:02

 13    6, 2023.  The time is approximately 10:06 a.m.           05:02:07

 14            My name is Lynne Nisson.  I am a certified        05:02:11

 15    shorthand reporter in the State of California.  I        05:02:17

 16    will be videotaping today's proceedings using Zoom       05:02:17

 17    recording.                                               05:02:17

 18            This is the case entitled Hall versus City        05:02:24

 19    of Weed, filed in the United States District,            05:02:24

 20    Eastern District of California, case number              05:02:32

 21    2:20-CV-01789-TLN-DMC.                                   05:02:32

 22            Today's deposition is taking place via           05:02:17

 23    videoconference with the deponent located in             05:02:20

 24    Willits, California.                                     05:02:20

 25            Would counsel please state their                 05:02:42
```

| | | |
|---|---|---|
| 1 | A.        Approximately three days ago. | 10:11:53 |
| 2 | Q.        And, again, I'm not entitled to know what | 10:12:00 |
| 3 | you and your counsel talked about, so keep that in | 10:12:04 |
| 4 | mind as we talk about the body cam review. | 10:12:06 |
| 5 | How long did you review the body cam | 10:12:09 |
| 6 | footage three days ago? | 10:12:13 |
| 7 | A.        I'm unsure.  I know we went through the -- | 10:12:14 |
| 8 | most of the video, if not the video in its entirety. | 10:12:25 |
| 9 | Q.        And the video in its entirety starts | 10:12:29 |
| 10 | pretty much where you show up on scene? | 10:12:32 |
| 11 | A.        That is correct. | 10:12:36 |
| 12 | Q.        And it actually ends -- and this is the | 10:12:37 |
| 13 | full video.  I think it ends when you're in a squad | 10:12:42 |
| 14 | car being transported to the hospital? | 10:12:45 |
| 15 | A.        To the best of my recollection, yes. | 10:12:47 |
| 16 | Q.        Now, we're going to talk about the details | 10:12:51 |
| 17 | of the event in -- at length throughout the | 10:12:57 |
| 18 | deposition, but I do want to just ask this question. | 10:13:02 |
| 19 | This might answer -- your answer might speed things | 10:13:06 |
| 20 | up a little bit. | 10:13:09 |
| 21 | But is it your contention that Mr. Gale | 10:13:10 |
| 22 | actually ignited himself on fire?  I'm sorry.  I | 10:13:15 |
| 23 | misspoke. | 10:13:19 |
| 24 | Starting over with the question. | 10:13:21 |
| 25 | Is it your contention that Mr. Hall lit | 10:13:23 |

| | | |
|---|---|---|
| 1 | himself on fire rather than being ignited by the | 10:13:27 |
| 2 | TASER? | 10:13:31 |
| 3 | A.      That was the sequence of events that I | 10:13:32 |
| 4 | perceived at that time. | 10:13:40 |
| 5 | Q.      Is that still your contention, that he lit | 10:13:41 |
| 6 | himself on fire rather than the TASER? | 10:13:45 |
| 7 | A.      I would have to relay back to the video | 10:13:47 |
| 8 | and what it shows as far as my perception during | 10:13:51 |
| 9 | that specific incident. | 10:13:55 |
| 10 | Q.      Yeah, I understand at the time you had a | 10:13:57 |
| 11 | perception, because you repeatedly told people at | 10:14:02 |
| 12 | the scene that Mr. Hall lit himself on fire. | 10:14:04 |
| 13 | But what I want to know is as we sit here | 10:14:08 |
| 14 | today, has that -- has that opinion changed? | 10:14:11 |
| 15 | MR. ALLEN:  And I'm going to object that | 10:14:16 |
| 16 | that assumes facts not in evidence in the form of | 10:14:17 |
| 17 | that question, Joe. | 10:14:19 |
| 18 | Q.      By MR. BABICH:  You can still answer it, | 10:14:20 |
| 19 | unless your lawyer tells you otherwise. | 10:14:24 |
| 20 | A.      I would just refer to the video and what | 10:14:27 |
| 21 | the video shows, um, that is -- that is factual. | 10:14:29 |
| 22 | Q.      Well, I want to know what you believe | 10:14:39 |
| 23 | happened that day right now. | 10:14:41 |
| 24 | What is your current state of mind?  Do | 10:14:42 |
| 25 | you believe that Mr. Hall lit himself on fire rather | 10:14:45 |

| | | |
|---|---|---|
| 1 | than having the fire ignited by the TASER?  At this | 10:14:49 |
| 2 | moment is that your belief? | 10:14:55 |
| 3 | A.       At this moment I am unsure. | 10:14:57 |
| 4 | Q.       And as I said, hoping without repeating | 10:14:58 |
| 5 | myself, we'll get into the whole sequence in a great | 10:15:03 |
| 6 | detail later. | 10:15:06 |
| 7 |          What's your date of birth? | 10:15:08 |
| 8 | A.       07/03/1991. | 10:15:11 |
| 9 | Q.       And what is your current height and | 10:15:18 |
| 10 | weight? | 10:15:21 |
| 11 | A.       Approximately five feet five inches and | 10:15:21 |
| 12 | approximately 120 pounds. | 10:15:27 |
| 13 | Q.       And what was your height and weight at the | 10:15:30 |
| 14 | time of the incident back in 2019? | 10:15:32 |
| 15 | A.       I would estimate it was approximately the | 10:15:35 |
| 16 | same. | 10:15:41 |
| 17 | Q.       All right.  Your high school education -- | 10:15:41 |
| 18 | I went through your file pretty extensively over the | 10:15:45 |
| 19 | weekend and yesterday, specifically. | 10:15:48 |
| 20 |          And you graduated from high school; | 10:15:50 |
| 21 | correct? | 10:15:52 |
| 22 | A.       That is correct. | 10:15:52 |
| 23 | Q.       You attended Fresno State College -- State | 10:15:53 |
| 24 | College? | 10:15:59 |
| 25 | A.       Yes, sir. | 10:15:59 |

```
 1   Q.        And what's the first law enforcement job      10:19:56

 2   that you received?                                       10:19:59

 3   A.        That would have been the Del Norte County      10:20:03

 4   Sheriff's Office.                                        10:20:07

 5   Q.        And it's Del Norte, you say, N-O-R-T-E?        10:20:07

 6   A.        Correct.                                       10:20:11

 7   Q.        You were born in Fresno, California?           10:20:11

 8   A.        Yes, sir.                                      10:20:15

 9   Q.        I have a list in your personnel file of       10:20:15

10   some of the jobs that you applied for.  I'm happy to    10:20:22

11   show it to you, if necessary.  But it has a list and    10:20:27

12   then it has an explanation -- a brief explanation       10:20:32

13   after each one where it says whether or not you're      10:20:37

14   on the eligibility list or you got disqualified.        10:20:39

15             But it looks like with the Visalia Police     10:20:44

16   Department application it says, "Oral interview         10:20:47

17   disqualified."                                          10:20:50

18             Do you know what that means?                  10:20:51

19   A.        I believe it means that I wasn't moved        10:20:52

20   forward with that.                                      10:20:58

21   Q.        And does it suggest that you failed the       10:20:59

22   oral interview?  Is that what it's telling us?          10:21:03

23   A.        That is my understanding.                     10:21:06

24   Q.        So the process of applying for law            10:21:07

25   enforcement involves, I presume, submitting an          10:21:12
```

| | | |
|---|---|---|
| 1 | application with a list of references, and then at | 10:21:14 |
| 2 | some point in time you get to the stage where you | 10:21:16 |
| 3 | get to be interviewed by the law enforcement agency. | 10:21:18 |
| 4 | Is that fair to say? | 10:21:21 |
| 5 | A.       That is correct. | 10:21:22 |
| 6 | Q.       You also applied for a job with the Fresno | 10:21:23 |
| 7 | Police Department.  And I'll read to you what the | 10:21:34 |
| 8 | list says. | 10:21:36 |
| 9 | It says, "Oral interview, polygraph | 10:21:36 |
| 10 | background, chief's oral disqualified." | 10:21:39 |
| 11 | Does that tell us you got through all of | 10:21:42 |
| 12 | those steps up until you spoke to the police -- or | 10:21:44 |
| 13 | the chief of police? | 10:21:48 |
| 14 | A.       That is my understanding, and that is how | 10:21:50 |
| 15 | I filled out the form.  Correct. | 10:21:54 |
| 16 | Q.       California Highway Patrol.  It says, | 10:21:59 |
| 17 | "Application written, physical ability, oral, | 10:22:04 |
| 18 | polygraph, background, conditional offer."  And then | 10:22:08 |
| 19 | it says "disqualified." | 10:22:13 |
| 20 | Do you know why you were disqualified with | 10:22:15 |
| 21 | the CHP? | 10:22:17 |
| 22 | A.       Yes.  That was for the psychological exam, | 10:22:18 |
| 23 | the psych test that is required for law enforcement | 10:22:28 |
| 24 | officers. | 10:22:32 |
| 25 | Q.       Did they actually give you what's known as | 10:22:32 |

| | | |
|---|---|---|
| 1 | an MMPI exam? That's a pretty long test with a lot | 10:22:36 |
| 2 | of questions. If you know. | 10:22:40 |
| 3 | A. To the best of my recollection, I know | 10:22:41 |
| 4 | there was a series of batteries before that test, | 10:22:44 |
| 5 | but I believe I remember something like that. | 10:22:48 |
| 6 | Q. Fresno County Sheriff's Office says, | 10:22:52 |
| 7 | "Application, oral, background, conditional offer, | 10:22:55 |
| 8 | disqualified." | 10:22:57 |
| 9 | Do you know why you were disqualified | 10:22:58 |
| 10 | there? | 10:23:00 |
| 11 | A. Yes, I do. | 10:23:00 |
| 12 | During the time when I was in the academy | 10:23:06 |
| 13 | and the last months of the academy before I was | 10:23:12 |
| 14 | going to graduate, I had a conditional offer on the | 10:23:15 |
| 15 | table for the California Highway Patrol. | 10:23:18 |
| 16 | I had moved forward with the process with | 10:23:22 |
| 17 | the Fresno Police Department. And it was a matter | 10:23:26 |
| 18 | of contention of where I had three competing offers | 10:23:34 |
| 19 | on the table, and I believe it was a -- it was | 10:23:39 |
| 20 | getting the documents required for that position. I | 10:23:44 |
| 21 | was not able to get them in time with regard to the | 10:23:51 |
| 22 | other offices, the positions. | 10:23:55 |
| 23 | Q. Thank you. | 10:23:59 |
| 24 | And then Madera County Sheriff's Office, | 10:24:00 |
| 25 | it says "Application, withdrew application before | 10:24:03 |

| | | |
|---|---|---|
| 1 | it's on there, yeah. | 10:25:18 |
| 2 | Q.        And then we're almost through.  Thanks for | 10:25:19 |
| 3 | your patience on this. | 10:25:21 |
| 4 | Turlock Police Department.  "Application, | 10:25:23 |
| 5 | failed oral interview." | 10:25:25 |
| 6 | Do you know what happened there with them, | 10:25:26 |
| 7 | with Turlock? | 10:25:30 |
| 8 | A.        I do not know a specific reason.  I was | 10:25:31 |
| 9 | just notified that I did not pass the oral | 10:25:35 |
| 10 | interview. | 10:25:38 |
| 11 | Q.        And my guess is when you fail an oral | 10:25:38 |
| 12 | interview under these circumstances the law | 10:25:40 |
| 13 | enforcement agency doesn't necessarily tell you why | 10:25:43 |
| 14 | you failed; is that correct? | 10:25:45 |
| 15 | A.        Generally correct. | 10:25:47 |
| 16 | Q.        Okay.  Of the failed oral exams that you | 10:25:48 |
| 17 | had, did you ever learn from any of the law | 10:25:53 |
| 18 | enforcement agencies why you failed? | 10:25:56 |
| 19 | A.        To my recollection, no. | 10:25:57 |
| 20 | Q.        Then you withdrew an application with | 10:26:00 |
| 21 | Merced County Sheriff's Office. | 10:26:06 |
| 22 | What happened there, if you recall? | 10:26:09 |
| 23 | A.        I don't recall. | 10:26:16 |
| 24 | Q.        That's fine. | 10:26:17 |
| 25 | California Department of Alcohol Beverage | 10:26:23 |

| | | |
|---|---|---|
| 1 | That was kind of a muddled question.  Let | 10:33:16 |
| 2 | me ask it a little differently. | 10:33:19 |
| 3 | Did you ever submit any written | 10:33:20 |
| 4 | description of how the incident involving you and | 10:33:24 |
| 5 | Mr. Hall happened when you were applying for these | 10:33:26 |
| 6 | jobs? | 10:33:28 |
| 7 | A.        I did not.  Not to my knowledge and my | 10:33:28 |
| 8 | recollection, no. | 10:33:32 |
| 9 | Q.        Did you submit any oral description of | 10:33:32 |
| 10 | what happened during the incident of October 12, | 10:33:37 |
| 11 | 2019 with Mr. Hall? | 10:33:39 |
| 12 | A.        As far as an oral explanation, perhaps | 10:33:41 |
| 13 | with answering a question through an interview or | 10:33:51 |
| 14 | notifying them of the litigation and use of force | 10:33:55 |
| 15 | review. | 10:34:03 |
| 16 | Q.        And that's the use of force review that | 10:34:03 |
| 17 | was conducted after your -- after the incident | 10:34:07 |
| 18 | you're referring to? | 10:34:10 |
| 19 | A.        That would be correct. | 10:34:11 |
| 20 | Q.        And we'll talk about that in a little bit, | 10:34:12 |
| 21 | but that use of force review found that you were in | 10:34:16 |
| 22 | violation of at least the City of Weed's policy with | 10:34:23 |
| 23 | regards to the use of the TASER.  Fair enough?  Is | 10:34:26 |
| 24 | that true? | 10:34:26 |
| 25 | A.        Then -- yes.  And then there was a | 10:34:35 |

```
 1    supplemental document that was added to that          10:34:38
 2    finding, yes.                                          10:34:41
 3    Q.       What was the supplemental document?  What     10:34:41
 4    did it say?                                            10:34:47
 5    A.       I believe that would have been Exhibit 12     10:34:47
 6    or 13.  12.  I'm sorry.  Exhibit 12, which was my      10:35:00
 7    understanding, through speaking with Chief Justin      10:35:09
 8    Mayberry, clarification on the findings from the Use   10:35:14
 9    of Force Review Board and underlying and reiterating   10:35:22
10    the totality of the circumstances that was             10:35:25
11    identified in the City of Weed policy.                 10:35:28
12    Q.       You had subsequent retraining on the use      10:35:33
13    of a TASER after the October 12, 2019 incident;        10:35:36
14    correct?                                               10:35:42
15    A.       That is correct.                              10:35:43
16    Q.       And that was done while you were still        10:35:44
17    with the City of Weed Police Department; correct?      10:35:48
18    A.       Yes.                                          10:35:52
19    Q.       And your status with the City of Weed         10:35:54
20    Police Department -- let's go to the point where the   10:35:59
21    incident occurs on October 12, 2019.                   10:36:02
22             What was your status of employment with       10:36:04
23    them at that point?                                    10:36:06
24    A.       I was a fully sworn police officer.           10:36:07
25    Q.       It's my understanding that you were on        10:36:16
```

| | | |
|---|---|---|
| 1 | probation still; is that correct? | 10:36:18 |
| 2 | A.        Yes, sir, that is correct. | 10:36:20 |
| 3 | Q.        And just to clarify, that's employment | 10:36:21 |
| 4 | probation? | 10:36:24 |
| 5 | A.        That is correct, yes. | 10:36:25 |
| 6 | Q.        Okay.  And you had a -- I understand -- | 10:36:26 |
| 7 | and we'll probably go into this in some detail | 10:36:32 |
| 8 | later, but just to review it, you had a -- prior to | 10:36:34 |
| 9 | this incident you had a review that extended your -- | 10:36:38 |
| 10 | you know, I'm kind of screwing up the dates.  Let me | 10:36:44 |
| 11 | leave that alone for now. | 10:36:47 |
| 12 |          Did you have any reviews after the | 10:36:49 |
| 13 | incident of October 12, 2019? | 10:36:51 |
| 14 | A.        That is correct. | 10:36:54 |
| 15 | Q.        Okay.  And one of the -- one of those | 10:36:55 |
| 16 | reviews extended your probation period for about six | 10:37:00 |
| 17 | months? | 10:37:04 |
| 18 | A.        Correct. | 10:37:04 |
| 19 | Q.        And then at that -- after that six-month | 10:37:04 |
| 20 | period lapse, that's when they let you go?  That's | 10:37:07 |
| 21 | when City of Weed let you go? | 10:37:10 |
| 22 | A.        That is correct. | 10:37:13 |
| 23 | Q.        And just -- I have the dates in front of | 10:37:19 |
| 24 | me, so this would be a good time to review them with | 10:37:22 |
| 25 | you. | 10:37:24 |

| | |
|---|---|
| 1 | I think the review was signed -- or excuse | 10:37:24 |
| 2 | me -- it was signed December 16, 2019, and it was | 10:37:28 |
| 3 | extended to the next evaluation date of July 7, | 10:37:32 |
| 4 | 2020. | 10:37:38 |
| 5 | I pulled that out of the records.  I just | 10:37:39 |
| 6 | wanted to let you know that. | 10:37:42 |
| 7 | A.    Okay. | 10:37:43 |
| 8 | Q.    Does that sound pretty accurate? | 10:37:44 |
| 9 | A.    That sounds pretty accurate, yes. | 10:37:45 |
| 10 | Q.    Do you know what your last date of | 10:37:47 |
| 11 | employment was with City of Weed? | 10:37:49 |
| 12 | A.    I believe it was July 6 or July 7. | 10:37:53 |
| 13 | Q.    I'd like to go over with you some of the | 10:37:59 |
| 14 | stuff that's in your personnel file.  And at any | 10:38:21 |
| 15 | time if you want me to share a document with you, I | 10:38:24 |
| 16 | will, but this is stuff coming from your personnel | 10:38:26 |
| 17 | file. | 10:38:30 |
| 18 | And that goes to counsel as well, if | 10:38:33 |
| 19 | anybody wants me to put this in the file, then I | 10:38:36 |
| 20 | certainly will. | 10:38:50 |
| 21 | So I'm looking at the personnel -- it's | 10:39:05 |
| 22 | called "Personal History Statement For Peace | 10:39:10 |
| 23 | Officers."  It's part of your application process. | 10:39:13 |
| 24 | It's a lot of yeses and no question and answers. | 10:39:15 |
| 25 | And usually when a yes pops up there's a | 10:39:20 |

|   |   |   |
|---|---|---|
| 1 | in illicit drug use.  And you were candid enough to | 10:43:47 |
| 2 | say you had a -- you had friends and my | 10:43:51 |
| 3 | brother-in-law who did recreational drugs, and you | 10:43:53 |
| 4 | go on to say that you disassociated yourself with | 10:43:57 |
| 5 | that. | 10:44:01 |
| 6 | But in any event, the reason I bring this | 10:44:01 |
| 7 | up is I'm just wondering what sort of recreational | 10:44:03 |
| 8 | drugs you had been exposed to, not personally using | 10:44:09 |
| 9 | them, but personally exposed through these | 10:44:13 |
| 10 | individuals before our incident. | 10:44:15 |
| 11 | So I'm wondering what sort of drugs you | 10:44:19 |
| 12 | had been exposed to. | 10:44:21 |
| 13 | A.      At this point it would have been a | 10:44:24 |
| 14 | recreational drug, referring to marijuana. | 10:44:26 |
| 15 | Q.      Again, I don't need to get too personal. | 10:44:28 |
| 16 | I don't need any names. | 10:44:33 |
| 17 | But before the October 12th incident, had | 10:44:34 |
| 18 | you ever been exposed to anybody who had been using | 10:44:39 |
| 19 | methamphetamine?  And this is outside your exposure | 10:44:42 |
| 20 | to them while involved in law enforcement. | 10:44:47 |
| 21 | A.      Outside of law enforcement, I do not | 10:44:51 |
| 22 | believe so. | 10:44:53 |
| 23 | Q.      And I take it while you were employed by | 10:44:54 |
| 24 | the police department for the City of Weed before | 10:44:57 |
| 25 | October 12, 2019, you had encountered individuals | 10:45:02 |

| | | |
|---|---|---|
| 1 | that had been exposed or using methamphetamine; | 10:45:09 |
| 2 | correct? | 10:45:12 |
| 3 | A.          Yes.  During the course of my duties, yes. | 10:45:12 |
| 4 | Q.          Did you receive any training on how to | 10:45:15 |
| 5 | recognize people who were using meth? | 10:45:17 |
| 6 | A.          I have. | 10:45:20 |
| 7 | Q.          And you had received that training prior | 10:45:20 |
| 8 | to October 12, 2019? | 10:45:23 |
| 9 | A.          Yes. | 10:45:24 |
| 10 | Q.          I just want to jump around a little bit | 10:45:26 |
| 11 | here. | 10:45:40 |
| 12 |           Okay.  Another portion of that personal | 10:46:11 |
| 13 | history statement, "Question 94:  Since the age of | 10:46:15 |
| 14 | 15, have you ever been involved in an anger-provoked | 10:46:20 |
| 15 | physical fight, confrontation, or other violent | 10:46:23 |
| 16 | act?" | 10:46:26 |
| 17 |           And you talked about this incident where | 10:46:26 |
| 18 | somebody was -- pulled a prank on you and pulled | 10:46:28 |
| 19 | your pants down and you hit them in the -- you | 10:46:31 |
| 20 | punched them in the face; correct? | 10:46:34 |
| 21 | A.          That is correct. | 10:46:36 |
| 22 | Q.          So this next exhibit I have, it's page 44 | 10:46:36 |
| 23 | of 154, at least on the PDF, but it's also listed as | 10:47:23 |
| 24 | page 188 in your personnel file. | 10:47:29 |
| 25 |           It says, "termination" dated 7/8/2020.  Do | 10:47:34 |

| | | |
|---|---|---|
| 1 | that specific form you showed me I hadn't seen, and | 10:49:08 |
| 2 | it seemed to have been signed and submitted by my | 10:49:13 |
| 3 | sergeant, former sergeant I should say. | 10:49:15 |
| 4 | Q.       All right.  Did they give you a reason for | 10:49:17 |
| 5 | why they discharged you at that time? | 10:49:19 |
| 6 | A.       They did.  I don't recall if that is part | 10:49:21 |
| 7 | of the exhibit.  They gave me approximately three or | 10:49:27 |
| 8 | four reasons. | 10:49:32 |
| 9 | Q.       Can you review those with me, please? | 10:49:34 |
| 10 | A.       I'm sorry. | 10:49:40 |
| 11 | Q.       List the three or four reasons they gave | 10:49:42 |
| 12 | you for discharge. | 10:49:45 |
| 13 | A.       I don't have that form.  Is that one of | 10:49:47 |
| 14 | the exhibits? | 10:49:50 |
| 15 | Q.       You know, I'm not trying to hide anything | 10:49:51 |
| 16 | from you.  It could be; it could not be, but I don't | 10:49:54 |
| 17 | have it. | 10:49:56 |
| 18 | A.       Okay.  I believe, to the best of my | 10:49:57 |
| 19 | recollection, that was the -- actually, it might be | 10:50:00 |
| 20 | right there -- report writing needs to improve, | 10:50:06 |
| 21 | 10-19 time needs to improve.  I know that's what we | 10:50:14 |
| 22 | have here in front of me.  I'm reading off the | 10:50:18 |
| 23 | shared screen.  I know my report writing was one of | 10:50:21 |
| 24 | them that was identified in that form. | 10:50:25 |
| 25 | Q.       Okay.  And what is the 1019?  What does | 10:50:26 |

| | |
|---|---|
| 1 | that mean? | 10:50:32 |
| 2 | A.       1019 is the code, the radio traffic code | 10:50:32 |
| 3 | that we use for in time the office. | 10:50:38 |
| 4 | Q.       And backing up -- and I'll show you one of | 10:50:45 |
| 5 | these documents. | 10:50:48 |
| 6 | The box -- and this is at page -- it says, | 10:50:50 |
| 7 | "City 000222."  The box is checked, "Lacks knowledge | 10:50:54 |
| 8 | or ability to perform essential skills in some | 10:51:03 |
| 9 | important phases of the job.  Accuracy and | 10:51:06 |
| 10 | thoroughness of work does not meet job requirements | 10:51:10 |
| 11 | in some areas." | 10:51:14 |
| 12 | And then it further explains, "Report | 10:51:15 |
| 13 | writing needs to improve, 1019 time needs to --" I'm | 10:51:19 |
| 14 | not sure what that says.  And then it says, "Know | 10:51:24 |
| 15 | when to Mirandize suspects detained, not on | 10:51:29 |
| 16 | detained." | 10:51:34 |
| 17 | So it sounded like that's what they're | 10:51:34 |
| 18 | describing your deficiencies in; correct? | 10:51:38 |
| 19 | A.       That is my understanding, yes. | 10:51:40 |
| 20 | Q.       Okay.  Continuing on.  This would be at | 10:51:42 |
| 21 | page 000224 of that document. | 10:51:56 |
| 22 | The box is checked where it says, | 10:52:01 |
| 23 | "Occasionally disregards safety practices and | 10:52:06 |
| 24 | security." | 10:52:09 |
| 25 | Do you see that? | 10:52:09 |

| | | |
|---|---|---|
| 1 | A.        Yes, I do see that. | 10:52:11 |
| 2 | Q.        And then it further explains that I guess | 10:52:12 |
| 3 | you had some sort of auto accident while you were in | 10:52:19 |
| 4 | pursuit of a stolen vehicle; is that correct? | 10:52:22 |
| 5 | A.        That is correct. | 10:52:25 |
| 6 | Q.        Is it your understanding that that's the | 10:52:26 |
| 7 | incident that they feel allows them to say | 10:52:29 |
| 8 | occasionally disregards safety practices and | 10:52:32 |
| 9 | security? | 10:52:35 |
| 10 | A.        That is my understanding based on their | 10:52:35 |
| 11 | explanation. | 10:52:43 |
| 12 | Q.        Was our incident of October 12, 2019, | 10:52:43 |
| 13 | listed as also an incident where you occasionally | 10:52:49 |
| 14 | disregard safety practices and security? | 10:52:51 |
| 15 | A.        Not that I can recall. | 10:52:53 |
| 16 | Q.        I want to kind of switch gears now.  I'm | 10:53:00 |
| 17 | going to stop sharing; get back to this view. | 10:53:20 |
| 18 | I want to talk a little bit about your | 10:53:23 |
| 19 | prior history with Mr. Paul Hall. | 10:53:27 |
| 20 | You know him as PJ Hall; correct? | 10:53:30 |
| 21 | A.        That is correct. | 10:53:32 |
| 22 | Q.        And when did you -- when did you first | 10:53:33 |
| 23 | come to town and first start working for the City of | 10:53:37 |
| 24 | Weed Police Department? | 10:53:48 |
| 25 | A.        I honestly don't have a -- I don't | 10:53:48 |

| | | |
|---|---|---|
| 1 | Q. Would you spend time in the City of Weed | 10:55:03 |
| 2 | before you began to work for the police department? | 10:55:06 |
| 3 | A. That's correct. | 10:55:08 |
| 4 | Q. So there are occasions while you were | 10:55:08 |
| 5 | working as a City of Weed police officer that you | 10:55:18 |
| 6 | had encountered Mr. Hall; correct? | 10:55:22 |
| 7 | A. That is correct. | 10:55:24 |
| 8 | Q. When you encountered him before our | 10:55:25 |
| 9 | incident, did he ever appear -- and this would | 10:55:28 |
| 10 | be before the day of the incident of October 12, | 10:55:31 |
| 11 | 2019 -- did he ever appear to be suicidal before? | 10:55:34 |
| 12 | A. Not in my specific contacts with him, | 10:55:45 |
| 13 | other than the discussions with the other officers. | 10:55:49 |
| 14 | Q. So as far as you're concerned, before | 10:55:50 |
| 15 | October 12, 2019, did you ever personally see him in | 10:55:55 |
| 16 | a suicidal state? | 10:56:00 |
| 17 | A. I would say no, or undetermined state of | 10:56:02 |
| 18 | mind. | 10:56:16 |
| 19 | Q. At any time before October 12, 2019, were | 10:56:16 |
| 20 | you aware that Mr. -- whether or not Mr. Hall had | 10:56:20 |
| 21 | ever expressed intentions to commit suicide? | 10:56:25 |
| 22 | A. Yes, sir, I was aware of other instances | 10:56:29 |
| 23 | which were spoken to me by other members of law | 10:56:35 |
| 24 | enforcement. | 10:56:39 |
| 25 | Q. What are their names? | 10:56:39 |

| | | |
|---|---|---|
| 1 | A.     Again, this is just specifically | 10:56:41 |
| 2 | remembering who spoke to me about it.  I don't know | 10:56:49 |
| 3 | to what degree, but that would have been Officer Sam | 10:56:51 |
| 4 | Hopkins, Corporal Tim Green, Sergeant Jared | 10:56:55 |
| 5 | Klomparens, and Chief Justin Mayberry, as well as | 10:57:04 |
| 6 | other deputies from the Siskiyou County Sheriff's | 10:57:09 |
| 7 | Office that I do not recall at this point.  But to | 10:57:15 |
| 8 | varying degrees I had spoken to them, those | 10:57:19 |
| 9 | individuals, at different times. | 10:57:23 |
| 10 | Q.     And, again, that was all before October | 10:57:25 |
| 11 | 12, 2019; correct? | 10:57:29 |
| 12 | A.     Yes, sir. | 10:57:30 |
| 13 | Q.     And do you know on how many occasions | 10:57:31 |
| 14 | these officers described incidents where Mr. Hall | 10:57:38 |
| 15 | was attempting or at least threatening to commit | 10:57:46 |
| 16 | suicide? | 10:57:50 |
| 17 | A.     I do not.  I would say there was one | 10:57:51 |
| 18 | specific incident that they had reported or had | 10:57:58 |
| 19 | relayed to me.  However, just through the sharing of | 10:58:01 |
| 20 | those officers' and deputies' experiences, I'm not | 10:58:05 |
| 21 | exactly sure how many times they had come in contact | 10:58:10 |
| 22 | with Mr. Hall previous. | 10:58:12 |
| 23 | Q.     What was the one previous incident that | 10:58:13 |
| 24 | you just referred to?  What were the circumstances? | 10:58:16 |
| 25 | A.     From the best of my recollection, again, | 10:58:19 |

| | | |
|---|---|---|
| 1 | A.         That would be correct. | 10:59:53 |
| 2 | Q.         Are you aware of any other incidents | 10:59:54 |
| 3 | before October 12, 2019, where he attempted or at | 10:59:57 |
| 4 | least threatened suicide? | 11:00:01 |
| 5 | A.         To the best of my knowledge, no. | 11:00:02 |
| 6 | Q.         On how many occasions do you think you | 11:00:06 |
| 7 | actually encountered Mr. Hall prior to October 12, | 11:00:10 |
| 8 | 2019, while you were on duty as a police officer? | 11:00:18 |
| 9 | A.         I would approximate it at two times.  Two | 11:00:21 |
| 10 | contacts while on duty. | 11:00:31 |
| 11 | Q.         And what were the circumstances of each? | 11:00:33 |
| 12 | Let's start with the first contact. | 11:00:37 |
| 13 | A.         Again, that's an approximation.  I don't | 11:00:40 |
| 14 | specifically remember times, dates, or what was | 11:00:44 |
| 15 | specifically discussed.  I know that -- other than | 11:00:51 |
| 16 | the fact that I know that I had engaged him once as | 11:00:58 |
| 17 | a consent contact and just talking with him. | 11:01:04 |
| 18 |         As far as my other contacts of him under | 11:01:08 |
| 19 | the law enforcement authority during the course of | 11:01:12 |
| 20 | my duties, I do not recall, and I would just have to | 11:01:17 |
| 21 | refer to any contact reports or documents that the | 11:01:20 |
| 22 | City of Weed has for those. | 11:01:29 |
| 23 | Q.         Okay.  Fair enough. | 11:01:30 |
| 24 |         Do you recall any time in your presence | 11:01:30 |
| 25 | Mr. Hall threatening suicide? | 11:01:33 |

| | | |
|---|---|---|
| 1 | A.        Before the incident? | 11:01:38 |
| 2 | Q.        Yes.  Before October 12, 2019. | 11:01:41 |
| 3 | A.        Not that I can recall. | 11:01:44 |
| 4 | Q.        Do you recall ever encountering Mr. Hall | 11:01:45 |
| 5 | prior to October 12, 2019, where he was threatening | 11:01:51 |
| 6 | physical violence to you? | 11:01:58 |
| 7 | A.        No. | 11:02:00 |
| 8 | Q.        Did you ever encounter Mr. Hall before | 11:02:05 |
| 9 | October 12, 2019, where you observed him threatening | 11:02:09 |
| 10 | physical violence to a third person? | 11:02:13 |
| 11 | A.        Not that I can recall. | 11:02:15 |
| 12 | Q.        Did you ever have any contact with | 11:02:23 |
| 13 | Mr. Hall while you were employed by the City of Weed | 11:02:30 |
| 14 | as a police officer but while you were not on duty | 11:02:35 |
| 15 | prior to October 12, 2019? | 11:02:41 |
| 16 | A.        Not that I can recall. | 11:02:42 |
| 17 | Q.        Prior to October 12, 2019, had you ever | 11:02:48 |
| 18 | encountered Mr. Hall where you felt that he was | 11:02:54 |
| 19 | under the influence of alcohol? | 11:02:59 |
| 20 | A.        Not that I recall.  Again, I do not recall | 11:03:01 |
| 21 | the previous contact with Mr. Hall. | 11:03:14 |
| 22 | Q.        At any time before October 12, 2019, did | 11:03:16 |
| 23 | you encounter Mr. Hall at a time where you felt he | 11:03:18 |
| 24 | was under the influence of any sort of drug or | 11:03:23 |
| 25 | narcotic? | 11:03:27 |

```
 1   A.        Again, I do not recall previous contacts        11:03:28

 2   with Mr. Hall.                                             11:03:32

 3   Q.        Did you have an understanding prior to           11:03:33

 4   October 12, 2019, on whether or not Mr. Hall was a         11:03:38

 5   drug user?                                                 11:03:45

 6   A.        Yes.   The incidences, what I had spoken to      11:03:47

 7   with other officers, yes.                                  11:03:55

 8   Q.        What was your understanding as the type of       11:03:56

 9   drug that he was using prior to October 12, 2019?          11:03:59

10   A.        Based on what they had reported to me, it        11:04:02

11   was believed to be methamphetamine.                        11:04:06

12   Q.        I presume you've received training on how        11:04:11

13   to recognize whether or not a person is under the          11:04:18

14   influence of methamphetamine?                              11:04:21

15   A.        Yes.                                             11:04:22

16   Q.        And what are the signs and symptoms of           11:04:23

17   being under the influence of methamphetamine based         11:04:26

18   on your understanding?                                     11:04:32

19   A.        Well, several cues that I look for is            11:04:32

20   the -- what I -- what we are trained to call are           11:04:43

21   piano fingers or fidgeting with the hands, erratic         11:04:51

22   behavior, unintentional or muscle spasms of the --         11:04:55

23   twitching or moving of the body as well as of the          11:05:05

24   jaw.                                                       11:05:08

25   Q.        Anything else?                                   11:05:09
```

| | | |
|---|---|---|
| 1 | A.        No, not that I can specifically think of | 11:05:17 |
| 2 | right now. | 11:05:22 |
| 3 | As far as the training, I -- the training | 11:05:23 |
| 4 | of knowledge and -- of how methamphetamine affects | 11:05:28 |
| 5 | the body has always been -- for my specific | 11:05:33 |
| 6 | situation and my training has been out in the field. | 11:05:36 |
| 7 | And so different situations affecting different | 11:05:38 |
| 8 | people, that's how I am able to see or determine. | 11:05:43 |
| 9 | Q.        Now, we asked you a specific question in | 11:05:48 |
| 10 | what we call a special interrogatory.  And that | 11:05:56 |
| 11 | interrogatory asks you very generally whether or not | 11:06:00 |
| 12 | you were claiming that Mr. Hall was in violation of | 11:06:04 |
| 13 | any statute at the time of the incident. | 11:06:07 |
| 14 | And one of the -- and, again, I'll show | 11:06:16 |
| 15 | this to you, if necessary, but I'll just paraphrase | 11:06:18 |
| 16 | it.  One of the statutes that you felt he was in | 11:06:20 |
| 17 | violation of was Welfare and Institution Code 5150. | 11:06:23 |
| 18 | Do you recall providing that answer? | 11:06:28 |
| 19 | A.        I believe so, yes. | 11:06:31 |
| 20 | Q.        And as a law enforcement officer, you're | 11:06:33 |
| 21 | very familiar with the Welfare and Institution Code | 11:06:35 |
| 22 | 5150; correct? | 11:06:39 |
| 23 | A.        That is correct. | 11:06:40 |
| 24 | Q.        And I can read it verbatim to you.  And | 11:06:41 |
| 25 | I'm not trying to test you here, but just generally, | 11:06:46 |

1   what's your understanding of a 5150 violation?                    11:06:49

2   A.          Someone would fall under a 5150 protection            11:06:52

3   if they are -- pose a danger to themselves or                     11:07:00

4   others, are gravely disabled, or cannot care for                  11:07:04

5   their own safety.                                                 11:07:08

6   Q.          And if you determine somebody is in                   11:07:10

7   violation of 5150, as a law enforcement officer what              11:07:13

8   are you allowed to do for that person at that point?              11:07:19

9   Do you place them under arrest for a violation of                 11:07:22

10  5150?                                                             11:07:28

11  A.          So it would be a detention.  It would be             11:07:29

12  taken under -- that would be the code we would use.              11:07:31

13  We would transport them to a hospital medical                    11:07:34

14  facility where we would provide the document of the              11:07:37

15  legal 5150 that we are placing them under.  And they             11:07:41

16  are under the care of a hospital at that time until              11:07:46

17  they can see the -- a doctor; receive care for their             11:07:52

18  mental situation that they are going through.                    11:07:55

19  Q.          And the 5150 hold allows the facility to             11:08:02

20  hold them for 72 hours; is that correct?                         11:08:07

21  A.          That is my understanding.  If that.  Or              11:08:13

22  they are required to see a doctor within that 72                 11:08:17

23  hours.  Again, on the medical side, I do not know.               11:08:21

24  Q.          In any event -- and we'll get into this in           11:08:24

25  more detail.  Probably after a break here soon.                  11:08:29

| | | |
|---|---|---|
| 1 | But if this incident had not occurred to | 11:08:37 |
| 2 | the point where the TASER was used and he caught on | 11:08:39 |
| 3 | fire, if you were able to detain him, was it your | 11:08:42 |
| 4 | intent to, pursuant to Welfare and Institution Code | 11:08:47 |
| 5 | 5150, take him to a hospital?  Was that your intent? | 11:08:52 |
| 6 | A.        Yes, sir. | 11:08:57 |
| 7 | Q.        You also claimed under that same answer to | 11:08:57 |
| 8 | interrogatory when we asked if you felt that | 11:09:03 |
| 9 | Mr. Hall violated any statutes, you stated that he | 11:09:06 |
| 10 | violated Penal Code 245, subsection B. | 11:09:09 |
| 11 | And we might have our subsections off, or | 11:09:14 |
| 12 | maybe I did my research wrong, but I looked that one | 11:09:18 |
| 13 | up, and it says, "Any person who commits an assault | 11:09:21 |
| 14 | upon a person of another with a semiautomatic | 11:09:24 |
| 15 | firearm shall be punished by imprisonment in the | 11:09:28 |
| 16 | state prison for three, six or nine years." | 11:09:32 |
| 17 | MR. BABICH:  Dale, you certainly can help | 11:09:36 |
| 18 | me out here.  But is that a contention that you felt | 11:09:37 |
| 19 | he -- is that an accurate contention, that you feel | 11:09:42 |
| 20 | he violated Penal Code Section 245(b)? | 11:09:45 |
| 21 | MR. ALLEN:  No.  I believe that should | 11:09:50 |
| 22 | have been -- and I may even be off on this now, | 11:09:51 |
| 23 | because it's my memory of when I was there.  245(d), | 11:09:53 |
| 24 | I think, is the applicable statute to law | 11:09:57 |
| 25 | enforcement. | 11:09:57 |

| | | |
|---|---|---|
| 1 | five years." | 11:14:06 |
| 2 | Is that what you had in mind, Dale? | 11:14:06 |
| 3 | MR. ALLEN:  It is. | 11:14:12 |
| 4 | And, Joe, could you tell me what | 11:14:13 |
| 5 | interrogatory we are discussing? | 11:14:15 |
| 6 | MR. BABICH:  Yeah.  Take a look at special | 11:14:16 |
| 7 | interrogatory number seven. | 11:14:17 |
| 8 | MR. ALLEN:  Thank you. | 11:14:19 |
| 9 | MR. KILDAY:  And, again, what I was | 11:14:24 |
| 10 | reading was Penal Code 245, subsection C, as in | 11:14:26 |
| 11 | Charles. | 11:14:30 |
| 12 | MR. ALLEN:  And we will amend this to | 11:14:34 |
| 13 | state Penal Code Section 245(c) to the form of your | 11:14:36 |
| 14 | question. | 11:14:40 |
| 15 | Q.      By MR. BABICH:  Okay.  So -- and, again, | 11:14:42 |
| 16 | we're going to go back and really go through the | 11:14:47 |
| 17 | events of the day and the incident in pretty good | 11:14:50 |
| 18 | detail after a break, which we're getting close to. | 11:14:54 |
| 19 | But what is your contention, Mr. Gale, | 11:14:57 |
| 20 | with regard to your claim that Mr. Hall assaulted | 11:15:01 |
| 21 | you -- hold on -- assaulted you with an instrument | 11:15:07 |
| 22 | other than a firearm? | 11:15:14 |
| 23 | A.      Again, I'm unfamiliar with interrogatory | 11:15:18 |
| 24 | number seven, which you guys are reviewing, but yes, | 11:15:21 |
| 25 | that was my belief at the time of the incident. | 11:15:25 |

| | | |
|---|---|---|
| 1 | Q.        But what are the facts to support that? | 11:15:27 |
| 2 | What was your impression?  If you can, list for me | 11:15:32 |
| 3 | the facts to support that violation that day. | 11:15:36 |
| 4 | A.        Oh, yes.  That he had the clear means, he | 11:15:38 |
| 5 | had possession of a lighter, a known flammable | 11:15:42 |
| 6 | fluid, and was in contact with me and was actively | 11:15:48 |
| 7 | attempting to light himself on fire.  And he had | 11:15:51 |
| 8 | made specific intent -- statements to me that if I | 11:15:56 |
| 9 | did not let him go, if I did not leave that I would | 11:16:03 |
| 10 | be injured, I would be hurt, I would subsequently be | 11:16:06 |
| 11 | lit on fire as well. | 11:16:11 |
| 12 | Q.        Now, you just said that he was actively | 11:16:13 |
| 13 | attempting to light himself on fire. | 11:16:16 |
| 14 | Are you stating that he was actually | 11:16:18 |
| 15 | clicking the lighter that he had in his hand during | 11:16:23 |
| 16 | this struggle? | 11:16:26 |
| 17 | A.        Yes, sir.  That he was actively attempting | 11:16:27 |
| 18 | to.  That was one of the items that during the | 11:16:30 |
| 19 | course of our physical struggle I was actively | 11:16:33 |
| 20 | preventing him from placing his thumb over the | 11:16:40 |
| 21 | ignition source of that lighter. | 11:16:44 |
| 22 | Q.        Okay.  And we'll talk about that in detail | 11:16:46 |
| 23 | after the break.  Thank you for sharing that with me | 11:16:48 |
| 24 | now. | 11:16:50 |
| 25 | Did you have a fire extinguisher in your | 11:16:56 |

```
 1    squad car when you arrived at the scene of this        11:17:05
 2    incident?                                              11:17:11
 3    A.        To my best of my recollection, yes.  I       11:17:11
 4    don't specifically recall, but I know that that was    11:17:14
 5    one of the issued items for the patrol vehicles.       11:17:16
 6              So that being said, I believe it was in      11:17:22
 7    the back of my patrol vehicle.                         11:17:25
 8    Q.        Any reason why you didn't bring it with      11:17:26
 9    you when you went up to the -- to the area where       11:17:28
10    Mr. Hall was threatening suicide?                      11:17:31
11    A.        No.  Other than I had been ushered inside.   11:17:34
12    Immediately exiting my patrol vehicle, I was ushered   11:17:53
13    inside to where I started speaking with Mr. Hall.      11:17:59
14    Q.        But when you received the call to go over    11:18:01
15    there to where Mr. Hall was, dispatch informed you     11:18:03
16    that he was threatening suicide; correct?              11:18:08
17    A.        I do not remember if they specifically       11:18:12
18    used those words, but that he had been attempting to   11:18:16
19    harm himself and placing flammable fluids on him.      11:18:20
20    Q.        You were aware of that before you actually   11:18:24
21    even saw him that day; correct?                        11:18:27
22    A.        Yes.                                          11:18:28
23              MR. BABICH:  All right.  That would be a     11:18:29
24    good time to take a break, guys, if you're okay with   11:18:31
25    that.                                                  11:18:35
```

```
 1              MR. ALLEN:  That's great, Joe.  Thanks.        11:18:35
 2              MR. BABICH:  Let's do about ten minutes or     11:18:38
 3    so.                                                      11:18:38
 4              THE REPORTER:  We are going off the            11:18:38
 5    record.  The time is 11:18 a.m.                          11:18:51
 6                   (Recess.)                                 11:18:51
 7              THE REPORTER:  We are back on the record.      11:18:51
 8    The time is 11:31.                                       11:31:22
 9    Q.         By MR. BABICH:  Mr. Gale, I want to go        11:31:22
10    through with you now some of the training that you       11:31:27
11    received with regard to the use of what's known as a     11:31:29
12    conducted energy device, also which, I believe,         11:31:34
13    includes a TASER.                                        11:31:38
14              And if you would look at Exhibit 3 of the      11:31:39
15    exhibits that we produced for you today.  And            11:31:43
16    Exhibit 3 to the deposition is Policy 309, Conducted     11:31:49
17    Energy Device.  And it's the policy of the Weed          11:31:53
18    Police Department.                                       11:31:58
19              Do you have that in front of you?              11:32:02
20    A.         Yes, sir, I do.                               11:32:03
21    Q.         Did you receive that document during your     11:32:04
22    training on the use of a TASER?                          11:32:08
23    A.         Yes, I did.                                   11:32:11
24    Q.         And just share with me the process of the     11:32:13
25    training.  And I really want to focus on TASER           11:32:17
```

```
 1    training.                                               11:32:21
 2              When in your time period with the police      11:32:22
 3    department did you first receive TASER training?        11:32:24
 4    A.        I do not recall when, a specific time         11:32:28
 5    exactly, after my course of duties started with the     11:32:36
 6    City of Weed.   I know that typically all of their      11:32:41
 7    pre-training is done before we start our field          11:32:44
 8    training, before we are out there on -- on the          11:32:51
 9    streets on patrol.                                      11:32:53
10              So it would be my recollection that this      11:32:54
11    was done -- this sort of training was done with the     11:32:57
12    department with the trainer before I had started my     11:33:01
13    field training portion and been on the streets.         11:33:05
14              And this would have been done in office       11:33:09
15    with the certified trainer.   We would have gone        11:33:12
16    through the policies, procedures systematically         11:33:18
17    and then had a portion of time that we would have       11:33:25
18    gone through the operation specific to the TASER        11:33:30
19    and had a portion of time when we can deploy the        11:33:34
20    TASER and speak about considerations based on that      11:33:39
21    as well.                                                11:33:45
22    Q.        Did you -- had you ever received any TASER    11:33:45
23    training before your employment with the City of        11:33:50
24    Weed Police Department?                                 11:33:59
25    A.        Yes.   The police academy that I attended     11:33:59
```

1    in 2015, they kind of went over the blanket policy    11:34:02

2    of TASERS, conducted energy weapons or devices, as    11:34:08

3    applied to law enforcement as a whole, and then each    11:34:12

4    department generally does another overview specific    11:34:14

5    to any changes that they -- their specific    11:34:19

6    department has adopted.    11:34:23

7              So that being said, it would have been    11:34:24

8    both the police academy, the Del Norte County    11:34:26

9    Sheriff's Office and then again at Weed at that    11:34:31

10   time.    11:34:34

11   Q.       So let's talk about the TASER training you    11:34:34

12   received at the police academy.    11:34:36

13              Do you recall what that involved?    11:34:42

14   A.       That involved going over, again, the    11:34:43

15   blanket policy.  I believe similar to what we are    11:34:45

16   seeing here, also went into the special    11:34:52

17   considerations, as well as how the TASER operates.    11:34:57

18   And then we were given a live classroom section    11:35:03

19   where we were tased.    11:35:07

20   Q.       And, again, this is specific to the police    11:35:12

21   academy training; correct?    11:35:15

22   A.       That is correct, yeah.    11:35:16

23   Q.       So you actually submitted to being tased    11:35:18

24   during that process?    11:35:22

25   A.       That is correct.  During the academy they    11:35:23

1    did a kind of a modified form of the TASER where          11:35:28

2    four cadets linked arms.  The cadets that were on          11:35:33

3    the end had the probes placed in their boots, and          11:35:37

4    then the prompter/instructor activated the conducted       11:35:40

5    energy weapon, which then gave the effect to the           11:35:47

6    four cadets.  I was part of that, yes.                     11:35:51

7    Q.        When you participated in that exercise,          11:35:55

8    did the tasing cause you to fall to the ground?            11:35:58

9    A.        That is correct.                                 11:36:01

10   Q.        And what's the best way to describe what         11:36:03

11   you felt that caused you to go to the ground?              11:36:07

12   A.        That would have been muscular                    11:36:10

13   incapacitation, as they state in the trainings.  It       11:36:17

14   was involuntary.  My muscles locked up, and I was          11:36:22

15   immobilized for the period of time that the TASER          11:36:28

16   was cycling.                                               11:36:33

17   Q.        And when you say during that exercise that       11:36:33

18   they placed the probes in the boots, did -- help me        11:36:37

19   understand that a little bit better.                       11:36:41

20             Did they just sit in the boot, or were          11:36:43

21   they actually -- were the probes actually attached         11:36:45

22   to something?                                              11:36:49

23   A.        Yes.  I believe that that was specific for       11:36:50

24   the parameters that they were under an educational         11:36:53

25   institution.  They were not allowed to inflict the         11:36:58

1   exact probes of the TASER onto any students.        11:37:04

2          So specifically for that training, it was    11:37:09

3   a cartridge that had been previously deployed at an  11:37:11

4   inert object or a wall, I believe it was.  And that  11:37:17

5   was to show how the TASER functioned, how the darts  11:37:20

6   deployed, and how it cycled after that.              11:37:24

7          We were also able to observe the probes       11:37:27

8   and the hooks that were on the ends of those probes. 11:37:32

9   To the best of my recollection, after we, as a       11:37:36

10  class, saw how it functioned and deployed and the    11:37:41

11  prongs, they removed those prongs, which left just   11:37:45

12  the tip of the projectile without any prong or barb  11:37:50

13  on it.  And those were the items that were stuck in, 11:37:58

14  basically, the outside of a shoe, outside of a sock, 11:38:02

15  inside of a shoe area.                               11:38:06

16  Q.      That allowed for the current to transfer     11:38:07

17  all the way through all four of you guys?            11:38:11

18  A.      That is correct.                             11:38:13

19  Q.      Okay.  Was that the only time that you'd     11:38:14

20  been tased?                                          11:38:20

21  A.      To the best of my recollection, yes.         11:38:21

22  Before the incident, I should say.                   11:38:30

23  Q.      And did that -- again, it took place at      11:38:32

24  the police academy.  What year, approximately, was   11:38:37

25  that?                                                11:38:39

1    A.        That would have been sometime in the          11:38:39

2    spring -- the first half, I should say, of 2015.       11:38:42

3    Q.        And while you were at the police academy,     11:38:47

4    how much time was devoted to TASER training?  Was it    11:38:51

5    one afternoon, a few years, several days?  How much     11:38:54

6    time was devoted to the TASER training?                 11:38:58

7    A.        As far as the number of classes or            11:39:03

8    specific trainings that we went through, I do not       11:39:11

9    know how many course hours or trainings that we went    11:39:15

10   through during the academy; however, it was taught      11:39:20

11   and kind of recapped throughout the course of the       11:39:26

12   academy.                                                11:39:30

13   Q.        And during your training at the academy       11:39:31

14   with regard to TASER use, you were told -- were you     11:39:37

15   told about how you shouldn't TASE someone who is        11:39:43

16   covered in gasoline?                                    11:39:57

17   A.        During those trainings they would have        11:39:58

18   identified that there were situational circumstances    11:40:02

19   to consider, and flammable fluids was one of them.      11:40:07

20   Q.        Okay.  And specifically, situational          11:40:16

21   circumstances involving a person who is covered in      11:40:22

22   gasoline was discussed?                                 11:40:26

23   A.        I believe the wording is flammable fluids,    11:40:29

24   which would fall under gasoline, but it was -- given    11:40:35

25   the totality of the circumstances of the situation      11:40:38

| | | |
|---|---|---|
| 1 | that we are in in a specific timeframe, there was | 11:40:41 |
| 2 | specific things to be aware of or be mindful of. | 11:40:50 |
| 3 | Yes. Flammable fluids is one of those, | 11:40:54 |
| 4 | yes. | 11:40:56 |
| 5 | Q. Well, at the police academy you were | 11:40:57 |
| 6 | taught that if you shot someone with a TASER who had | 11:40:59 |
| 7 | gasoline or some sort of flammable material on their | 11:41:05 |
| 8 | clothing that they could catch on fire; correct? | 11:41:09 |
| 9 | A. That that was a possibility, yes. | 11:41:13 |
| 10 | Q. Okay. It was more than a possibility in | 11:41:15 |
| 11 | your training, though, wasn't it? Didn't they | 11:41:17 |
| 12 | emphasize that it's the likelihood is what's going | 11:41:19 |
| 13 | to happen if you TASER somebody that's covered with | 11:41:21 |
| 14 | a flammable? | 11:41:24 |
| 15 | A. Based on the training that I've gone | 11:41:25 |
| 16 | through, it's a -- states to be mindful that this | 11:41:28 |
| 17 | is a possibility or that is something to be mindful | 11:41:34 |
| 18 | of, both through the policies that I've gone through | 11:41:36 |
| 19 | as well as the TASER -- the TASER trainings that | 11:41:39 |
| 20 | I've gone through. Given the totality of | 11:41:46 |
| 21 | circumstances, that is something to be mindful of, | 11:41:50 |
| 22 | be aware of. | 11:41:52 |
| 23 | Q. So did they give you any explanation in | 11:41:53 |
| 24 | your training at the police academy under what | 11:42:00 |
| 25 | circumstances would be appropriate to fire a TASER | 11:42:03 |

1    at someone who has a flammable fluid in their          11:42:06

2    clothing?                                               11:42:12

3    A.        Not specifically.                             11:42:13

4              If I may, the discussion was presented in     11:42:23

5    not specific situations that we might face as law       11:42:26

6    enforcement officers in the future; however, the        11:42:30

7    designation was made that all of these items are        11:42:31

8    less lethal, and the differentiation between less       11:42:35

9    lethal and less than lethal was identified and          11:42:42

10   spoken to through the academy.                          11:42:45

11             And so, again, they refer to the totality     11:42:48

12   of the circumstances of in the specific situation       11:42:51

13   that we're in items to be aware of, circumstances to    11:42:56

14   be aware of.                                            11:42:59

15   Q.        Were you ever taught in any of your           11:42:59

16   training that when possible avoid using a TASER in      11:43:03

17   known flammable hazard conditions?  Was that ever       11:43:08

18   taught to you?                                          11:43:12

19   A.        Yes.  When -- yeah.                           11:43:12

20   Q.        In fact, that's part of the TASER handheld    11:43:14

21   warning that is in Exhibit number 6.                    11:43:18

22             Why don't you take a look at that, since      11:43:23

23   we're talking about it.                                 11:43:25

24             Do you see at the very top there, Exhibit     11:43:47

25   6?                                                      11:43:50

| | | |
|---|---|---|
| 1 | A. Yes, I do. I know from my training and | 11:43:50 |
| 2 | experience I've seen this document prior. I know | 11:43:55 |
| 3 | that this is a supplement through training that | 11:43:58 |
| 4 | TASER produces and is something that goes along with | 11:44:01 |
| 5 | the policies. | 11:44:07 |
| 6 | Q. And Exhibit 6 is something you're familiar | 11:44:08 |
| 7 | with? | 11:44:13 |
| 8 | A. Yes, I have seen this document prior. | 11:44:13 |
| 9 | Q. And you saw Exhibit 6, the TASER handheld | 11:44:16 |
| 10 | warnings and instructions, you saw that multiple | 11:44:20 |
| 11 | times during your training? | 11:44:23 |
| 12 | A. Yes. | 11:44:24 |
| 13 | Q. That would be your training at the police | 11:44:31 |
| 14 | academy and also at Del Norte? | 11:44:35 |
| 15 | A. Yeah. That would be correct, yes. | 11:44:37 |
| 16 | Q. And also your training on TASER use at | 11:44:38 |
| 17 | City of Weed Police Department, you saw this Exhibit | 11:44:45 |
| 18 | 6 as well; correct? | 11:44:49 |
| 19 | A. That is correct. | 11:44:50 |
| 20 | Q. Do you recall ever having to sign it to | 11:44:51 |
| 21 | acknowledge that you received it? | 11:44:55 |
| 22 | A. I don't -- I don't recall that specific -- | 11:44:56 |
| 23 | signing this document. | 11:45:01 |
| 24 | Q. During your training at the police academy | 11:45:02 |
| 25 | with regard to TASER use, did you ever sit through | 11:45:06 |

```
 1   any Power Point presentations on TASER use?          11:45:09

 2   A.        Yes.   I believe it was the Axon TASER      11:45:15

 3   Power Point.                                          11:45:23

 4   Q.        If you look at Exhibit 7, that's the        11:45:23

 5   Axon -- it's a select number of pages from the Axon  11:45:26

 6   Power Point that has been produced by the City of    11:45:30

 7   Weed.  So it's my understanding the City of Weed has 11:45:37

 8   actually used these slides in their training.        11:45:42

 9            So maybe my first -- my first question       11:45:44

10   would be do you recall seeing Exhibit 7 in your      11:45:46

11   training for TASER use when you were trained at City 11:45:49

12   of Weed Police Department?                           11:45:58

13   A.        Yes.                                        11:45:58

14   Q.        And did this same Exhibit 7 with these      11:45:58

15   slides, was it also included in your training at     11:46:01

16   Del Norte?                                           11:46:05

17   A.        For the most part.                          11:46:06

18            I'd like to identify it was a different      11:46:14

19   TASER.  It wasn't the TASER 7.                        11:46:17

20            I believe that they have had several         11:46:19

21   different generations of the conducted energy device 11:46:21

22   or weapon that has come out.  And so some iteration  11:46:25

23   of this, yes.                                         11:46:29

24   Q.        Okay.  So in your training at the police    11:46:30

25   academy, the TASER Axon training Power Points        11:46:37
```

1    included at page two of Exhibit 7, a list of things          11:46:45

2    to avoid, and it says, "avoid flammable and                  11:46:48

3    explosive -- and explosives."                                11:46:52

4           Do you see that?                                      11:46:56

5    A.     Yes, I do.                                            11:46:56

6    Q.     And you would agree that you were aware of            11:46:56

7    that through your training at the police academy;            11:46:59

8    correct?                                                     11:47:05

9    A.     Yes.                                                  11:47:05

10   Q.     And you were aware of this key safety                 11:47:05

11   guideline of avoiding flammable -- flammables and            11:47:10

12   explosives through your training at Del Norte;               11:47:13

13   correct?                                                     11:47:16

14   A.     Yeah, as it related to department policy.             11:47:16

15   Q.     And in the TASER use training at Weed --              11:47:22

16   again, this is a document that Weed produced for us,         11:47:25

17   so I presume you recall being aware of this item two         11:47:28

18   under "key safety guidelines" in Exhibit 7 that says         11:47:31

19   "avoid flammables and explosives."  Correct?                 11:47:35

20   A.     That is correct, when directly applied to             11:47:40

21   the policy.                                                  11:47:42

22   Q.     What do you mean, when directly applied to            11:47:43

23   the policy?  I'm not following you there.                    11:47:46

24   A.     So as a law enforcement officer we are                11:47:50

25   directly governed by the policies and procedures of         11:47:55

```
1    our department.  And each department takes trainings        11:47:58
2    and they offer it to their officer, and then they          11:48:04
3    directly apply it and gives more formal situations         11:48:06
4    or direction for their officers.                           11:48:11
5            So yes, this would be something that was            11:48:14
6    presented by Axon and would fall under the policies        11:48:16
7    and procedures of the City of Weed Police                  11:48:21
8    Department.  And we are expected to apply these            11:48:26
9    trainings under the guidelines of that policy and          11:48:29
10   procedures.                                                11:48:36
11   Q.       So sticking with Exhibit 7 for a moment.          11:48:36
12   Can you turn to page -- I think it's the third page        11:48:41
13   of Exhibit 7.  It looks like a -- possibly -- I'm          11:48:45
14   not certain, but to me this looks like a screen            11:48:50
15   capture from a video.                                      11:48:52
16           Do you see that where it says "avoid               11:48:54
17   flammables and explosives"?                                11:48:56
18   A.       I do.                                             11:48:58
19   Q.       Do you recall during the Power Point              11:48:59
20   presentation whether this was in fact a video, or         11:49:02
21   was it just a single slide?  Do you know?                 11:49:06
22   A.       I believe this is a video clip.                  11:49:10
23   Q.       What do you recall about that video clip          11:49:12
24   that you received during your training regarding the      11:49:15
25   use of a TASER?                                           11:49:18
```

```
 1    A.        My recollection of this was that through      11:49:21
 2    the deployment of a TASER the individual depicted on    11:49:26
 3    the left was -- they were subsequently on fire.         11:49:32
 4              Again, I don't remember this exact video      11:49:45
 5    other than, I believe, I remember seeing it in          11:49:49
 6    motion.                                                 11:49:51
 7    Q.        Okay.  Was it your impression it was a        11:49:51
 8    body cam video that captured this page three in         11:49:54
 9    Exhibit 7?                                              11:50:01
10    A.        To the best of my recollection, yes.          11:50:01
11    Q.        And you actually recall seeing the -- in      11:50:03
12    the video do you recall seeing the TASER strike the     11:50:08
13    subject and then the subject began to become on fire    11:50:11
14    in the video?                                           11:50:21
15    A.        That -- I don't recall watching that other    11:50:22
16    than the fact that that was what we were talking        11:50:27
17    about, if that makes sense.                             11:50:30
18              I don't exactly recall in this specific       11:50:33
19    video the officer deploying the TASER; however,         11:50:35
20    given the fact that it is within the training and I     11:50:39
21    remember viewing this video, that would be safe to      11:50:41
22    say that he -- I observed something like that.          11:50:45
23    Q.        How many times have you seen a video --       11:50:51
24    and let's exclude the video involving you and           11:50:53
25    Mr. Hall.                                               11:50:56
```

| | | |
|---|---|---|
| 1 | But how many times have you seen a video | 11:50:56 |
| 2 | where a TASER has been shot at an individual and the | 11:50:59 |
| 3 | individual catches on fire? | 11:51:02 |
| 4 | A.       I would approximate three times. | 11:51:03 |
| 5 | Q.       That was all during your training? | 11:51:09 |
| 6 | A.       I would say throughout the training and | 11:51:16 |
| 7 | other subsequent videos that have been released on | 11:51:21 |
| 8 | social media platforms or news platforms. | 11:51:25 |
| 9 | Q.       Were -- those three events where the | 11:51:28 |
| 10 | TASERS caught somebody on fire, did you see all of | 11:51:32 |
| 11 | those before October 12, 2019? | 11:51:35 |
| 12 | A.       I do not recall the specific circumstances | 11:51:37 |
| 13 | of these videos nor when I watched them. | 11:51:43 |
| 14 | Q.       But you do know that you saw at least one | 11:51:48 |
| 15 | video before 2000- -- or before October 12, 2019 | 11:51:50 |
| 16 | where a subject was shot with a TASER and caught on | 11:51:55 |
| 17 | fire.  Is that fair to say? | 11:52:01 |
| 18 | A.       Yeah, I believe so.  Yes.  Yes. | 11:52:03 |
| 19 | Q.       Sticking with Exhibit 7, I think the -- | 11:52:04 |
| 20 | one of the later pages says, "best outcome is to | 11:52:13 |
| 21 | deescalate."  Do you see that? | 11:52:17 |
| 22 | A.       Yes. | 11:52:19 |
| 23 | Q.       What attempts did you make to deescalate | 11:52:23 |
| 24 | the situation when you encountered Mr. Hall on | 11:52:28 |
| 25 | October 12, 2019? | 11:52:32 |

1    A.          I spoke to him a number of times trying to          11:52:35

2    relate with him, trying to build rapport with him,          11:52:42

3    trying to remind him of other times that we had          11:52:48

4    interactions that we had had outside of law          11:52:53

5    enforcement, trying to figure out what he was going          11:52:59

6    to -- going through -- excuse me -- and make myself          11:53:03

7    available at that time to talk to him about the          11:53:08

8    situations or dilemmas that he was dealing with          11:53:13

9    personally.          11:53:19

10   Q.          You've watched the video of that period of          11:53:19

11   time that you encountered him up until the point          11:53:23

12   that the TASER was used; correct?          11:53:26

13   A.          Yes, I reviewed that video with my          11:53:28

14   attorney.          11:53:31

15   Q.          And during that interview, would you say          11:53:32

16   it's fair to say that that pretty much captures your          11:53:36

17   attempt to deescalate the situation?          11:53:41

18   A.          Yes.          11:53:44

19   Q.          If you go to the next slide -- or next          11:53:45

20   page in Exhibit 7, it says "Flammability."  Do you          11:53:51

21   see that?          11:53:54

22   A.          Yes.          11:53:55

23   Q.          That's a document that you received or at          11:53:56

24   least looked at during your training at Weed City          11:54:01

25   Police Department regarding the use of a TASER;          11:54:09

1    correct?                                                11:54:11

2    A.          That is correct.                            11:54:11

3    Q.          And it speaks for itself, but I want to go   11:54:12

4    over a couple of things.                                11:54:14

5               It says, "TASER CEW can ignite explosive      11:54:15

6    materials, liquids, fumes, gases, vapors, and other     11:54:19

7    flammable substances."                                  11:54:23

8               You understood that to be the case on         11:54:23

9    October 12, 2019; correct?                              11:54:25

10   A.          Yes.                                        11:54:27

11   Q.          I saw somewhere that the -- it might be in   11:54:28

12   the policy, and we'll get to it.  The -- I think the     11:54:38

13   policy said that you should check the spark device      11:54:43

14   of the unit before you use it that day.                 11:54:46

15              Do you know what I'm talking about there?     11:54:48

16   A.          Yes.  Generally there is a function test     11:54:50

17   that is typically done at the beginning of a shift      11:54:57

18   to make sure that the device is operating properly      11:55:01

19   and also checks the battery.                            11:55:06

20   Q.          Did you do that on October 12, 2019,         11:55:09

21   before you used your TASER that day?                     11:55:13

22   A.          I do not recall.                            11:55:16

23   Q.          Is that something that your policy calls     11:55:18

24   for to do every -- every start of your shift?  Feel      11:55:21

25   free to look at the policy, if that helps.              11:55:27

```
 1              Mr. Allen, can you hear us?            
 2              MR. ALLEN:  I can.  Thank you very much.
 3    Q.        By MR. BABICH:  Okay.  So looking at    11:59:53
 4    Exhibit 3, Mr. Gale?                              11:59:55
 5    A.        Yes, sir.                               11:59:59
 6    Q.        First page, kind of in the middle, it   12:00:00
 7    says, "Members carrying a CED should perform a spark  12:00:02
 8    test on the unit prior to every shift."          12:00:08
 9              Do you see that?                        12:00:10
10    A.        I do.                                   12:00:10
11    Q.        And did you do that the day of the      12:00:11
12    incident?                                         12:00:13
13    A.        I do not remember.                      12:00:14
14    Q.        And that test is basically an effort to 12:00:16
15    make sure the device is properly functioning and the 12:00:20
16    battery's at the proper level; correct?          12:00:24
17    A.        That is correct.                        12:00:27
18    Q.        While we're on Exhibit 3, we may as well 12:00:27
19    go up to the top.                                 12:00:31
20              At the very first -- or second section, 12:00:34
21    309.02, it says, "The conducted energy device is  12:00:37
22    intended to control a violent or potentially violent 12:00:41
23    individual while minimizing the risk of serious  12:00:44
24    injury."                                          12:00:47
25              Do you remember being aware of that policy 12:00:48
```

| | | |
|---|---|---|
| 1 | before our incident? | 12:00:50 |
| 2 | A.       Yes. | 12:00:52 |
| 3 | Q.       And then it says, "The appropriate use of | 12:00:53 |
| 4 | such a device should result in fewer serious | 12:00:59 |
| 5 | injuries to officers and suspects." | 12:01:02 |
| 6 | You were aware of that as well before the | 12:01:04 |
| 7 | incident? | 12:01:06 |
| 8 | A.       Yes. | 12:01:06 |
| 9 | Q.       I'd like to go to 309.5.2 of that policy, | 12:01:08 |
| 10 | which is, again, in Exhibit 3.  It's toward the | 12:01:25 |
| 11 | bottom there. | 12:01:30 |
| 12 | A.       Yes, sir. | 12:01:30 |
| 13 | Q.       This is the special deployment | 12:01:31 |
| 14 | considerations.  I think you may have referred to | 12:01:37 |
| 15 | this earlier. | 12:01:39 |
| 16 | But it says, "The use of the CED on | 12:01:39 |
| 17 | certain individuals should generally be avoided | 12:01:45 |
| 18 | unless the totality of the circumstances indicates | 12:01:48 |
| 19 | that other available options reasonably appear | 12:01:50 |
| 20 | ineffective or would present a greater danger to the | 12:01:57 |
| 21 | officer, the subject, or others, and the officer | 12:02:00 |
| 22 | reasonably believes that the need to control the | 12:02:04 |
| 23 | individual outweighs the risk of using the device." | 12:02:07 |
| 24 | You were aware of that, at least, | 12:02:10 |
| 25 | introductory paragraph before the incident? | 12:02:14 |

```
 1   A.        Yes.                                        12:02:16

 2   Q.        And then it goes on to list the items to    12:02:16

 3   avoid.                                                12:02:20

 4             It starts with somebody that's known to be  12:02:21

 5   pregnant.  You wouldn't want to shoot the TASER at    12:02:23

 6   somebody that's known to be pregnant; correct?        12:02:26

 7   A.        It's an item to keep in consideration,      12:02:30

 8   yes.                                                  12:02:36

 9   Q.        The next one is elderly individuals or      12:02:36

10   obvious juveniles; correct?                           12:02:39

11   A.        Yes, that is one of the considerations.     12:02:41

12   Q.        You want to avoid, if you can, using the    12:02:43

13   TASER on individuals with obviously low body mass;    12:02:49

14   correct?                                              12:02:54

15   A.        That's correct.                             12:02:54

16   Q.        And if circumstances allow, you want to     12:02:55

17   avoid shooting a TASER at individuals who are         12:02:58

18   handcuffed or otherwise restrained; correct?          12:03:01

19   A.        That is correct.                            12:03:04

20   Q.        And then you want to avoid using a TASER    12:03:05

21   on individuals who have been recently sprayed with    12:03:14

22   flammable chemical agent or who are otherwise in      12:03:17

23   close proximity to any known combustible vapor or     12:03:21

24   flammable material, including alcohol-based -- I      12:03:25

25   don't know how to pronounce this word -- oleoresin,   12:03:28
```

| | | |
|---|---|---|
| 1 | also known as OC spray. | 12:03:34 |
| 2 | That's a circumstance you want to avoid; | 12:03:36 |
| 3 | correct? | 12:03:39 |
| 4 | A.     Yes, that is one of the considerations. | 12:03:39 |
| 5 | Q.     And then the last item on the next page | 12:03:44 |
| 6 | says you want to -- it lists individuals whose | 12:03:46 |
| 7 | position or activity may result in collateral | 12:03:48 |
| 8 | injury; i.e., or e.g., falls from height operating | 12:03:52 |
| 9 | vehicles; correct? | 12:03:55 |
| 10 | A.     Yes, that is included as well. | 12:03:55 |
| 11 | Q.     So all of those items are included in this | 12:03:57 |
| 12 | policy, you are aware of that, of this specific | 12:04:01 |
| 13 | policy as of October 12, 2019; correct? | 12:04:04 |
| 14 | A.     That is correct. | 12:04:09 |
| 15 | Q.     Do you know whether or not Del Norte | 12:04:10 |
| 16 | Sheriff's Department had a similar policy that I | 12:04:13 |
| 17 | just read to you? | 12:04:16 |
| 18 | A.     I believe they have a similar policy, if | 12:04:17 |
| 19 | I'm not mistaken. | 12:04:19 |
| 20 | Q.     The policy, again, 309.5.2, in the first | 12:04:20 |
| 21 | paragraph, kind of toward the back -- or toward the | 12:04:40 |
| 22 | end it says -- I don't want to take this out of | 12:04:43 |
| 23 | context, but generally it says the officer | 12:04:48 |
| 24 | reasonably believes that the need to use -- or to | 12:04:51 |
| 25 | control the individual outweighs the risk of using | 12:04:54 |

| | | |
|---|---|---|
| 1 | the device. | 12:04:57 |
| 2 | That's something you're going to factor in | 12:04:57 |
| 3 | on whether or not you use the device; correct? | 12:05:01 |
| 4 | A.        That is correct. | 12:05:03 |
| 5 | Q.        What -- in your mind, with regard to | 12:05:03 |
| 6 | Mr. Hall's encounter, what was the -- what was it | 12:05:10 |
| 7 | that caused you to reasonably believe that the need | 12:05:15 |
| 8 | to control the individual outweighed the risk of | 12:05:19 |
| 9 | using the device? | 12:05:22 |
| 10 | A.        The statements and actions that Mr. Hall | 12:05:23 |
| 11 | made to me while I was both talking with him and | 12:05:29 |
| 12 | then struggling with him over the lighter led me to | 12:05:32 |
| 13 | believe that if I did not take him into control then | 12:05:39 |
| 14 | he would kill himself. | 12:05:42 |
| 15 | Q.        And you made the decision based on that to | 12:05:47 |
| 16 | use the TASER even though you knew he was covered | 12:05:53 |
| 17 | with a flammable? | 12:05:56 |
| 18 | A.        I did. | 12:05:57 |
| 19 | Q.        At any time before using the TASER, did | 12:06:01 |
| 20 | you appreciate that there was high likelihood that | 12:06:08 |
| 21 | he was going to catch on fire if you used the TASER | 12:06:14 |
| 22 | on him? | 12:06:18 |
| 23 | A.        I did remember that as part of my policy | 12:06:19 |
| 24 | given the circumstances as I was going through it in | 12:06:24 |
| 25 | that instance. | 12:06:28 |

```
 1    Q.         And if you knew that if there was a chance          12:06:30
 2    that he could catch on fire, how does that cause you          12:06:42
 3    to use that process of using the TASER to try to             12:06:47
 4    save his life?  I'm having trouble with that logic.          12:06:51
 5    A.         Given the course of the situation as it is        12:06:54
 6    depicted on the body camera footage, at that time I          12:07:04
 7    had exhausted every other means of attempting to             12:07:10
 8    stop him from harming himself.  It had escalated             12:07:13
 9    into him making statements that he was going to harm         12:07:18
10    me and that I was going to be personally harmed.             12:07:20
11               I did not believe that I could walk away,         12:07:24
12    one, because he had entered through a locked door,           12:07:29
13    and there was a point where I could not exit; as             12:07:35
14    well as if the option had been to leave that he              12:07:40
15    would have killed himself regardless.                        12:07:47
16    Q.         You realize when you did pull the trigger         12:07:49
17    of the TASER that you possibly could kill him                12:07:53
18    because of the -- his clothing catching fire;                12:07:56
19    correct?                                                     12:08:02
20    A.         Based on my training and experience, that         12:08:02
21    was the item and device that I had that would have           12:08:05
22    presented the least amount of possibility of great           12:08:10
23    bodily injury or death at the time.                          12:08:16
24    Q.         But you would agree that when you pulled          12:08:18
25    the trigger of the TASER that day and struck                 12:08:20
```

| | | |
|---|---|---|
| 1 | Mr. Hall that he could catch on fire and die? | 12:08:22 |
| 2 | A.        I know that that was a special | 12:08:30 |
| 3 | circumstance, as we outlined here, to remember with | 12:08:34 |
| 4 | the deployment of a TASER. | 12:08:37 |
| 5 | Q.        You were aware that he could have died by | 12:08:38 |
| 6 | you shooting him with a TASER before you shot him; | 12:08:42 |
| 7 | correct? | 12:08:46 |
| 8 | A.        That is correct. | 12:08:46 |
| 9 | Q.        What was it about the circumstances -- | 12:08:46 |
| 10 | well, let me back up. | 12:08:54 |
| 11 | When you decided to shoot him with the | 12:08:56 |
| 12 | TASER, did you think that he was not going to catch | 12:08:58 |
| 13 | on fire? | 12:09:00 |
| 14 | A.        I believe that that was a possibility, | 12:09:01 |
| 15 | yes. | 12:09:06 |
| 16 | Q.        That he was not going to catch on fire? | 12:09:06 |
| 17 | A.        That he was not going to catch on fire; | 12:09:09 |
| 18 | correct. | 12:09:11 |
| 19 | Q.        What makes you -- what makes you say that? | 12:09:11 |
| 20 | What's going through your mind to cause you to think | 12:09:15 |
| 21 | maybe he won't catch on fire if I shoot two electric | 12:09:17 |
| 22 | probes into him and he's covered with gasoline or | 12:09:23 |
| 23 | his clothes are covered with gasoline? | 12:09:26 |
| 24 | A.        Because during the training by both Axon | 12:09:28 |
| 25 | and through policy, it is identified that there is | 12:09:35 |

```
 1    to gain compliance and weigh that against the need      12:13:09
 2    to control him, and my belief that if I were to         12:13:14
 3    leave he would kill himself.                            12:13:17
 4    Q.        By MR. BABICH:  So based on that you          12:13:20
 5    decided to shoot him with the TASER?                    12:13:22
 6    A.        That is the course of action I took on        12:13:25
 7    that day.                                               12:13:28
 8    Q.        Now, what is it about Exhibit 12 that         12:13:29
 9    leads you to believe that it changed the findings of    12:13:34
10    the internal investigation that's outlined in 11?       12:13:38
11            I'm not following you there.  Maybe I           12:13:45
12    misunderstood you.  But do you understand what I'm      12:13:53
13    asking you?                                             12:13:55
14    A.        Yes, I do understand what you are --          12:13:55
15            Exhibit 12 just signifies that the items       12:14:17
16    identified by the Use of Force Review Board were        12:14:25
17    reviewed and documented, and it is not to negate        12:14:28
18    Exhibit 11 but just to add clarification to it.         12:14:38
19            And, again, that is my understanding of it     12:14:43
20    as speaking with Chief Nicholas -- excuse me --         12:14:47
21    Chief Mayberry at the time.                             12:14:51
22    Q.        Just to be clear, Exhibit 12, in the third   12:14:51
23    paragraph, second sentence, it says, "The Use of       12:15:13
24    Force Review Board recommended that you receive        12:15:15
25    retraining with the use of CEW after the               12:15:18
```

| | | |
|---|---|---|
| 1 | determination you violated 309.5.2(e) Special | 12:15:22 |
| 2 | Deployment Considerations." | 12:15:30 |
| 3 | So it still concludes that you violated | 12:15:32 |
| 4 | that policy; correct? | 12:15:34 |
| 5 | A.        Yes.  That is what this document shows, | 12:15:35 |
| 6 | yes. | 12:15:42 |
| 7 | Q.        Now, you had some retraining done after | 12:15:42 |
| 8 | the incident with the use of -- for the use of a | 12:15:48 |
| 9 | TASER; correct? | 12:15:51 |
| 10 | A.        That is correct. | 12:15:52 |
| 11 | Q.        And that was -- if you look at Exhibit 13, | 12:15:55 |
| 12 | it's a letter that kind of summarizes that training. | 12:16:08 |
| 13 | It looks like the training took place on November | 12:16:13 |
| 14 | 22nd, 2019. | 12:16:16 |
| 15 | Is that your recollection? | 12:16:22 |
| 16 | A.        That's my recollection, and that's what | 12:16:23 |
| 17 | this is dated, yes. | 12:16:25 |
| 18 | Q.        Among other things, at the end it states | 12:16:26 |
| 19 | "the scenarios --" let me back up a little bit. | 12:16:34 |
| 20 | "The training of the TASER consisted of | 12:16:35 |
| 21 | practical exercises with the HALT suite, including | 12:16:38 |
| 22 | deployment of the two HALT cartridges." | 12:16:42 |
| 23 | What are the HALT cartridges? | 12:16:45 |
| 24 | A.        From my recollection, the HALT suite and | 12:16:48 |
| 25 | the HALT cartridge are a special training device | 12:16:55 |

```
 1   which allows a user to wear a essential Velcro suit    12:16:59

 2   and then provides HALT cartridges, which are TASER      12:17:07

 3   cartridges that are equipped with the opposing         12:17:13

 4   Velcro.  So you can actively deploy it at the          12:17:20

 5   participant during the training scenario, and the      12:17:24

 6   placement of the TASER probes will stick to the        12:17:28

 7   Velcro.                                                12:17:31

 8   Q.       Then it goes on to state, "The scenarios      12:17:31

 9   consist of TASE/don't TASE drills in which the         12:17:34

10   subject was suicidal and covered in a flammable        12:17:39

11   liquid."                                               12:17:46

12            Do you remember actually participating in     12:17:47

13   that scenario?                                         12:17:49

14   A.       I do.                                         12:17:50

15   Q.       Now, when they say "scenario," is it a        12:17:50

16   descriptive scenario or an actual scenario?            12:17:54

17   A.       To my recollection, this was an active        12:17:57

18   scenario.                                              12:17:59

19   Q.       So was somebody covered in a flammable        12:17:59

20   liquid while you were going through these exercises?   12:18:03

21   A.       No, sir.                                      12:18:05

22   Q.       Okay.  But in any event, did you actually     12:18:05

23   have to walk through this process and you had the      12:18:13

24   TASER in hand and there was a person on the other     12:18:16

25   side that was at least -- I know they weren't          12:18:19
```

| | | |
|---|---|---|
| 1 | covered with a flammable, but the circumstances | 12:18:26 |
| 2 | called for you to believe they were, and then did | 12:18:28 |
| 3 | you actually have to figure out when to shoot and | 12:18:30 |
| 4 | when not to shoot? | 12:18:32 |
| 5 | A.        Yes, sir. | 12:18:33 |
| 6 |         From my recollection of the training, | 12:18:34 |
| 7 | there was one participant who was wearing the HALT | 12:18:36 |
| 8 | suit, and the TASER that I had been given at that | 12:18:41 |
| 9 | point for the training simulation had been outfitted | 12:18:44 |
| 10 | with the HALT cartridges.  And before the start of | 12:18:48 |
| 11 | the training scenario simulation, the parameters | 12:18:52 |
| 12 | were described of the situation that I was supposed | 12:18:58 |
| 13 | to be placing myself into and mentally aware of at | 12:19:03 |
| 14 | the time. | 12:19:07 |
| 15 | Q.        And so there were certain scenarios where | 12:19:07 |
| 16 | you had to make a decision on whether to TASE or not | 12:19:13 |
| 17 | TASE; correct? | 12:19:17 |
| 18 | A.        Yes, that is correct. | 12:19:17 |
| 19 | Q.        And in this scenario or this set of | 12:19:18 |
| 20 | scenarios when you were training with the | 12:19:23 |
| 21 | understanding that the subject you might be shooting | 12:19:25 |
| 22 | with the TASER was suicidal and had flammable liquid | 12:19:28 |
| 23 | on him, was there ever a scenario where you're in | 12:19:34 |
| 24 | the retraining they said it was okay to shoot him | 12:19:36 |
| 25 | with a TASER? | 12:19:38 |

```
1    A.         I remember discussions of that.  I do not      12:19:43

2    remember the specific parameters that were given.        12:19:50

3              I know that there was one example given          12:19:54

4    during that retraining of -- that would necessitate       12:19:58

5    a no shoot.  And I remember that there is a               12:20:03

6    parameters within that training simulation that          12:20:09

7    necessitated a shoot of the TASER.                        12:20:13

8              Other than that specific, I don't recall.       12:20:18

9    Q.         Okay.  So let's just be clear here,            12:20:20

10   because --                                                12:20:24

11             Are you saying that in this training            12:20:24

12   that's described in Exhibit 13 there was a scenario       12:20:26

13   where you were taught to shoot the TASER at an            12:20:31

14   individual that was suicidal and covered in a             12:20:36

15   flammable liquid?                                         12:20:40

16   A.         Again, based on my recollection of what        12:20:42

17   the parameters were in place and given the fact that      12:20:48

18   it was a shoot/don't shoot simulation, I believe         12:20:52

19   that that was discussed.                                  12:20:58

20   Q.         Well, whether or not it was discussed is       12:21:00

21   really not my question.                                   12:21:03

22             I want to know very specifically whether        12:21:06

23   you were trained where a scenario called for a            12:21:10

24   suicide individual covered with flammable liquid          12:21:17

25   where you were taught that there was a circumstance       12:21:20
```

| | | |
|---|---|---|
| 1 | where you could shoot that person with a TASER? | 12:21:23 |
| 2 | A.        So speaking to the exact training that was | 12:21:26 |
| 3 | put in place by the TASER instructor, I do not | 12:21:31 |
| 4 | recall the parameters or the training that he had | 12:21:35 |
| 5 | placed. | 12:21:38 |
| 6 |          I do remember as the active participant in | 12:21:38 |
| 7 | that training that there was one scenario that I did | 12:21:41 |
| 8 | not fire my TASER, there was one scenario that I | 12:21:44 |
| 9 | passively arced my TASER, and there was one example | 12:21:49 |
| 10 | where I actively deployed the TASER and the Velcro | 12:21:55 |
| 11 | probes. | 12:22:02 |
| 12 | Q.        I understand that.  You've told me that | 12:22:02 |
| 13 | before, but you still haven't answered my question. | 12:22:04 |
| 14 | And really this question -- I'm not arguing with | 12:22:06 |
| 15 | you, but to me this question calls for a yes or no | 12:22:08 |
| 16 | or I don't remember or I don't know. | 12:22:11 |
| 17 | A.        I don't know. | 12:22:13 |
| 18 | Q.        Let me -- I'm going to ask the question in | 12:22:13 |
| 19 | fairness to you so it's clear on the record. | 12:22:16 |
| 20 |          Was there a scenario during this | 12:22:20 |
| 21 | retraining session described in Exhibit 13 where you | 12:22:25 |
| 22 | were told it was okay to TASE an individual that was | 12:22:31 |
| 23 | suicidal and covered with a flammable liquid?  Yes, | 12:22:36 |
| 24 | no or I don't know or I don't remember? | 12:22:40 |
| 25 | A.        I don't remember. | 12:22:41 |

| | | |
|---|---|---|
| 1 | of a situation that the subject would pose a danger | 12:24:08 |
| 2 | to others or myself or another officer. | 12:24:18 |
| 3 | Q.        By MR. BABICH:  And in our situation | 12:24:27 |
| 4 | involving you and Mr. Hall, the -- what was the | 12:24:30 |
| 5 | danger to others that was -- that he was | 12:24:37 |
| 6 | threatening, if any? | 12:24:43 |
| 7 | A.        Based on what I had been dispatched to and | 12:24:44 |
| 8 | the presence of his family whenever I arrived and | 12:24:48 |
| 9 | the family members being in the house and the threat | 12:24:53 |
| 10 | of lighting himself on fire, as well as the active | 12:24:57 |
| 11 | threat that he posed to me and his verbal threats of | 12:25:03 |
| 12 | me being harmed through the process of him harming | 12:25:08 |
| 13 | himself. | 12:25:12 |
| 14 | Q.        So the third persons -- and that would -- | 12:25:12 |
| 15 | what I mean by that, that does not include you and | 12:25:16 |
| 16 | it does not include Mr. Hall for the moment. | 12:25:19 |
| 17 | The third persons that you were concerned | 12:25:21 |
| 18 | about being harmed were who? | 12:25:24 |
| 19 | A.        The family members or other individuals | 12:25:26 |
| 20 | that were in the house. | 12:25:30 |
| 21 | Q.        Now, let's talk about the room that you | 12:25:33 |
| 22 | guys were in for a moment. | 12:25:42 |
| 23 | Do you happen to recall the address that | 12:25:44 |
| 24 | this occurred at?  This isn't a test.  We can go get | 12:25:45 |
| 25 | it if necessary. | 12:25:50 |

```
1    A.          Yeah, I do not remember.              12:25:52

2    Q.          Okay.  How about just a description of the   12:25:53

3    building itself.  Was it a multilevel?         12:25:56

4    A.          I know it is a building located on Main   12:26:01

5    Street.  It is multilevel.  I know that there is   12:26:07

6    a -- at least a second story.  And I know that   12:26:10

7    there was at the time either individuals or tenants   12:26:17

8    that were actively in the other portions of the   12:26:22

9    building.                                       12:26:25

10   Q.          And what floor did the incident occur at?   12:26:25

11   A.          I would -- the ground floor.  I don't know   12:26:31

12   exactly how many floors are on the building, again,   12:26:37

13   but I was on the ground floor.                  12:26:39

14   Q.          And how did you enter the ground floor?   12:26:41

15   Kind of walk me through that path.             12:26:44

16   A.          Through the front door.  I was ushered in   12:26:46

17   or I was called in to the front door, and that's   12:26:52

18   where I entered.                               12:26:55

19   Q.          And then once you got inside the front   12:26:58

20   door, where did you go?                         12:27:00

21   A.          I walked through the main room of the   12:27:01

22   house, and I believe I went straight back to -- the   12:27:06

23   next room was a kitchen or utility room area, a back   12:27:11

24   room.                                          12:27:18

25   Q.          And is that where you encountered   12:27:18
```

```
 1    Mr. Hall?                                          12:27:22

 2    A.         That is correct.                        12:27:22

 3    Q.         And if we looked at the video, that --  12:27:23

 4    your body cam video, that would walk us pretty much 12:27:28

 5    through what you just described?                   12:27:31

 6    A.         That is correct.                        12:27:33

 7    Q.         So when you entered that room, I presume 12:27:34

 8    the door was open where he was?                    12:27:38

 9    A.         The front door was open, and the first  12:27:42

10    room which I interacted with Mr. Hall was open.    12:27:46

11    Q.         So the room that he was in had a single 12:27:50

12    door on it?                                        12:27:55

13    A.         That I don't recall.  I would have to   12:27:56

14    relay back to the video to show that specific thing. 12:27:58

15    But whenever I first interacted with Mr. Hall.     12:28:05

16    Q.         But in any event, when you first        12:28:08

17    interacted with him you entered through an open    12:28:12

18    door?                                              12:28:15

19    A.         That is correct.                        12:28:15

20    Q.         To that room?                           12:28:16

21    A.         That is correct.                        12:28:17

22    Q.         And did everything take place in that room 12:28:18

23    up until the time you tased him?                   12:28:21

24    A.         No, it did not.                         12:28:23

25    Q.         So from that room where did you go?     12:28:24
```

```
 1    A.        From that room that's whenever I first      12:28:28

 2    started speaking with Mr. Hall in attempting to       12:28:30

 3    figure out what was going on and tried to speak with  12:28:32

 4    him.                                                  12:28:34

 5              He made his way to another door, which      12:28:35

 6    appeared to be locked, but he was able to manipulate  12:28:39

 7    the door and open it.  And as I was speaking with     12:28:45

 8    him he proceeded through that door, closed it behind  12:28:48

 9    him.  And by the time I made it to that door it was   12:28:53

10    locked again.                                         12:28:56

11              I do remember trying to open it from the    12:28:57

12    outside where I was standing, and I did reach         12:29:00

13    through and attempt to open it from the inside        12:29:04

14    through an open -- either an open window or a window   12:29:07

15    that had been broken out.  I'm not sure.  But an      12:29:12

16    opening in that door.  I attempted to open it from    12:29:14

17    both the outside and the inside.                      12:29:17

18    Q.        Did you open it?                            12:29:18

19    A.        I was not able to open it.                  12:29:19

20    Q.        Did you encounter him in that room          12:29:22

21    eventually?                                           12:29:25

22    A.        Yes.                                        12:29:26

23    Q.        How did you get in?                         12:29:27

24    A.        I entered through the -- through that       12:29:29

25    opening in the door.                                  12:29:35
```

| | | |
|---|---|---|
| 1 | Q. Where was the opening? | 12:29:38 |
| 2 | A. I'm sorry? | 12:29:40 |
| 3 | Q. Where was the opening in the door? | 12:29:41 |
| 4 | A. It was in the top half of the door. I | 12:29:44 |
| 5 | believe that would have been where a window | 12:29:49 |
| 6 | generally would have been placed. So the top half | 12:29:53 |
| 7 | middle of the doorway. | 12:29:55 |
| 8 | Q. So this is a door where the top half is | 12:29:55 |
| 9 | either a broken out window or just a broken out | 12:30:00 |
| 10 | door? | 12:30:03 |
| 11 | A. That is correct. | 12:30:03 |
| 12 | Q. And you crawled over that? | 12:30:03 |
| 13 | A. That is correct. | 12:30:06 |
| 14 | Q. Did you have any trouble getting in? | 12:30:07 |
| 15 | A. I remember specifically having to watch | 12:30:10 |
| 16 | for broken glass and manipulate my body as where my | 12:30:16 |
| 17 | belt wouldn't have caught on it. | 12:30:24 |
| 18 | Q. Okay. Did you have to use a stool or | 12:30:26 |
| 19 | anything to get over it? | 12:30:29 |
| 20 | A. No. I don't remember if I stepped on | 12:30:30 |
| 21 | anything. | 12:30:34 |
| 22 | Q. And once you got in, that's where the | 12:30:34 |
| 23 | encounter took place and ultimately the TASER was | 12:30:39 |
| 24 | shot? | 12:30:42 |
| 25 | A. That is correct. | 12:30:42 |

```
 1   Q.        So what prevented you from just leaving          12:30:42

 2   the situation before you shot the TASER?                   12:30:45

 3   A.        The locked door.  By that time there was         12:30:52

 4   people outside of the -- that room near and around         12:30:57

 5   the exterior of that -- that door that I'm speaking         12:31:02

 6   of, as well as the time for me to attempt to get           12:31:07

 7   back through the door, I believe that PJ would have        12:31:16

 8   harmed himself or attempted to harm me farther --          12:31:23

 9   further.                                                   12:31:29

10   Q.        What was going through your mind that --         12:31:29

11   on how he was going to attempt to harm you further?        12:31:32

12   What did you suspect that he was going to do?              12:31:36

13   A.        Continue to physically assault me.  My           12:31:39

14   fear was that if I took the time to get caught --          12:31:44

15   climb through the door, if I got caught up within          12:31:49

16   the doorway or turned my back on that situation was        12:31:51

17   something I believe was un- -- not feasible at the         12:31:58

18   time.                                                      12:32:02

19   Q.        Did you ever ask any of the people outside       12:32:02

20   the door to unlock it?                                     12:32:04

21   A.        I do not specifically recall addressing          12:32:05

22   them to unlock it; however, I do remember that I           12:32:11

23   tried to open the door again.                              12:32:14

24   Q.        Did you consider just kicking the door           12:32:16

25   down?                                                      12:32:19
```

| | | |
|---|---|---|
| 1 | A.          I did not believe that I could at that | 12:32:19 |
| 2 | point. | 12:32:27 |
| 3 | Q.          What prevented you from doing that? | 12:32:27 |
| 4 | A.          I don't believe that I would have the | 12:32:30 |
| 5 | physical ability to kick the door outward given the | 12:32:42 |
| 6 | space of the room. | 12:32:45 |
| 7 | Q.          Was there another door in that -- in that | 12:32:47 |
| 8 | room you were in with Mr. Hall? | 12:32:49 |
| 9 | A.          Yes.  That would have been behind where | 12:32:51 |
| 10 | Mr. Hall had been. | 12:32:54 |
| 11 | Q.          Did you ever consider going out that door? | 12:32:55 |
| 12 | A.          No. | 12:33:01 |
| 13 | Q.          Were there any windows in the room that | 12:33:01 |
| 14 | you could have gotten out of? | 12:33:03 |
| 15 | A.          Two of that I know of, yes. | 12:33:06 |
| 16 | Q.          Did you ever consider getting out of the | 12:33:11 |
| 17 | room through the windows? | 12:33:12 |
| 18 | A.          No. | 12:33:13 |
| 19 | Q.          The individuals that were outside the door | 12:33:13 |
| 20 | of that last room that you were in before shooting | 12:33:18 |
| 21 | the TASER, do you recall their names? | 12:33:20 |
| 22 | A.          I do not. | 12:33:22 |
| 23 | Q.          Do you know who Spencer Hall is? | 12:33:24 |
| 24 | A.          Only from my -- speaking through with my | 12:33:29 |
| 25 | attorney regarding this matter. | 12:33:35 |

1  Q.        And, again, I don't want to get any    12:33:37

2  further into that, so keep -- let's keep that out of  12:33:39

3  the discussion.                                  12:33:42

4            Spencer Hall is listed as somebody that  12:33:45

5  was there, at least in part, that day.           12:33:47

6            Do you remember his name coming up that  12:33:50

7  day?                                             12:33:52

8  A.        That day, no.  I have been made aware that  12:33:52

9  he was there after the fact.                     12:33:57

10 Q.        And then there's Mike -- I can't pronounce  12:33:58

11 this, maybe I can -- Bedzyk, B-E-D-Z-Y-K.  Do you  12:34:01

12 know who that is?                                12:34:09

13 A.        Yes, I do.                            12:34:09

14 Q.        Who is that?                          12:34:10

15 A.        That is a member of the community who I  12:34:11

16 have previous knowledge of, I have spoken to, and  12:34:13

17 had several interactions before this incident.   12:34:16

18           It is my understanding that he happened  12:34:20

19 upon the incident as he was at his wife's hair salon  12:34:25

20 directly across from where the -- Mr. Hall's house  12:34:32

21 had been located.                                12:34:36

22 Q.        Did he bring a fire extinguisher out, if  12:34:37

23 you know?                                        12:34:46

24 A.        That is my understanding of sequence  12:34:46

25 events after the fact.                           12:34:49

| | | |
|---|---|---|
| 1 | Q.          Did he bring it out by the time Mr. Hall | 12:34:50 |
| 2 | had reached the street? | 12:34:52 |
| 3 | A.          My recollection was that that was after we | 12:34:53 |
| 4 | had removed the clothing from Mr. Hall. | 12:34:58 |
| 5 | Q.          Did you ever ask anyone for a fire | 12:35:01 |
| 6 | extinguisher? | 12:35:18 |
| 7 | A.          I did not. | 12:35:18 |
| 8 | Q.          What training, if any, have you received | 12:35:26 |
| 9 | before October 12, 2019, with regard to situations | 12:35:29 |
| 10 | where you encounter someone that is suicidal? | 12:35:35 |
| 11 | A.          The main goal, the best case scenario is | 12:35:39 |
| 12 | also -- is always to gain a form of understanding | 12:35:52 |
| 13 | and compliance where they can get help. | 12:35:57 |
| 14 | There is steps that are generally taken | 12:36:01 |
| 15 | when addressing somebody who poses a threat to | 12:36:05 |
| 16 | themselves or a threat to others, as identified | 12:36:08 |
| 17 | under 5150. | 12:36:11 |
| 18 | My understanding is trying to speak to | 12:36:15 |
| 19 | them, get to a level of rapport where you can gain | 12:36:17 |
| 20 | compliance through communication. | 12:36:26 |
| 21 | And after that the next level would have | 12:36:28 |
| 22 | been a physical use of force where if a rapport and | 12:36:34 |
| 23 | verbal does not remove the threat to the individual | 12:36:39 |
| 24 | or the threat to others, then it is generally | 12:36:45 |
| 25 | accepted to move to a physical means. | 12:36:54 |

```
1              Again, it's a -- kind of a ladder          12:36:58

2   progression where verbal communication, physical      12:37:04

3   communication and so on and on forth and attempting   12:37:09

4   to speak to them.                                      12:37:14

5   Q.        Do you feel you went through those steps     12:37:14

6   in dealing with Mr. Hall on October 12, 2019?          12:37:18

7   A.        I do.                                        12:37:23

8   Q.        Do you believe that he was experiencing a    12:37:23

9   mental health crisis that day?                         12:37:26

10  A.        That I do not know.                          12:37:31

11  Q.        Did you consider calling any supervisors     12:37:32

12  or help to assess his mental condition before you      12:37:35

13  shot him with a TASER?                                 12:37:38

14  A.        Yes.  In fact, I did.  En route to the --    12:37:40

15  the call I had signified to dispatch to contact my     12:37:47

16  direct supervisor or anybody else within my            12:37:52

17  department that can respond to my location.            12:37:54

18            I also requested that fire personnel and     12:37:58

19  ambulance respond and stage to the situation.          12:38:01

20  Because given my training and experience during an     12:38:05

21  active incident with potentially harmful subjects,     12:38:09

22  medical and fire personnel stage before they are       12:38:16

23  entering a scene.                                      12:38:21

24            And that was all done prior to me speaking   12:38:22

25  with Mr. Hall.                                         12:38:24
```

```
 1    Q.        So you called the fire department because    12:38:26

 2    you were concerned there may be a fire?                12:38:30

 3    A.        That is correct.                             12:38:31

 4    Q.        And given your concern that there may be a   12:38:33

 5    fire, did you make any efforts to look for a fire      12:38:38

 6    extinguisher before you encountered him?               12:38:42

 7    A.        My first encounter with Mr. Hall was         12:38:46

 8    verbal negotiations and trying to speak with him.      12:38:49

 9    Q.        No.  My question is did you make any         12:38:51

10    effort to locate a fire extinguisher before you       12:38:54

11    encountered him?                                       12:38:57

12    A.        No, not that I recall.                       12:38:58

13    Q.        Any reason why not?                          12:38:59

14    A.        Because when -- by the time I had personal   12:39:01

15    knowledge, as opposed to what was given to me          12:39:14

16    strictly off of dispatch, and realized the situation   12:39:17

17    that Mr. Hall was placing upon himself, I would have   12:39:25

18    had to exit the dwelling to go back to my patrol       12:39:29

19    vehicle to open up the trunk to attempt to see if I    12:39:35

20    had a fire extinguisher or attempt to locate the --    12:39:38

21    any fire extinguisher, if available anywhere else.     12:39:44

22              And I believe that if I had left Mr. Hall    12:39:47

23    at that time he would have killed himself.             12:39:49

24    Q.        Well, again, as you were approaching the     12:39:51

25    scene and even before you got out of your car, you     12:39:58
```

| | | |
|---|---|---|
| 1 | were advised by dispatch over the radio that the | 12:40:01 |
| 2 | reporting party stated male was attempting to light | 12:40:05 |
| 3 | himself on fire with gasoline.  That's true, isn't | 12:40:09 |
| 4 | it? | 12:40:13 |
| 5 | A.       That is correct. | 12:40:13 |
| 6 | Q.       So even before you encountered Mr. Hall | 12:40:14 |
| 7 | you knew that him being caught on fire was a | 12:40:18 |
| 8 | potential; correct? | 12:40:21 |
| 9 | A.       That is correct. | 12:40:22 |
| 10 | Q.       And you also had called the fire | 12:40:24 |
| 11 | department over those concerns before you | 12:40:28 |
| 12 | encountered him? | 12:40:32 |
| 13 | A.       That is correct. | 12:40:33 |
| 14 | Q.       Yet you still, for some reason -- still | 12:40:34 |
| 15 | unclear why -- chose not to look for a fire | 12:40:38 |
| 16 | extinguisher before you entered the room.  Why is | 12:40:42 |
| 17 | that? | 12:40:45 |
| 18 | A.       It was my belief at the time that speaking | 12:40:47 |
| 19 | with and spending the time of attempting to locate a | 12:40:52 |
| 20 | fire extinguisher, which I did not have readily | 12:41:01 |
| 21 | available to myself, would have left valuable time | 12:41:04 |
| 22 | when I could have been interacting and attempting to | 12:41:11 |
| 23 | speak to Mr. Hall.  That is why I chose to speak | 12:41:14 |
| 24 | with him, given the fact that I knew the fire | 12:41:17 |
| 25 | department would have the firefighting capabilities | 12:41:20 |

```
 1    directly at hand when they responded.                    12:41:26

 2    Q.          When you entered the room where Mr. Gale      12:41:29

 3    -- or excuse me -- where Mr. Hall was ultimately,         12:41:32

 4    you could smell flammable material; correct?             12:41:36

 5    A.          I recall that.  Yes, I do remember that.      12:41:40

 6    Q.          And after you had your physical encounter     12:41:42

 7    with him and you separated, some of that flammable       12:41:48

 8    material was on your clothes?                            12:41:50

 9    A.          That is correct.                             12:41:52

10    Q.          What portion of your clothes had the          12:41:53

11    flammable material on it?                                12:41:56

12    A.          I know my hands and gloves, the arms, I       12:41:57

13    believe -- I believe the arms of my shirt, the shirt     12:42:06

14    sleeves, as well as the top portion of my uniform        12:42:10

15    shirt.                                                   12:42:16

16    Q.          Was the TASER that you used that day          12:42:16

17    equipped with a -- any sort of memory card or memory     12:43:01

18    device that recorded the actual video?                  12:43:06

19    A.          I do not know.  I do not recall, I should     12:43:14

20    say.                                                     12:43:17

21              I know that it does have a internal             12:43:17

22    function which logs every time it is cycled, which I     12:43:20

23    believe may show if I had cycle tested it that day.      12:43:25

24    But as far as a video or audio function, I don't         12:43:29

25    remember.                                                12:43:33
```

| | | |
|---|---|---|
| 1 | A.          From my recollection, no. | 12:49:37 |
| 2 | Q.          Did you make any effort to actually aim at | 12:49:41 |
| 3 | a spot that you felt didn't have the gasoline on his | 12:49:46 |
| 4 | clothes? | 12:49:51 |
| 5 | A.          The location of his body, when I tried to | 12:49:52 |
| 6 | target, would have maximized the muscular | 12:50:02 |
| 7 | incapacitation, again, with attempting to prevent | 12:50:05 |
| 8 | him from harming himself or give me an opportunity | 12:50:08 |
| 9 | to overcome his physical resistance to where I can | 12:50:12 |
| 10 | get the lighter away from him. | 12:50:17 |
| 11 | That was the -- that was the reasoning and | 12:50:19 |
| 12 | the thought process behind my targeting that | 12:50:24 |
| 13 | specific region of his body, was that it would have | 12:50:30 |
| 14 | maximized muscular incapacitation. | 12:50:33 |
| 15 | Q.          So in picking your target, did you | 12:50:37 |
| 16 | consider trying to avoid areas of gasoline? | 12:50:40 |
| 17 | A.          I do not recall -- no, I don't -- I don't | 12:50:43 |
| 18 | believe so.  I don't recall specifically seeing | 12:50:49 |
| 19 | portions of his body that were covered in gasoline | 12:50:53 |
| 20 | versus portions that were not. | 12:50:56 |
| 21 | Q.          I think we can look at this policy, but | 12:50:58 |
| 22 | somewhere I saw that when you use the TASER you're | 12:51:01 |
| 23 | supposed to prepare a CED report. | 12:51:06 |
| 24 | Does that refresh your recollection at | 12:51:09 |
| 25 | all?  Let me see. | 12:51:11 |

```
 1    what time did your shift start?                      01:40:35

 2    A.        From the best of my recollection, I        01:40:38

 3    believe that was a 6:00 a.m.  I don't really recall. 01:40:45

 4    Q.        What would they have called that shift?     01:40:51

 5    A.        I was working the dayshift.                 01:40:56

 6    Q.        And the dayshift generally runs from 6:00  01:40:58

 7    a.m. to what?                                         01:41:01

 8    A.        I'm having difficulties remembering the    01:41:02

 9    exact time.  6:00 a.m. until the afternoon, whenever 01:41:12

10    the mid shift or the swing shift would have come on  01:41:14

11    in the early evening or afternoon time.              01:41:19

12    Q.        And I suppose we could pull this up.  I    01:41:22

13    don't have it right in front of me.                  01:41:28

14              But approximately what time did the TASER  01:41:30

15    shooting take place?                                 01:41:32

16    A.        I would have to refer to the timestamp     01:41:33

17    that the video portrays.                             01:41:39

18              MR. BABICH:  I thought I had a police      01:42:22

19    report here.  Does anybody have it in front of them 01:42:24

20    and can confirm the time?                            01:42:29

21              MR. KILDAY:  I'm looking at Exhibit 9,     01:42:31

22    which is the CAD incident report.                    01:42:34

23              MR. BABICH:  Oh, that will help.  Thank    01:42:36

24    you.                                                 01:42:40

25              MR. KILDAY:  And it looks to me like it    01:42:40
```

| | | |
|---|---|---|
| 1 | <mark>might be 13:31 hours.</mark> | 01:42:42 |
| 2 | MR. BABICH:  Thank you. | 01:42:49 |
| 3 | Q.      By MR. BABICH:  Okay.  So, Mr. Gale, as of | 01:42:50 |
| 4 | right now you think you started your shift at 6:00 | 01:42:59 |
| 5 | a.m. that day? | 01:43:02 |
| 6 | A.      Yes, to the best of my recollection.  I | 01:43:03 |
| 7 | know that the -- at that time they worked ten-hour | 01:43:06 |
| 8 | shifts. | 01:43:10 |
| 9 | Q.      If you were on duty as of the day -- or as | 01:43:10 |
| 10 | of the time of the TASER discharge, which we think | 01:43:17 |
| 11 | was at 13:31 or thereabouts, what other shift could | 01:43:21 |
| 12 | you have worked to put on you duty at that time | 01:43:26 |
| 13 | other than the dayshift? | 01:43:29 |
| 14 | In other words, can we conclude that you | 01:43:34 |
| 15 | were working the dayshift knowing that you were on | 01:43:35 |
| 16 | duty at 13:31? | 01:43:38 |
| 17 | A.      Yes. | 01:43:39 |
| 18 | Q.      Okay.  Do you have any recollection of | 01:43:41 |
| 19 | just how your day or your morning proceeded that | 01:43:47 |
| 20 | morning before you got the call to deal with | 01:43:49 |
| 21 | Mr. Hall's situation? | 01:43:55 |
| 22 | A.      As far as calls for service, I don't | 01:43:56 |
| 23 | recall.  I do recall being on the phone with my | 01:44:08 |
| 24 | mother whenever the call came out over the radio. | 01:44:12 |
| 25 | Q.      And what was the purpose of being on the | 01:44:15 |

| | | |
|---|---|---|
| 1 | call with your mom? | 01:44:19 |
| 2 | A.        It was a personal call.  Just speak with | 01:44:20 |
| 3 | my mom about life. | 01:44:25 |
| 4 | Q.        Were you having any emotional issues over | 01:44:29 |
| 5 | that conversation? | 01:44:34 |
| 6 | A.        Not that I recall. | 01:44:35 |
| 7 | Q.        Did that conversation with your mother | 01:44:36 |
| 8 | upset you at all? | 01:44:39 |
| 9 | A.        No. | 01:44:40 |
| 10 | Q.        So when you did receive the call, you were | 01:44:41 |
| 11 | on the phone with your mother; is that correct? | 01:44:46 |
| 12 | A.        Yes. | 01:44:49 |
| 13 | Q.        Do you have any recollection of any calls | 01:44:49 |
| 14 | that you responded to that morning before the | 01:44:52 |
| 15 | incident with Mr. Hall? | 01:44:56 |
| 16 | A.        I do not. | 01:44:57 |
| 17 | Q.        And go ahead and open up Exhibit 9.  That | 01:44:58 |
| 18 | might be an easy way for all of us to follow through | 01:45:02 |
| 19 | some of the sequence of events that day. | 01:45:05 |
| 20 |          Do you have that in front of you? | 01:45:08 |
| 21 | A.        I do, yes, sir. | 01:45:10 |
| 22 | Q.        Under the incident comments it says, "911 | 01:45:11 |
| 23 | that Hall has doused himself with gasoline and is | 01:45:14 |
| 24 | going to light himself on fire.  Lewin Hall advised | 01:45:19 |
| 25 | that his father had a rope around his neck then | 01:45:24 |

```
1    doused himself with gasoline."                        01:45:31

2            So is that an actual call that you            01:45:34

3    actually heard over the radio, what I just read to    01:45:37

4    you?                                                   01:45:42

5    A.       I believe that to be an accurate             01:45:42

6    description of what was put over the radio.           01:45:45

7    Q.       Do you remember hearing that call?           01:45:48

8    A.       I remember hearing that call.                01:45:52

9    Q.       Then it goes on to say, "Upon 1449 --" or    01:45:55

10   excuse me.   "Upon L449 arrival Hall ran out the      01:46:04

11   door."                                                01:46:08

12           First of all, what's the -- do you you        01:46:10

13   know what the source of that comment is?              01:46:11

14   A.       So the L449, that is my descriptor.  That    01:46:13

15   was my call sign, Lincoln 449, while working for the  01:46:17

16   City of Weed.                                         01:46:21

17           Generally the sequence of events is this      01:46:23

18   is a dispatcher that is typing details as she is      01:46:25

19   getting them from either the RP/victim/suspect or     01:46:31

20   whoever it may be, and also the information that I     01:46:36

21   am providing back to her while I'm on scene.          01:46:39

22           So I'm specifically trying to find the one    01:46:43

23   where it says PJ ran out the door, as you referred    01:46:47

24   to.                                                   01:46:54

25           From -- from this document here, it          01:46:59
```

```
1   appears that at 13:24 hours dispatch logged that I        01:47:02

2   went 10-97, which means I was arriving on scene, and      01:47:10

3   that at 13:28 hours I had logged that I was out with      01:47:16

4   Hall, meaning that I had identified him as the one        01:47:22

5   of the subjects involved and that's who I was            01:47:25

6   speaking of.                                              01:47:29

7   Q.        Okay.  So the comment "Arrival Hall ran         01:47:29

8   out --" or let me start over.                             01:47:37

9             It says, "Upon L449 arrival Hall ran out        01:47:39

10  the door."                                                01:47:44

11            What time do you think that took place          01:47:45

12  based on what you see in Exhibit 9?                       01:47:47

13  A.        I'm failing to see where it says Hall ran       01:47:48

14  out the door.  Is that on page one of Exhibit 9?          01:47:54

15  Q.        Yeah.  It's under "incident comments,"          01:47:57

16  about two-thirds of the way down.                         01:47:59

17  A.        Incident comments.                              01:48:01

18  Q.        Starts with "911."                              01:48:03

19  A.        Yeah.                                            01:48:09

20  Q.        Do you see --                                   01:48:20

21  A.        Again, I'm not specifically sure on how         01:48:21

22  the dispatcher came to that sequence of events.           01:48:24

23            Again, I'm not sure what door they had          01:48:30

24  been -- reported that Hall ran out of at that time.      01:48:37

25            I know that this is -- incident comment is      01:48:40
```

```
 1   generally a synopsis of the incident as a whole.      01:48:43
 2   And so going onto the next section where it           01:48:49
 3   designates numbers one, two, three, four, five and    01:48:54
 4   so on, that would be the natural sequence of events   01:48:58
 5   as it was reported to dispatch.                       01:49:02
 6   Q.        All right.  So --                           01:49:04
 7   A.        So the answer to your question is I don't   01:49:05
 8   know.                                                 01:49:07
 9   Q.        So it looks like 13:24 and 14 seconds,      01:49:07
10   that's number two on that event list.  Is that the    01:49:17
11   time you arrived at 180 Main Street?                  01:49:20
12   A.        Yes.                                        01:49:23
13   Q.        And then --                                 01:49:24
14   A.        Approximate time.                           01:49:26
15   Q.        And then the third item in that event list  01:49:30
16   just says "L449 10-97."                               01:49:32
17             And, again, what does that mean?            01:49:35
18   A.        10-97 is the radio call sign or radio       01:49:37
19   qualifier which we indicate or we use that means on   01:49:48
20   scene or arriving at scene.                           01:49:53
21   Q.        And then the next one says -- it's at       01:49:56
22   13:28 -- "Out with Hall."                             01:49:58
23             Now, is that a synopsis of what the         01:50:01
24   dispatcher heard over the radio, or do you know?      01:50:03
25   A.        That would be my understanding, yes, that   01:50:06
```

1    I had advised -- based on this, how she wrote it, it          01:50:09

2    would have -- that I advised dispatch that I was out          01:50:12

3    at Hall at 13:28 hours.                                        01:50:16

4    Q.        Okay.  And then at 13:30:21 seconds,                 01:50:18

5    hours, it says you requested extra units; correct?            01:50:22

6    A.        Yes.  That was additional law enforcement           01:50:25

7    units.  Prior to this I already requested ambulance           01:50:30

8    and fire personnel respond.                                   01:50:34

9    Q.        Where would that be logged in, if                   01:50:36

10   anywhere?                                                      01:50:39

11   A.        I would have to refer to the recording of           01:50:39

12   the radio.                                                     01:50:42

13   Q.        We have some -- we have a lot of the                01:50:45

14   recordings, and probably don't really need to go              01:50:48

15   through that.                                                  01:50:51

16           But in any event, you had requested fire             01:50:51

17   to show up even before you arrived at scene;                  01:50:54

18   correct?                                                       01:50:57

19   A.        From the best of my recollection, yes.              01:50:57

20   Q.        And then let's go to event number six.              01:50:59

21   "C385 will respond."  What is that?                           01:51:09

22   A.        Charles 35 was the designator for Corporal          01:51:12

23   Green at that time.                                            01:51:19

24           Previously I had also requested that a               01:51:21

25   supervisor be notified as our -- the policy.  And so          01:51:24

```
 1   it is my understanding that at 13:30 hours Charles          01:51:29

 2   35 Corporal Timothy Green was contacted and had told        01:51:34

 3   dispatch that he will be responding.                         01:51:40

 4   Q.        Is his call number C385 or C35?                    01:51:42

 5   A.        I believe it's C, as in Charles, 385.             01:51:48

 6   Again, that's just my recollection, and that's             01:51:55

 7   what's identified here in the CAD report.                   01:51:57

 8   Q.        So based on what we're seeing here in the         01:52:01

 9   CAD report, can you tell us when you actually              01:52:05

10   entered the house?                                          01:52:10

11   A.        Based on the CAD report of whenever I went        01:52:16

12   10-97 at approximately 13:24 and with the previous         01:52:21

13   knowledge that I immediately ran into the house with       01:52:26

14   the family.  And then at approximately 13:28 hours         01:52:29

15   dispatch logged that I was out with Hall.                  01:52:38

16            So I would approximate my time between            01:52:40

17   13:24 and 13:28 hours is whenever I first made            01:52:43

18   contact entering the house and spoke with Mr. Hall.       01:52:47

19   Q.        Okay.  Fair enough.  Thank you.                  01:52:49

20            And he ultimately -- it's ultimately             01:52:51

21   reported in this document, Exhibit 9, "Subject on         01:52:56

22   fire as of 13:31:51."  Correct?                           01:52:59

23   A.        Correct.                                         01:53:06

24   Q.        That's event number eight; correct?             01:53:06

25   A.        That is correct.                                 01:53:08
```

```
1    A.        That was before, yes, sir.              02:02:04

2    Q.        Okay.  Now, at that moment in time,     02:02:07

3    witnessing firsthand that there's alcohol -- or   02:02:10

4    excuse me -- that there's gasoline present, did you 02:02:12

5    make any effort to inquire or try to obtain a fire 02:02:16

6    extinguisher?                                      02:02:27

7              MR. ALLEN:  Objection.  Asked and        02:02:28

8    answered.                                          02:02:31

9              THE WITNESS:  I'm sorry?                 02:02:31

10             MR. BABICH:  There was an objection made. 02:02:32

11             MR. ALLEN:  You can answer.  If I object 02:02:34

12   you still have to answer the question.             02:02:36

13             THE WITNESS:  Okay.                      02:02:38

14             The -- after I entered the room.  No.    02:02:41

15   Because at that point, again, I was effectively    02:02:47

16   locked in the room with him.  And I believe that   02:02:53

17   if I would have left, based on the statements that 02:02:59

18   he was making to me, that he would have killed     02:03:01

19   himself.                                           02:03:05

20   Q.        By MR. BABICH:  Now, again we went through 02:03:05

21   that room in a little bit of detail.  But there's  02:03:10

22   the room that -- or there's the door that was locked 02:03:12

23   that you climbed through the opening in the door;  02:03:15

24   correct?                                           02:03:17

25   A.        Correct.                                 02:03:17
```

```
 1    Q.        Is there a second door that exits outside      02:03:18
 2    in that room?                                            02:03:24
 3    A.        From my recollection, yes.  And it would       02:03:25
 4    have been the far door that was directly behind          02:03:30
 5    where Mr. Hall had been majority of the time.            02:03:34
 6    Q.        So just to confirm this, as far as you can     02:03:39
 7    recall there were only two doors that led to that        02:03:42
 8    room?                                                    02:03:45
 9    A.        As far as -- yes.                              02:03:45
10    Q.        Did you ever attempt to get out of that        02:03:46
11    room through that second door?                           02:03:48
12    A.        No.  I did not attempt to pass past            02:03:51
13    Mr. Hall to attempt to open a door that he was           02:03:57
14    blocking.                                                02:03:59
15    Q.        When you first encountered Mr. Hall, was       02:04:00
16    he standing or seated?                                   02:04:07
17    A.        I believe he was standing.                     02:04:09
18    Q.        At any time did you see him seated that        02:04:12
19    day before he was shot with the TASER?                   02:04:17
20    A.        Not that I can recall, no.                     02:04:19
21    Q.        Did you ever see a chair in that back room     02:04:20
22    that you encountered him at?                             02:04:25
23    A.        Not that I remember.                           02:04:27
24    Q.        Did you see --                                 02:04:28
25    A.        Oh.  Other than one that he had picked up      02:04:31
```

| | | |
|---|---|---|
| 1 | Q.        Did you see any other containers that you | 02:05:58 |
| 2 | thought may have contained some sort of flammable | 02:06:02 |
| 3 | before you shot your TASER? | 02:06:05 |
| 4 | A.        Not that I remember. | 02:06:09 |
| 5 | Q.        Could you see that his clothing was doused | 02:06:09 |
| 6 | with some sort of fluid when you first entered? | 02:06:16 |
| 7 | A.        When I first entered?  No. | 02:06:20 |
| 8 | Q.        At any time before you pulled the trigger | 02:06:22 |
| 9 | of the TASER, did you see any evidence -- visually | 02:06:26 |
| 10 | see what you thought was liquid fluid on his | 02:06:29 |
| 11 | clothing? | 02:06:33 |
| 12 | A.        Again, in that last room, that is whenever | 02:06:33 |
| 13 | I definitely remember identifying he had a fluid | 02:06:39 |
| 14 | on his body. | 02:06:45 |
| 15 | Q.        That was before you pulled the trigger? | 02:06:46 |
| 16 | A.        That was before. | 02:06:50 |
| 17 | Q.        Did you see that his hair was wet? | 02:06:51 |
| 18 | A.        I don't remember. | 02:06:55 |
| 19 | Q.        Did you see any fluid on the floor before | 02:06:58 |
| 20 | he pulled the trigger? | 02:07:01 |
| 21 | A.        I don't remember. | 02:07:04 |
| 22 | Q.        So other than seeing the fluid that you | 02:07:09 |
| 23 | described on his body before the incident and the | 02:07:11 |
| 24 | smell of gasoline, was there any other evidence to | 02:07:15 |
| 25 | support the fact that he had gasoline on himself | 02:07:19 |

| | | |
|---|---|---|
| 1 | my role of law enforcement, but that is not a | 02:10:36 |
| 2 | criteria that is something I have to weigh my | 02:10:40 |
| 3 | actions against. | 02:10:44 |
| 4 | Q.        Well, when you make the decision to | 02:10:45 |
| 5 | physically confront him, you're hoping to achieve a | 02:10:49 |
| 6 | goal; correct? | 02:10:52 |
| 7 | A.        That is correct. | 02:10:53 |
| 8 | Q.        And in your mind that goal was to wrestle | 02:10:53 |
| 9 | the lighter out of his hand? | 02:10:56 |
| 10 | A.        That's correct. | 02:10:58 |
| 11 | Q.        And you have to make an assessment whether | 02:10:59 |
| 12 | or not you're going to be physically capable of | 02:11:02 |
| 13 | doing that before you do it -- attempt it; correct? | 02:11:05 |
| 14 | A.        No.  And that consideration is if I know | 02:11:07 |
| 15 | if -- if I had a belief that he was going to harm | 02:11:14 |
| 16 | himself, I cannot -- me believing ahead of time, | 02:11:16 |
| 17 | without trying, that I am not going to succeed in a | 02:11:28 |
| 18 | circumstance and would therefore not act at all was | 02:11:34 |
| 19 | not something that was considered at the time. | 02:11:38 |
| 20 | Q.        So you do have the physical confrontation | 02:11:41 |
| 21 | with him.  And let's talk about that in a little bit | 02:11:45 |
| 22 | of detail as best we can. | 02:11:47 |
| 23 |          What caused you to make that decision at | 02:11:50 |
| 24 | that point in time? | 02:11:55 |
| 25 | A.        Prior -- well, whenever I made the | 02:11:57 |

1    decision to go hands-on, I observed Mr. Hall put          02:12:03
2    his head through one pane of glass, and I believe         02:12:09
3    that he was attempting to harm himself with that          02:12:13
4    glass.  And he had moved on to another panel of           02:12:17
5    glass and had begin to attempt to put his head            02:12:22
6    through or harm himself on that glass.  So that's         02:12:27
7    whenever I decided to, like, go hands-on.                 02:12:30
8    Q.       And as best you can describe for me, just        02:12:34
9    describe the hands-on sequencing.                         02:12:39
10           You step forward to him and engaged with          02:12:44
11   him physically at that point; correct?                    02:12:47
12   A.       Correct.                                         02:12:49
13   Q.       And were you actually trying to grab his         02:12:50
14   arm, his wrist, his hand, his thumb?  What were you       02:12:55
15   trying to do with regard to that hand that had the        02:12:59
16   lighter in it?                                            02:13:01
17   A.       So before going hands-on it had previously       02:13:02
18   been identified that he had picked up a lighter           02:13:08
19   while we were in that room together.                      02:13:09
20           So my decision to go hands-on was twofold:        02:13:13
21   One, the immediate hazard of the glass, my attempts       02:13:19
22   to take control -- take hold of his arms to remove        02:13:26
23   him from the area of glass where he was actively          02:13:29
24   attempting to cut himself in the windows, and then        02:13:32
25   second, actively subduing his hand which contained       02:13:36

```
 1    the lighter in it.                                02:13:44

 2    Q.        Did you ever actually physically touch the   02:13:45

 3    lighter during the physical confrontation with him?    02:13:51

 4    A.        I did.                                  02:13:53

 5    Q.        And what portion of it did you grab or  02:13:53

 6    touch?                                            02:13:56

 7    A.        I believe I would have touched both the    02:13:56

 8    body, the plastic body of the lighter, as well as    02:14:07

 9    the metal head which contains the ignition device    02:14:10

10    and flicker.                                      02:14:15

11              There was a sequence of events where I was   02:14:19

12    able to, with one hand, hold Mr. Hall up against a    02:14:31

13    wall and with the other hand had my hand over     02:14:35

14    the -- the head of the lighter.                   02:14:39

15    Q.        And in that position was his thumb over   02:14:43

16    the back of your hand?                            02:14:46

17    A.        That would be correct.                  02:14:47

18    Q.        And how long did you remain in that     02:14:49

19    position with the lighter?                        02:14:55

20    A.        Again, I would have to relate it to what   02:14:58

21    the body camera shows of minute by minute.  My    02:15:03

22    recollection of time as it was, given the combative   02:15:07

23    situation that I was in, I'm not confident on a   02:15:14

24    timeframe.                                        02:15:17

25    Q.        You would agree that the body cam shows no   02:15:18
```

```
 1    evidence of him attempting to ignite the lighter?      02:15:22
 2    You would agree with that, wouldn't you?              02:15:26
 3    A.        That is correct.  My body camera was on my  02:15:27
 4    chest, which would have been up against his chest.    02:15:30
 5    Q.        But at any time -- you would agree that     02:15:32
 6    the body cam has no evidence on it at any time that   02:15:37
 7    would demonstrate he was attempting to light the     02:15:40
 8    lighter with his thumb?                              02:15:42
 9    A.        That would be correct.                     02:15:44
10    Q.        When you made the decision to go           02:15:45
11    hands-on -- that's your term, correct, hands-on?     02:15:51
12    A.        Yes.                                       02:15:53
13    Q.        Okay.  When you made the decision to go    02:15:54
14    hands-on with Mr. Hall that day, did you have any    02:15:57
15    evidence that he was under the influence of any sort 02:16:02
16    of drug?                                             02:16:05
17    A.        The -- the bizarre statements that he was  02:16:06
18    making and his actions and relating that to my       02:16:23
19    previous knowledge of Mr. Hall did lead me to        02:16:26
20    believe that at the time.                            02:16:30
21    Q.        What drug did you suspect he was under the 02:16:31
22    influence of?                                        02:16:37
23    A.        Again, based on what I've been spoken      02:16:38
24    of, the drug that he used in the past was            02:16:42
25    methamphetamine.                                     02:16:46
```

```
1    Q.         So as you entered that day, you were aware    02:16:47

2    that he had a history of methamphetamine use?          02:16:50

3    A.         That is correct.                             02:16:53

4    Q.         Did you see any evidence of piano fingers,   02:16:53

5    as you described earlier in the deposition?            02:16:57

6    A.         Can you repeat that?                         02:16:59

7    Q.         Yeah.  One of the signs and symptoms of      02:17:00

8    meth use, according to your list earlier in the day    02:17:03

9    today, was somebody under the influence of             02:17:05

10   methamphetamine will show piano fingers; correct?      02:17:09

11   A.         Correct.  That is one thing I said early,    02:17:14

12   yes.                                                   02:17:18

13   Q.         So my question is did you see any evidence   02:17:18

14   of Mr. Hall demonstrating piano fingers that day?      02:17:20

15   A.         Not that I remember.                         02:17:24

16   Q.         And one of the other signs and symptoms      02:17:25

17   was erratic behavior.  You already described what      02:17:31

18   you felt was erratic behavior by him attempting to     02:17:33

19   kill himself?                                           02:17:39

20   A.         That is correct.                             02:17:39

21   Q.         Another sign or symptom of methamphetamine   02:17:40

22   use that you listed is muscle twitching both in your   02:17:43

23   body and your jaw.                                      02:17:46

24              Did you see evidence of that in him before   02:17:47

25   pulling the TASER trigger?                             02:17:50
```

```
 1   A.        Not that I recall.                          02:17:52

 2   Q.        While you were in that back room with       02:17:53

 3   Mr. Hall, did anyone else enter the room other        02:18:08

 4   than -- let me ask you this.                           02:18:14

 5             So were you and Mr. Hall the only ones in    02:18:15

 6   the room during that period that you were back         02:18:17

 7   there?                                                 02:18:18

 8   A.        I believe so.  I know someone was at the     02:18:19

 9   door which I entered, but I do not believe that they   02:18:26

10   entered.                                               02:18:30

11   Q.        And that was going to be my next line of     02:18:30

12   questioning.  Because on the audio-video you can       02:18:32

13   hear a third person talking and actually making some   02:18:36

14   expression to Mr. Hall.                                02:18:39

15             Do you remember that, hearing that person    02:18:41

16   talking?                                               02:18:45

17   A.        I remember hearing them.  I don't exactly    02:18:45

18   remember what they were saying.                        02:18:47

19   Q.        And as you sit here today, can you tell us   02:18:49

20   whether or not that person was inside the room or      02:18:52

21   outside the room when you heard him talking?           02:18:55

22   A.        To my best recollection, they were outside   02:18:59

23   of the room.                                           02:19:02

24   Q.        At any time while you were back in that      02:19:02

25   back room, did anybody attempt to enter the room as    02:19:06
```

```
 1              There was a continually -- continual      02:20:48

 2    dialogue that transpired between Mr. Hall and I     02:20:51

 3    throughout.                                         02:20:56

 4    Q.        So the deescalation process takes place,  02:20:59

 5    then you make the decision to go hands-on, that     02:21:02

 6    takes place, and now you're physically apart from   02:21:06

 7    one another.  That's the stage I want to be at.  Are 02:21:10

 8    you with me there?                                  02:21:13

 9    A.        So after the physical altercation?  Yes.  02:21:14

10    Q.        Yeah.  After the hands-on you're          02:21:17

11    separated?                                          02:21:20

12    A.        Correct.                                  02:21:20

13    Q.        And about how far are you from him when   02:21:21

14    you decide to pull your TASER out?                  02:21:23

15    A.        I would estimate it to be within five     02:21:26

16    yards -- or excuse me -- ten to five feet, the      02:21:32

17    length of the room as I recall it.                  02:21:39

18    Q.        Okay.  What is the range of the TASER?    02:21:41

19    A.        I don't recall the specific designation of 02:21:43

20    the range of the TASER 7 as identified through      02:21:53

21    either policy or Axon.                              02:21:57

22    Q.        So we're at this point where you -- the   02:21:58

23    hands-on confrontation has taken place; you are     02:22:08

24    several feet away from him, at least.               02:22:14

25              And is that when you decide to pull the   02:22:17
```

| | | |
|---|---|---|
| 1 | TASER out? | 02:22:19 |
| 2 | A.        Yes, that is whenever -- after I moved | 02:22:23 |
| 3 | back and attempted to open the back door and he was | 02:22:26 |
| 4 | still acting -- saying that he was trying to light | 02:22:32 |
| 5 | himself on fire and wouldn't drop the TASER -- the | 02:22:36 |
| 6 | lighter, that's whenever I pulled my TASER from the | 02:22:39 |
| 7 | holster. | 02:22:43 |
| 8 | Q.        Now, that moment in time that you had the | 02:22:44 |
| 9 | confrontation, the physical confrontation, and you | 02:22:46 |
| 10 | fail in your attempt to get the lighter from him, is | 02:22:51 |
| 11 | your -- is your state of mind such that you're kind | 02:22:55 |
| 12 | of beginning to lose your temper with him? | 02:22:58 |
| 13 | A.        No. | 02:23:00 |
| 14 | Q.        Do you feel that you ever lost control of | 02:23:02 |
| 15 | your temper that day when you encountered Mr. Hall? | 02:23:05 |
| 16 | A.        No. | 02:23:10 |
| 17 | Q.        Now, when you decide to use the TASER, we | 02:23:12 |
| 18 | can hear on the camera what exactly you said.  But | 02:23:22 |
| 19 | generally speaking, you begin to count down | 02:23:27 |
| 20 | number-wise; correct? | 02:23:32 |
| 21 | A.        Um-hmm. | 02:23:32 |
| 22 | Q.        Is that a yes? | 02:23:33 |
| 23 | A.        Yes, I do recall that. | 02:23:34 |
| 24 | Q.        And do you recall what number you started | 02:23:36 |
| 25 | at? | 02:23:38 |

| | | |
|---|---|---|
| 1 | A.         I do not recall.  I'd have to refer to the | 02:23:38 |
| 2 | video. | 02:23:47 |
| 3 | Q.         Okay.  We -- | 02:23:47 |
| 4 | A.         Might be three. | 02:23:49 |
| 5 | Q.         We can pull it up in a minute. | 02:23:50 |
| 6 |           But is there any protocol in place, if you | 02:23:51 |
| 7 | know, as to what number you should start at when you | 02:23:57 |
| 8 | start to do a countdown before you shoot a TASER? | 02:24:00 |
| 9 | A.         No. | 02:24:03 |
| 10 | Q.         Did you ever consider doing the countdown | 02:24:03 |
| 11 | and sort of bluffing and not shooting it? | 02:24:13 |
| 12 | A.         Yes.  I -- prior to that I -- I had | 02:24:16 |
| 13 | attempted to use physical, you know, force to remove | 02:24:29 |
| 14 | the lighter from him.  I had -- he had already told | 02:24:32 |
| 15 | me that if I used my pepper spray that he would | 02:24:35 |
| 16 | light himself on fire. | 02:24:39 |
| 17 |           And so I do remember specifically thinking | 02:24:44 |
| 18 | what items I had available to me given the | 02:24:48 |
| 19 | circumstances and -- if that answers your question. | 02:24:51 |
| 20 | Q.         I think my question was did you consider | 02:24:56 |
| 21 | bluffing and not -- and counting down without | 02:25:12 |
| 22 | shooting? | 02:25:15 |
| 23 | A.         To address that, it would have been based | 02:25:16 |
| 24 | on my knowledge and experience projecting the TASER, | 02:25:25 |
| 25 | activating it, and telling the individual that they | 02:25:31 |

```
1    statement, yes.                                    02:27:07

2    Q.        It's also fair to say that you were hoping  02:27:07

3    that he was going to drop the lighter before you had  02:27:10

4    to TASE him; right?                                02:27:14

5    A.        Correct.                                 02:27:15

6    Q.        And you were hoping that he dropped the  02:27:16

7    lighter before you had to TASE him in your mind,   02:27:19

8    because you knew that if you tased him he could    02:27:22

9    catch on fire; correct?                            02:27:24

10             MR. ALLEN:  Objection.  Compound.  Calls  02:27:27

11   for speculation.  Argumentative.                   02:27:29

12             You can answer.                          02:27:30

13             THE WITNESS:  No.  The reason why I chose  02:27:31

14   that time for the use of the TASER was I knew to   02:27:34

15   eliminate the threat to Mr. Hall, the threat that he  02:27:37

16   posed to himself, was to either get the lighter out  02:27:42

17   of his hand, which I attempted to do by physical   02:27:45

18   force earlier.  And it was my hope that the TASER  02:27:51

19   would have presented muscular incapacitation to    02:27:55

20   which I could move forward and remove the lighter  02:27:59

21   from Mr. PJ Hall's hand or that the TASER would have  02:28:03

22   caused him muscular incapacitation to where he would  02:28:09

23   have, on his own, dropped it, or me presenting the  02:28:12

24   TASER would have caused him to drop the lighter    02:28:17

25   before I had to take any further action.           02:28:23
```

| | | |
|---|---|---|
| 1 | Q.        By MR. BABICH:  Well, right.  That's | 02:28:28 |
| 2 | everything that you hoped would happen; correct? | 02:28:29 |
| 3 | A.        Correct. | 02:28:31 |
| 4 | Q.        And none of that happened; correct? | 02:28:31 |
| 5 | A.        Correct. | 02:28:33 |
| 6 | Q.        And when you pulled the trigger you knew | 02:28:37 |
| 7 | there was a risk of him catching on fire; correct? | 02:28:41 |
| 8 | A.        Correct. | 02:28:44 |
| 9 | Q.        Why did you do the countdown? | 02:28:47 |
| 10 | A.        Because it was my hope that he would drop | 02:28:50 |
| 11 | the lighter. | 02:28:59 |
| 12 | Q.        Again, this can be demonstrated on the | 02:28:59 |
| 13 | video. | 02:29:10 |
| 14 |          But when the TASER is actually -- or when | 02:29:10 |
| 15 | the probes actually connected with his body, could | 02:29:14 |
| 16 | you hear the electrical charge taking place? | 02:29:18 |
| 17 | A.        From my memory, yes, I could. | 02:29:21 |
| 18 | Q.        And could you tell -- based on watching | 02:29:26 |
| 19 | this event in person rather than on the video, can | 02:29:32 |
| 20 | you tell where the flames first started on his body? | 02:29:35 |
| 21 | A.        During the time of the incident, I could | 02:29:42 |
| 22 | not. | 02:29:43 |
| 23 | Q.        Since the time of the incident you've had | 02:29:43 |
| 24 | the opportunity to look at the video. | 02:29:49 |
| 25 |          Does the video tell you in any way where | 02:29:52 |

| | | |
|---|---|---|
| 1 | the flames actually started? | 02:29:55 |
| 2 | A.        Again, based on review of the video, I | 02:29:56 |
| 3 | still am not sure where the flames started. | 02:30:01 |
| 4 | Q.        Who was the officer that transported you | 02:30:03 |
| 5 | to the hospital? | 02:30:11 |
| 6 | A.        That was a deputy from the Siskiyou County | 02:30:11 |
| 7 | Sheriff's Office.  I remember reviewing his name, | 02:30:17 |
| 8 | but I do not recall that name of the deputy at this | 02:30:25 |
| 9 | time. | 02:30:28 |
| 10 | Q.        Looking at the body cam video and audio, I | 02:30:29 |
| 11 | recall you telling him that Mr. Hall lit himself on | 02:30:35 |
| 12 | fire.  Is that an accurate statement? | 02:30:39 |
| 13 | A.        If that is what is depicted by the video, | 02:30:42 |
| 14 | then that's what I told him.  I don't recall making | 02:30:45 |
| 15 | that statement. | 02:30:47 |
| 16 | Q.        As you sit here today, why was it | 02:30:48 |
| 17 | necessary for you to tell the officer that's | 02:30:51 |
| 18 | transporting you to the hospital that Mr. Hall lit | 02:30:54 |
| 19 | himself on fire? | 02:31:00 |
| 20 | A.        In the same regard to why I reported that | 02:31:01 |
| 21 | to dispatch, I believe it was important for other | 02:31:07 |
| 22 | officers to be aware of what I had seen, done and | 02:31:10 |
| 23 | heard up to that point.  And that would have been in | 02:31:16 |
| 24 | important for any officer or deputy responding to | 02:31:20 |
| 25 | the area who is involved in a circumstance like | 02:31:24 |

```
 1    Q.         By MR. BABICH:  I can't hear anything      02:42:14

 2    inside the squad car, but it may have happened        02:42:15

 3    beforehand.                                            02:42:19

 4              But let me just ask you this, Mr. Gale.      02:42:19

 5              Do you recall telling anyone at the scene    02:42:22

 6    outside the house that Mr. Hall lit himself on fire?   02:42:24

 7    A.         Yes, I do.                                  02:42:29

 8    Q.         Who would you have told that to?            02:42:29

 9    A.         That I do not know.  That statement, to     02:42:32

10    the best of my recollection, was done while Mr. Hall   02:42:37

11    was struggling with me in the middle of the street     02:42:42

12    after I was able to remove his -- the clothes which    02:42:46

13    were on fire.  He engaged me in another physical       02:42:50

14    altercation.  And at that point I remember several     02:42:55

15    individuals running around in what I would describe    02:42:58

16    circling.  One of those individuals being -- again,    02:43:03

17    to the best of my recollection, being Mr. Bedzyk,      02:43:06

18    who we spoke about before, running up with the fire    02:43:11

19    extinguisher.                                          02:43:16

20              Who else was involved in surrounding         02:43:18

21    myself and Mr. Hall, I do not specifically recall.     02:43:21

22    Q.         Okay.  So during that period -- and we can  02:43:25

23    cue it to if necessary.  But during that period when   02:43:30

24    Mr. Hall is out of the house, he's still on fire and   02:43:34

25    you're having a physical confrontation with him at     02:43:37
```

```
 1   that point; correct?                                02:43:40

 2   A.        No.   After the fire the -- he exits the  02:43:41

 3   house to wherever I am able to remove his shirt and 02:43:52

 4   remove his pants.   And this image here is just     02:43:55

 5   depicting after he's been -- the burning clothes    02:44:00

 6   have been removed and the fire has been put out.    02:44:06

 7   Q.        When in the sequence of events do you tell 02:44:08

 8   people that Mr. Hall lit himself on fire?           02:44:12

 9   A.        After the fire has been put out and he is 02:44:14

10   fighting with me in the street.                     02:44:19

11   Q.        Let me go ahead and just play it.   I know 02:44:21

12   you won't be able to hear it, but maybe you can tell 02:44:25

13   me to stop when you're at that point.               02:44:27

14             MR. ALLEN:   Joe, we're getting no audio.  02:44:42

15             MR. BABICH:   Say that again.              02:44:44

16             MR. ALLEN:   We're not -- I'm not getting  02:44:46

17   any audio.   Bruce?                                 02:44:50

18             MR. BABICH:   You're not going to hear any 02:44:50

19   audio.                                              02:44:52

20             MR. ALLEN:   Oh.   I misunderstood what you 02:44:52

21   instructed Mr. Gale to do.                          02:44:56

22             You want him to watch the video and see if 02:44:57

23   he can identify when he made the comment?           02:44:59

24             MR. BABICH:   And if I hear the comment    02:45:03

25   I'll share that with you too.                       02:45:04
```

```
 1              (Video playing.)                          02:45:23
 2              THE WITNESS:  It would have been somewhere  02:45:23
 3     in here.                                           02:45:24
 4              MR. BABICH:  Okay.  And just for the      02:45:25
 5     record, that's at -- it looks like 8:11 of that   02:45:27
 6     video.                                             02:45:31
 7              MR. ALLEN:  I agree that's what it        02:45:39
 8     reflects.                                          02:45:40
 9     Q.       By MR. BABICH:  Okay.  What I'd like to do  02:46:00
10     is -- and I haven't gone through the whole video   02:46:01
11     during this deposition to actually cue in where that  02:46:04
12     took place.  I'll represent that to you.           02:46:08
13              But in any event, you do inform people    02:46:10
14     around you while you had the physical confrontation  02:46:14
15     with Mr. Hall out on the street that he lit himself  02:46:16
16     on fire; correct?                                  02:46:19
17     A.       Correct.                                  02:46:20
18     Q.       And what was the purpose of telling people  02:46:21
19     that he lit himself on fire at that point?         02:46:25
20     A.       I believe that would have been just       02:46:27
21     relaying the sequence of events as I recall them or  02:46:43
22     I -- I don't know.                                 02:46:49
23     Q.       Isn't it true that the reason you were    02:46:50
24     verbalizing that Mr. Hall lit himself on fire is   02:46:56
25     because you wanted to put the blame on him rather  02:46:59
```

| | | |
|---|---|---|
| 1 | than you? | 02:47:02 |
| 2 | A.        No. | 02:47:03 |
| 3 | Q.        Now, let's walk through that physical | 02:47:04 |
| 4 | confrontation on the street.  You touched on it | 02:47:19 |
| 5 | briefly, but I want to put it back in the sequence. | 02:47:22 |
| 6 |           What was your purpose for having any type | 02:47:24 |
| 7 | of physical confrontation with him out on the | 02:47:26 |
| 8 | street? | 02:47:29 |
| 9 | A.        Again, that answer would be twofold.  One, | 02:47:29 |
| 10 | he was combative with me, so there was a portion | 02:47:38 |
| 11 | that I needed to overcome his resistance at that | 02:47:44 |
| 12 | time.  But also, I knew that as long as he was | 02:47:46 |
| 13 | combative, generally speaking, with regard to a | 02:47:50 |
| 14 | policy of the fire department and the ambulance | 02:47:54 |
| 15 | service is if there's a combative suspect they will | 02:47:58 |
| 16 | not engage. | 02:48:02 |
| 17 |           I knew that they had been staging, but | 02:48:03 |
| 18 | it's getting him under control or subduing him | 02:48:10 |
| 19 | enough where they can come to his aid as well. | 02:48:14 |
| 20 | That's what I was trying to achieve at that point. | 02:48:18 |
| 21 | Q.        Did you actually tackle him? | 02:48:20 |
| 22 | A.        I believe so.  I know that I was able to | 02:48:25 |
| 23 | remove his shirt, which was inflamed.  I was able to | 02:48:29 |
| 24 | do that while he was still standing.  I believe I | 02:48:33 |
| 25 | removed his pants, which were inflamed after he was | 02:48:44 |

| | | |
|---|---|---|
| 1 | on the ground.  The process of that I don't remember | 02:48:47 |
| 2 | exactly. | 02:48:54 |
| 3 | Q.        And during the sequence of events, did you | 02:48:55 |
| 4 | burn your hands while you were taking his clothes | 02:49:01 |
| 5 | off, as far as you know? | 02:49:04 |
| 6 | A.        That is correct. | 02:49:05 |
| 7 | Q.        And your purpose for taking his clothes | 02:49:06 |
| 8 | off was to eliminate the flame on him, apparently; | 02:49:09 |
| 9 | correct? | 02:49:12 |
| 10 | A.        The purpose for removing his clothes was | 02:49:12 |
| 11 | that was the immediate threat; that is what was on | 02:49:19 |
| 12 | fire at that time. | 02:49:22 |
| 13 | Q.        Did you make a workers' comp claim as a | 02:49:24 |
| 14 | result of burning your hands? | 02:49:29 |
| 15 | A.        I did. | 02:49:30 |
| 16 | Q.        And I don't need a lot of detail on that, | 02:49:32 |
| 17 | but is it still pending? | 02:49:37 |
| 18 | A.        No. | 02:49:38 |
| 19 | Q.        At any time did you have to testify in the | 02:49:39 |
| 20 | workers' comp claim about what happened that day? | 02:49:44 |
| 21 | A.        I don't recall.  I believe I -- to the | 02:49:46 |
| 22 | best of my recollection, the department assisted me | 02:49:57 |
| 23 | with getting a doctor's appointment. | 02:49:59 |
| 24 | Q.        Did you have a lawyer representing you in | 02:50:05 |
| 25 | the workers' comp claim? | 02:50:10 |

| | | |
|---|---|---|
| 1 | the question and see if he's got an answer for you. | 03:08:55 |
| 2 | Because I think in the context earlier it was you | 03:09:06 |
| 3 | were asking him what was said to a deputy in the | 03:09:09 |
| 4 | car. | 03:09:13 |
| 5 | MR. BABICH:  Right.  This is different | 03:09:14 |
| 6 | now. | 03:09:15 |
| 7 | MR. ALLEN:  Okay.  So I think if you ask | 03:09:15 |
| 8 | him that, I think it isn't going to necessarily -- I | 03:09:19 |
| 9 | don't know.  Maybe he doesn't need his memory for | 03:09:23 |
| 10 | the question on that point. | 03:09:25 |
| 11 | MR. BABICH:  Okay.  Well, let's -- I'll | 03:09:26 |
| 12 | ask it, but I probably still want to try to find the | 03:09:28 |
| 13 | clip. | 03:09:30 |
| 14 | Q.     By MR. BABICH:  But in any event, | 03:09:31 |
| 15 | Mr. Gale, the clip I just heard off the record and | 03:09:33 |
| 16 | during the break sounded like a female was having a | 03:09:35 |
| 17 | discussion with you and you told the female that he | 03:09:39 |
| 18 | lit himself on fire. | 03:09:42 |
| 19 | Do you remember making that statement? | 03:09:43 |
| 20 | A.     I remember making that statement to | 03:09:44 |
| 21 | somebody that was at that scene at that time, yes. | 03:09:47 |
| 22 | Q.     Okay.  And what was the purpose of you | 03:09:50 |
| 23 | making that statement about accusing Mr. Hall for | 03:09:55 |
| 24 | lighting himself on fire? | 03:10:05 |
| 25 | A.     Again, that's how the sequence of events | 03:10:06 |

```
 1   transpired as I believed them to at that time.  I         03:10:12

 2   also remember telling my sergeant the same thing, at      03:10:18

 3   that time, given the circumstances, that's what I         03:10:22

 4   believed.                                                 03:10:25

 5           MR. ALLEN:  Why did you say it, John?             03:10:27

 6   That's what he's asking.                                  03:10:29

 7           THE WITNESS:  It was in response to what          03:10:31

 8   they were accusing and they were telling me.              03:10:33

 9   Q.      By MR. BABICH:  And when you say "they,"          03:10:38

10   was that the crowd or was that a group of people?         03:10:41

11   Who was that?                                             03:10:43

12   A.      I would say the individuals that were             03:10:44

13   around at that time.                                      03:10:47

14   Q.      So those individuals were accusing you of         03:10:48

15   lighting him on fire with the TASER, it sounds like;      03:10:53

16   correct?                                                  03:10:57

17   A.      I believe so, yes.                                03:10:58

18   Q.      And your response was, I didn't light him         03:10:59

19   on fire with the TASER; he lit himself on fire,           03:11:02

20   roughly?                                                  03:11:06

21   A.      My response was relaying what I had               03:11:07

22   seen -- what I had encountered on scene.                  03:11:11

23   Q.      And your response was, No, he lit himself         03:11:17

24   on fire; correct?                                         03:11:21

25   A.      Something to that effect.  The video would        03:11:22
```

| | | |
|---|---|---|
| 1 | show my exact words, but yes. | 03:11:28 |
| 2 | Q.       So is it your testimony that he lit | 03:11:30 |
| 3 | himself on fire before you shot the TASER? | 03:11:38 |
| 4 |        MR. ALLEN:  Objection.  Asked and | 03:11:43 |
| 5 | answered. | 03:11:44 |
| 6 |        You have to answer that question, John. | 03:11:46 |
| 7 |        THE WITNESS:  That was what I observed and | 03:11:48 |
| 8 | believed at the time of this incident. | 03:11:51 |
| 9 | Q.       By MR. BABICH:  If he lit himself on fire | 03:11:55 |
| 10 | before you pulled the trigger on the TASER, why did | 03:11:56 |
| 11 | you even pull the trigger on the TASER? | 03:11:59 |
| 12 | A.       Because the situation that I was in, it | 03:12:01 |
| 13 | appeared to be simultaneous.  There wasn't a | 03:12:14 |
| 14 | separate designation between the two incidents. | 03:12:19 |
| 15 | Q.       Did you actually see him ignite the | 03:12:23 |
| 16 | lighter at the moment that you shot the TASER? | 03:12:41 |
| 17 | A.       I can see -- I remember seeing him moving | 03:12:45 |
| 18 | his body and moving his arm and his hand at or | 03:12:54 |
| 19 | around the same time that I deployed the TASER. | 03:12:59 |
| 20 | Q.       Did you see him ignite the lighter at any | 03:13:01 |
| 21 | time? | 03:13:06 |
| 22 | A.       Again, I would have to review the -- go | 03:13:06 |
| 23 | back to that specific part in the video.  That would | 03:13:17 |
| 24 | depict exactly what happens.  I do not know. | 03:13:19 |
| 25 | Q.       Well, as you sit here today, do you recall | 03:13:25 |

1   seeing him ignite the lighter?                    03:13:28

2   A.        I don't know.                           03:13:29

3   Q.        When you were out on the street telling 03:13:30

4   everyone that he lit himself on fire, did you also 03:13:35

5   include the fact that you simultaneously shot the  03:13:38

6   laser at the same time?                           03:13:41

7   A.        I do not believe so.  I was -- my       03:13:44

8   statements were in response to the statements that 03:13:53

9   they were -- so I don't believe I --              03:13:55

10  Q.        Well, they were accusing you of lighting 03:14:01

11  him on fire with the TASER; right?                03:14:05

12  A.        That is what I -- as I remember it.      03:14:08

13  Q.        Yeah.  You put all the blame on him and  03:14:16

14  didn't tell them that you also shot the TASER at the 03:14:20

15  same time; right?                                 03:14:23

16          MR. ALLEN:  Objection.  Compound and      03:14:24

17  argumentative.                                    03:14:26

18          You have to answer it if you understand   03:14:27

19  it.  You have to answer the question if you       03:14:31

20  understand the question, John.                    03:14:44

21          THE WITNESS:  Oh, I'm sorry.              03:14:46

22          As they were stating that I had fired the 03:14:53

23  TASER, I did not respond by telling them I fired the 03:14:56

24  TASER.  I did not -- I do not recall telling them I 03:15:01

25  fired the TASER.  That was, I believe, based on what 03:15:06

1    they were saying to me.                                03:15:09

2    Q.        By MR. BABICH:   Is there any reason why     03:15:13

3    you didn't tell them that you shot the TASER the       03:15:14

4    same time that you felt he lit himself on fire?        03:15:17

5    A.        Because that was a sequence of events that   03:15:19

6    they already knew about.                               03:15:24

7    Q.        What sequence was that?                      03:15:25

8    A.        The sequence of events that we are -- as     03:15:29

9    a -- my interactions with Mr. Hall.                    03:15:38

10   Q.        Well, how did they know that, if you know?   03:15:41

11   A.        Because the two individuals that I believe   03:15:50

12   are speaking, again, to the best of my recollection,   03:15:54

13   one of them was at the doorway when it occurred, and   03:15:57

14   the other one was -- if not in the house, was near     03:16:01

15   the entrance of the house.   Last time I had           03:16:06

16   contacted her it was at the entrance of the house.     03:16:09

17   Q.        So they accused -- go ahead.                 03:16:13

18   A.        I was going to say that I believe that       03:16:15

19   they were there at the exact moment.                   03:16:18

20   Q.        So they were there and they accused you of   03:16:20

21   shooting him with a TASER and causing him to be lit    03:16:24

22   on fire, and your response is, No, he lit himself on   03:16:28

23   fire; correct?                                         03:16:34

24   A.        That is, yes, correct.                       03:16:34

25   Q.        Did at any time you deny shooting the        03:16:38

| | | |
|---|---|---|
| 1 | TASER? | 03:16:46 |
| 2 | A.       I don't believe so. | 03:16:52 |
| 3 | Q.       Is there any reason you didn't tell the | 03:16:53 |
| 4 | people that were accusing you of shooting the TASER | 03:16:57 |
| 5 | that, Yeah, I shot the TASER at the same time he lit | 03:17:00 |
| 6 | himself on fire?  Is there any reason you didn't | 03:17:05 |
| 7 | disclose that? | 03:17:08 |
| 8 | A.       Again, because the people I believe that I | 03:17:08 |
| 9 | was talking to were there and observed me deploy the | 03:17:10 |
| 10 | TASER. | 03:17:14 |
| 11 | Q.       So you felt that they didn't need that | 03:17:17 |
| 12 | information? | 03:17:20 |
| 13 | MR. ALLEN:  Objection.  Argumentative. | 03:17:20 |
| 14 | Q.       By MR. BABICH:  You felt that they already | 03:17:21 |
| 15 | had that information, so you didn't need to share it | 03:17:24 |
| 16 | with them? | 03:17:27 |
| 17 | A.       That is correct. | 03:17:27 |
| 18 | Q.       Okay.  So now I'm going to play the clip | 03:17:28 |
| 19 | of the moments before the TASER is ignited.  And I | 03:17:35 |
| 20 | want you to look at it, and then I'd like you to | 03:17:39 |
| 21 | tell me if you see any evidence in the video of him | 03:17:42 |
| 22 | actually igniting the fire with the lighter. | 03:17:46 |
| 23 | Give me a second to pull this up. | 03:18:08 |
| 24 | MR. KILDAY:  Joe, is the video portion | 03:18:15 |
| 25 | that you're about to play going to be part of the | 03:18:17 |

```
 1    bent over and he brings his right hand, which        03:21:41

 2    contains the lighter, into his chest area.           03:21:45

 3    Q.        I'm going to kind of walk you through this  03:21:48

 4    frame by frame, and you tell me where to stop where  03:22:00

 5    it shows what you just described.  Is it before or   03:22:03

 6    after this?                                          03:22:05

 7    A.        So I believe this is -- this specific      03:22:07

 8    still frame is after I've deployed the TASER.  And   03:22:10

 9    the subsequent frames you can see his right arm come 03:22:17

10    up to his T-shirt.                                   03:22:22

11    Q.        Okay.  So this is at 36 seconds of the     03:22:24

12    video.  Are you saying that he lit himself on fire   03:22:33

13    after this point?                                    03:22:35

14    A.        From the video that I'm reviewing, I       03:22:38

15    cannot see a specific -- the moment that he -- the   03:22:40

16    fire starts.  I'm simply trying to relay the -- what 03:22:49

17    I saw at that exact -- given that -- at the time of  03:22:54

18    the incident.                                        03:22:58

19    Q.        Well, I know that, but I'm asking you what 03:22:58

20    the video shows now.                                 03:23:01

21              So let's clarify a couple of things here.  03:23:05

22    A.        Okay.                                      03:23:08

23    Q.        When you say this event take place live,   03:23:08

24    describe for me what you saw that leads you to       03:23:12

25    believe that he lit himself on fire.                 03:23:14
```

1    A.        At the time of the incident which led me

2    to believe that he lit himself on fire, I deployed

3    the TASER.  There was a period of time before the

4    flames start that I observed him bring his right

5    hand, which contained the lighter, up to his belt

6    area or his shirt area as he is kind of keeled over

7    from the TASER.

8    Q.        Is that -- is that something you're

9    describing based on what you remember seeing live?

10   A.        That is based on what I remember seeing

11   live.

12   Q.        Okay.  And then did you actually see his

13   thumb engage the switch on the -- on the lighter?

14   A.        I did not.

15   Q.        Are you just assuming that he actually

16   engaged the lighter?

17   A.        I'm simply explaining what I believe

18   occurred given the timeframe of the deploying of the

19   TASER, him bringing the -- his hand to his shirt,

20   and my perception given the circumstances at the

21   time was that.

22   Q.        But based on your observations live -- and

23   well get to the video in a second.  Based on your

24   observations live at the moment, did you actually

25   see him click the lighter?

03:23:20
03:23:23
03:23:27
03:23:34
03:23:40
03:23:43
03:23:48
03:23:49
03:23:55
03:23:58
03:24:00
03:24:00
03:24:05
03:24:09
03:24:11
03:24:16
03:24:17
03:24:29
03:24:36
03:24:42
03:24:44
03:24:45
03:24:54
03:24:57
03:25:06

| | | |
|---|---|---|
| 1 | A.       Live I did not see him click the lighter. | 03:25:09 |
| 2 | I saw him bring it to his chest. | 03:25:20 |
| 3 | Q.       Okay.   And the mere fact that he brought | 03:25:22 |
| 4 | the lighter to his chest, that's the only factual | 03:25:24 |
| 5 | support that you have that can support your | 03:25:28 |
| 6 | contention at the time that he lit himself on fire. | 03:25:32 |
| 7 | Is that fair to say? | 03:25:34 |
| 8 | A.       That is what led me to believe that he had | 03:25:35 |
| 9 | lit'n himself on fire. | 03:25:40 |
| 10 | Q.       So what I'm going to do again -- and we're | 03:25:41 |
| 11 | almost done here.   Thanks so much for everyone's | 03:25:44 |
| 12 | patience so far. | 03:25:47 |
| 13 | I'm going to start at 35 seconds.   Do you | 03:25:48 |
| 14 | see that in the video? | 03:25:50 |
| 15 | A.       Yes. | 03:25:53 |
| 16 | Q.       Do you see my cursor as well? | 03:25:53 |
| 17 | A.       I do. | 03:25:57 |
| 18 | Q.       So I'm pointing at what looks like a green | 03:25:57 |
| 19 | laser.   Do you see that? | 03:26:03 |
| 20 | A.       Yes. | 03:26:04 |
| 21 | Q.       And then I'm also pointing at kind of down | 03:26:04 |
| 22 | by his pants below his belt, the red TASER. | 03:26:08 |
| 23 | A.       Yes. | 03:26:12 |
| 24 | Q.       It's your understanding that those are the | 03:26:12 |
| 25 | two probe targets? | 03:26:14 |

```
 1    A.        Yes.  That is generally the area where the    03:26:16

 2    probes would --                                         03:26:19

 3    Q.        Okay.  And when you saw this live, you         03:26:22

 4    knew that his shirt was doused with gasoline;            03:26:25

 5    correct?                                                 03:26:28

 6    A.        That was what I believed, yes.                 03:26:28

 7    Q.        And you also knew that his pants were          03:26:31

 8    doused with gasoline when you saw this live?             03:26:34

 9    A.        At this point I did not know what part of      03:26:36

10    his clothing was doused.                                 03:26:43

11    Q.        Well, you did know that his -- you did         03:26:46

12    know that is -- at the 35-second mark of this video,     03:26:49

13    you do know that the shirt was doused; correct?          03:26:52

14    A.        That's what I believe, yes.                    03:26:55

15    Q.        And so I'm going to go ahead and play it       03:26:57

16    at 35 seconds.  And then as best you can, I'd like       03:27:02

17    you to tell me when you think you brought the            03:27:12

18    lighter to his chest and -- well, let me do it this      03:27:17

19    way.  I'll just play it out, and then I'll have some     03:27:21

20    questions for you.                                       03:27:24

21              So are you ready to go?                        03:27:25

22    A.        Yeah.  Do you want me to stop you or wait      03:27:26

23    until after the clip's done?                             03:27:29

24    Q.        That's a good question.  You can stop me       03:27:30

25    if you'd like.  So just say "stop."                      03:27:33
```

| | | |
|---|---|---|
| 1 | Q.       Well, when the probes entered his body, | 03:29:09 |
| 2 | you could actually hear the electric charge taking | 03:29:12 |
| 3 | place; correct? | 03:29:15 |
| 4 | A.       That is -- I recall that, yes. | 03:29:16 |
| 5 | Q.       And when the electric charge first starts | 03:29:21 |
| 6 | to take place, there's no fire; correct? | 03:29:25 |
| 7 | A.       Based on my recollection, yes. | 03:29:29 |
| 8 | Q.       And then almost immediately the fire | 03:29:32 |
| 9 | happens after that.  Is that your recollection? | 03:29:35 |
| 10 | A.       Yes.  As he's -- we are seen here as he's | 03:29:42 |
| 11 | moving. | 03:29:49 |
| 12 | Q.       So I'm at -- now we're kind of into | 03:29:51 |
| 13 | fractions of a second of this frame-by-frame | 03:29:57 |
| 14 | analysis.  I'm at the 36-second mark. | 03:29:59 |
| 15 |          Do you see where the flame is there? | 03:30:04 |
| 16 | A.       Yes.  At his waistline? | 03:30:07 |
| 17 | Q.       Yeah.  That's not coming from his shirt, | 03:30:08 |
| 18 | is it, as far as you can tell, his chest? | 03:30:11 |
| 19 | A.       I can't -- from that picture, I can't tell | 03:30:14 |
| 20 | where the flame is coming from. | 03:30:21 |
| 21 | Q.       Well, in fact, you see there's a -- | 03:30:22 |
| 22 | there's a ball of flame kind of at his belt line and | 03:30:27 |
| 23 | in that area at 36; correct? | 03:30:31 |
| 24 | A.       Yeah.  I can see what would appear to be a | 03:30:37 |
| 25 | ball of flame both touching part of the photo -- the | 03:30:40 |

1    further questions.  Thanks for your time today,          03:35:47

2    Mr. Gale.                                                 03:35:50

3              THE WITNESS:  Thank you, sir.                   03:35:50

4              MR. ALLEN:  No questions.                       03:35:52

5              MR. KILDAY:  I have no questions at this        03:35:53

6    time.                                                     03:35:54

7              THE REPORTER:  We are off the record.           03:35:54

8    This concludes the deposition of John Gale on            03:35:54

9    February 6, 2023.  The time is 3:36 p.m.                 03:36:58

10                   ---oOo---                                 03:37:08

11             (Proceedings concluded at 3:36 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    WITNESS'S SIGNATURE

 2
        Pursuant to Section 2025.520 of the Code of Civil
 3      Procedure of the State of California, I hereby
        certify that I have read my deposition transcript,
 4      taken Monday, February 6, 2023, pages 1 through 35,
        made the changes and corrections I deem necessary
 5      and approve the same as true and correct.

 6           I hereby state there are:

 7         (check one)_____ no corrections
                       _____ corrections per attached
 8

 9      _____      _____
        JOHN GALE                    DATE
10

11
                         ---oOo---
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              WITNESS'S CHANGES OR CORRECTIONS

 2            NOTE:  If you are adding to your
      testimony, print the exact words you want to add.
 3    If you are deleting from your testimony, print the
      exact words you want to delete.  Specify with "Add"
 4    or "Delete" and sign this form.

 5    Deposition of:  JOHN GALE
      Case Title:  HALL v. WEED
 6    Date of Deposition:  Monday, February 6, 2023

 7
      Page Line          Change/Add/Delete
 8

 9    _____  _____     _____

10    _____  _____     _____

11    _____  _____     _____

12    _____  _____     _____

13    _____  _____     _____

14    _____  _____     _____

15    _____  _____     _____

16    _____  _____     _____

17    _____  _____     _____

18    _____  _____     _____

19    _____  _____     _____

20    _____  _____     _____

21
      Pursuant to Section 2025.520 of the Code of Civil
22    Procedure of the State of California, I hereby
      certify that I have read my deposition transcript
23    and made the above-noted changes and corrections and
      approve them as true and correct.
24
      _____  _____
25    JOHN GALE                          Date
```

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I certify that the witness in the

 4   foregoing deposition,

 5                    JOHN GALE

 6          was by me duly sworn to testify the truth,

 7   the whole truth, in the within-entitled cause; that

 8   said deposition was taken at the time and place

 9   therein named; that the testimony of said witness

10   was reported by me, a duly Certified Shorthand

11   Reporter and a disinterested person, and was

12   thereafter transcribed into typewriting.

13          I further certify that I am not of counsel

14   or attorney for either or any of the parties to said

15   deposition, nor in any way interested in outcome of

16   the cause named in said caption.

17          IN WITNESS WHEREOF, I have hereunto set my

18   hand this 15th day of February, 2023.

19

20

21

22          LYNNE M. NISSON, CSR 7317
            State of California

23

24

25
```

**Policy**
**300**

Case 3:20-cv-01789-TLN-DMC   Document 44-4   Filed 11/15/23   Page 177 of 317
**Weed Police Department**
Weed PD Policy Manual

**EXHIBIT**
**1**

**CSR 7317**
**1**
**J. Gale - 2-6-23**

# Use of Force

### 300.1  PURPOSE AND SCOPE
This policy provides guidelines on the reasonable use of force. While there is no way to specify the exact amount or type of reasonable force to be applied in any situation, every member of this department is expected to use these guidelines to make such decisions in a professional, impartial and reasonable manner.

300.1.1  DEFINITIONS
Definitions related to this policy include:

**Deadly force** - Force reasonably anticipated and intended to create a substantial likelihood of causing death or very serious injury.

**Force** - The application of physical techniques or tactics, chemical agents or weapons to another person. It is not a use of force when a person allows him/herself to be searched, escorted, handcuffed or restrained.

### 300.2  POLICY
The use of force by law enforcement personnel is a matter of critical concern, both to the public and to the law enforcement community. Officers are involved on a daily basis in numerous and varied interactions and, when warranted, may use reasonable force in carrying out their duties.

Officers must have an understanding of, and true appreciation for, their authority and limitations. This is especially true with respect to overcoming resistance while engaged in the performance of law enforcement duties.

The Department recognizes and respects the value of all human life and dignity without prejudice to anyone. Vesting officers with the authority to use reasonable force and to protect the public welfare requires monitoring, evaluation and a careful balancing of all interests.

300.2.1  DUTY TO INTERCEDE
Any officer present and observing another officer using force that is clearly beyond that which is objectively reasonable under the circumstances shall, when in a position to do so, intercede to prevent the use of unreasonable force. An officer who observes another employee use force that exceeds the degree of force permitted by law should promptly report these observations to a supervisor.

### 300.3  USE OF FORCE
Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.

The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably

**Weed Police Department**
Weed PD Policy Manual

## Use of Force

appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.

Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.

It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.

While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.

### 300.3.1   USE OF FORCE TO EFFECT AN ARREST
Any peace officer may use reasonable force to effect an arrest, to prevent escape or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested; nor shall an officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest, prevent escape or to overcome resistance (Penal Code § 835a).

### 300.3.2   FACTORS USED TO DETERMINE THE REASONABLENESS OF FORCE
When determining whether to apply force and evaluating whether an officer has used reasonable force, a number of factors should be taken into consideration, as time and circumstances permit. These factors include, but are not limited to:

(a)   Immediacy and severity of the threat to officers or others.

(b)   The conduct of the individual being confronted, as reasonably perceived by the officer at the time.

(c)   Officer/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of officers available vs. subjects).

(d)   The effects of drugs or alcohol.

(e)   Subject's mental state or capacity.

(f)   Proximity of weapons or dangerous improvised devices.

(g)   The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained.

(h)   The availability of other options and their possible effectiveness.

City000685

*Use of Force*

---

(i)    Seriousness of the suspected offense or reason for contact with the individual.

(j)    Training and experience of the officer.

(k)    Potential for injury to officers, suspects and others.

(l)    Whether the person appears to be resisting, attempting to evade arrest by flight or is attacking the officer.

(m)    The risk and reasonably foreseeable consequences of escape.

(n)    The apparent need for immediate control of the subject or a prompt resolution of the situation.

(o)    Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others.

(p)    Prior contacts with the subject or awareness of any propensity for violence.

(q)    Any other exigent circumstances.

### 300.3.3  PAIN COMPLIANCE TECHNIQUES

Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:

(a)    The degree to which the application of the technique may be controlled given the level of resistance.

(b)    Whether the person can comply with the direction or orders of the officer.

(c)    Whether the person has been given sufficient opportunity to comply.

The application of any pain compliance technique shall be discontinued once the officer determines that compliance has been achieved.

### 300.3.4  CAROTID CONTROL HOLD

The proper application of the carotid control hold may be effective in restraining a violent or combative individual. However, due to the potential for injury, the use of the carotid control hold is subject to the following:

(a)    The officer shall have successfully completed department-approved training in the use and application of the carotid control hold.

(b)    The carotid control hold may only be used when circumstances perceived by the officer at the time indicate that such application reasonably appears necessary to control a person in any of the following circumstances:

    1.    The subject is violent or physically resisting.

---

Copyright Lexipol, LLC 2018/08/20, All Rights Reserved.
Published with permission by Weed Police Department

City000595

2. The subject, by words or actions, has demonstrated an intention to be violent and reasonably appears to have the potential to harm officers, him/herself or others.

(c) The application of a carotid control hold on the following individuals should generally be avoided unless the totality of the circumstances indicates that other available options reasonably appear ineffective, or would present a greater danger to the officer, the subject or others, and the officer reasonably believes that the need to control the individual outweighs the risk of applying a carotid control hold:

1. Females who are known to be pregnant

2. Elderly individuals

3. Obvious juveniles

4. Individuals who appear to have Down syndrome or who appear to have obvious neck deformities or malformations, or visible neck injuries

(d) Any individual who has had the carotid control hold applied, regardless of whether he/she was rendered unconscious, shall be promptly examined by paramedics or other qualified medical personnel and should be monitored until examined by paramedics or other appropriate medical personnel.

(e) The officer shall inform any person receiving custody, or any person placed in a position of providing care, that the individual has been subjected to the carotid control hold and whether the subject lost consciousness as a result.

(f) Any officer attempting or applying the carotid control hold shall promptly notify a supervisor of the use or attempted use of such hold.

(g) The use or attempted use of the carotid control hold shall be thoroughly documented by the officer in any related reports.

## 300.3.5 USE OF FORCE TO SEIZE EVIDENCE

In general, officers may use reasonable force to lawfully seize evidence and to prevent the destruction of evidence. However, officers are discouraged from using force solely to prevent a person from swallowing evidence or contraband. In the instance when force is used, officers should not intentionally use any technique that restricts blood flow to the head, restricts respiration or which creates a reasonable likelihood that blood flow to the head or respiration would be restricted. Officers are encouraged to use techniques and methods taught by the Weed Police Department for this specific purpose.

## 300.4 DEADLY FORCE APPLICATIONS

Use of deadly force is justified in the following circumstances:

(a) An officer may use deadly force to protect him/herself or others from what he/she reasonably believes would be the an imminent threat of death or serious bodily injury.

Copyright Lexipol, LLC 2018/09/25, All Rights Reserved.
Published with permission by Weed Police Department

City0006867

Weed Police Department
Weed PD Policy Manual

*Use of Force*

(b)   An officer may use deadly force to stop a fleeing subject when the officer has probable cause to believe that the person has committed, or intends to commit, a felony involving the infliction or threatened infliction of serious bodily injury or death, and the officer reasonably believes that there is an imminent risk of serious bodily injury or death to any other person if the subject is not immediately apprehended. Under such circumstances, a verbal warning should precede the use of deadly force, where feasible.

Imminent does not mean immediate or instantaneous. An imminent danger may exist even if the suspect is not at that very moment pointing a weapon at someone. For example, an imminent danger may exist if an officer reasonably believes any of the following:

1.   The person has a weapon or is attempting to access one and it is reasonable to believe the person intends to use it against the officer or another.

2.   The person is capable of causing serious bodily injury or death without a weapon and it is reasonable to believe the person intends to do so.

300.4.1   SHOOTING AT OR FROM MOVING VEHICLES
Shots fired at or from a moving vehicle are rarely effective. Officers should move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants. An officer should only discharge a firearm at a moving vehicle or its occupants when the officer reasonably believes there are no other reasonable means available to avert the threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others.

Officers should not shoot at any part of a vehicle in an attempt to disable the vehicle.

**300.5   REPORTING THE USE OF FORCE**
Any use of force by a member of this department shall be documented promptly, completely and accurately in an appropriate report, depending on the nature of the incident. The officer should articulate the factors perceived and why he/she believed the use of force was reasonable under the circumstances. To collect data for purposes of training, resource allocation, analysis and related purposes, the Department may require the completion of additional report forms, as specified in department policy, procedure or law.

300.5.1   NOTIFICATION TO SUPERVISORS
Supervisory notification shall be made as soon as practicable following the application of force in any of the following circumstances:

(a)   The application caused a visible injury.

(b)   The application would lead a reasonable officer to conclude that the individual may have experienced more than momentary discomfort.

(c)   The individual subjected to the force complained of injury or continuing pain.

Copyright Lexipol, LLC 2019/06/26, All Rights Reserved.
Published with permission by Weed Police Department

City000568

    (d)   The individual indicates intent to pursue litigation.

    (e)   Any application of a CED or control device.

    (f)   Any application of a restraint device other than handcuffs, shackles or belly chains.

    (g)   The individual subjected to the force was rendered unconscious.

    (h)   An individual was struck or kicked.

    (i)   An individual alleges any of the above has occurred.

300.5.2  REPORTING TO CALIFORNIA DEPARTMENT OF JUSTICE
Statistical data regarding all officer-involved shootings and incidents involving use of force resulting in serious bodily injury is to be reported to the California Department of Justice as required by Government Code § 12525.2. See the Records Section policy.

**300.6  MEDICAL CONSIDERATION**
Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed.

Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff or medical staff at the jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.

The on-scene supervisor or, if the on-scene supervisor is not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).

Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.

**Weed Police Department**

Weed PD Policy Manual

## Use of Force

### 300.7 SUPERVISOR RESPONSIBILITY

When a supervisor is able to respond to an incident in which there has been a reported application of force, the supervisor is expected to:

(a) Obtain the basic facts from the involved officers. Absent an allegation of misconduct or excessive force, this will be considered a routine contact in the normal course of duties.

(b) Ensure that any injured parties are examined and treated.

(c) When possible, separately obtain a recorded interview with the subject upon whom force was applied. If this interview is conducted without the person having voluntarily waived his/her *Miranda* rights, the following shall apply:

    1. The content of the interview should not be summarized or included in any related criminal charges.

    2. The fact that a recorded interview was conducted should be documented in a property or other report.

    3. The recording of the interview should be distinctly marked for retention until all potential for civil litigation has expired.

(d) Once any initial medical assessment has been completed or first aid has been rendered, ensure that photographs have been taken of any areas involving visible injury or complaint of pain, as well as overall photographs of uninjured areas. These photographs should be retained until all potential for civil litigation has expired.

(e) Identify any witnesses not already included in related reports.

(f) Review and approve all related reports.

(g) Determine if there is any indication that the subject may pursue civil litigation.

    1. If there is an indication of potential civil litigation, the supervisor should complete and route a notification of a potential claim through the appropriate channels.

(h) Evaluate the circumstances surrounding the incident and initiate an administrative investigation if there is a question of policy non-compliance or if for any reason further investigation may be appropriate.

In the event that a supervisor is unable to respond to the scene of an incident involving the reported application of force, the supervisor is still expected to complete as many of the above items as circumstances permit.

### 300.7.1 SHIFT SUPERVISOR RESPONSIBILITY

The Shift Supervisor shall review each use of force by any personnel within his/her command to ensure compliance with this policy and to address any training issues.

Copyright Lexipol, LLC 2017/09/25, All Rights Reserved.
Published with permission by Weed Police Department

City0000570

**Weed Police Department**

Weed PD Policy Manual

*Use of Force*

## 300.8   TRAINING

Officers will receive periodic training on this policy and demonstrate their knowledge and understanding.

## 300.9   USE OF FORCE ANALYSIS

At least annually, the Operations Division Commander should prepare an analysis report on use of force incidents. The report should be submitted to the Chief of Police. The report should not contain the names of officers, suspects or case numbers, and should include:

    (a)    The identification of any trends in the use of force by members.

    (b)    Training needs recommendations.

    (c)    Equipment needs recommendations.

    (d)    Policy revision recommendations.



**Policy**

**308**

**Weed Police Department**

Weed PD Policy Manual

**CSR 7317**

**2**

**J. Gale - 2-6-23**

# Control Devices and Techniques

### 308.1  PURPOSE AND SCOPE
This policy provides guidelines for the use and maintenance of control devices that are described in this policy.

### 308.2  POLICY
In order to control subjects who are violent or who demonstrate the intent to be violent, the Weed Police Department authorizes officers to use control devices in accordance with the guidelines in this policy and the Use of Force Policy.

### 308.3  ISSUING, CARRYING AND USING CONTROL DEVICES
Control devices described in this policy may be carried and used by members of this department only if the device has been issued by the Department or approved by the Chief of Police or the authorized designee.

Only officers who have successfully completed department-approved training in the use of any control device are authorized to carry and use the device.

Control devices may be used when a decision has been made to control, restrain or arrest a subject who is violent or who demonstrates the intent to be violent, and the use of the device appears reasonable under the circumstances. When reasonable, a verbal warning and opportunity to comply should precede the use of these devices.

When using control devices, officers should carefully consider potential impact areas in order to minimize injuries and unintentional targets.

### 308.4  RESPONSIBILITIES

#### 308.4.1  WATCHCOMMANDER RESPONSIBILITIES
The Shift Supervisor may authorize the use of a control device by selected personnel or members of specialized units who have successfully completed the required training.

#### 308.4.2  RANGEMASTER RESPONSIBILITIES
The Rangemaster shall control the inventory and issuance of all control devices and shall ensure that all damaged, inoperative, outdated or expended control devices or munitions are properly disposed of, repaired or replaced.

Every control device will be periodically inspected by the Rangemaster or the designated instructor for a particular control device. The inspection shall be documented.

#### 308.4.3  USER RESPONSIBILITIES
All normal maintenance, charging or cleaning shall remain the responsibility of personnel using the various devices.

Copyright Lexipol, LLC 2019/06/26, All Rights Reserved.
Published with permission by Weed Police Department

City000572

Any damaged, inoperative, outdated or expended control devices or munitions, along with documentation explaining the cause of the damage, shall be returned to the Rangemaster for disposition. Damage to City property forms shall also be prepared and forwarded through the chain of command, when appropriate, explaining the cause of damage.

**308.5  BATON GUIDELINES**
The need to immediately control a suspect must be weighed against the risk of causing serious injury. The head, neck, throat, spine, heart, kidneys and groin should not be intentionally targeted except when the officer reasonably believes the suspect poses an imminent threat of serious bodily injury or death to the officer or others.

When carrying a baton, uniformed personnel shall carry the baton in its authorized holder on the equipment belt. Plainclothes and non-field personnel may carry the baton as authorized and in accordance with the needs of their assignment or at the direction of their supervisor.

**308.6  TEAR GAS GUIDELINES**
Tear gas may be used for crowd control, crowd dispersal or against barricaded suspects based on the circumstances. Only the Shift Supervisor, Incident Commander may authorize the delivery and use of tear gas, and only after evaluating all conditions known at the time and determining that such force reasonably appears justified and necessary.

When practicable, fire personnel should be alerted or summoned to the scene prior to the deployment of tear gas to control any fires and to assist in providing medical aid or gas evacuation if needed.

**308.7  OLEORESIN CAPSICUM (OC) GUIDELINES**
As with other control devices, oleoresin capsicum (OC) spray and pepper projectiles may be considered for use to bring under control an individual or groups of individuals who are engaging in, or are about to engage in violent behavior. Pepper projectiles and OC spray should not, however, be used against individuals or groups who merely fail to disperse or do not reasonably appear to present a risk to the safety of officers or the public.

308.7.1  OC SPRAY
Uniformed personnel carrying OC spray shall carry the device in its holster on the equipment belt. Plainclothes and non-field personnel may carry OC spray as authorized, in accordance with the needs of their assignment or at the direction of their supervisor.

308.7.2  PEPPER PROJECTILE SYSTEMS
Pepper projectiles are plastic spheres that are filled with a derivative of OC powder. Because the compressed gas launcher delivers the projectiles with enough force to burst the projectiles on impact and release the OC powder, the potential exists for the projectiles to inflict injury if they strike the head, neck, spine or groin. Therefore, personnel using a pepper projectile system should not intentionally target those areas, except when the officer reasonably believes the suspect poses an imminent threat of serious bodily injury or death to the officer or others.

Copyright Lexipol, LLC 2019/06/26, All Rights Reserved.
Published with permission by Weed Police Department

City000573

*Control Devices and Techniques*

Officers encountering a situation that warrants the use of a pepper projectile system shall notify a supervisor as soon as practicable. A supervisor shall respond to all pepper projectile system incidents where the suspect has been hit or exposed to the chemical agent. The supervisor shall ensure that all notifications and reports are completed as required by the Use of Force Policy.

Each deployment of a pepper projectile system shall be documented. This includes situations where the launcher was directed toward the suspect, whether or not the launcher was used. Unintentional discharges shall be promptly reported to a supervisor and documented on the appropriate report form. Only non-incident use of a pepper projectile system, such as training and product demonstrations, is exempt from the reporting requirement.

308.7.3   TREATMENT FOR OC SPRAY EXPOSURE
Persons who have been sprayed with or otherwise affected by the use of OC should be promptly provided with clean water to cleanse the affected areas. Those persons who complain of further severe effects shall be examined by appropriate medical personnel.

**308.8   POST-APPLICATION NOTICE**
Whenever tear gas or OC has been introduced into a residence, building interior, vehicle or other enclosed area, officers should provide the owners or available occupants with notice of the possible presence of residue that could result in irritation or injury if the area is not properly cleaned. Such notice should include advisement that clean up will be at the owner's expense. Information regarding the method of notice and the individuals notified should be included in related reports.

**308.9   KINETIC ENERGY PROJECTILE GUIDELINES**
This department is committed to reducing the potential for violent confrontations. Kinetic energy projectiles, when used properly, are less likely to result in death or serious physical injury and can be used in an attempt to de-escalate a potentially deadly situation.

308.9.1   DEPLOYMENT AND USE
Only department-approved kinetic energy munitions shall be carried and deployed. Approved munitions may be used to compel an individual to cease his/her actions when such munitions present a reasonable option.

Officers are not required or compelled to use approved munitions in lieu of other reasonable tactics if the involved officer determines that deployment of these munitions cannot be done safely. The safety of hostages, innocent persons and officers takes priority over the safety of subjects engaged in criminal or suicidal behavior.

Circumstances appropriate for deployment include, but are not limited to, situations in which:

(a)   The suspect is armed with a weapon and the tactical circumstances allow for the safe application of approved munitions.

(b)   The suspect has made credible threats to harm him/herself or others.

Copyright Lexipol, LLC 2019/06/26, All Rights Reserved.
Published with permission by Weed Police Department

City000574

**Weed Police Department**

Weed PD Policy Manual

___

(c) The suspect is engaged in riotous behavior or is throwing rocks, bottles, or other dangerous projectiles at people and/or officers.

(d) There is probable cause to believe that the suspect has already committed a crime of violence and is refusing to comply with lawful orders.

### 308.9.2 DEPLOYMENT CONSIDERATIONS

Before discharging projectiles, the officer should consider such factors as:

(a) Distance and angle to target.

(b) Type of munitions employed.

(c) Type and thickness of subject's clothing.

(d) The subject's proximity to others.

(e) The location of the subject.

(f) Whether the subject's actions dictate the need for an immediate response and the use of control devices appears appropriate.

A verbal warning of the intended use of the device should precede its application, unless it would otherwise endanger the safety of officers or when it is not practicable due to the circumstances. The purpose of the warning is to give the individual a reasonable opportunity to voluntarily comply and to warn other officers and individuals that the device is being deployed.

Officers should keep in mind the manufacturer's recommendations and their training regarding effective distances and target areas. However, officers are not restricted solely to use according to manufacturer recommendations. Each situation must be evaluated on the totality of circumstances at the time of deployment.

The need to immediately incapacitate the subject must be weighed against the risk of causing serious injury or death. The head and neck should not be intentionally targeted, except when the officer reasonably believes the suspect poses an imminent threat of serious bodily injury or death to the officer or others.

### 308.9.3 SAFETY PROCEDURES

Shotguns specifically designated for use with kinetic energy projectiles will be specially marked in a manner that makes them readily identifiable as such.

Officers will inspect the shotgun and projectiles at the beginning of each shift to ensure that the shotgun is in proper working order and the projectiles are of the approved type and appear to be free from defects.

When it is not deployed, the shotgun will be unloaded and properly and securely stored in the vehicle. When deploying the kinetic energy projectile shotgun, the officer shall visually inspect the kinetic energy projectiles to ensure that conventional ammunition is not being loaded into the shotgun.

Copyright Lexipol, LLC 2018/06/29, All Rights Reserved.
Published with permission by Weed Police Department

City000675

Absent compelling circumstances, officers who must transition from conventional ammunition to kinetic energy projectiles will employ the two-person rule for loading. The two-person rule is a safety measure in which a second officer watches the unloading and loading process to ensure that the weapon is completely emptied of conventional ammunition.

### 308.10 TRAINING FOR CONTROL DEVICES

The Training Manager shall ensure that all personnel who are authorized to carry a control device have been properly trained and certified to carry the specific control device and are retrained or recertified as necessary.

(a) Proficiency training shall be monitored and documented by a certified, control-device weapons or tactics instructor.

(b) All training and proficiency for control devices will be documented in the officer's training file.

(c) Officers who fail to demonstrate proficiency with the control device or knowledge of this agency's Use of Force Policy will be provided remedial training. If an officer cannot demonstrate proficiency with a control device or knowledge of this agency's Use of Force Policy after remedial training, the officer will be restricted from carrying the control device and may be subject to discipline.

### 308.11 REPORTING USE OF CONTROL DEVICES AND TECHNIQUES

Any application of a control device or technique listed in this policy shall be documented in the related incident report and reported pursuant to the Use of Force Policy.

City000576



| Policy **309** | **Weed Police Department**<br>Weed PD Policy Manual |

**CSR 7317**

**3**

**J. Gale - 2-6-23**

# Conducted Energy Device

### 309.1  PURPOSE AND SCOPE
This policy provides guidelines for the issuance and use of CEDs.

### 309.2  POLICY
The Conducted Energy Device is intended to control a violent or potentially violent individual, while minimizing the risk of serious injury. The appropriate use of such a device should result in fewer serious injuries to officers and suspects.

### 309.3  ISSUANCE AND CARRYING EMDTDEVICES
Only members who have successfully completed department-approved training may be issued and carry the CED.

CEDs are issued for use during a member's current assignment. Those leaving a particular assignment may be required to return the device to the department's inventory.

Officers shall only use the CED and cartridges that have been issued by the Department. Uniformed officers who have been issued the CED shall wear the device in an approved holster on their person. Non-uniformed officers may secure the CED in the driver's compartment of their vehicle.

Members carrying the CED should perform a spark test on the unit prior to every shift.

When carried while in uniform officers shall carry the CED in a weak-side holster on the side opposite the duty weapon.

(a)  All CEDs shall be clearly and distinctly marked to differentiate them from the duty weapon and any other device.

(b)  Whenever practicable, officers should carry two or more cartridges on their person when carrying the CED.

(c)  Officers shall be responsible for ensuring that their issued CED is properly maintained and in good working order.

(d)  Officers should not hold both a firearm and the CED at the same time.

### 309.4  VERBAL AND VISUAL WARNINGS
A verbal warning of the intended use of the CED should precede its application, unless it would otherwise endanger the safety of officers or when it is not practicable due to the circumstances. The purpose of the warning is to:

(a)  Provide the individual with a reasonable opportunity to voluntarily comply.

(b)  Provide other officers and individuals with a warning that the CED may be deployed.

---

Copyright Lexipol, LLC 2019/06/26, All Rights Reserved.<br>Published with permission by Weed Police Department

City000577

*Conducted Energy Device*

If, after a verbal warning, an individual is unwilling to voluntarily comply with an officer's lawful orders and it appears both reasonable and feasible under the circumstances, the officer may, but is not required to, display the electrical arc (provided that a cartridge has not been loaded into the device), or the laser in a further attempt to gain compliance prior to the application of the CED. The aiming laser should never be intentionally directed into the eyes of another as it may permanently impair his/her vision.

The fact that a verbal or other warning was given or the reasons it was not given shall be documented by the officer deploying the CED in the related report.

### 309.5  USE OF THE EMDTDEVICE
The CED has limitations and restrictions requiring consideration before its use. The CED should only be used when its operator can safely approach the subject within the operational range of the device. Although the CED is generally effective in controlling most individuals, officers should be aware that the device may not achieve the intended results and be prepared with other options.

309.5.1  APPLICATION OF THE EMDTDEVICE
The CED may be used in any of the following circumstances, when the circumstances perceived by the officer at the time indicate that such application is reasonably necessary to control a person:

(a)   The subject is violent or is physically resisting.

(b)   The subject has demonstrated, by words or action, an intention to be violent or to physically resist, and reasonably appears to present the potential to harm officers, him/herself or others.

Mere flight from a pursuing officer, without other known circumstances or factors, is not good cause for the use of the CED to apprehend an individual.

309.5.2  SPECIAL DEPLOYMENT CONSIDERATIONS
The use of the CED on certain individuals should generally be avoided unless the totality of the circumstances indicates that other available options reasonably appear ineffective or would present a greater danger to the officer, the subject or others, and the officer reasonably believes that the need to control the individual outweighs the risk of using the device. This includes:

(a)   Individuals who are known to be pregnant.

(b)   Elderly individuals or obvious juveniles.

(c)   Individuals with obviously low body mass.

(d)   Individuals who are handcuffed or otherwise restrained.

(e)   Individuals who have been recently sprayed with a flammable chemical agent or who are otherwise in close proximity to any known combustible vapor or flammable material, including alcohol-based oleoresin capsicum (OC) spray.

Copyright Lexipol, LLC 2019/06/26, All Rights Reserved.
Published with permission by Weed Police Department

City000578

*Conducted Energy Device*

    (f)    Individuals whose position or activity may result in collateral injury (e.g., falls from height, operating vehicles).

Because the application of the CED in the drive-stun mode (i.e., direct contact without probes) relies primarily on pain compliance, the use of the drive-stun mode generally should be limited to supplementing the probe-mode to complete the circuit, or as a distraction technique to gain separation between officers and the subject, thereby giving officers time and distance to consider other force options or actions.

The CED shall not be used to psychologically torment, elicit statements or to punish any individual.

### 309.5.3  TARGETING CONSIDERATIONS

Reasonable efforts should be made to target lower center mass and avoid the head, neck, chest and groin. If the dynamics of a situation or officer safety do not permit the officer to limit the application of the CED probes to a precise target area, officers should monitor the condition of the subject if one or more probes strikes the head, neck, chest or groin until the subject is examined by paramedics or other medical personnel.

### 309.5.4  MULTIPLE APPLICATIONS OF THE EMDTDEVICE

Officers should apply the CED for only one standard cycle and then evaluate the situation before applying any subsequent cycles. Multiple applications of the CED against a single individual are generally not recommended and should be avoided unless the officer reasonably believes that the need to control the individual outweighs the potentially increased risk posed by multiple applications.

If the first application of the CED appears to be ineffective in gaining control of an individual, the officer should consider certain factors before additional applications of the CED, including:

    (a)    Whether the probes are making proper contact.

    (b)    Whether the individual has the ability and has been given a reasonable opportunity to comply.

    (c)    Whether verbal commands, other options or tactics may be more effective.

Officers should generally not intentionally apply more than one CED at a time against a single subject.

### 309.5.5  ACTIONS FOLLOWING DEPLOYMENTS

Officers shall notify a supervisor of all CED discharges. Confetti tags should be collected and the expended cartridge, along with both probes and wire, should be submitted into evidence. The cartridge serial number should be noted and documented on the evidence paperwork. The evidence packaging should be marked "Biohazard" if the probes penetrated the subject's skin.

Copyright Lexipol, LLC 2019/06/26, All Rights Reserved.
Published with permission by Weed Police Department.

City000579

*Conducted Energy Device*

### 309.5.6 DANGEROUS ANIMALS

The CED may be deployed against an animal as part of a plan to deal with a potentially dangerous animal, such as a dog, if the animal reasonably appears to pose an imminent threat to human safety and alternative methods are not reasonably available or would likely be ineffective.

### 309.5.7 TASER® CAM™

The TASER CAM is activated any time the safety is in the off position. The safety should be in the safe position unless the officer intends to use the device. Because the TASER CAM memory is limited, the video and audio data should be downloaded frequently and retained as required by the department records retention schedule.

### 309.5.8 OFF-DUTY CONSIDERATIONS

Officers are not authorized to carry department CEDs while off-duty.

Officers shall ensure that CEDs are secured while in their homes, vehicles or any other area under their control, in a manner that will keep the device inaccessible to others.

### 309.6 DOCUMENTATION

Officers shall document all CED discharges in the related arrest/crime report and the CED report form. Notification shall also be made to a supervisor in compliance with the Use of Force Policy. Unintentional discharges, pointing the device at a person, laser activation and arcing the device will also be documented on the report form.

### 309.6.1 EMDTDEVICE FORM

Items that shall be included in the CED report form are:

(a) The type and brand of CED and cartridge and cartridge serial number.

(b) Date, time and location of the incident.

(c) Whether any display, laser or arc deterred a subject and gained compliance.

(d) The number of CED activations, the duration of each cycle, the duration between activations, and (as best as can be determined) the duration that the subject received applications.

(e) The range at which the CED was used.

(f) The type of mode used (probe or drive-stun).

(g) Location of any probe impact.

(h) Location of contact in drive-stun mode.

(i) Description of where missed probes went.

(j) Whether medical care was provided to the subject.

(k) Whether the subject sustained any injuries.

(l) Whether any officers sustained any injuries.

Copyright Lexipol, LLC 2019/08/26, All Rights Reserved.
Published with permission by Weed Police Department

City000580

## Conducted Energy Device

The Training Manager should periodically analyze the report forms to identify trends, including deterrence and effectiveness. The Training Manager should also conduct audits of data downloads and reconcile CED report forms with recorded activations. CED information and statistics, with identifying information removed, should periodically be made available to the public.

### 309.6.2 REPORTS
The officer should include the following in the arrest/crime report:

(a) Identification of all personnel firing CEDs

(b) Identification of all witnesses

(c) Medical care provided to the subject

(d) Observations of the subject's physical and physiological actions

(e) Any known or suspected drug use, intoxication or other medical problems

### 309.7 MEDICAL TREATMENT
Consistent with local medical personnel protocols and absent extenuating circumstances, only appropriate medical personnel should remove CED probes from a person's body. Used CED probes shall be treated as a sharps biohazard, similar to a used hypodermic needle, and handled appropriately. Universal precautions should be taken.

All persons who have been struck by CED probes or who have been subjected to the electric discharge of the device shall be medically assessed prior to booking. Additionally, any such individual who falls under any of the following categories should, as soon as practicable, be examined by paramedics or other qualified medical personnel:

(a) The person is suspected of being under the influence of controlled substances and/or alcohol.

(b) The person may be pregnant.

(c) The person reasonably appears to be in need of medical attention.

(d) The CED probes are lodged in a sensitive area (e.g., groin, female breast, head, face, neck).

(e) The person requests medical treatment.

Any individual exhibiting signs of distress or who is exposed to multiple or prolonged applications (i.e., more than 15 seconds) shall be transported to a medical facility for examination or medically evaluated prior to booking. If any individual refuses medical attention, such a refusal should be witnessed by another officer and/or medical personnel and shall be fully documented in related reports. If an audio recording is made of the contact or an interview with the individual, any refusal should be included, if possible.

The transporting officer shall inform any person providing medical care or receiving custody that the individual has been subjected to the application of the CED.

*Conducted Energy Device*

## 309.8 SUPERVISOR RESPONSIBILITIES

When possible, supervisors should respond to calls when they reasonably believe there is a likelihood the CED may be used. A supervisor should respond to all incidents where the CED was activated.

A supervisor should review each incident where a person has been exposed to an activation of the CED. The device's onboard memory should be downloaded through the data port by a supervisor or Rangemaster and saved with the related arrest/crime report. Photographs of probe sites should be taken and witnesses interviewed.

## 309.9 TRAINING

Personnel who are authorized to carry the CED shall be permitted to do so only after successfully completing the initial department-approved training. Any personnel who have not carried the CED as a part of their assignment for a period of six months or more shall be recertified by a department-approved CED instructor prior to again carrying or using the device.

Proficiency training for personnel who have been issued CEDs should occur every year. A reassessment of an officer's knowledge and/or practical skill may be required at any time if deemed appropriate by the Training Manager. All training and proficiency for CEDs will be documented in the officer's training file.

Command staff, supervisors and investigators should receive CED training as appropriate for the investigations they conduct and review.

Officers who do not carry CEDs should receive training that is sufficient to familiarize them with the device and with working with officers who use the device.

The Training Manager is responsible for ensuring that all members who carry CEDs have received initial and annual proficiency training. Periodic audits should be used for verification.

Application of CEDs during training could result in injury to personnel and should not be mandatory for certification.

The Training Manager should ensure that all training includes:

    (a)    A review of this policy.

    (b)    A review of the Use of Force Policy.

    (c)    Performing weak-hand draws or cross-draws to reduce the possibility of unintentionally drawing and firing a firearm.

    (d)    Target area considerations, to include techniques or options to reduce the unintentional application of probes near the head, neck, chest and groin.

    (e)    Handcuffing a subject during the application of the CED and transitioning to other force options.

    (f)    De-escalation techniques.

Copyright Lexipol, LLC 2019/06/26, All Rights Reserved.
Published with permission by Weed Police Department

City000582



**Policy**
**340**

**Weed Police Department**
Weed PD Policy Manual

**CSR 7317**
**4**
**J. Gale - 2-6-23**

# Standards of Conduct

## 340.1  PURPOSE AND SCOPE

This policy establishes standards of conduct that are consistent with the values and mission of the Weed Police Department and are expected of all department members. The standards contained in this policy are not intended to be an exhaustive list of requirements and prohibitions but they do identify many of the important matters concerning conduct. In addition to the provisions of this policy, members are subject to all other provisions contained in this manual, as well as any additional guidance on conduct that may be disseminated by this department or a member's supervisors.

## 340.2  POLICY

The continued employment or appointment of every member of the Weed Police Department shall be based on conduct that reasonably conforms to the guidelines set forth herein. Failure to meet the guidelines set forth in this policy, whether on- or off-duty, may be cause for disciplinary action.

## 340.3  DIRECTIVES AND ORDERS

Members shall comply with lawful directives and orders from any department supervisor or person in a position of authority, absent a reasonable and bona fide justification.

### 340.3.1  UNLAWFUL OR CONFLICTING ORDERS

Supervisors shall not knowingly issue orders or directives that, if carried out, would result in a violation of any law or department policy. Supervisors should not issue orders that conflict with any previous order without making reasonable clarification that the new order is intended to countermand the earlier order.

No member is required to obey any order that appears to be in direct conflict with any federal law, state law or local ordinance. Following a known unlawful order is not a defense and does not relieve the member from criminal or civil prosecution or administrative discipline. If the legality of an order is in doubt, the affected member shall ask the issuing supervisor to clarify the order or shall confer with a higher authority. The responsibility for refusal to obey rests with the member, who shall subsequently be required to justify the refusal.

Unless it would jeopardize the safety of any individual, members who are presented with a lawful order that is in conflict with a previous lawful order, department policy or other directive shall respectfully inform the issuing supervisor of the conflict. The issuing supervisor is responsible for either resolving the conflict or clarifying that the lawful order is intended to countermand the previous lawful order or directive, in which case the member is obliged to comply. Members who are compelled to follow a conflicting lawful order after having given the issuing supervisor the opportunity to correct the conflict, will not be held accountable for disobedience of the lawful order or directive that was initially issued.

Copyright Lexipol, LLC 2019/06/26, All Rights Reserved.
Published with permission by Weed Police Department

City000589

*Standards of Conduct*

The person countermanding the original order shall notify, in writing, the person issuing the original order, indicating the action taken and the reason.

### 340.3.2 SUPERVISOR RESPONSIBILITIES

Supervisors and managers are required to follow all policies and procedures and may be subject to discipline for:

    (a)    Failure to be reasonably aware of the performance of their subordinates or to provide appropriate guidance and control.

    (b)    Failure to promptly and fully report any known misconduct of a member to his/her immediate supervisor or to document such misconduct appropriately or as required by policy.

    (c)    Directing a subordinate to violate a policy or directive, acquiesce to such a violation, or are indifferent to any such violation by a subordinate.

    (d)    The unequal or disparate exercise of authority on the part of a supervisor toward any member for malicious or other improper purpose.

### 340.4 GENERAL STANDARDS

Members shall conduct themselves, whether on- or off-duty, in accordance with the United States and California Constitutions and all applicable laws, ordinances and rules enacted or established pursuant to legal authority.

Members shall familiarize themselves with policies and procedures and are responsible for compliance with each. Members should seek clarification and guidance from supervisors in the event of any perceived ambiguity or uncertainty.

Discipline may be initiated for any good cause. It is not mandatory that a specific policy or rule violation be cited to sustain discipline. This policy is not intended to cover every possible type of misconduct.

### 340.5 CAUSES FOR DISCIPLINE

The following are illustrative of causes for disciplinary action. This list is not intended to cover every possible type of misconduct and does not preclude the recommendation of disciplinary action for violation of other rules, standards, ethics and specific action or inaction that is detrimental to efficient department service:

### 340.5.1 LAWS, RULES AND ORDERS

    (a)    Violation of, or ordering or instructing a subordinate to violate any policy, procedure, rule, order, directive, requirement or failure to follow instructions contained in department or City manuals.

    (b)    Disobedience of any legal directive or order issued by any department member of a higher rank.

    (c)    Violation of federal, state, local or administrative laws, rules or regulations.

Copyright Lexipol, LLC 2019/05/29, All Rights Reserved.
Published with permission by Weed Police Department

City000590

## 340.5.2 ETHICS

(a) Using or disclosing one's status as a member of the Weed Police Department in any way that could reasonably be perceived as an attempt to gain influence or authority for non-department business or activity.

(b) The wrongful or unlawful exercise of authority on the part of any member for malicious purpose, personal gain, willful deceit or any other improper purpose.

(c) The receipt or acceptance of a reward, fee or gift from any person for service incident to the performance of the member's duties (lawful subpoena fees and authorized work permits excepted).

(d) Acceptance of fees, gifts or money contrary to the rules of this department and/or laws of the state.

(e) Offer or acceptance of a bribe or gratuity.

(f) Misappropriation or misuse of public funds, property, personnel or services.

(g) Any other failure to abide by the standards of ethical conduct.

## 340.5.3 DISCRIMINATION, OPPRESSION OR FAVORITISM

Discriminating against, oppressing or providing favoritism to any person because of age, race, color, creed, religion, sex, sexual orientation, gender identity or expression, national origin, ancestry, marital status, physical or mental disability, medical condition or other classification protected by law, or intentionally denying or impeding another in the exercise or enjoyment of any right, privilege, power or immunity, knowing the conduct is unlawful.

## 340.5.4 RELATIONSHIPS

(a) Unwelcome solicitation of a personal or sexual relationship while on-duty or through the use of one's official capacity.

(b) Engaging in on-duty sexual activity including, but not limited to, sexual intercourse, excessive displays of public affection or other sexual contact.

(c) Establishing or maintaining an inappropriate personal or financial relationship, as a result of an investigation, with a known victim, witness, suspect or defendant while a case is being investigated or prosecuted, or as a direct result of any official contact.

(d) Associating with or joining a criminal gang, organized crime and/or criminal syndicate when the member knows or reasonably should know of the criminal nature of the organization. This includes any organization involved in a definable criminal activity or enterprise, except as specifically directed and authorized by this department.

(e) Associating on a personal, rather than official basis with persons who demonstrate recurring involvement in serious violations of state or federal laws after the member knows, or reasonably should know of such criminal activities, except as specifically directed and authorized by this department.

Copyright Lexipol, LLC 2019/06/26, All Rights Reserved.
Published with permission by Weed Police Department

City000591

**Weed Police Department**

Weed PD Policy Manual

*Standards of Conduct*

## 340.5.5 ATTENDANCE

(a) Leaving the job to which the member is assigned during duty hours without reasonable excuse and proper permission and approval.

(b) Unexcused or unauthorized absence or tardiness.

(c) Excessive absenteeism or abuse of leave privileges.

(d) Failure to report to work or to place of assignment at time specified and fully prepared to perform duties without reasonable excuse.

## 340.5.6 UNAUTHORIZED ACCESS, DISCLOSURE OR USE

(a) Unauthorized and inappropriate intentional release of confidential or protected information, materials, data, forms or reports obtained as a result of the member's position with this department.

 1. Members of this department shall not disclose the name, address or image of any victim of human trafficking except as authorized by law (Penal Code § 293).

(b) Disclosing to any unauthorized person any active investigation information.

(c) The use of any information, photograph, video or other recording obtained or accessed as a result of employment or appointment to this department for personal or financial gain or without the express authorization of the Chief of Police or the authorized designee.

(d) Loaning, selling, allowing unauthorized use, giving away or appropriating any Weed Police Department badge, uniform, identification card or department property for personal use, personal gain or any other improper or unauthorized use or purpose.

(e) Using department resources in association with any portion of an independent civil action. These resources include, but are not limited to, personnel, vehicles, equipment and non-subpoenaed records.

## 340.5.7 EFFICIENCY

(a) Neglect of duty.

(b) Unsatisfactory work performance including, but not limited to, failure, incompetence, inefficiency or delay in performing and/or carrying out proper orders, work assignments or the instructions of supervisors without a reasonable and bona fide excuse.

(c) Concealing, attempting to conceal, removing or destroying defective or incompetent work.

(d) Unauthorized sleeping during on-duty time or assignments.

(e) Failure to notify the Department within 24 hours of any change in residence address, contact telephone numbers or marital status.

Copyright Lexipol, LLC 2019/05/05, All Rights Reserved
Published with permission by Weed Police Department

City000532

**Weed Police Department**

Weed PD Policy Manual

## 340.5.8  PERFORMANCE

(a)  Failure to disclose or misrepresenting material facts, or making any false or misleading statement on any application, examination form, or other official document, report or form, or during the course of any work-related investigation.

(b)  The falsification of any work-related records, making misleading entries or statements with the intent to deceive or the willful and unauthorized removal, alteration, destruction and/or mutilation of any department record, public record, book, paper or document.

(c)  Failure to participate in, or giving false or misleading statements, or misrepresenting or omitting material information to a supervisor or other person in a position of authority, in connection with any investigation or in the reporting of any department-related business.

(d)  Being untruthful or knowingly making false, misleading or malicious statements that are reasonably calculated to harm the reputation, authority or official standing of this department or its members.

(e)  Disparaging remarks or conduct concerning duly constituted authority to the extent that such conduct disrupts the efficiency of this department or subverts the good order, efficiency and discipline of this department or that would tend to discredit any of its members.

(f)  Unlawful gambling or unlawful betting at any time or any place. Legal gambling or betting under any of the following conditions:

1.  While on department premises.

2.  At any work site, while on-duty or while in uniform, or while using any department equipment or system.

3.  Gambling activity undertaken as part of an officer official duties and with the express knowledge and permission of a direct supervisor is exempt from this prohibition.

(g)  Improper political activity including:

1.  Unauthorized attendance while on-duty at official legislative or political sessions.

2.  Solicitations, speeches or distribution of campaign literature for or against any political candidate or position while on-duty or, on department property  except as expressly authorized by City policy, the memorandum of understanding, or the Chief of Police.

(h)  Engaging in political activities during assigned working hours except as expressly authorized by City policy, the memorandum of understanding, or the Chief of Police.

(i)  Any act on- or off-duty that brings discredit to this department.

## 340.5.9  CONDUCT

(a)  Failure of any member to promptly and fully report activities on his/her part or the part of any other member where such activities resulted in contact with any other law

Copyright Lexipol, LLC 2019/2025, All Rights Reserved.
Published with permission by Weed Police Department

City0005293

## Standards of Conduct

    enforcement agency or that may result in criminal prosecution or discipline under this policy.

(b)  Unreasonable and unwarranted force to a person encountered or a person under arrest.

(c)  Exceeding lawful peace officer powers by unreasonable, unlawful or excessive conduct.

(d)  Unauthorized or unlawful fighting, threatening or attempting to inflict unlawful bodily harm on another.

(e)  Engaging in horseplay that reasonably could result in injury or property damage.

(f)  Discourteous, disrespectful or discriminatory treatment of any member of the public or any member of this department or the City.

(g)  Use of obscene, indecent, profane or derogatory language while on-duty or in uniform.

(h)  Criminal, dishonest, or disgraceful conduct, whether on- or off-duty, that adversely affects the member's relationship with this department.

(i)  Unauthorized possession of, loss of, or damage to department property or the property of others, or endangering it through carelessness or maliciousness.

(j)  Attempted or actual theft of department property; misappropriation or misuse of public funds, property, personnel or the services or property of others; unauthorized removal or possession of department property or the property of another person.

(k)  Activity that is incompatible with a member's conditions of employment or appointment as established by law or that violates a provision of any memorandum of understanding or contract to include fraud in securing the appointment or hire.

(l)  Initiating any civil action for recovery of any damages or injuries incurred in the course and scope of employment or appointment without first notifying the Chief of Police of such action.

(m)  Any other on- or off-duty conduct which any member knows or reasonably should know is unbecoming a member of this department, is contrary to good order, efficiency or morale, or tends to reflect unfavorably upon this department or its members.

### 340.5.10   SAFETY

(a)  Failure to observe or violating department safety standards or safe working practices.

(b)  Failure to maintain current licenses or certifications required for the assignment or position (e.g., driver license, first aid).

(c)  Failure to maintain good physical condition sufficient to adequately and safely perform law enforcement duties.

(d)  Unsafe firearm or other dangerous weapon handling to include loading or unloading firearms in an unsafe manner, either on- or off- duty.

(e)  Carrying, while on the premises of the work place, any firearm or other lethal weapon that is not authorized by the member's appointing authority.

*Standards of Conduct*

(f)   Unsafe or improper driving habits or actions in the course of employment or appointment.

(g)   Any personal action contributing to a preventable traffic collision.

(h)   Concealing or knowingly failing to report any on-the-job or work-related accident or injury as soon as practicable but within 24 hours.

### 340.5.11   INTOXICANTS

(a)   Reporting for work or being at work while intoxicated or when the member's ability to perform assigned duties is impaired due to the use of alcohol, medication or drugs, whether legal, prescribed or illegal.

(b)   Possession or use of alcohol at any work site or while on-duty, except as authorized in the performance of an official assignment. A member who is authorized to consume alcohol is not permitted to do so to such a degree that it may impair on-duty performance.

(c)   Unauthorized possession, use of, or attempting to bring a controlled substance, illegal drug or non-prescribed medication to any work site.

Copyright Lexipol, LLC 2018/05/29. All Rights Reserved.
Published with permission by Weed Police Department

City000595

**EXHIBIT**
5

Policy
**466**

**Weed Police Department**
Weed PD Policy Manual

CSR 7317
**5**
J. Gale - 2-6-23

# Crisis Intervention Incidents

## 466.1  PURPOSE AND SCOPE
This policy provides guidelines for interacting with those who may be experiencing a mental health or emotional crisis. Interaction with such individuals has the potential for miscommunication and violence. It often requires an officer to make difficult judgments about a person's mental state and intent in order to effectively and legally interact with the individual.

### 466.1.1  DEFINITIONS
Definitions related to this policy include:

**Person in crisis** - A person whose level of distress or mental health symptoms have exceeded the person's internal ability to manage his/her behavior or emotions. A crisis can be precipitated by any number of things, including an increase in the symptoms of mental illness despite treatment compliance; non-compliance with treatment, including a failure to take prescribed medications appropriately; or any other circumstance or event that causes the person to engage in erratic, disruptive or dangerous behavior that may be accompanied by impaired judgment.

## 466.2  POLICY
The Weed Police Department is committed to providing a consistently high level of service to all members of the community and recognizes that persons in crisis may benefit from intervention. The Department will collaborate, where feasible, with mental health professionals to develop an overall intervention strategy to guide its members' interactions with those experiencing a mental health crisis. This is to ensure equitable and safe treatment of all involved.

## 466.3  SIGNS
Members should be alert to any of the following possible signs of mental health issues or crises:

(a)   A known history of mental illness

(b)   Threats of or attempted suicide

(c)   Loss of memory

(d)   Incoherence, disorientation or slow response

(e)   Delusions, hallucinations, perceptions unrelated to reality or grandiose ideas

(f)   Depression, pronounced feelings of hopelessness or uselessness, extreme sadness or guilt

(g)   Social withdrawal

(h)   Manic or impulsive behavior, extreme agitation, lack of control

(i)   Lack of fear

(j)   Anxiety, aggression, rigidity, inflexibility or paranoia

Copyright Lexipol, LLC 2019/06/26, All Rights Reserved.
Published with permission by Weed Police Department

City000583

*Crisis Intervention Incidents*

Members should be aware that this list is not exhaustive. The presence or absence of any of these should not be treated as proof of the presence or absence of a mental health issue or crisis.

## 466.4   COORDINATION WITH MENTAL HEALTH PROFESSIONALS

The Chief of Police should designate an appropriate Division Commander to collaborate with mental health professionals to develop an education and response protocol. It should include a list of community resources, to guide department interaction with those who may be suffering from mental illness or who appear to be in a mental health crisis.

## 466.5   FIRST RESPONDERS

Safety is a priority for first responders. It is important to recognize that individuals under the influence of alcohol, drugs or both may exhibit symptoms that are similar to those of a person in a mental health crisis. These individuals may still present a serious threat to officers; such a threat should be addressed with reasonable tactics. Nothing in this policy shall be construed to limit an officer's authority to use reasonable force when interacting with a person in crisis.

Officers are reminded that mental health issues, mental health crises and unusual behavior alone are not criminal offenses. Individuals may benefit from treatment as opposed to incarceration.

An officer responding to a call involving a person in crisis should:

   (a)   Promptly assess the situation independent of reported information and make a preliminary determination regarding whether a mental health crisis may be a factor.

   (b)   Request available backup officers and specialized resources as deemed necessary and, if it is reasonably believed that the person is in a crisis situation, use conflict resolution and de-escalation techniques to stabilize the incident as appropriate.

   (c)   If feasible, and without compromising safety, turn off flashing lights, bright lights or sirens.

   (d)   Attempt to determine if weapons are present or available.

       1.   Prior to making contact, and whenever possible and reasonable, conduct a search of the Department of Justice Automated Firearms System via the California Law Enforcement Telecommunications System (CLETS) to determine whether the person is the registered owner of a firearm (Penal Code § 11106.4).

   (e)   Take into account the person's mental and emotional state and potential inability to understand commands or to appreciate the consequences of his/her action or inaction, as perceived by the officer.

   (f)   Secure the scene and clear the immediate area as necessary.

   (g)   Employ tactics to preserve the safety of all participants.

   (h)   Determine the nature of any crime.

   (i)   Request a supervisor, as warranted.

   (j)   Evaluate any available information that might assist in determining cause or motivation for the person's actions or stated intentions.

City000584

## Crisis Intervention Incidents

(k)   If circumstances reasonably permit, consider and employ alternatives to force.

### 466.6   DE-ESCALATION

Officers should consider that taking no action or passively monitoring the situation may be the most reasonable response to a mental health crisis.

Once it is determined that a situation is a mental health crisis and immediate safety concerns have been addressed, responding members should be aware of the following considerations and should generally:

- Evaluate safety conditions.

- Introduce themselves and attempt to obtain the person's name.

- Be patient, polite, calm, courteous and avoid overreacting.

- Speak and move slowly and in a non-threatening manner.

- Moderate the level of direct eye contact.

- Remove distractions or disruptive people from the area.

- Demonstrate active listening skills (e.g., summarize the person's verbal communication).

- Provide for sufficient avenues of retreat or escape should the situation become volatile.

Responding officers generally should not:

- Use stances or tactics that can be interpreted as aggressive.

- Allow others to interrupt or engage the person.

- Corner a person who is not believed to be armed, violent or suicidal.

- Argue, speak with a raised voice or use threats to obtain compliance.

### 466.7   INCIDENT ORIENTATION

When responding to an incident that may involve mental illness or a mental health crisis, the officer should request that the Public Safety Dispatcher provide critical information as it becomes available. This includes:

(a)   Whether the person relies on drugs or medication, or may have failed to take his/her medication.

(b)   Whether there have been prior incidents, suicide threats/attempts, and whether there has been previous police response.

(c)   Contact information for a treating physician or mental health professional.

Additional resources and a supervisor should be requested as warranted.

## 466.8 SUPERVISOR RESPONSIBILITIES

A supervisor should respond to the scene of any interaction with a person in crisis. Responding supervisors should:

(a)  Attempt to secure appropriate and sufficient resources.

(b)  Closely monitor any use of force, including the use of restraints, and ensure that those subjected to the use of force are provided with timely access to medical care (see the Handcuffing and Restraints Policy).

(c)  Consider strategic disengagement. Absent an imminent threat to the public and, as circumstances dictate, this may include removing or reducing law enforcement resources or engaging in passive monitoring.

(d)  Ensure that all reports are completed and that incident documentation uses appropriate terminology and language.

(e)  Conduct an after-action tactical and operational debriefing, and prepare an after-action evaluation of the incident to be forwarded to the Division Commander.

Evaluate whether a critical incident stress management debriefing for involved members is warranted.

## 466.9 INCIDENT REPORTING

Members engaging in any oral or written communication associated with a mental health crisis should be mindful of the sensitive nature of such communications and should exercise appropriate discretion when referring to or describing persons and circumstances.

Members having contact with a person in crisis should keep related information confidential, except to the extent that revealing information is necessary to conform to department reporting procedures or other official mental health or medical proceedings.

### 466.9.1 DIVERSION

Individuals who are not being arrested should be processed in accordance with the Mental Illness Commitments Policy.

## 466.10 NON-SWORN INTERACTION WITH PEOPLE IN CRISIS

Non-sworn members may be required to interact with persons in crisis in an administrative capacity, such as dispatching, records request, and animal control issues.

(a)  Members should treat all individuals equally and with dignity and respect.

(b)  If a member believes that he/she is interacting with a person in crisis, he/she should proceed patiently and in a calm manner.

(c)  Members should be aware and understand that the person may make unusual or bizarre claims or requests.

If a person's behavior makes the member feel unsafe, if the person is or becomes disruptive or violent, or if the person acts in such a manner as to cause the member to believe that the person

City000586

**Weed Police Department**

Weed PD Policy Manual

may be harmful to him/herself or others, an officer should be promptly summoned to provide assistance.

### 466.11 EVALUATION

The Division Commander designated to coordinate the crisis intervention strategy for this department should ensure that a thorough review and analysis of the department response to these incidents is conducted annually. The report will not include identifying information pertaining to any involved individuals, officers or incidents and will be submitted to the Chief of Police through the chain of command.

### 466.12 TRAINING

In coordination with the mental health community and appropriate stakeholders, the Department will develop and provide comprehensive education and training to all department members to enable them to effectively interact with persons in crisis.

This department will endeavor to provide Peace Officer Standards and Training (POST)-approved advanced officer training on interaction with persons with mental disabilities, welfare checks and crisis intervention (Penal Code § 11106.4; Penal Code § 13515.25; Penal Code § 13515.27; Penal Code § 13515.30).

Copyright Lexipol, LLC 2019/06/26, All Rights Reserved.
Published with permission by Weed Police Department

City000587

CSR 7317
J. Gale - 2-6-23

**⚡ TASER**

**TASER Handheld CEW
Warnings, Instructions, and
Information: Law Enforcement**



⚠️ **WARNING** **Fire and Explosion Hazard**. CEW use can result in a fire or explosion when flammable gases, fumes, vapors, liquids or materials are present. Use of a CEW in presence of fire or explosion hazard could result in death or serious injury. When possible, avoid using a CEW in known flammable hazard conditions.

A CEW can ignite explosive or flammable clothing or materials, liquids, fumes, gases or vapors (e.g., gasoline, vapor or gas found in sewer lines or methamphetamine labs, butane-type lighters, flammable hair gels or some self-defense sprays). Do not knowingly use a CEW in the presence of any explosive or flammable substance unless the situation justifies an increased risk.

## SAFETY INFORMATION: GENERAL PRECAUTIONS

⚠️ **WARNING** **Unintentional CEW Deployment or Discharge Hazard.** Unintentional CEW activation or unexpected cartridge discharge could result in death or serious injury to the user, subject or others.

To reduce the risk of unintentional deployment or discharge:

1. **Avoid static electricity.** Keep cartridge away from sources of static electricity. Static electricity can cause a CEW or X26, X26P, or M26 cartridge to discharge unexpectedly, possibly resulting in serious injury.

2. **Keep body parts away from front of CEW or cartridge.** Always keep your hands and body parts away from the front of the CEW and cartridge. If the CEW discharges unexpectedly, you could be injured.

3. **Avoid electronic equipment interference.** Electronic transmission equipment close to a CEW could interfere with the proper CEW operation and cause the CEW to deploy or discharge. Keep the CEW at least several inches away from other electronic equipment. Place the CEW safety switch in the down (SAFE) position whenever it is near electronic equipment, including transmitting radios and cell phones. Remember to place the CEW safety switch in the up (ARMED) position before use.

4. **Avoid dropping CEW or cartridge.** If a CEW or cartridge is dropped or damaged, it may unintentionally deploy or discharge, become inoperable, or fail to function making it unsafe for continued use. If a CEW or cartridge has been dropped or damaged refer to the procedure recommended in the current version of the TASER Training materials.

## SAFETY INFORMATION: MAINTENANCE

⚠️ **WARNING** Failure to maintain a CEW as instructed may cause the CEW to malfunction or fail to function optimally, increasing the risk of death or serious injury. Follow recommended maintenance procedures.

To reduce these risks:

1. **Safely perform spark (function) test before each shift.** Testing helps verify that the CEW is functioning properly. See the current version of the TASER Training materials for further information on testing.

2. **Avoid using a damaged CEW or cartridge.** Do not use a cartridge with a missing blast door unless facing an immediate threat. CEW repair or modification by an unauthorized person may cause the CEW to fire or malfunction, will void the warranty, and may put the user or other person at risk of death or serious injury. Cartridges with blast doors that have been repaired should only be used for training and not for field use.

3. **Update CEW software.** Some CEWs have updateable software. Current CEW software may be obtained by contacting Axon's Customer Service Department or following instructions at www.evidence.com or www.axon.com.

4. **Use only Axon-approved components, batteries, accessories and cartridges.** The CEW is a sophisticated electronic system. For proper function, use only Axon-approved components, batteries, accessories and cartridges with your CEW. Use of anything other than Axon-approved components,

M26, TASER CAM, Smart Cartridge, X2, X3, X26, X26P, TASER, TASER 7, and ⚡ are trademarks of Axon Enterprise, Inc., some of which are registered in the US and other countries. All rights reserved. © 2018 Axon Enterprise, Inc.

**EXHIBIT**

**6**

City000378

# TASER 7

AXON Academy I TASER Training

TASER 7 Conducted Energy Weapon (CEW) – User Course

Version 21 - Effective January 14, 2019

# Key Safety Guidelines

1. Avoid Dangerous Falls

2. Avoid Flammables & Explosives

3. Use Preferred Target Zones

4. Restrain Fast – Avoid Prolonged Exposures

5. Use Caution with Sensitive Populations

City000418
© 2019 Axon Enterprise, Inc.



# RECAP: Key Safety Guidelines

1. Avoid Dangerous Falls

2. Avoid Flammables & Explosives

3. Use Preferred Target Zones

4. Restrain Fast – Avoid Prolonged Exposures

5. Use Caution with Sensitive Populations

City000431
© 2019 Axon Enterprises, Inc.

**BEST OUTCOME:**

**De-Escalate**

G. S. PARKER

© 2019 Axon Enterprises, Inc.

City000391

# Flammability

- TASER CEW can ignite explosive materials, liquids, fumes, gases, vapors, or other flammable substances
(Gasoline, sewer gases, meth labs, flammable personal defense sprays, hair gels, butane lighters, etc.)

- Some propulsion agents (carriers) are flammable

- Do not deploy a CEW in conjunction with flammable personal defense sprays

**CAUTION**   Test to ensure your personal defense spray is not flammable

City000466
© 2019 Axon Enterprises, Inc.

EXHIBIT

8

## AXON Academy | TASER TRAINING

**TASER Training Version 21**

# TASER 7® CEW User Applicant Certification Form
# Annual Recertification

### PRINT LEGIBLY AND CLEARLY PLEASE!

**CSR 7317**

**8**

**J. Gale - 2-6-23**

Name: _JOHN GALE_          Agency: _WEED PD_
Email: _gale@ci.weed.ca.us_   Phone: _530-859-5014_
Address/State/Zip: _550 MAIN ST., WEED, CA 96094_

By signing below, I hereby acknowledge receipt of TASER's Product Warnings. I understand that I must Read and understand these warnings PRIOR to participating in any hands-on CEW drills required by the certification Course.

Student Signature: *(Required)* _[signature]_

## TASER Instructor Use Only

Instructor is required to verify that applicant has successfully completed all CEW User Certification/Recertification requirements.

_✓_ Review current Annual User Recertification Course PowerPoint Presentation(s) & training bulletins (if applicable)

_✓_ Demonstrate safe handling of CEW to include; proper finger positioning, aiming and deploying at preferred target area and while loading / unloading

_✓_ Deploy a minimum of 4 live cartridges placing both probes in preferred target zones

_✓_ Successfully complete scenarios using HALT System deploying a minimum of 4 HALT Cartridges

_✓_ Perform a proper warning ARC

_✓_ Utilize the ARC switch to re-energize deployed probes

I hereby certify that the above-named applicant has satisfactorily completed all components of the TASER End-User Certification, or Annual Re-Certification, training program and is hereby certified as a user of this system for one year.

Attested by Certifying Instructor: _SHAWN JOLS_     _[signature]_
                                    (Print Name)        (Signature)

Date: _5/19/9_          Location of Training: _WEED PD_

### Do not Send this Form to TASER Training
### Keep this Form for Department Training Records

PowerPoint is a trademark of Microsoft Corporation.

Axon, M26, X2, X3, X26, and X26P, TASER, and the "Bolt within Circle Logo" are trademarks of Axon Enterprise, some of which are registered in the US and other countries. For more information, visit www.axon.com/legal. All rights reserved. © 2017 Axon Enterprise, Inc.

USER0001(0)(1)



# AXON Academy

## CERTIFICATE OF COMPLETION

AWARDED TO

John Gale

OF WEED PD

IN RECOGNITION OF YOUR SUCCESSFUL COMPLETION OF

## TASER 7 CEW V.21 USER CERTIFICATION COURSE

TRAINING CERTIFICATE

ISSUED May 19, 2019



AXON Academy | TASER TRAINING

[TASER Training Version 21]

# TASER® CEW (X26P/X2) User Transition Course
## Applicant Certification Form

### PRINT LEGIBLY AND CLEARLY PLEASE!

**Which CEW were you certified on (Check all that apply):**   ☐ X26P   ☒ X2

Name: _JOHN GALE_

Email: _GALE@CI.WEED.CA.US_

Address/State/Zip: _550 MAIN ST WEED, CA_

Agency: _WEED PD_

Phone: _530-939-5000_

## TASER Instructor Use Only

Instructor is required to verify that applicant has successfully completed all X26P/X2 CEW Transition Course requirements. **This course alone does NOT fulfill the requirements for annual recertification**

✓ Currently certified as a TASER CEW User

✓ Review current Annual User Recertification Course PowerPoint Presentation(s) & training bulletins (if applicable)

✓ Demonstrate safe handling of CEW to include:
    proper finger positioning, aiming and deploying at preferred target area and while loading / unloading

✓ Perform a proper warning ARC

✓ (X2 & X3) Utilize the ARC switch to re-energize deployed probes

I hereby certify that the above named applicant has satisfactorily completed all components of the TASER Transition End-User Certification and is hereby certified as a user of this system for one year.

Attested by Certifying Instructor: _STEVE FAHMY_   _(Signature)_
                                   (Print Name)

Date: _____   Location of Training: _WEED PD_

### Do not Send this Form to TASER Training
### Keep this Form for Department Training Records

Axon, X2, X26P, TASER, and the "Bolt within Circle Logo" are trademarks of Axon Enterprise, Inc., registered in the US and other countries. For more information, visit www.axon.com/legal. All rights reserved. © 2019 Axon Enterprise, Inc.

City000542

**WEED POLICE DEPARTMENT**

Page 1

**CAD INCIDENT REPORT**
**1910120044**

**9**
**J. Gale - 2-6-23**

10/16/2019

| Location | | Cross Streets | | City | |
|---|---|---|---|---|---|
| 180 MAIN ST | | GROVE ST/E LAKE ST | | WEED | |

| Incident Type | | Call Taker | | Dispatcher | |
|---|---|---|---|---|---|
| 911AST - 911 ASSIST CALL | | 378 | | 378 | |

| Date | Priority | Primary Unit | Beat | Fire Zone | Area | Map | Source |
|---|---|---|---|---|---|---|---|
| 10/12/2019 | 2 | L449 | 1 | | 6 | | TELEPHONE CALL |

| Caller Name | Caller Address | Caller Phone |
|---|---|---|
| LEWIN-HALL, DEVIN NATHANIEL | 180 Main Street, Weed, CA | 530-859-8228 |

| Dispositions | Weapon | Alm Level | Case Number |
|---|---|---|---|
| Report Taken | | | 19-1608 |

| Vehicles | Associated Incidents |
|---|---|
| | |

| Incident Times | | Special Circumstances | | | | |
|---|---|---|---|---|---|---|
| Received | 13:23:21 | | | | | |
| Created | 13:23:47 | Persons | Sex | DOB | Race | DL |
| Dispatched | 13:24:14 | | | | | |
| En Route | 13:24:14 | | | | | |
| On Scene | 13:24:14 | | | | | |
| Closed | 19:36:50 | | | | | |
| Rcvd-Closed | 6:13:29 | | | | | |

| Unit Times | Officers | Dispatched | Enroute | On Scene | Clear | Disp-On Scene | Enrt-On Scene | On Scene-Clear | Disp-Clear |
|---|---|---|---|---|---|---|---|---|---|
| L449 | 449 | 13:24:14 | 13:24:14 | 13:24:14 | 18:19:11 | N/A | N/A | 4:54:57 | 4:54:57 |
| C385 | 385 | 13:36:31 | 13:36:31 | 13:38:39 | 19:36:37 | 02:08 | 02:08 | 5:57:58 | 6:00:06 |
| L456 | 456 | 13:36:31 | 13:36:31 | | 13:38:48 | N/A | N/A | | 02:17 |
| V300 | 300 | 14:50:01 | 14:50:01 | 14:54:42 | 16:16:17 | 04:41 | 04:41 | 1:21:35 | 1:26:16 |
| E14 | 14 | 15:09:56 | 15:09:56 | 15:09:56 | 17:43:18 | N/A | N/A | 2:33:22 | 2:33:22 |
| S284 | 284 | 15:09:58 | 15:09:58 | 15:09:58 | 19:36:50 | N/A | N/A | 4:26:52 | 4:26:52 |
| L456 | 456 | 15:11:58 | 15:11:58 | 15:11:58 | 16:15:53 | N/A | N/A | 1:03:55 | 1:03:55 |
| L456 | 456 | 16:34:29 | 16:34:29 | 16:34:29 | 19:36:47 | N/A | N/A | 3:02:18 | 3:02:18 |
| V300 | 300 | 16:34:54 | 16:34:54 | 16:34:54 | 19:36:43 | N/A | N/A | 3:01:49 | 3:01:49 |

**Incident Comments**

**\*\*911\*\*** THAT HALL HAS DOUSED HIMSELF WITH GASOLINE AND IS GOING TO LIGHT HIMSELF ON FIRE.
LEWIN HALL ADVISED THAT HIS FATHER HAD A ROPE AROUND HIS NECK THEN DOUSED HIMSELF WITH
GASOLINE. UPON L449 ARRIVAL HALL RAN OUT THE DOOR. L449 HAD ONE AT TASER POINT AND HALL LIT
HIMSELF ON FIRE./MLM
HALL AND L449 WERE TRANSPORTED TO MERCY FOR INJURIES. SEE REPORT FOR FURTHER./JC

| TIME | # | EVENT | BY |
|---|---|---|---|
| 13:23:47 | 1 | Incident initiated at 180 Main St, Weed | 378 |
| 13:24:14 | 2 | L449 10-85. 180 Main St, Weed | 378 |
| 13:24:14 | 3 | L449 10-97. | 378 |
| 13:28:00 | 4 | L449 OUT WITH HALL | 378 |
| 13:30:21 | 5 | L449 REQUESTING EXTRA UNITS | 378 |
| 13:30:49 | 6 | C385 WILL RESPOND | 378 |
| 13:31:39 | 7 | L449 ONE ON TASER POINT | 378 |
| 13:31:51 | 8 | L449 SUBJECT ON FIRE | 378 |
| 13:36:10 | 9 | L449 ADVISED SUBJECT WITH MULTIPLE BURNS | 378 |
| 13:36:31 | 10 | C385 10-85. 180 Main St, Weed | 378 |
| 13:36:31 | 11 | L456 10-85. 180 Main St, Weed | 378 |
| 13:38:15 | 12 | C385 FIRE ON SCENE | 378 |
| 13:38:39 | 13 | C385 10-97. | 378 |
| 13:38:48 | 14 | L456 10-8. Freed | 378 |
| 13:39:17 | 15 | C385 AWAITING MEDICAL | 378 |

**EXHIBIT**
**9**

City000001

CAD Incident 1910120044 — Page 2

| TIME | # | EVENT | BY |
|------|---|-------|-----|
| 13:41:40 | 1 | C385  L449 RECEIVED BURNS AND IS  WITH S/O EN ROUTE TO MT | 378 |
| | 2 | SHASTA | |
| 13:43:19 | 3 | L449  10-85. MERCY MT SHASTA WITH BURNS | 378 |
| 13:47:52 | 4 | C385  C-4. | 378 |
| 13:48:34 | 5 | C385  MEDICAL, FIRE AND S/O ON SCENE | 378 |
| 13:49:19 | 6 | S284 ADVISED | 378 |
| 13:49:49 | 7 | C385  REQUESTING CSO FOR TRAFFIC CONTROL | 378 |
| 13:51:58 | 8 | L449  BUSY. | 378 |
| 13:54:24 | 9 | DAVIS/PUBLIC WORKS WILL RESPOND FOR TRAFFIC CONTROL | 378 |
| 13:59:45 | 10 | R136 ADVISED THAT HE LOCKED UP L449 EQUIPTMENT AND FIREARM | 378 |
| | 11 | IN SAFE AT MERCY MT SHASTA. | |
| 14:05:48 | 12 | L449  REQUESTING HIS WIFE BE NOTIFIED | 378 |
| 14:07:46 | 13 | LEFT MESSAGE WITH KATIE TO CALL WPD | 378 |
| 14:08:30 | 14 | C385  BUSY. CODE 4 | 378 |
| 14:15:21 | 15 | C385  REQUESTING V300 FOR CRIME SCENE | 378 |
| 14:23:44 | 16 | S284 REQUESTING L456 RESPOND | 378 |
| 14:24:08 | 17 | S284 REQUESTING MAJOR CRIME UNIT SUPERVISOR 10-21 HIS | 378 |
| | 18 | PERSONAL CELL | |
| 14:24:37 | 19 | S284 REQUESTING V300 FOR MERCY 5150 HOLD | 378 |
| 14:25:56 | 20 | GALE, KATIE ADVISED | 378 |
| 14:27:29 | 21 | L449  Case number 19-1608 assigned to 1910120044 | 378 |
| 14:50:01 | 22 | V300  10-85. 180 Main St, Weed | 378 |
| 14:50:19 | 23 | V300  10-85. 10-19 | 378 |
| 14:54:42 | 24 | V300  10-97. 10-19 | 378 |
| 15:04:48 | 25 | L449 ADVISED, WILL. RESPOND. | 378 |
| 15:09:56 | 26 | E14  10-85. 180 Main St, Weed | 378 |
| 15:09:56 | 27 | E14  10-97. | 378 |
| 15:09:58 | 28 | S284  10-85. 180 Main St, Weed | 378 |
| 15:09:58 | 29 | S284  10-97. | 378 |
| 15:10:23 | 30 | S284  REQUESTING SGT RANDALL CALL HIS CELL. | 378 |
| 15:11:58 | 31 | L456  10-85. 180 Main St, Weed | 378 |
| 15:11:58 | 32 | L456  10-97. | 378 |
| 15:12:07 | 33 | L456  10-85. MERCY MT SHASTA | 378 |
| 15:12:17 | 34 | V300  10-85. MERCY MT SHASTA | 378 |
| 15:15:11 | 35 | S284  10-85. MERCY MT SHASTA | 378 |
| 15:27:08 | 36 | C385  10-97. | 378 |
| 15:27:08 | 37 | E14  10-97. | 378 |
| 15:27:09 | 38 | L449  10-97. | 378 |
| 15:27:09 | 39 | L456  10-97. | 378 |
| 15:27:09 | 40 | S284  10-97. | 378 |
| 15:27:09 | 41 | V300  10-97. | 378 |
| 15:28:34 | 42 | L456  BUSY. MERCY MT SHASTA | 378 |
| 15:28:41 | 43 | V300  BUSY. MERCY MT SHASTA | 378 |
| 15:28:47 | 44 | S284  BUSY. MERCY MT SHASTA | 378 |
| 15:49:21 | 45 | S284  10-97. 10-19 | 378 |
| 16:05:18 | 46 | L456  10-85. CITY | 378 |
| 16:05:24 | 47 | V300  10-85. CITY | 378 |
| 16:15:53 | 48 | L456  10-8. CITY | 378 |
| 16:16:00 | 49 | V300  C-4. CITY | 378 |
| 16:16:17 | 50 | V300  10-8. | 378 |
| 16:34:29 | 51 | L456  10-85. 180 Main St, Weed | 450 |
| 16:34:29 | 52 | L456  10-97. | 450 |
| 16:34:54 | 53 | V300  10-85. 180 Main St, Weed | 450 |
| 16:34:54 | 54 | V300  10-97. | 450 |
| 16:35:05 | 55 | V300  ON SCENE AS CSI | 450 |
| 17:43:18 | 56 | E14  10-8. Freed | 450 |
| 18:19:11 | 57 | L449  10-8. | 450 |

CITY OF WEED POLICE DEPARTMENT CONTROLLED DOCUMENT -Duplication or reissuance controlled by law.
Released to: SGORE By: R. Auxo Date: 10/16/2019

City000002

CAD Incident 1910120044

| TIME | # | EVENT | BY |
|------|---|-------|-----|
| 18:28:53 | 1 | C385  MAIN ST IS OPEN | 450 |
| 19:19:26 | 2 | L456  10-85, 10-19 | 450 |
| 19:19:41 | 3 | C385  FIRE ON SCENE | 450 |
| 19:32:43 | 4 | L456  10-97 | 450 |
| 19:36:19 | 5 | C385  FIRE HAS CLEARED THE SCENE. | 450 |
| 19:36:37 | 6 | C385  10-8 . . Disposition RT | 450 |
| 19:36:43 | 7 | V300  10-8 . . Disposition RT | 450 |
| 19:36:47 | 8 | L456  10-8 . . Disposition RT | 450 |
| 19:36:50 | 9 | S284  10-8 | 450 |
| 19:36:51 | 10 | S284  Closed – Disposition RT | 450 |

CITY OF WEED POLICE DEPARTMENT CONTROLLED DOCUMENT - Duplication or reissuance controlled by law.
Released to: SCORE By: B. Jones Date: 10/16/2019

City000003

CSR 7317
**10**
J. Gale - 2-6-23

Date: 11/04/2019
To: Chief Nicholas
From: Sgt. Jared Klomparens
Re: Officer Gale I.A. –Allegations and Findings (Paul Hall)

**Introduction**

On 10/12/2019, I was assigned to investigate a Weed Police Department use of force incident regarding a Conducted Energy Device. The incident involved Paul Hall, DOB 02/26/1972. In the incident, Officer Gale was dispatched to 180 Main St., in the City of Weed, County of Siskiyou to investigate a report of Hall attempting to harm himself with rope and had used gasoline to try to light himself on fire. Officer Gale arrived on scene and contacted Paul. Paul had a lighter in his hand and was attempting to light himself on fire. Officer Gale used his Conducted Energy Device on Paul. Paul became engulfed in flames and ran out of the backroom where Officer Gale had contacted him.

On 11/04/2019, I completed an Administrative Investigation involving Officer Gale. I reviewed the body camera footage from Officer Gale. I interviewed Devin Lewin Hall, Jeanette Lewin, Spencer Hall, Robert Thomas Jr., and Officer Gale.

**Synopsis**

On Saturday, October 12th, 2019, Officer Gale was on patrol in the City of Weed, at approximately 1324 hours, Officer Gale was dispatched to 180 Main St. to investigate a report of male tied up in a chair with a rope around his neck and was locked in a room. As Officer Gale was responding, dispatch advised Officer Gale over the radio that the reporting party stated the male was attempting to light himself on fire with gasoline. Officer Gale advised dispatch to notify fire and to contact a supervisor. Officer Gale arrived on scene and advised dispatch that he was out with "PJ Hall." Paul Hall is known by PJ Hall to officers of the Weed Police Department, as well as members of his family. Officer Gale requested another unit at this time. Officer Gale advised dispatch that he had one at "Taser Point" and Paul had the lighter up to himself and was threatening to light it. Officer Gale then advises dispatch that Paul had lit himself on fire. This information was gathered using the radio recordings through dispatch.

I watched Officer Gale's body camera and observed the following:

Officer Gale arrived at 180 Main St., and ran past two subjects that were standing in the front doorway, who were later identified as Devin Lewin-Hall and Jeanette Hall. Officer Gale ran towards the back of the residence and contacted Paul standing in the kitchen. Paul told Officer Gale to step back and Officer Gale told him that he was not approaching him. While watching Officer Gale's body camera, I observed Paul's red shirt seemed to have some sort of fluid on it. Paul opened the door to a backroom and walked through it and shut the door behind him. Officer Gale attempted to open the door but was unsuccessful, so he jumped through an opening to the door. Officer Gale and Paul were in a smaller room together, while Officer Gale contacted Paul.

**EXHIBIT**
**10**

City000350

Officer Gale asked Paul to talk to him about what was going on and Paul replied it's not safe for him here. Officer Gale asked Paul to clarify what he meant. Paul stated that he was "about ready to go." Paul stated that he was covered in everything that he could be covered in. Officer Gale asked Paul what he meant. Paul replied, "I'm going." Paul began to become more upset and throw items inside the room, and at one point it appeared that he picked up a lighter from the corner of the room. Officer Gale advised Paul to put the lighter down. Paul then told Officer Gale that he was begging him to just go. Paul advised Officer Gale that he had "done his job and that all he was doing was putting himself in danger." Paul told Officer Gale that he was not worth it and then proceeded to break two glass windows with his forehead.

At that point Officer Gale advised Paul to place his hands behind his back and grabbed Paul's right arm and hand. Officer Gale advised Paul not to fight him and Paul kept on repeating "I never have been worth it" and stated that he was going to go up in flames. Officer Gale advised Paul to drop the lighter. Officer Gale pushed Paul up against the wall and Paul stated that Officer Gale was not going to overpower him. Officer Gale advised Paul that he was not trying to overpower him and that he was trying to get the lighter from him. Officer Gale gave Paul several commands to give him the lighter and Paul responded with "Go be safe." Paul then started to push Officer Gale away from him and stated, "I am going to light us both." Officer Gale and Paul continued to struggle for the lighter and Paul told Officer Gale that he was not trying to hurt him and that he just wanted him to go be safe and to take care of who he loves. Officer Gale advised Paul to give him the lighter and told Paul that this was not how it has to go. Paul replied with saying this is how it's going. While watching the body camera, I observed a lighter in Paul's left hand and his thumb was covering the striking mechanism. Paul stated that "Nothing was going to stop this from happening, this is happening." Officer Gale and Paul continue to fight over the lighter and Paul states, "I am going to fucking light it, I swear to God."

At this point it appears that Officer Gale pulls out his OC spray, as Paul states," I will still flick it if you spray me. I will, you know I will" Officer Gale puts the OC back and orders Paul to give him the lighter again. Paul states, "Only death will stop me." Paul states, "You are going to kill me or I am going up, one of the two." Officer Gale then backs up away from Paul and pulls out his Taser. Paul is holding the lighter in his right hand close to his chest. At this point I can hear Spencer Hall saying, "PJ don't do it, this isn't you man." Officer Gale orders Paul to drop the lighter again and tells Paul he will give him to the count of 3. Officer Gale counts to 3 and yells, "Drop the lighter" once more before deploying his Taser. Once the Taser is displayed, Officer Gale walks towards Paul in what appears to be him reaching for the lighter and Paul becomes engulfed in flames. Paul then runs out of the room and into the street, where bystanders and Officer Gale are able to extinguish the flames off of Paul. Corporal Green arrives on scene to assist. Medical Personnel arrive on scene and start treating Paul. Deputy Ortiz of the Siskiyou County Sheriff's Department placed Officer Gale into his patrol vehicle and takes him to Dignity Health in Mount Shasta due to the burns on his hands.

On Monday, 10/28/2019, at approximately 2038 hours, I spoke to Devin Lewin-Hall, DOB 07/08/1997 at the Weed Police Department. I asked Devin to explain to me the events that occurred on and leading up to 10/12/2019. The following is what Devin stated:

City000351

Devin stated that Paul had not been staying at the residence but came the night before to apologize to them and explain what he had learned about the previous charges Paul had. Devin stated that Paul had recently met with his attorney. Devin stated that Paul stayed the night at the residence, and they woke up and everything was fine, and Paul was making jokes. Devin stated that Paul then became quiet and went downstairs and he heard the screw gun being used. Devin stated that Paul was screwing the doors shut. Devin stated that Paul came back upstairs and grabbed a bottle of tequila and went back downstairs. Devin stated that his mom and him had blocked Paul's number so Paul was using his little brother to communicate to them. Devin stated that Paul was asking them to come downstairs so they could talk.

Devin stated that he walked downstairs and observed Paul sitting in a green lawn chair and was tied up with an extension cord. Devin stated that the extension cord was wrapped around his waist and the arm openings of the chair. He stated that the extension cord went up and around Paul's neck. Devin stated that he ran upstairs to grab a bat to break the glass of the door so he could enter the residence. Devin told me that as he was coming downstairs his mom had already entered the residence and opened the front door so he could enter. Devin stated that when he entered the front door he observed Paul sitting in the chair and he was now pouring gasoline over his head from a gasoline can/ Devin stated that is when he told dispatch that Paul was trying to light himself on fire. Devin then stated that he grabbed his mother's phone while he was speaking to dispatch and called Spencer to come help him. Devin stated that he started talking to Paul, to try to get him to calm down. He stated that Paul picked up the gasoline can again and started to pour gas on himself again and gets on Devin's feet. Devin stated that he then walked towards Paul and told him go ahead and do it if that's what you're going to do it. Devin stated that he was trying to call Paul's bluff.

Devin stated that Paul started to untie himself and get out of the chair and then Devin walked outside to look for the police and for fire personnel. Devin stated that Officer Gale arrived on scene and ran inside the house. He stated that Paul had already untied himself and ran to the rear of the residence. Devin stated that he then walked to the rear of the residence and overheard Officer Gale tell Paul to drop the lighter. Devin stated that he observed Paul in the corner of the room with his back towards the wall. He stated that he observed Officer Gale grabbing Paul's wrists with Officer Gale's shoulder pressed up against Paul's chest keeping him pressed into the wall and telling Paul to drop the lighter. Devin stated that Paul told Officer Gale to shoot him or he was going to light himself up "or something to that manner." Devin stated that he was trying to talk to Paul and tell him that it was okay. He stated that he observed Officer Gale take a step back from Paul and observed Spencer walking into the residence. Devin stated that at one point he said, "Just shoot him" and then Devin started walking towards the front of the residence. He stated that he heard a "zapping" noise and heard Spencer yell, "He's on fucking fire." Devin then stated that Paul ran outside, and they were able to extinguish the flames off of Paul.

I asked Devin if he ever heard Paul threaten to light Officer Gale on fire or threaten Officer Gale at any time. Devin stated that he did not. I asked Devin if observed Officer Gale and Paul fighting any other time other than what he described. He stated that he did not.

I questioned Devin about the events leading up to the incident again. Devin stated that Paul stated that he received a text message from Jeanette's boyfriend and just kinds snapped. Devin

stated that on Thursday, 10/10/2019 Paul was beating on the tenant's door with a machete. He stated that it looked like a scene from "The Shining." Devin stated that Paul was "severely high when all of this went down." Devin clarified and stated that he was high on meth. Devin stated that Paul being high was a big factor on why Paul was so far off the deep end. Devin stated that Paul needed five times the amount of morphine to put him to sleep because of how high Paul was.

On Tuesday, 10/29/2019, at approximately 1933 hours, I spoke to Jeanette Lewin, DOB 06/27/1977 at the Weed Police Department. The following is a summary of Jeanette's statement:

Jeanette stated that Paul had moved out a few months ago and then moved back into the middle floor of the building. She stated that Paul came over and slept in her son's bedroom. She stated that when Paul woke up on Saturday morning they began to argue. She stated that Paul would be fine one minute and then they would go back to arguing. She stated that Paul went downstairs around 1100 hours and she started to hear the screw gun as Paul was screwing the doors shut again. Jeanette stated that she received a text message from work and decided to leave to go into work for a little bit. She stated that she exited the residence using the rear of the residence. She stated that she received a text from her son Dominick asking her to go speak to Paul. She stated that when she returned to the residence Dominick texted her again and asked her to bring Devin with her.

Jeanette stated that she walked downstairs and could see Paul sitting in a green chair tied up through the glass doors. Jeanette stated that she tried to get into a rear door but Paul had the door bolted shut so she was able to climb through a broken window after she removed the board. Jeanette stated that she then opened the front door to let Devin inside. Jeanette stated that she was trying to talk to Paul to calm him down and Paul was yelling at her telling her that she did this to him. She stated that Paul told her that if she only loved him or wanted him. Jeanette stated that Paul threw a tequila bottle at her and she walked outside the house to call Paul's mother. Jeanette stated that she went back inside the residence and Devin user her cellphone to call Spencer at the same time he was talking to dispatch. Jeanette stated at that time Paul was untying himself from the chair. Jeanette stated that she remembers Paul going towards the kitchen as she went outside.

Jeanette stated that she thought she was on the phone with Dominick and saw Officer Gale arrive and jump through the half of the door that lead to the backroom. She stated that she heard Officer Gale tell Paul to give him the lighter and put the lighter down. She stated that she saw Paul yelling go be with your family. She stated that she did not walk back to the rear room, but she could hear Officer Gale and Paul talking. She stated that she heard glass shatter and then Dominick called her, and she walked outside. She stated that Spencer arrived, and she told Spencer that they were in the back room. She stated that then Spencer came out yelling that he was on fire and then she observed Paul come running out of the house fully engulfed. She stated that she went to go get a fire extinguisher, but Paul had already been extinguished.

I asked Jeanette if she observed Paul dumping gasoline on himself. She stated that she observed Paul pouring gasoline from a red gas can over his head and on his body. Jeanette stated that at one-point Devin walked towards Paul while he was still sitting in the green chair and asked if he

was going to light both of them on fire. I asked Jeanette if at any point she lost sight of Officer Gale. Jeanette stated that she was back and forth from being outside and inside and she wasn't sure. I asked her if she saw Officer Gale and Paul fighting over the lighter. Jeanette stated that she did not. Jeanette stated that she only heard bits and pieces of Officer Gale and Paul's conversation.

I asked Jeanette if Paul had been drinking earlier in the day. She stated that she knows Paul had a beer earlier in the day and had grabbed a tequila bottle that had 1/4th of it left. Jeanette stated that she was unsure if Paul had drunk the tequila or not but did state that when it was thrown at her it was empty. I asked Jeanette if Paul was using illegal drugs. Jeanette stated that he was using. She stated that when Paul isn't using, he is a whole different person.

Jeanette stated that Paul had moved out a few months prior to the incident. She stated that they would see each other and talk. She stated they would be nice for five minutes and then they would begin to argue again, and Paul would call her a "fucking bitch" and tell her that he hates her. She stated that she ended up blocking Paul from her phone and then obtained a new phone from her son. Jeanette stated that Paul had found out that she was talking to someone early on Saturday morning and that is when Paul and her began to really argue. I asked if she believed Paul received a text message from the person she was talking to and she stated that she did not believe he did. Jeanette told me that Paul would get angry at points and threaten to kill her and then threaten to kill himself.

I asked Jeanette if she believed Paul was going to try to kill himself during the incident. She stated that she did not think he was going to and believed it was a cry for help. Jeanette stated that Paul hates fire and she believes it was more to try to get her attention. I asked Jeanette if she thought Paul was trying to create a "suicide by cop" situation. Jeanette stated that it was a good question and that she was trying to rack her brain on that question too. Jeanette stated that Paul had never mentioned that to her before, but she also knows that he was not in a good mind state. Jeanette stated that in the 23 years of being with Paul, she had never seen him this unstable. Jeanette stated that she honestly didn't know the answer to that question. She stated that Paul could be very persistent in a mind set and she would hope he would not do that in front of his kids. She stated that hopefully this was the rock bottom of Paul and that everyone knows that he uses and has been using for awhile. She stated that she told Paul that they wouldn't get back together because she did not want to be cheated on anymore. Jeanette stated that Paul was already angry at her, so that's why she did not go to the rear of the residence when Officer Gale was talking to him. Jeanette stated that she had called the police on Paul Thursday night (10/10/2019) because Paul was banging on the tenant's door and he was scaring the tenant. Jeanette stated that Paul and she had been off and on having conflicts since Tuesday, 10/08/2019.

On Monday, 11/04/2019, at approximately 1550 hours, Robert Thomas Jr., DOB 12/13/1960 came into the Weed Police Department so I could speak to him. I asked Robert to tell me what he observed. Robert stated that he was across the street and heard a commotion at Paul's house. He stated that he heard Paul say she is going to leave me I am going to burn myself up. He stated that he saw Paul have two lighters in his hand. Robert stated that he went to the front of the residence and saw Officer Gale running towards the front door and he was shaking his hands. Robert standing that when he was watching Paul and Officer Gale inside the residence from the

City000354

alley, he could hear Officer Gale say don't make this worse. He stated that he saw Paul standing there like a raging bull with two lighters in his hand. Robert stated that he could not see if Paul lit himself on fire.

At approximately 1618 hours, I spoke to Spencer Hall, DOB 05/13/1996 at the Weed Police Department. I asked Spencer to tell me what he had observed. Spencer stated that he had received a telephone call from his grandma saying that Paul was down at the house threatening to commit suicide. Spencer stated that while he was driving there Devin had called him and said his dad was there in gasoline on him and told him to get there. Spencer stated that he walked inside, and Devin was walking past him, and Spencer asked Devin if they were physically fighting and Devin stated no. Spencer stated that he walked to the backroom and leaned in through the broken door and observed Officer Gale with his Taser out. Spencer stated that he tried talking to Paul and he observed Paul leaning against the wall with the lighter to his chest. Spencer stated that he tried talking to Paul and asked what he was doing. He stated that Paul told him that this was his life. Spencer stated that Officer Gale told Paul to put the fucking lighter down or he was going to taser him. Spencer stated that Officer Gale counted down 3,2,1 and Paul tucked down and as soon as the taser hit him Paul caught on fire. Spencer stated as soon as he saw the fire he ran outside and looked through the patrol vehicle for a fire extinguisher. He stated that he ran back inside, and Paul and Officer Gale were already running outside. I asked Spencer if he heard Devin tell Officer Gale to shoot Paul in the leg. Spencer stated that he did not. Spencer stated that he was only inside the residence for approximately 20 seconds.

At approximately 1341 hours, I spoke to Officer Gale with his attorney present, Brett Shurman. I read Officer Gale the Garrity Warning and his Miranda rights. Officer Gale invoked his Miranda Right and I ordered him to answer my questions regarding the incident that occurred on October 12th 2019.

I advised Officer Gale that he was dispatched to a subject attempting to harm himself. I asked him if when he arrived on scene if he heard dispatch advise him that the subject was trying to light himself on fire with gasoline. Officer Gale stated that as he was arriving yes, he did hear that. I asked Officer Gale if he recalled if dispatch advised him that the male was trying to light himself on fire with gasoline or if he was dousing himself with gasoline. Officer Gale stated that he did not recall the specific designation. I asked Officer Gale if he smelled gasoline as he entered the residence. Officer Gale stated, "Not at the time, no." I asked him if at that time Paul was running towards the back of the room. Officer Gale stated, "Correct." I asked Officer Gale after Paul entered the backroom and he was able to jump through the opening of the door if he observed fluids on Paul's shirt. Officer Gale stated, "Yes." I asked Officer Gale what he believed that to be. Officer Gale stated that he believed that to be some sort of flammable fluid given the previous radio call. I advised Officer Gale that at one-point Paul reached down and grabbed the lighter. Officer Gale stated that on his recollection Paul had the lighter the entire time. I asked Officer Gale at one point if Paul made comments that he was going to light himself on fire. Officer Gale answered, "Yes."

I asked Officer Gale there was a point where Paul became amped up and started to break glass and Officer Gale chose to go hands on. I asked him if he went hands on because he believed Paul was going to light himself on fire. Officer Gale stated that he believed he was going to light

himself on fire and by Paul putting his head through a window he was doing other things that were potentially harmful to himself. I asked Officer Gale if his point of going hands on was to protect him from harming himself. Officer Gale stated, "Yes sir." I asked Officer Gale if he recalled if Paul made any comments that were threatening to him. Officer Gale stated that Paul made several statements asking him to leave and that he was going to light himself. Officer Gale stated that he did not remember that exact words that Paul was saying only that Paul was saying that he would get hurt or that he did not want him to get hurt. I asked Officer Gale if he thought if he continued to approach Paul, he believed Paul would light himself on fire and that could more than likely cause harm to him. Officer Gale stated, "Yes sir." I asked Officer Gale that while he was fighting with Paul over the lighter if he believed fluids were transferred to his uniform and Officer Gale stated, "Yes sir." Officer Gale stated that based on the close proximity to Paul at that time he could smell the fluids and the fact that Paul was touching him, and Officer Gale was touching Paul. Officer Gale stated that there were times when they would come chest to chest and his arms and clothing were touching Paul, he did believe fluid had transferred to his clothing.

I asked Officer Gale while Paul and he were fighting over the lighter if he believed Paul was going to do something that would cause harm to him. Officer Gale stated, "Yes." Officer Gale then wanted to explain more and stated, "He was actively pushing me, umm trying to control my arms and I was trying to control his arms. Majority of the time I was able to keep control of the fist that had the lighter in it. Umm and at one point I was able to get the fist with the lighter behind his back and I would alternate between trying to remove his fingers to get the lighter out of his hand and as he was doing that I could feel him moving his hand in a way that was attempting to light it. And so I would stop prying his fingers and I would just hold his fist closed alleviating the fact that he was able to move his fingers and that continued the majority of the time when we were both trying to get control of each other's arms. So while we were fighting, as I was trying to physically remove the lighter from his hands he was actively moving his hands in a way that lead me to believe he was going to light it." I asked Officer Gale that when he had ahold of Paul's arm, he could feel Paul trying to flick the lighter. Officer Gale stated, "Yes sir." I advised Officer Gale that Paul made a statement that he was going to light them both on fire, I asked Officer Gale if he believed that and Officer Gale stated, "Yes sir." Officer Gale stated that he had unclipped his pepper spray and Paul made a statement saying to go ahead and pepper spray me I will light myself. Officer Gale stated at the moment when he stepped back Paul had manipulated the lighter to a way that Paul was standing there with his finger on the flint and steel or ignition device.

I advised Officer Gale that when they separated, I observed Paul bring his arms to his chest area and asked him at that point if he believed Paul was going to light himself on fire. Officer Gale stated, "Yes sir." I advised Officer Gale that he had given Paul the taser warning that he was going to "tase" him and at that point he did deploy the taser. Officer Gale stated, "Yes sir." I asked Officer Gale why he deployed the taser. Officer Gale stated, "I knew I needed to get the lighter away from him or to incapacitate himself, him in a way that he would not be able to continually bring the lighter around himself, to light himself on fire. So the reason why I brought the taser out was because if I could get him to drop the lighter or if I could get him to be immobilized enough to he could no longer with his thumb on the ignition part bring to his body that would umm that would stop him from potentially lighting himself on fire."

City000356

I asked Officer Gale if he believed Paul was high on any controlled substances. Officer Gale stated that based on his training and experience and the past history and knowledge of the narcotic use that it was going through his mind. I asked Officer Gale that believing Paul was on a controlled substance if he thought Paul was going to light himself on fire. Officer Gale stated that he did think that. I asked him if the reason for deploying the taser was to unhinge the lighter out of Paul's hand and Officer Gale stated yes. I asked him if the reason for that was for the safety of Officer Gale and for the safety of others. Officer Gale stated, "Yes."

Officer Gale's attorney asked a clarifying question about entering the backroom of the residence. He asked Officer Gale how he entered the backroom. Officer Gale stated that he climbed through the opening of the door. Officer Gale was asked why he entered that way, Officer Gale stated because Paul had locked it though the outside and the inside. Officer Gale was asked if that was going through his mind while he was in the backroom. Officer Gale stated, "Yes sir." I then asked Officer Gale if he believed he could not open the door while he was in the backroom speaking to Paul. Officer Gale stated, "Correct."



CSR 7317

**11**

**J. Gale - 2-6-23**

# YREKA POLICE DEPARTMENT



To: Sgt. Klomparens

Date: 11/12/19

Use of Force Review Board Findings:

      On 11/8/19 the Weed Police Department assembled a use of force board in regard to an incident that took place on 10/12/19 at about 1324 hours with Officer Gail within the city of Weed.  The Weed Police Department policy's to be reviewed were policy section 300, Use of Force and Police Section 309, Conducted Energy Device.

The board was unanimous on the following sections.

1. Use of Force Policy 300.  The board found that Officer Gale was within policy.

2. Conducted Energy Device Policy 309.  The board found that Officer Gale was in violation of Policy Section 309.5.2 (e), Individuals who have been recently sprayed with a flammable chemical agent of who are otherwise in close proximity to any known combustible vapor or flammable material, including alcohol-based oleoresin capsicum (OC) spray.

The board recommends that Officer Gale be retrained with the use of a taser and go over the Conducted Energy Device Policy 309.

Lt. Chris Betts

Yreka Police Department

**EXHIBIT**

**11**

City000348

**To:**   **Chief Nicholas**

**Date:**   **11/12/2019**

**Use of Force Review Board Findings:**

On Friday, 11/08/2019, at approximately 1500 hours a Use of Force Review Board was assembled in regards to the incident that took place on Saturday, 10/12/2019 with Officer Gale. The review board consisted of: Lt. Betts and Sergeant Potter with the Yreka Police Department, Chief Short from the Etna Police Department, Officer Jole from the Weed Police Department, and Michael Michelon. The attached memo are the findings of the Use of Force Review Board panel.

**Sergeant Jared Klomparens**

City000349



# Weed Police Department

**550 Main St, Weed, CA. 96094**
**Phone: 530.938.5000 – Fax: 530-938-5005**
**www.ci.weed.ca.us**



**CSR 7317**
# 12
**J. Gale - 2-6-23**

11/19/2019

To: John Gale

From: Justin Mayberry, Administrative Sergeant

Re: Administrative Review of Incident #1910120044

This letter is to inform you of the Administrative Review findings for Incident #1910120044, which occurred on October 12th, 2019. During the administrative review of the incident, a determination of the use of force used was made with both an internal review by assigned personnel and by a Use of Force Review Board (Policy 302.4). The Board consisted of an outside Agency Chief of Police, an outside agency Lieutenant, an outside agency Sergeant, the department taser training instructor, and a citizen from the Weed Community.

In review of Policy #300.3, the determination after internal review showed the use of force to fall within the established policy. The Use of Force Review Board was unanimous in their determination the officer was within policy for the use of force.

In review of Policy #309.5.2, the determination of the internal review showed the use of force to fall within the established policy. The Use of Force Review Board recommended that you receive re-training with the use of CEW after the determination you violated 309.5.2(e) Special Deployment Considerations.

The recommended re-training will occur with the certified department CEW instructor.

You will and return to full duty on November 19th, 2019 at 09:00.

Justin Mayberry, Sergeant
p.p.
Martin Nicholas, Chief of Police

**EXHIBIT**
**12**

City000588



*City of Weed*
*Police Department*

CSR 7317

**13**

J. Gale - 2-6-23

December 9, 2019

Justin Mayberry, Chief of Police
Sgt. Klomparens
Weed Police Department
550 Main St.
Weed Ca. 96094

RE: Officer Gale's retraining of the TASER and Department TASER Use of Force Policy per the Use of Force Review Board.

On November 22, 2019, Officer Gale and I reviewed the Use of Force policy for TASER deployment. The review of the policy included verbal scenarios. The training of the TASER consisted of practical exercises with the HALT suite, including deployment of the 2 HALT cartridges. The scenarios consisted of TASE/Don't TASE drills in which the subject was suicidal and covered with a flammable liquid. Officer Gale completed all training satisfactorily.

Shawn Jole 447

Officer / TASER Instructor
Weed Police Department
550 Main St.
Weed, CA. 96094

530-938-5000
Fax 530-938-5005
P.O. Box470
550 Main Street
Weed, California 96094



**EXHIBIT**

13

City000228

# EXHIBIT D

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

---oOo---


PAUL J. HALL, and JEANNETTE
HALL,

                Plaintiffs,

vs.                      CASE NO. 2:20-cv-01789-TLN-DMC

CITY OF WEED, JOHN GALE, and
DOES 1 through 10, inclusive,

_____Defendants.___/


Videoconference Deposition of

**CHIEF JUSTIN MAYBERRY**

Tuesday, March 8, 2022


NOTICING ATTORNEY:  JOSEPH J. BABICH
REPORTER:  LYNNE M. NISSON, CSR 7317

```
 1                    REMOTE APPEARANCES

 2

 3    For the Plaintiffs:

 4         DREYER BABICH BUCCOLA WOOD CAMPORA, LLP
           BY:  JOSEPH J. BABICH, ESQ.
 5         20 Bicentennial Circle
           Sacramento, California  95826
 6         916-379-3500
           jbabich@dbbwc.com
 7

 8    For the Defendant City of Weed:

 9         ANGELO, KILDAY & KILDUFF, LLP
           BY:  BRUCE A. KILDAY, ESQ.
10         601 University Avenue, Suite 150
           Sacramento, California  95825
11         916-564-6100
           bkilday@akk-law.com
12

13    For the Defendant John Gale:

14         ALLEN, GLASSNER, HAZELWOOD & WERTH, LLP
           BY:  DALE L. ALLEN, JR., ESQ.
15         180 Montgomery Street, Suite 1200
           San Francisco, California  94104
16         415-697-2000
           dallen@aghwlaw.com
17

18

19

20

21

22

23

24

25
```

Hall v. Weed                    Justin Mayberry              March 8, 2022

```
 1                    INDEX OF EXAMINATIONS

 2                                                        PAGE

 3    EXAMINATION BY MR. BABICH                            4

 4

 5                        ---oOo---

 6

 7                    INDEX OF EXHIBITS

 8                                                        PAGE

 9    DEPOSITION

10

11     13        letter dated December 9, 2019;
                 City000228
12               (1 page)................................pre

13                        ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         ---oOo---

2              BE IT REMEMBERED that on Tuesday, March 8,

3       2022, at the hour of 10:02 a.m., of said day, with all

4       participants appearing remotely via videoconference,

5       before me, Lynne M. Nisson, a Certified Shorthand

6       Reporter, State of California, appeared CHIEF JUSTIN

7       MAYBERRY, who was examined as a witness in said cause.

8                         ---oOo---

9                  CHIEF JUSTIN MAYBERRY

10      the Witness, called on behalf of the Plaintiffs, having

11      been administered an oath in accordance with C.C.P.

12      Section 2094, was examined and testified as follows:

13                  EXAMINATION BY MR. BABICH

14      Q.       By MR. BABICH:  Can you please state your name?

15      **A.**       My name is Justin, J-U-S-T-I-N, Mayberry,

16      M-A-Y-B-E-R-R-Y.

17      Q.       And, Mr. Mayberry, you are the chief of police

18      for the City of Weed Police Department; correct?

19      **A.**       Yes.

20      Q.       My name is Joe Babich.  I represent Paul Hall

21      regarding the incident that occurred involving Officer

22      Gale back on October 12, 2019.

23              During the deposition today I'll be referring

24      to the incident or the Taser incident.  I may be more

25      descriptive, but that's what we're talking about.

1   around 16 to 18 years.

2   Q.      And I want to go back and talk about the

3   suicidal incident that you mentioned earlier.   I think

4   you said it occurred in or about 2017.

5          Can you share with us more detail on that?

6          First of all, did -- let me ask you this.   Did

7   you respond to that particular call?

8   A.      I did.

9   Q.      And share with me what you remember with regard

10   to his attempts for suicide?

11   A.      Family was reporting that he was making

12   suicidal statements and had -- possibly had a gun in the

13   residence.

14          We went to his parents' house, which is at 649

15   Stringtown Avenue.   I remember the incident was somewhat

16   frustrating because his mother seemed to be unconcerned

17   with -- necessarily with his mental status; she only

18   wanted to go back inside the house.   And I was having

19   trouble convincing her she needed to stay outside until

20   I determined what was going on.

21          After talking to PJ on the phone we were able

22   to get him to come outside.   He stated -- during a

23   conversation on the deck with us that lasted, I would

24   say, probably an hour.   We sat on the deck and talked

25   about issues that he was having in his life, and he, at

1    that point, didn't exhibit anything that he was

2    suicidal; stated he didn't have a gun; he was just

3    trying to -- you know, he was having some personal

4    problems with his wife, and also he had -- he stated at

5    that time he was having some issues with some drug use

6    and the combination was a bit overwhelming for him at

7    that time, I think.

8    Q.        So it sounds like you were able to arrive and

9    deescalate the situation and sort of calm him down?

10   **A.**       Yeah.  He never -- he was never elevated

11   during that.  I mean, he came outside.  He didn't want

12   to come outside.  I don't know.  I think he had in his

13   mind that we were going to either arrest him or take him

14   to the hospital, but I had to establish what was

15   occurring.  And the safest thing was bring him out on

16   the deck, and he came out on the deck, and we ended up

17   sitting there.

18           I remember we were at one point just sitting on

19   the steps having a conversation about his life.

20   Q.        Other than that particular incident in 2017 and

21   our particular incident in October of 2019, are you

22   aware of whether or not Mr. Hall had ever threatened

23   suicide before?

24   **A.**       I believe there was a previous incident that

25   I was not involved in in which he had -- had made

1    statements to that.  And I want to say there was an

2    incident where he went into the hospital and ran out of

3    the hospital down in Mt. Shasta.

4            And I don't know if that was on a hold, some

5    sort of law enforcement hold, or if he had voluntarily

6    gone down there.

7    Q.       What details do you know about the third

8    suicidal incident?

9    A.       And by third, which one are we talking about?

10   Q.       Well, I'm going to do them in order that I

11   have.

12           2017, the one we've already talked about; 2019,

13   which involves our incident in October.  And then I

14   thought you mentioned a third one.  Maybe there's a

15   third and a fourth, but --

16   A.       Well, the third one, I believe, was that one

17   where -- and I remember just being told in passing, you

18   know, it's kind of a -- like a shift change kind of

19   thing.

20           Somebody -- I remember somebody saying that he

21   had been at the hospital at Mt. Shasta for some sort of

22   evaluation -- whether it was voluntary or not, I don't

23   know -- and that he had ran out of the hospital.

24   Q.       What detail do you know with regard to any

25   threat for suicide in that incident?

1    A.        I do not know if it has.

2    Q.        In reviewing the video -- and I appreciate it's

3    been some time since you reviewed it.   But in reviewing

4    the video of the incident -- first of all, when you did

5    review it you certainly were aware of the Taser

6    protocols that were in place?

7    A.        Yes.

8    Q.        And do you feel that Officer Gale followed the

9    Weed City Police Department Taser protocols that day

10   when he made that decision to shoot or use the Taser?

11   A.        I believe he used the Taser under use of force

12   correctly, which would be the 300 section.

13   Q.        So let's go to Exhibit 11.

14   A.        I have it.

15   Q.        So the Use of Force Board had two findings.

16   One was the Use of Force Policy 300 was complied with,

17   basically; correct?

18   A.        Yes.

19   Q.        You -- as the current police chief of Weed City

20   Police Department, you agreed with that; correct?

21   A.        Yes.

22   Q.        The other finding in Exhibit 11 by the Use of

23   Force Review Board -- I'm going to paraphrase it here --

24   but they felt that Officer Gale was in violation of

25   policy section 309, 309.5.2(e).

1    A.        Yes.

2    Q.        And you agree with that?

3    A.        I'm just reading through briefly.  Sorry.

4    Q.        Go ahead.

5    A.        I would say yes, that he used that

6    inappropriately with somebody who was flammable,

7    chemical agent, yes.

8    Q.        Did you ever interview Officer Gale with regard

9    to this incident?

10   A.        I have not.

11   Q.        Have you ever spoken to him about this

12   incident?

13   A.        I have not.  Well, can I clarify something on

14   that?

15   Q.        Sure.

16   A.        So my only time that I have -- and it wasn't

17   directly about the incident.  I spoke to him about his

18   injuries.  So in one way I did speak to him about the

19   incident, because I inquired about his injuries

20   received.  So that would be the only thing that we

21   spoke of.

22   Q.        And his injuries generally involved -- he had

23   burns on his hands; correct?

24   A.        That is correct.  I believe he was treated at

25   UC Davis Burn Center for those.

1   Q.        At any time that you reviewed the video of the

2   incident, did you form an opinion of being critical of

3   Officer Gale in the manner in which he used the Taser

4   that day?

5            MR. KILDAY:  You understand the nature of the

6   question, Pete?

7            THE WITNESS:  You're asking me if I have a

8   negative opinion of what -- of his use of that Taser?

9   Q.        By MR. BABICH:  Yes.  I'm generally asking were

10  you critical of him when you reviewed the video?

11  A.        The capacity that I was reviewing the video

12  was not to be critical.  I can say what I would have

13  done in that situation, but I was not Officer Gale at

14  the time.

15  Q.        Do you have an opinion of whether or not you

16  are critical of his conduct that day with regard to the

17  use of the Taser?

18  A.        Based on his experience and the situation he

19  was in, I believe -- my opinion is he placed himself in

20  a dangerous -- not just PJ Hall, but the use with

21  flammable materials, it was dangerous for himself to be

22  using that based on the video that I saw.

23  Q.        And are you critical of him for that?

24  A.        Yes.

25  Q.        I want to go through the hiring process with

1    that Use of Force Review Board.  I want to say that was

2    November of 2019.

3    Q.        Okay.

4             MR. KILDAY:  And, Joe, is that the subject of

5    the new document that you submitted today?

6             MR. BABICH:  Yeah, it is.  I just figured that

7    out.

8    Q.        By MR. BABICH:  So that was the recertification

9    that took place -- Exhibit 13 -- took place on or about

10   December 9, 2019?

11   A.        That is correct.

12   Q.        Going back to the very first certification,

13   which would be page 3 of Exhibit 8.

14             I'm guessing there's a whole different set of

15   training documents and/or videos for the X2?

16   A.        Yeah.  They would have been very similar.  Just

17   offhand, I can explain the difference of the X2 versus

18   the 7.  The X2 had a camera on it, whereas the X -- or

19   the 7 does not have a camera on the handle.

20   Q.        Same manufacturer?

21   A.        Same manufacturer, yes.

22   Q.        And the Power Point for the TASER 7, do you

23   know if that's similar to the Power Point for -- I'm

24   assuming there was a Power Point for the X2?

25   A.        Yes, they're typically Power Point slides.  And

1    and having been through recertifications and my initial

2    certifications, they don't vary much.  They're pretty

3    similar.  Maybe a few slides may look different, but the

4    information stays the same pretty much.

5    Q.        Okay.  And in both of those training documents

6    it's emphasized to avoid using the Taser when somebody

7    is doused with gasoline?

8    A.        Yes.

9    Q.        And it also emphasizes not to use the Taser

10   when there's flammable materials in the area?

11   A.        Yes.

12   Q.        I think I'll get to it a little bit later, but

13   I recall seeing in the documents -- I'll get through

14   them once I get through my outline, frankly, but I want

15   to ask you this question before I forget it.

16            I thought I saw somewhere in the documents that

17   protocol called for the downloading of the video from

18   the Taser whenever it's been used.

19   A.        Yes.

20   Q.        You're familiar with that process?

21   A.        I am.

22   Q.        But I think, based on your testimony, we

23   couldn't do that in this case because the TASER 7 does

24   not have a camera on it?

25   A.        TASER 7s do not have a camera.

1     may or may not have taken place.

2              But was there a major incidence investigation

3     conducted by anyone?

4     A.        That was conducted by the Siskiyou County

5     Sheriff's Department.

6     Q.        And then I know that there was the internal

7     affairs investigation done by the Weed Police

8     Department; correct?

9     A.        Correct.

10    Q.        And let's take a look at that.  It's the report

11    from -- by officer -- or Sergeant Klomparens as Exhibit

12    10.

13    A.        Okay.

14    Q.        The second paragraph there in the introduction

15    section says that, "Officer Klomparens completed an

16    administrative investigation involving Officer Gale."

17             Is that the same thing as the internal affairs

18    investigation?

19    A.        Yes.

20    Q.        In reviewing Sergeant Klomparens' report in

21    Exhibit 10, I don't really see anywhere where he made

22    any findings, even though the report is titled

23    "Allegations and Findings."

24             Are you aware of any findings that he

25    ultimately made?

```
 1    A.        I am not.  They would have been included in

 2    this report.

 3    Q.        To me it looks more like an investigation

 4    report without findings.  Would you agree?

 5    A.        I would agree.

 6    Q.        Do you know why Sergeant Klomparens never asked

 7    questions -- or at least based on what I'm seeing in the

 8    report, there doesn't appear to be any questioning of

 9    Officer Gale about his knowledge of the use of the Taser

10    where flammables are present.

11    A.        I don't see that in the report either.

12    Q.        Are you critical of Officer Klomparens or

13    Sergeant Klomparens for not including that in the

14    inquiry?

15    A.        It would have been a good question to ask.

16    Q.        So if you look at the last page of Exhibit 10,

17    it's Bates stamped 357.

18    A.        Okay.

19    Q.        And toward the end of that first paragraph --

20    I'm going to read it and then have some questions for

21    you.

22              It says, "I asked him --" and that him is

23         Officer Gale.  "I asked him if the reason for

24         deploying the Taser was to unhinge the lighter out

25         of Paul's hand, and Officer Gale stated 'Yes.'"
```

Hall v. Weed                    Justin Mayberry                  March 8, 2022

```
 1   hypothetical.
 2            MR. KILDAY:  Join the objection.
 3   Q.       By MR. BABICH:  You can still answer it.
 4   A.       Again, I would not have had a Taser to use, so
 5   no, I would not have used the Taser.
 6   Q.       By MR. BABICH:  Well, had you had one in your
 7   hand under these circumstances and given all the
 8   knowledge you have about the events leading up to it,
 9   would you have attempted to use the Taser to unhinge the
10   lighter from Paul's hands?
11   A.       Based on the knowledge I have -- I'm sorry.
12            MR. KILDAY:  Objection.  Calls for speculation.
13   And lack of foundation.
14   Q.       By MR. BABICH:  You can answer it.
15   A.       Based on the knowledge I have of this incident
16   and my knowledge of the Taser and its capabilities, I
17   would not have used the Taser in this circumstance.
18   Q.       Thank you.
19            I want to talk about Officer Gale's
20   qualifications and his progress or lack of progress
21   during the year and a half that he was with the
22   department.
23            I looked at some of his reviews in the
24   documents that have been produced, and the reviewing
25   process was critical of him at times.  I'm just kind of
```

```
 1   make sense to me.  I'm not arguing with you, but I'm
 2   just telling you.
 3   A.        No.  I'm not arguing with you either.  I
 4   understand the confusion on that.
 5   Q.        So looking at the scenario, the decision by
 6   Officer Gale to physically take the lighter away from
 7   Mr. Hall was, in your view, a use of force; correct?
 8   A.        In my view use of force is just his presence.
 9   Officer presence is technically a use of force.  That's
10   the first level.
11             But yes, I would say his trying to take --
12   physically take the Taser was a use of force.
13   Q.        And you're of the opinion that that probably
14   wasn't a good idea given the size difference between the
15   two men?
16   A.        Well, based on my experience and -- you know, I
17   can't say why -- what Officer Gale was thinking or what
18   he was doing.  He was going into that room, I believe,
19   to save somebody.  He placed himself into a room that
20   was highly dangerous, not only to the person who's
21   threatening to light themselves on fire but to himself,
22   in an effort to retrieve that lighter.
23             Based on the scenario, I don't know if I would
24   have even gone through that window into that room.
25   Q.        If you know, how tall is Officer Gale?
```

1    questioning, but what did he tell you in that regard?

2    **A.**      He was not on scene yet.  It sounded like he --

3    well, he stated -- I'm going -- this is me paraphrasing

4    him -- "I'm responding because it sounds like PJ may

5    have set himself on fire."

6    Q.      Did you get any more detail about the incident

7    on that phone conversation?

8    **A.**      I didn't.  I almost didn't answer the phone.

9    It was my first vacation in ten years, and I was sitting

10   in an airport in Hawaii.

11   Q.      Heading home?

12   **A.**      Yes.  I was coming home that day, yes.

13          MR. BABICH:  That's all I have.  Thanks again

14   for your patience, and I appreciate it.  I'm all done.

15          THE WITNESS:  You're welcome.

16          MR. KILDAY:  I have nothing.

17          Dale, you were muted, I think.

18          MR. ALLEN:  I have no questions.

19          MR. KILDAY:  For the record, Chief -- you might

20   have already done this -- would you also just give the

21   address for the Weed Police Department for our records.

22          THE WITNESS:  Sure.  It's 550 Main Street, Weed

23   California, 96094.

24                   ---oOo---

25          (Proceedings concluded at 11:58 a.m.)

1                    WITNESS'S SIGNATURE

2

     Pursuant to Section 2025.520 of the Code of Civil
3    Procedure of the State of California, I hereby certify
     that I have read my deposition transcript, taken
4    Tuesday, March 8, 2022, pages 1 through 79, made the
     changes and corrections I deem necessary and approve the
5    same as true and correct.

6           I hereby state there are:

7           (Check one)_____ no corrections

8                       _____ corrections per attached

9    _____      _____
     CHIEF JUSTIN MAYBERRY                 DATE
10

11                    ---oOo---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              WITNESS'S CHANGES OR CORRECTIONS

 2              NOTE:  If you are adding to your testimony,
        print the exact words you want to add.  If you are
 3      deleting from your testimony, print the exact words you
        want to delete.  Specify with "Add" or "Delete" and sign
 4      this form.

 5      Deposition of:  CHIEF JUSTIN MAYBERRY
        Case Title:  HALL v. WEED
 6      Date of Deposition:  Tuesday, March 8, 2022

 7
        Page Line            Change/Add/Delete
 8

 9      ____    ____     _____

10      ____    ____     _____

11      ____    ____     _____

12      ____    ____     _____

13      ____    ____     _____

14      ____    ____     _____

15      ____    ____     _____

16      ____    ____     _____

17      ____    ____     _____

18      ____    ____     _____

19      ____    ____     _____

20      ____    ____     _____

21
        Pursuant to Section 2025.520 of the Code of Civil
22      Procedure of the State of California, I hereby certify
        that I have read my deposition transcript and made the
23      above-noted changes and corrections and approve them as
        true and correct.
24
        _____     _____
25      CHIEF JUSTIN MAYBERRY                    Date
```

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I certify that the witness in the foregoing

 4     deposition,

 5                    CHIEF JUSTIN MAYBERRY

 6          was by me duly sworn to testify the truth, the

 7     whole truth, in the within-entitled cause; that said

 8     deposition was taken at the time and place therein

 9     named; that the testimony of said witness was reported

10     by me, a duly Certified Shorthand Reporter and a

11     disinterested person, and was thereafter transcribed

12     into typewriting.

13          I further certify that I am not of counsel or

14     attorney for either or any of the parties to said

15     deposition, nor in any way interested in outcome of the

16     cause named in said caption.

17          IN WITNESS WHEREOF, I have hereunto set my hand

18     this 21st day of March, 2022.

19

20

21     _____
       LYNNE M. NISSON, CSR 7317
22     State of California

23

24

25
```

# EXHIBIT E

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

---oOo---


PAUL J. HALL, and JEANNETTE
HALL,

                Plaintiffs,

vs.                      CASE NO. 2:20-cv-01789-TLN-DMC

CITY OF WEED, JOHN GALE, and
DOES 1 through 10, inclusive,

_____ ___ ___Defendants.___/




Videoconference Deposition of

**CHIEF MARTIN NICHOLAS**

Friday, March 4, 2022






NOTICING ATTORNEY:  JOSEPH J. BABICH
REPORTER:  LYNNE M. NISSON, CSR 7317

```
 1                    REMOTE APPEARANCES

 2


 3    For the Plaintiffs:

 4          DREYER BABICH BUCCOLA WOOD CAMPORA, LLP
            BY:  JOSEPH J. BABICH, ESQ.
 5          20 Bicentennial Circle
            Sacramento, California  95826
 6          916-379-3500
            jbabich@dbbwc.com
 7


 8    For the Defendant City of Weed:

 9          ANGELO, KILDAY & KILDUFF, LLP
            BY:  BRUCE A. KILDAY, ESQ.
10          601 University Avenue, Suite 150
            Sacramento, California  95825
11          916-564-6100
            bkilday@akk-law.com
12


13    For the Defendant John Gale:

14          ALLEN, GLASSNER, HAZELWOOD & WERTH, LLP
            BY:  DALE L. ALLEN, JR., ESQ.
15          180 Montgomery Street, Suite 1200
            San Francisco, California  94104
16          415-697-2000
            dallen@aghwlaw.com
17

18

19

20

21

22

23

24

25
```

1          INDEX OF EXAMINATIONS

2                                                    PAGE

3    EXAMINATION BY MR. BABICH                        4

4    EXAMINATION BY MR. ALLEN                         64

5

6

7                    ---oOo---

8

9

10          INDEX OF EXHIBITS

11               (None)

12

13

14                    ---oOo---

15

16

17

18

19

20

21

22

23

24

25

1                         ---oOo---

2          BE IT REMEMBERED that on Friday, March 4, 2022,

3   at the hour of 10:00 a.m., of said day, with all

4   participants appearing remotely via videoconference,

5   before me, Lynne M. Nisson, a Certified Shorthand

6   Reporter, State of California, appeared CHIEF MARTIN

7   NICHOLAS, who was examined as a witness in said cause.

8                         ---oOo---

9                 CHIEF MARTIN NICHOLAS

10  the Witness, called on behalf of the Plaintiffs, having

11  been administered an oath in accordance with C.C.P.

12  Section 2094, was examined and testified as follows:

13              EXAMINATION BY MR. BABICH

14  Q.       By MR. BABICH:  Can you please state your name?

15  **A.**       Yes.  It's Martin Nicholas, N-I-C-H-O-L-A-S.

16  Q.       And you are the former chief of police for the

17  Weed Police Department; correct?

18  **A.**       Correct.

19  Q.       And how long have you been retired?

20  **A.**       Since December of 2019.

21  Q.       I'm guessing you've had your deposition taken

22  before on a number of occasions?

23  **A.**       I have.

24  Q.       And you've also testified in front of a jury

25  and judge on occasion?

Hall v. Weed                    Martin Nichols                    March 4, 2022

```
 1    A.        Do I know that?  No.

 2    Q.        Is that something that would be standard

 3    procedure, however?

 4    A.        Yes, it would be.

 5    Q.        And I think I can figure this out on my own

 6    just intuitively.

 7              But the camera that's in the TASER CAM is

 8    actually toward the end of it, and it's -- whatever the

 9    Taser is pointing at would be what the camera sees?

10    A.        Correct.

11    Q.        Do you happen to know if those videos that are

12    produced because of that are in color or black and

13    white?

14    A.        It depends on the model of the particular unit

15    that they were using, and I don't know that at this

16    particular point.

17    Q.        Now, just kind of reviewing the video -- I've

18    seen it one time, and it was quite some time ago, but I

19    have it -- in my mind I have segments of it.

20              There's the initial encounter where Officer

21    Gale is actually talking to Mr. Hall, and it appears

22    that he's trying to deescalate the situation.

23              Would you agree with that?

24    A.        Yes, I would.

25    Q.        And then at some point in time Officer Gale
```

1  makes a decision to try to physically -- what appears to

2  me, to physically take the lighter from Mr. Hall.

3          Would you agree with that?

4  **A.**     Yes.

5  Q.     At that moment when he decides to take the

6  lighter physically from Mr. Hall, do you feel that that

7  was an appropriate use of -- well, first of all, do you

8  feel that was a use of force?

9  **A.**     Yes.

10 Q.     And do you feel that was an appropriate use of

11 force given the circumstances?

12 **A.**     Given the circumstances, him trying to take the

13 lighter away, yes, I see that as being appropriate.

14         I'm not sure that that would be the technique

15 other people would use.

16 Q.     What other options were available to Officer

17 Gale at that point?

18 **A.**     At that point, you know, his best option was --

19 was his ability to communicate.

20 Q.     And that had been going along pretty well up

21 until the moment that he decided to physically try to

22 take the lighter; correct?

23 **A.**     I thought so.

24 Q.     Other than continuing to have dialogue and

25 speak with Mr. Hall, what other options were available

1    to Officer Gale rather than trying to physically take

2    that lighter away?

3    **A.**      I'm not sure there was any other options at

4    that point.

5    **Q.**      What's your opinion on the option of using the

6    Taser and shooting him with the Taser at the moment he

7    did in the video?

8    **A.**      I wouldn't have done that, no.

9    Q.      Are you critical of Officer Gale for making

10   that decision?

11   **A.**      It's difficult to be critical of a person's

12   decisionmaking without being there yourself; however, as

13   I said, I'm not sure that I would have done that.

14   Q.      I know it may be difficult, but can you make

15   that determination on whether or not you're critical of

16   him under those circumstances?

17   **A.**      I'm not sure I can.  Really, I'm not sure I can

18   say that I am critical of the fact that he did what he

19   did.  He believed that he was doing what he needed to

20   do.

21   Q.      You are aware that part of the training of the

22   use of the Taser emphasizes to avoid using it where

23   there's flammables in the area; correct?

24   **A.**      That's what I understand, yes.

25   Q.      Have you been through the Taser training

1  is that going to be a paraphrase that the dispatcher

2  puts together as she enters this information, or is this

3  verbatim, if you know?

4  **A.**        No.  I would say that it is a summary of what

5  has been said.

6  Q.        Just logistically, how does that work?  Is the

7  dispatcher typing this information down as it's coming

8  in live over the radio?

9  **A.**        Normally, yes.

10  Q.        Chief Nicholas, if you can, kind of picture the

11  video.  And, again, I appreciate it's been some time

12  since you saw it last.

13          But did you -- in looking at the video, did you

14  see any evidence of Mr. Hall actually trying to ignite

15  himself with the lighter?

16          In other words, did you see any evidence of him

17  moving his thumb or his fingers to spark the lighter

18  before the Taser was used?

19  **A.**        I didn't see him trying to -- I saw no spark

20  from -- from the lighter or anything in that nature that

21  I recognized.  I did see his thumb on the lighter as if

22  he could have struck the lighter.

23  Q.        Did you see his thumb moving at all in the

24  video as best you recall?

25  **A.**        Not that I recall.

Hall v. Weed                  Martin Nichols              March 4, 2022

```
1            So, you know, whether or not -- whether or not

2    he used it, it was the use of force.  Whether or not he

3    was right in using force is a question that -- you know,

4    I still have a question in my mind on that at this

5    point.

6    Q.       Well, as the chief at the time of the incident,

7    can you state that his use of force by using the Taser

8    at that moment with Mr. Hall complied with the Use of

9    Force Policy Number 300?

10   A.       That's a very difficult question.  And the

11   reason I'm saying that is because, you know, it depends

12   on the circumstances; it depends on his mindset at the

13   particular time.

14            If I was in that situation, knowing PJ, knowing

15   PJ's background, I would not have done that.  It doesn't

16   necessarily mean that Officer Gale was wrong in doing

17   what he did.

18   Q.       Well, is it your understanding that one of

19   Officer Gale's concerns was to do something to avoid

20   Mr. Hall from igniting himself on fire?

21   A.       Yeah, I believe he was -- he was trying to

22   prevent him from igniting himself or anyone else in that

23   building on fire.

24   Q.       Does it make any sense to you that in an effort

25   to stop somebody from lighting themselves on fire you
```

Hall v. Weed                    Martin Nichols                    March 4, 2022

1   shoot them with a Taser and light them on fire?

2   **A.**        No, it makes no sense at all.

3   Q.        And going to page two of Exhibit 1 -- and that

4   would be Bates stamp 565.

5   **A.**        Okay.

6   Q.        The third paragraph -- actually, the second

7   full paragraph toward the end, it says, "In such

8   circumstances the use of any improved [sic] device or

9   method."

10           Do you see where that is?

11  **A.**        I don't see that.  I'm sorry.

12  Q.        Yeah.

13           MR. KILDAY:  Improvised.

14  Q.        By MR. BABICH:  Oh, I'm sorry.  I need my

15  reading glasses.

16           So it says, "The use of any improvised device

17  or method must nonetheless be reasonable."

18           Do you see that?  That would be the second full

19  paragraph, last sentence.

20  **A.**        On page two?

21  Q.        Yeah.  And it's Bates stamp 565.

22  **A.**        I'm sorry.  I don't see that.  Let me pull it

23  back up on my phone here.  Page two.

24  Q.        It's Exhibit 1, page two.

25  **A.**        Yeah.  Okay.

1          Did Mr. Hall appear to be attempting to evade

2     arrest by flight?

3     A.          You know, as I recall, he tried going out a

4     back door or something and broke some glass.  I -- you

5     know, that's kind of -- kind of in my head at this

6     point.

7     Q.          Okay.  Well, what was Mr. -- as far as you

8     could tell looking at the video, what was Mr. Hall's

9     status as a subject of police inquiry when the officer

10    arrived?

11          So in other words, was he a suspect of a crime?

12    Was he about to be arrested?  Was he being detained?

13    And this is the moment the officer arrives.

14    A.          As I recall, the situation was is that the

15    calling party, I believe, was the son, had reported that

16    he was attempting to light himself on fire.

17    Q.          And so Officer Gale was not there to

18    necessarily detain Mr. Hall, was he?

19    A.          No.

20    Q.          Was Mr. Hall ever subject to arrest that day

21    before the Taser was used?

22    A.          I don't know the complete elements of what took

23    place prior to the Taser, but what I saw on the video, I

24    would say no.

25    Q.          What was your impression of his mental health

1          MR. KILDAY:  I'm fine.  Just for me I've got a

2    binder with them, and I'll just add to that binder has

3    more come up.

4                         ---oOo---

5              (Proceedings concluded at 10:44 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    WITNESS'S SIGNATURE

2

3     Pursuant to Section 2025.520 of the Code of Civil
      Procedure of the State of California, I hereby certify
      that I have read my deposition transcript, taken Friday,
4     March 4, 2022, pages 1 through 34, made the changes and
      corrections I deem necessary and approve the same as
5     true and correct.

6             I hereby state there are:

7             (Check one)_____ no corrections

8                         _____ corrections per attached

9     _____     _____
      CHIEF MARTIN NICHOLAS               DATE
10

11

12                      ---oOo---

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 WITNESS'S CHANGES OR CORRECTIONS

 2            NOTE:  If you are adding to your testimony,
        print the exact words you want to add.  If you are
 3      deleting from your testimony, print the exact words you
        want to delete.  Specify with "Add" or "Delete" and sign
 4      this form.

 5      Deposition of:  CHIEF MARTIN NICHOLAS
        Case Title:  HALL v. WEED
 6      Date of Deposition:  Friday, March 4, 2022

 7
        Page Line          Change/Add/Delete
 8

 9      ____    ____       _____

10      ____    ____       _____

11      ____    ____       _____

12      ____    ____       _____

13      ____    ____       _____

14      ____    ____       _____

15      ____    ____       _____

16      ____    ____       _____

17      ____    ____       _____

18      ____    ____       _____

19      ____    ____       _____

20      ____    ____       _____

21
        Pursuant to Section 2025.520 of the Code of Civil
22      Procedure of the State of California, I hereby certify
        that I have read my deposition transcript and made the
23      above-noted changes and corrections and approve them as
        true and correct.
24
        _____    _____
25      CHIEF MARTIN NICHOLAS                 Date
```

```
1                    REPORTER'S CERTIFICATE

2

3          I certify that the witness in the foregoing

4    deposition,

5                    CHIEF MARTIN NICHOLAS

6          was by me duly sworn to testify the truth, the

7    whole truth, in the within-entitled cause; that said

8    deposition was taken at the time and place therein

9    named; that the testimony of said witness was reported

10   by me, a duly Certified Shorthand Reporter and a

11   disinterested person, and was thereafter transcribed

12   into typewriting.

13          I further certify that I am not of counsel or

14   attorney for either or any of the parties to said

15   deposition, nor in any way interested in outcome of the

16   cause named in said caption.

17          IN WITNESS WHEREOF, I have hereunto set my hand

18   this 21st day of March, 2022.

19

20

21   _____

22   LYNNE M. NISSON, CSR 7317
     State of California

23

24

25
```

# EXHIBIT F

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

---oOo---


PAUL J. HALL, and JEANNETTE
HALL,

                  Plaintiffs,

vs.                                    CASE NO. 2:20-cv-01789-TLN-DMC

CITY OF WEED, JOHN GALE, and
DOES 1 through 10, inclusive,

_____ ___ ___Defendants.   /




Videoconference Deposition of

**CORPORAL TIM GREEN**

Thursday, March 3, 2022






NOTICING ATTORNEY:  JOSEPH J. BABICH
REPORTER:  LYNNE M. NISSON, CSR 7317

```
 1                        REMOTE APPEARANCES

 2

 3     For the Plaintiffs:

 4          DREYER BABICH BUCCOLA WOOD CAMPORA, LLP
            BY:  JOSEPH J. BABICH, ESQ.
 5          20 Bicentennial Circle
            Sacramento, California  95826
 6          916-379-3500
            jbabich@dbbwc.com
 7

 8     For the Defendant City of Weed:

 9          ANGELO, KILDAY & KILDUFF, LLP
            BY:  BRUCE A. KILDAY, ESQ.
10          601 University Avenue, Suite 150
            Sacramento, California  95825
11          916-564-6100
            bkilday@akk-law.com
12

13     For the Defendant John Gale:

14          ALLEN, GLASSNER, HAZELWOOD & WERTH, LLP
            BY:  DALE L. ALLEN, JR., ESQ.
15          180 Montgomery Street, Suite 1200
            San Francisco, California  94104
16          415-697-2000
            dallen@aghwlaw.com
17

18

19

20

21

22

23

24

25
```

1                    INDEX OF EXAMINATIONS

2                                                           PAGE

3    EXAMINATION BY MR. BABICH                                4

4

5                         ---oOo---

6

7

8                    INDEX OF EXHIBITS

9                                                           PAGE

10   DEPOSITION

11

12      1        Policy 300 Use of Force;
                 City000564-571
13               (8 pages)..................................pre

14      2        Policy 308 Control Devices and
                 Techniques; City000572-576
15               (5 pages)..................................pre

16      3        Policy 309 Conducted Energy Device;
                 City000577-582
17               (6 pages)..................................pre

18      4        Policy 340 Standards of Conduct;
                 City000589-595
19               (7 pages)..................................pre

20      5        Policy 466 Crisis Intervention
                 Incidents; City000583-587
21               (5 pages)..................................pre

22      6        Taser Handheld CEW Warnings,
                 Instructions, and Information:
23               Law Enforcement; City000378
                 (1 page)...................................pre

24

25

Hall v. Weed                    Tim Green                March 3, 2022

```
 1                    INDEX OF EXHIBITS (cont.)

 2                                                         PAGE

 3     DEPOSITION

 4

 5       7        Taser Axon Academy Taser Training
                  Power Point
 6                (6 pages)................................pre

 7       8        Axon Taser 7 CEW User Application
                  Form, Annual Recertification;
 8                City000380, 381, 542
                  (3 pages)................................pre
 9
         9        CAD Incident Report 191012004;
10                City000001-3
                  (3 pages)................................pre
11
        10        report dated 11/04/2019, Re:  Officer
12                Gale IA, Allegations and Findings
                  (Paul Hall); City000350-357
13                (8 pages)................................pre

14      11        Yreka Police Department 11/12/19
                  Use of Force Review Board Findings;
15                City000348-349
                  (2 pages)................................pre
16
        12        letter dated 11/19/2019 to John Gale
17                from Justin Mayberry, re: Administrative
                  Review of Incident; City000588
18                (1 page).................................pre

19

20                        ---oOo---

21

22

23

24

25
```

1                        ---oOo---

2              BE IT REMEMBERED that on Thursday, March 3,

3       2022, at the hour of 10:02 a.m., of said day, with all

4       participants appearing remotely via videoconference,

5       before me, Lynne M. Nisson, a Certified Shorthand

6       Reporter, State of California, appeared CORPORAL TIM

7       GREEN, who was examined as a witness in said cause.

8                        ---oOo---

9                   CORPORAL TIM GREEN

10      the Witness, called on behalf of the Plaintiffs, having

11      been administered an oath in accordance with C.C.P.

12      Section 2094, was examined and testified as follows:

13              EXAMINATION BY MR. BABICH

14      Q.      By MR. BABICH:  Can you please state your name?

15      **A.**      Timothy Green.

16      Q.      And you are a corporal in the Weed Police

17      Department; correct?

18      **A.**      Yes, sir.

19      Q.      And where are you currently at this moment?

20      **A.**      In Hutchinson, Kansas.

21      Q.      What are you doing out there?

22      **A.**      Visiting my 94-year-old grandmother.

23      Q.      Thank you for making yourself available today.

24      My name is Joe Babich.  I represent Paul Hall, also

25      known as PJ Hall, regarding the Taser incident that

1    Police Department prior to October 12, 2019?

2    **A.**        Yes.

3    Q.        In the discovery process we've received a

4    number of those reports.

5              But just generally, what was your understanding

6    of the contacts that Weed PD had with Mr. Hall prior to

7    October 12, 2019?

8    **A.**        I could probably only talk about the contacts

9    I've had with him.

10   Q.        Okay.  Can you share those with us?

11   **A.**        Generally, PJ and I are friendly.  My wife's

12   been friends with the family for a long time.  So, you

13   know, he drives down the road, I see him, we wave at

14   each other.  We still do that to this day.

15             I had one incident that I can recall at his

16   mother's house where I was -- I was sent to his home.

17   His mother had called and said that he was suicidal and

18   upstairs of the house with a shotgun; and arrived on

19   scene, a couple deputies showed up and basically cleared

20   out the house; had Mary come out and just talk to him,

21   try to talk him down; had him on a phone.  I don't know

22   how long after I was there, but it was -- it was a good

23   amount of time.  At the time Chief Mayberry, who was a

24   sergeant at the time, arrived on scene, and we both

25   eventually talked him down and out and spoke to him for

1    about an hour behind the house.

2           I had another incident where I found him in a

3    house that was under construction late at night, and

4    just went out and talked to him and asked him why he was

5    there.  At that time I don't think I knew the family

6    dynamics, and he was in his -- it would be his

7    brother-in-law's home doing some insulation work.

8    Q.      Okay.  Do you recall any other police

9    encounters with him?

10   A.      Nothing that would come to memory of being

11   anything of significance.

12   Q.      Did you have an understanding of his use of

13   drugs?

14   A.      Yes.

15   Q.      And what's that understanding?

16   A.      That he was a -- he -- well, admittedly, that

17   day that we had talked about when he was upstairs in the

18   house with the shotgun, you know, and he spoke about

19   methamphetamine and that was something that he -- you

20   know, that was his narcotic of choice.

21          I know that prior to my employment with the

22   City of Weed that he was arrested for sales.  Just --

23   that's kind of common knowledge.  We know about, you

24   know, the people, things that happen.  So it's just one

25   of the things that have come up in history.

```
 1    or a group of people that were looking into the

 2    circumstances of the incident.  And I know that Officer

 3    Jole was involved in that because he's the Taser

 4    instructor.

 5    Q.        And what is Officer Jole -- is it Joel,

 6    J-O-E-L?

 7    A.        J-O-L-E.

 8    Q.        What's his first name?

 9    A.        Shawn, S-H-A-W-N.

10    Q.        Is it your understanding he was the Taser

11    instructor that instructed Officer Gale?

12    A.        Yes.

13    Q.        Did you participate in any Taser programs or

14    training with Officer Jole?

15    A.        Yes.  He -- I'm certified through him.

16    Q.        And is it your understanding that Officer Gale

17    is also certified through him?

18    A.        Yes.  He has -- every officer has to be -- has

19    to be go through the instruction in order to carry the

20    Taser on duty.

21    Q.        And when you were instructed on the use of the

22    Taser, you had -- you learned and had an understanding

23    that one of the things you want to avoid is using the

24    Taser around flammables?

25    A.        Yes.
```

 1    all 12 of the exhibits to this depo.  And if we add more

 2    later we'll continue to consecutively number them after

 3    12.

 4             MR. KILDAY:  Yeah.  That's a good idea, Joe,

 5    especially because you provided these 12 for the

 6    deposition tomorrow and next week as well.

 7             MR. BABICH:  Right.

 8             MR. KILDAY:  I have no questions.

 9                       ---oOo---

10             (Proceedings concluded at 10:44 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    WITNESS'S SIGNATURE

2

3     Pursuant to Section 2025.520 of the Code of Civil
      Procedure of the State of California, I hereby certify
      that I have read my deposition transcript, taken
4     Thursday, March 3, 2022, pages 1 through 35, made the
      changes and corrections I deem necessary and approve the
5     same as true and correct.

6            I hereby state there are:

7                 (Check one)_____  no corrections
                             _____  corrections per attached
8

9     _____      _____
      CORPORAL TIM GREEN                DATE
10

11

12                        ---oOo---

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    WITNESS'S CHANGES OR CORRECTIONS

2            NOTE:  If you are adding to your testimony,
   print the exact words you want to add.  If you are
3  deleting from your testimony, print the exact words you
   want to delete.  Specify with "Add" or "Delete" and sign
4  this form.

5  Deposition of:  CORPORAL TIM GREEN
   Case Title:  HALL v. WEED
6  Date of Deposition:  Thursday, March 3, 2022

7
   Page Line           Change/Add/Delete
8

9  ____   ____    _____

10 ____   ____    _____

11 ____   ____    _____

12 ____   ____    _____

13 ____   ____    _____

14 ____   ____    _____

15 ____   ____    _____

16 ____   ____    _____

17 ____   ____    _____

18 ____   ____    _____

19 ____   ____    _____

20 ____   ____    _____

21
   Pursuant to Section 2025.520 of the Code of Civil
22 Procedure of the State of California, I hereby certify
   that I have read my deposition transcript and made the
23 above-noted changes and corrections and approve them as
   true and correct.
24
   _____    _____
25 CORPORAL TIM GREEN                        Date

 1                    REPORTER'S CERTIFICATE

 2

 3          I certify that the witness in the foregoing

 4     deposition,

 5                    CORPORAL TIM GREEN

 6          was by me duly sworn to testify the truth, the

 7     whole truth, in the within-entitled cause; that said

 8     deposition was taken at the time and place therein

 9     named; that the testimony of said witness was reported

10     by me, a duly Certified Shorthand Reporter and a

11     disinterested person, and was thereafter transcribed

12     into typewriting.

13          I further certify that I am not of counsel or

14     attorney for either or any of the parties to said

15     deposition, nor in any way interested in outcome of the

16     cause named in said caption.

17          IN WITNESS WHEREOF, I have hereunto set my hand

18     this 21st day of March, 2022.

19

20

21     _____

       LYNNE M. NISSON, CSR 7317

22     State of California

23

24

25

# EXHIBIT G

**LEXITAS**

**LEXITAS ORDER NUMBER:**
166422-01

**RECORDS REGARDING:**
Paul Hall

**CLAIM NUMBER:** 0
**ATTORNEY OR EXAMINER:** Derick Konz

**RECORDS FROM:**

Siskiyou County District Attorney's Office
311 Fourth Street, Room 204
Yreka, CA 96097

AB
SMR

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

Case 2:20-cv-01789-TLN-DMC Document 44-4 Filed 11/15/23 Page 285 of 317

# UNITED STATES DISTRICT COURT

for the
District of UNITED STATES DISTRICT COURT - SACRAMENTO

| | | |
|---|---|---|
| **Paul Hall and Jeannette Hall** | ) | |
| *Plaintiff* | ) | |
| v. | ) | |
| | ) | Civil Action No.: **2:20-cv-01789** |
| **City of Weed** | ) | *If the action is pending in another district, state where:* |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

TO: **Siskiyou County District Attorney's Office, J. Kirk Andrus , 311 Fourth Street, Room 204, Yreka, CA 96097**

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

**Any and all records, reports, interviews, writings, findings, all notes and files pertaining to investigation into incident on 10.12.2019, concerning: Paul Hall AKA PJ Hall AKA Paul Jason Hall  DOB: February 26, 1972 and John Gale**

| | |
|---|---|
| Place: (800) 497 7618<br>Lexitas, 2550 Warren Drive, Rocklin, CA 95677<br> **Mail To: Lexitas Records Dept. P.O. Box 3010 Rocklin, CA 95677** | Date and Time:<br>May 01, 2023<br>10:00AM |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| | |
|---|---|
| Place: | Date and Time: |

    The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: March 30, 2023

        *CLERK OF COURT*

                                 OR               **/s/ Derick Konz**

    *Signature of Clerk or Deputy Clerk*                              *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing the **Defendant: City of Weed**, who issues or requests this subpoena, are:
**Derick Konz         916-564-6100**
**Angelo Kilday & Kilduff**
601 University Ave., #150 , Sacramento, Ca 95825

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

Case 2:20-cv-01785-BNW Document 44-4 Filed 11/15/23 Page 286 of 317

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
  (i) is a party or a party's officer; or
  (ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
 (A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 (B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
 (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
 (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  (i) fails to allow a reasonable time to comply;
  (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
  (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  (iv) subjects a person to undue burden.
 (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
  (i) disclosing a trade secret or other confidential research, development, or commercial information; or

 (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
 (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
 (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  (i) expressly make the claim; and
  (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

1
2
3
4
5
6
7
8
9
10
11
12

**UNITED STATES DISTRICT COURT**

**For the**
**Eastern District of California**

| | | |
|---|---|---|
| Paul Hall and Jeannette Hall | ) | Case No.: 2:20-cv-01789v-01789 |
| | ) | |
| Plaintiff, | ) | **DEFENDANTS' NOTICE OF SUBPOENA** |
| | ) | **FOR PRODUCTION OF THIRD PARTY** |
| vs. | ) | **RECORDS** |
| | ) | |
| City of Weed | ) | **[PURSUANT TO FEDERAL RULES OF** |
| | ) | **CIVIL PROCEDURE 45]** |
| Defendants. | ) | |

13
14
15
16
17
18

19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

TO PARTIES AND THEIR ATTORNEYS OF RECORD IN THIS ACTION:

PLEASE TAKE NOTICE THAT, Pursuant to Rule 45 of the Federal Rules of Procedure, Defendant City of Weed will be serving upon a third party to this action a subpoena for the production of party records. Defendant is seeking records from: Siskiyou County District Attorney's Office. True correct copies of subpoenas are attached hereto.

Dated: March 30, 2023

By: ___ /s/Derick Konz ___

1

COURT:            **United States District Court - For the Eastern District of California**

2

CASE NO.:       **2:20-cv-01789**

CASE NAME:   **Paul Hall and Jeannette Hall**

3

## PROOF OF SERVICE

4

5

I am a citizen of the United States, employed in the County of Placer, State of California. My business address is 2550 Warren Dr., Rocklin, California 95677. I am over the age of 18 years and not a party to the above-entitled action.

6

7

On March 30, 2023, I caused the within **Defendant: City of Weed Notice of Subpoena for Production of Third Party Records**, a copy of which was produced on recycled paper, to be served via

8

9

☒    E-MAIL ---

10

I am readily familiar with the business practice for collection and processing of correspondence for emailing and that the correspondence described below will be emailed today in the ordinary course of business. I am also aware that service made pursuant to this paragraph, upon motion of a party served, shall be presumed invalid if the email date is more than one day after the date for emailing contained in this affidavit.

11

12

13

On March 30, 2023 served the attached Subpoena, Notice to all Parties of Taking Deposition (records only, if applicable), Notice to Consumer (if applicable) and request for copies of records on the parties or attorneys for all parties, in said action by emailing each party addressed as listed below:

14

15

**Joseph Babich Dryer (dbbwc-eservice@dbbwc.com) of Babich Buccola Wood Campora, Representing: Plaintiff: Paul Hall and Jeannette Hall**

16

**Dale Allen Allen (dallen@aghwlaw.com) of Glaessner Hazelwood & Werth, Representing: Defendant: John Gale**

17

☒    I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

18

19

Executed on March 30, 2023 at Rocklin, California.

20

21

                                                    /s/ Sonjia Richards

22

23

24

25

26

27

--3--

28

Defendants' Notice of Subpoena for Production of Third Party Records

1-19-1921

Paul Q. Goyette
Gary G. Goyette
Daniel P. Thompson
Rafael Ruano
Brett F. Sherman
Nicole Valentine
Heather N. Phillips
Richard P. Fisher
Scott Nelson
Sarah Tobias
David J. Garcia
Rachel E. Simons
Ian D. Woo



**Labor Representatives:**
Steve Allen
Paul Konsdorf
Kim Gillingham
Paul Heckman
Tim Cantillon
David Swim, D.P.A.
Dorothea A. Contreras
Matt Rokes
Tony Silva
Ryan Friesen

**Sacramento Office**
2366 Gold Meadow Way, Suite 200
Gold River, CA 95670
(916) 851-1900
Toll Free (888) 993-1600
Facsimile (916) 851-1995
info@goyette-assoc.com

March 13, 2020

Siskiyou County Sheriff's Office
Attn: Jeff Moser
305 Butte Street
Yreka, CA 96097

Dear Mr. Moser:

Enclosed please find a copy of Officer John Gale's statement to the Weed Police Department on November 4, 2019 regarding the October 12, 2019 incident.

If you have any questions or concerns, please contact me at (916) 851-1900 or via email at brett@goyette-assoc.com.

Very truly yours,

**GOYETTE & ASSOCIATES, INC.**
**A Professional Law Corporation**

Brett Sherman, Esq.

Enclosures


RECEIVED
MAY 13 2020
By_____

GOLD RIVER      MODESTO      REDDING      FRESNO      YREKA

# CRAIG WOOD REPORTING

P.O. Box 493577 ◆ Redding, CA 96049-3577 ◆ (530) 244-0789 ◆ FAX: 244-0787

In The Matter Of:                    )        CERTIFIED
                                     )         COPY
                                     )
OFFICER JOHN GALE.                   )
                                     )   No.
_____)


ADMINISTRATIVE INTERVIEW OF OFFICER JOHN GALE

WEED POLICE DEPARTMENT


Monday, November 4, 2019

1:41 p.m.

RECEIVED

MAY 13 2020

By_____


Transcribed By:    CRAIG W. WOOD, RPR, CSR No. 9789

Administrative Interview of Officer John Gale              Monday, November 4, 2019



1

2                                    **APPEARANCES**

3

4

     For Officer John Gale:
5
          GOYETTE & ASSOCIATES, INC.
6         2366 Gold Meadow Way, Suite 200
          Gold River, CA 95670
7         (916) 851-1900
          BY:  BRETT F. SHERMAN
8

9

     Interviewer:
10
          Sergeant Jared Klomparens
11

12

13
                              ---oOo---
14

15

16

17

18

19

20

21

22

23                                                  RECEIVED
24                                                  MAY 13 2020
25                                              By_____

1                        PROCEEDINGS

2                        ---oOo---

3

4          SERGEANT KLOMPARENS:  So it is 1:41 on Monday

5    the 4th.  I'm sitting here with Officer John Gale and

6    his attorney, attorney Brett Sher- -- I always forget

7    your last name.

8          MR. SHERMAN:  Brett Sherman from Goyette &

9    Associates.

10         SERGEANT KLOMPARENS:  I apologize.

11         The first thing I'm going to do, Officer Gale, is

12   read you the Garrity warning.

13         I would advise you are being questioned as part

14   of an official investigation of the Weed Police

15   Department.  You'll be asked questions specifically

16   directed and narrowly related to your performance of

17   your official duties or fitness for office.

18         You're entitled to all these rights and

19   privileges guaranteed by the laws and the Constitution

20   of the state and the Constitution of the United States,

21   including the right not to be compelled to incriminate

22   yourself or have -- sorry, let me start -- compelled to

23   incriminate yourself and to have representation present

24   during questioning.

25         I further wish to advise you if you refuse to

RECEIVED
MAY 13 2020
By_____

1    his body, that would -- that would stop him from

2    potentially lighting himself on fire.

3        Q.    And you've been an officer for almost two years

4    now.   You're aware of how people act when they are high

5    on any type of controlled substances.

6           Do you believe PJ was high on any controlled

7    substances based upon your training and experience?

8        A.    Based on my training and experience and past

9    history and knowledge of the narcotic use, that was

10   going through my mind, yes.

11       Q.    And based upon that, with him believing or -- I

12   don't want to put words in your mouth.

13           Did you believe at that point he was on

14   controlled -- on something?

15       A.    Yes, sir.

16       Q.    Believing that he was on some type of

17   controlled substance, you believed he was actually going

18   to light himself on fire at that point?

19       A.    Yes, sir.

20       Q.    And which -- what ultimately possibly spread

21   to, obviously, the house and you, as well; causing

22   damage to yourself?

23       A.    Yes, sir.

24       Q.    Or causing harm to yourself?

25           So you made the decision based upon that to go

RECEIVED
MAY 13 2020
By_____

1    else to add or anything like that?

2         MR. SHERMAN:  I have nothing at this point.

3         SERGEANT KLOMPARENS:  Okay.  I'm going to end

4    now at 1401 hours.

5         (End of interview.)

6

7                    ---oOo---

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RECEIVED
MAY 13 2020
By

Administrative Interview of Officer John Gale             Monday, November 4, 2019

1                       CERTIFICATE OF REPORTER

2          DECLARATION OF COURT REPORTER REGARDING CCP 237(a)(2)

3

4

5          I, CRAIG W. WOOD, a Certified Shorthand Reporter,
    licensed by the State of California, License No. 9789,
6   being empowered to administer oaths and affirmations
    pursuant to Section 2093(b) of the Code of Civil
7   Procedure, do hereby certify:

8          That the foregoing proceedings were taken in
    stenographic shorthand before me at the time and place
9   herein stated, that said proceedings were taken before
    me in shorthand writing, and were thereafter transcribed
10  under my direction by computer-aided transcription;

11         That the foregoing transcript, pages 1 to 19,
    constitutes a full, true, and accurate record of the
12  proceedings which took place;

13         That I am not of counsel or attorney for any of the
    parties hereto, or in any way interested in the event of
14  this cause, and that I am not related to any of the
    parties hereto.

15         I further declare that pursuant to the provisions
    of the Code of Civil Procedure section 237(a)(2) and to
16  the best of my ability, personal juror identifying
    information has been redacted from those portions of the
17  reporter's transcript governed by CCP 237(a)(2).

18         IN WITNESS WHEREOF, I have hereunto subscribed my
    signature.

19

20         DATED:     November 20, 2019

21

22

23         _____

24               CRAIG W. WOOD, RPR, CSR 9789

25

RECEIVED
MAY 13 2020
By_____

**CRAIG WOOD REPORTING**
Redding, California --- (530) 244-0789

19

0120

**LEXITAS**™

This form MUST be completed and returned, whether or not you have records.

PHONE (888) 739-2279 | FAX (888) 797-4849 |
RECORDS916@LEXITASLEGAL.COM
P.O. BOX 3010, ROCKLIN, CA 95677

## DECLARATION OF CUSTODIAN OF RECORDS

Siskiyou County District Attorney's Office
311 Fourth Street, Room 204
Yreka, CA 96097

Lexitas Work Order # 166422-01

Case Name   Paul Hall and Jeannette Hall
vs.         City of Weed

The Custodian of Records or other qualified witness for Siskiyou County District Attorney's Office, in regards to Any and all records, reports, interviews, writings, findings, all notes and files pertaining to investigation into incident on 10.12.2019, concerning: Paul Hall AKA PJ Hall AKA Paul Jason Hall  AKA PJ Hall AKA Paul Jason Hall  DOB: February 26, 1972 and John Gale

**1. Records Produced:** (check all that apply) ☒ **RECORDS**  ☐ **X-RAY/ MRI / CT IMAGES**  ☐ **BILLS & STATEMENTS**

As the duly authorized Custodian of Records, or other qualified witness for the above named entity, I have authority to certify these records. The records submitted herein are true copies of all the records described in the Subpoena Duces Tecum /Authorization. Or pursuant to subdivision (e) of Section § 1560 of the California Evidence Code, the records were delivered to the attorney or the attorney's representative for copying at the custodian's place of business, as the case may be. To the best of my knowledge, all such records were prepared or compiled by the personnel of the above named business in the ordinary course of business at or near the time of the acts, conditions or events recorded. The sources of information and method and time of preparation were such as to indicate its trustworthiness. No documents have been withheld in order to avoid their being copied. If we have only part of the records described in the Subpoena Duces Tecum/Authorization such records as are now available, have been provided. The mode of preparation is that our paper and computer records were searched, and copies were made available.

**2. Records NOT Produced:** (check all that apply) ☐ **RECORDS**  ☐ **X-RAY/ MRI / CT IMAGES**  ☐ **BILLS & STATEMENTS**

A thorough search has been made for the documents described in the Subpoena Duces Tecum/ Authorization and, based on the information provided to us for identification, no such records were found. To the best of my knowledge, the records sought

☐ Never Existed     ☐ Are Lost     ☐ Have Been Destroyed [Retention Period? ___ years]

Records are not found at our facility, but may be located at: _____

Only partial records are provided.
REASON: _____

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on  5/9/23  at  Yreka, CA         Phone  530-842-8125

Print Name  Rachel Parks     Signature _____

> Complete This Section

### THIS SECTION FOR PROFESSIONAL PHOTOCOPIER USE ONLY

☐ The Custodian refused to sign the declaration and/or generate a similar document at the time of records production.

The undersigned certifies that he/she is an employee of a Professional Photocopier (Business and Professions Code § 22450) and that Lexitas is registered in Santa Clara County, Registration # 1 and Placer County, Registration #7.

I certify that these records have been transmitted or distributed to authorized persons or entities only. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on _____ at _____
                (Date)          (City & State)
Print Name _____     Signature _____

LGDECL_SMR

# EXHIBIT H

Case 2:20-cv-01789-TLN-DMC   Document 44-4   Filed 11/15/23   Page 299 of 317
HALL vs CITY OF WEED
Police - Use of Force Incident on 10/12/2019

1

2

3

4

5        UNITED STATES DISTRICT COURT

6      EASTERN DISTRICT OF CALIFORNIA

7          CASE NO. 2:20-cv-01789

8

9

10      TRANSCRIPT OF AUDIO-RECORDED

11         USE OF FORCE INCIDENT

12   IN THE MATTER OF HALL V. CITY OF WEED

13            OCTOBER 12, 2019

14

15

16

17

18

19

20

21

22

23

24

25

**HALL vs CITY OF WEED**
**Police - Use of Force Incident on 10/12/2019**                        Page 2

```
 1          JEANETTE:  Now, he's going out the back door.

 2          MR. HALL:  Take your fucking calls [ph] off --

 3     fucking --

 4          OFF. GALE:  PJ, what's going on?

 5          MR. HALL:  I'm fucking leaving.

 6          OFF. GALE:  Weed PD 449, Gale, PJ Hall. What's

 7     going on, man

 8          MR. HALL:  Step back, you know. I'm not --

 9          OFF. GALE:  Okay.

10          MR. HALL:  -- I am not well [ph].

11          OFF. GALE:  All right. I'm not coming towards

12     you. I just want to know --

13          MR. HALL:  So --

14          OFF. GALE:  -- what's going on.

15          MR. HALL:  Just go.

16          OFF. GALE:  Weed PD 449, Gale, PJ Hall.

17          Talk to me about what's going on, man? PJ. Look,

18     I can't go anywhere. Weed PD P449. Send me another

19     unit. Talk to me about -- so, what's going on. I'm not

20     --

21          [talking over each other].

22          OFF. GALE:  -- going anywhere. What?

23          MR. HALL:  It's not safe for you.

24          OFF. GALE:  What do you mean it's not safe for me

25     here?
```

**HALL vs CITY OF WEED**
**Police - Use of Force Incident on 10/12/2019**                    **Page 3**

1      MR. HALL:  Because I'm about ready to go?

2      OFF. GALE:  Why you ready to go?

3      MR. HALL:  I'm covering with everything you could

4  ever do to [inaudible].

5      OFF. GALE:  Okay. What does that mean?

6      MR. HALL:  I'm going.

7      OFF. GALE:  Why are you going?

8      MR. HALL:  I'm leaving.

9      OFF. GALE:  Leaving where?

10     MR. HALL:  Leaving this place.

11     OFF. GALE:  Why? Dude, I was just over here

12  talking to you the other day. And you had a plan for

13  cleaning this place up.

14     MR. HALL:  I didn't have nothing. What I have is

15  somebody, um -- who -- who's to pay for this place for

16  one [ph]?

17     OFF. GALE:  Okay, PJ.

18     MR. HALL:  She knew what she was doing.

19     OFF. GALE:  Put the lighter down.

20     MR. HALL:  She knew what she was doing.

21     OFF. GALE:  PJ, put --

22     MR. HALL:  It's not safe.

23     OFF. GALE:  -- the lighter down.

24     MR. HALL:  It's not safe for you. Just please go.

25     OFF. GALE:  Okay. PJ, put the lighter down.

**HALL vs CITY OF WEED**
**Police - Use of Force Incident on 10/12/2019**                    **Page 4**

1      MR. HALL:  It's not safe for you. Please go --

2      OFF. GALE:  Okay.

3      MR. HALL:  -- okay?

4      OFF. GALE:  PJ, put the lighter down.

5      MR. HALL:  I'm begging you, please just go.

6      OFF. GALE:  I can't go anywhere. Put the lighter

7   down, man.

8      MR. HALL:  I'm begging you, please just go for

9   everybody's sake. And please just go.

10      OFF. GALE:  I'm concerned about your safety.

11      MR. HALL:  You've done your job.

12      OFF. GALE:  I've done my job? No, I haven't.

13      MR. HALL:  Yeah, you have.

14      OFF. GALE:  How?

15      MR. HALL:  You're here [ph]. I tried.

16      OFF. GALE:  What?

17      MR. HALL:  All you're doing is putting yourself

18   in jeopardy, and it's not worth it.

19      OFF. GALE:  What you mean it's not worth it?

20      MR. HALL:  I'm not worth it.

21      OFF. GALE:  That's not true. Look, man, just talk

22   to me. Come on. PJ --

23      MR. HALL:  I'm not worth it.

24      OFF. GALE:  Yes, you are.

25      MR. HALL:  I'm not.

**HALL vs CITY OF WEED**
**Police - Use of Force Incident on 10/12/2019**                    **Page 5**

1      OFF. GALE:  Why?

2      MR. HALL:  I never have been.

3      OFF. GALE:  Okay. PJ, put your hands behind your

4  back.

5      MR. HALL:  I never have been worth it.

6      OFF. GALE:  Put your hands behind me. Don't fight

7  me, man.

8      MR. HALL:  I never have been worth it.

9      OFF. GALE:  Don't fight me, man.

10      MR. HALL:  I never have been worth it.

11      OFF. GALE:  Okay. I don't think that's true. I'm

12  asking you. Don't fight me right now.

13      MR. HALL:  I never have been worth it. I'm, uh,

14  [talking over each other] right now.

15      OFF. GALE:  Don't fight me right now.

16      MR. HALL:  And I'm going to go play [talking over

17  each other].

18      OFF. GALE:  Drop the lighter, sir. Drop the

19  lighter.

20      MR. HALL:  I'm warning you.

21      OFF. GALE:  Give me the lighter.

22      MR. HALL:  [talking over each other].

23      OFF. GALE:  Give me the lighter.

24      MR. HALL:  Please be safe. Please take your --

25  take care of yourself. Take care of everybody you

**HALL vs CITY OF WEED**
**Police - Use of Force Incident on 10/12/2019**                    Page 6

1    love.

2        OFF. GALE:  80449 [talking over each other]. Give

3    me the lighter.

4        MR. HALL:  Just go.

5        OFF. GALE:  Give me the lighter.

6        MR. HALL:  You're not going to overpower me, man.

7        OFF. GALE:  Give me the lighter, man. I'm trying

8    to get the lighter --

9        MR. HALL:  Yes, you are.

10       OFF. GALE:  -- from you. Give me the lighter,

11   now.

12       MR. HALL:  Just go be safe. Go be safe.

13       OFF. GALE:  Give me the lighter.

14       MR. HALL:  Just be safe.

15       OFF. GALE:  Let go of the lighter.

16       MR. HALL:  Go be safe.

17       OFF. GALE:  Give me the lighter.

18       MR. HALL:  Go be safe. Go take care of who you

19   love

20       OFF. GALE:  [talking over each other]. Give me

21   the lighter.

22       MR. HALL:  You're not going to overpower me. Go

23   be safe of who you love.

24       OFF. GALE:  Give me the lighter, man

25       MR. HALL:  Go be safe on who you love.

1        OFF. GALE:  PJ, give me the lighter.

2        MR. HALL:  Just go take care of them.

3        OFF. GALE:  Give me the lighter.

4        MR. HALL:  Take care of them.

5        OFF. GALE:  Give me the lighter.

6        MR. HALL:  Take care of who you love.

7        OFF. GALE:  I am. Give me the lighter.

8        MR. HALL:  Take care of who you love. Don't --

9   not me.

10       OFF. GALE:  Let go.

11       MR. HALL:  I'm not worth it.

12       OFF. GALE:  Let go [talking over each other].

13       MR. HALL:  I'm not worth it.

14       OFF. GALE:  Let go of the lighter.

15       MR. HALL:  I'm not worth it. Go.

16       OFF. GALE:  Give me the lighter, man.

17       MR. HALL:  No. I'm not --

18       OFF. GALE:  Give me the lighter, [talking over

19   each other].

20       MR. HALL:  -- I'm not worth it.

21       OFF. GALE:  Give me the lighter.

22       MR. HALL:  I'm not worth it. Go.

23       OFF. GALE:  Let go of the lighter.

24       MR. HALL:  Go. I'm not worth it.

25       OFF. GALE:  I'm not going anywhere.

**HALL vs CITY OF WEED**
**Police - Use of Force Incident on 10/12/2019**                    Page 8

1          MR. HALL:  I'm not worth it.

2          OFF. GALE:  Give me the lighter.

3          MR. HALL:  I'm not worth it.

4          OFF. GALE:  Give me the lighter.

5          MR. HALL:  I'm going to light us both if you get

6     me [ph].

7          OFF. GALE:  I'm telling you, man, give me the

8     lighter.

9          MR. HALL:  Just go. Let me --

10          OFF. GALE:  Give me the lighter now.

11          MR. HALL:  I'm telling you, just go.

12          OFF. GALE:  Give me the lighter.

13          MR. HALL:  Uh, please, just go.

14          OFF. GALE:  Give me the lighter now.

15          MR. HALL:  Just go. I'm not trying to hurt you.

16     I'm not [talking over each other] --

17          OFF. GALE:  I'm not trying to hurt you either,

18     man.

19          MR. HALL:  -- do anything. I just want to go be

20     safe.

21          OFF. GALE:  Just give me the lighter.

22          MR. HALL:  Go be safe. Go take care of --

23          OFF. GALE:  Give me the lighter.

24          MR. HALL:  -- who you love.

25          OFF. GALE:  Give me the lighter.

**HALL vs CITY OF WEED**
**Police - Use of Force Incident on 10/12/2019**                    Page 9

1        MR. HALL:  Go take care of who you love. Go.

2        OFF. GALE:  Give me the lighter.

3        MR. HALL:  Take care of who you love.

4        OFF. GALE:  Give me the lighter now.

5        MR. HALL:  Take care of what's important to you.

6        OFF. GALE:  Give me the lighter now, PJ. This is

7   not how it needs to go.

8        MR. HALL:  This is how it's going.

9        OFF. GALE:  Why?

10       MR. HALL:  Because I -- I have nothing left.

11       OFF. GALE:  Yes, you do.

12       MR. HALL:  No, I don't. I have nothing.

13       OFF. GALE:  Yes, you do.

14       MR. HALL:  I have nothing. I'm begging you.

15  Please, just go. Go. I don't want to hurt you. I don't

16  want to hurt you. I don't want nothing to happen.

17  Please, just go.

18       OFF. GALE:  I'm right here. All right?

19       MR. HALL:  If the lights out [ph], we both go.

20  Just go. Just go, man.

21       OFF. GALE:  I'm not leaving, PJ. I'm not leaving.

22       MR. HALL:  Nothing's going to stop this from

23  happening. This is happening.

24       OFF. GALE:  PJ, I'm right here with you, man.

25       MR. HALL:  This is what happened. This is --

**HALL vs CITY OF WEED**
**Police - Use of Force Incident on 10/12/2019**                                    Page 10

1        OFF. GALE:  I'm right here.

2        MR. HALL:  -- this is all I'm worth.

3        OFF. GALE:  Okay. I'm right here.

4        MR. HALL:  I'm begging -- I told you not to stop.

5    I'm about to start --

6        OFF. GALE:  Don't light it, PJ. Stop.

7        MR. HALL:  I'm going to fucking light it. I swear

8    to fucking God.

9        OFF. GALE:  [talking over each other]. Let it go.

10       MR. HALL:  Go be happy.

11       OFF. GALE:  Put it down.

12       MR. HALL:  Save your life. Put it down. Live your

13    life.

14       OFF. GALE:  Put it down.

15       MR. HALL:  I still flick it when you -- when you

16    stung me. I will.

17       OFF. GALE:  Put it down.

18       MR. HALL:  You know I will.

19       OFF. GALE:  Put it down. Drop the lighter.

20       MR. HALL:  You know I will.

21       OFF. GALE:  Drop the lighter. Give me the

22    lighter, PJ.

23       MR. HALL:  Only death will -- will stop me.

24       OFF. GALE:  Give me the lighter.

25       MR. HALL:  Only death will stop me.

**HALL vs CITY OF WEED**
Police - Use of Force Incident on 10/12/2019                    Page 15

```
 1   OFF. GALE:  Get on the ground, dude.

 2   MR. HALL:  PJ, [talking over each other].

 3   OFF. GALE:  PJ, PJ.

 4   JEANETTE:  PJ.

 5   MR. HALL:  You can stop bullying me.

 6   OFF. GALE:  We need [talking over each other].

 7   MR. TROY:  What the fuck.

 8   OFF. GALE:  PJ. Stop.

 9   JEANETTE:  [talking over each other].

10   OFF. GALE:  Stop fighting.

11   MR. HALL:  Dumb motherfucker. You kill me --

12   JEANETTE:  Get down.

13   MR. HALL:  -- if you wanted to.

14   OFF. GALE:  You lit this.

15   MR. HALL:  You knew what I was doing.

16   OFF. GALE:  You lit the match.

17   MR. HALL:  You knew it'd be going up.

18   OFF. GALE:  You lit the match.

19   MR. HALL:  Fucking little faggot.

20   MR. TROY:  Hey, zip [ph] you cock.

21   JEANETTE:  Damage. See you wrong [ph].

22   OFF. GALE:  Stop fighting.

23   JEANETTE:  You're wrong.

24   FEMALE 2:  He's my brother.

25   OFF. GALE:  [talking over each other]. Stop
```

Case 2:20-cv-01789-TLN-DMC   Document 44-4   Filed 11/15/23   Page 310 of 317
**HALL vs CITY OF WEED**
Police - Use of Force Incident on 10/12/2019                          Page 16

```
 1   fighting me.

 2         FEMALE 2:  I don't care. He's my brother.

 3         OFF. GALE:  PJ, you lit the match right in front

 4   of me.

 5         JEANETTE:  PJ.

 6         OFF. GALE:  I shot a taser, the taser.

 7         FEMALE 2:  Leave him alone.

 8         OFF. GALE:  The taser's going [be the pressure

 9   ph].

10         MR. TROY:  Down the [ph] --

11         FEMALE 2:  Leave him alone.

12         OFF. GALE:  Don't fight.

13         JEANETTE:  Uh, PJ.

14         MR. HALL:  PJ.

15         OFF. GALE:  Step back.

16         FEMALE 2:  Leave him alone.

17         JEANETTE:  PJ, stop. [talking over each other].

18         OFF. GALE:  PJ.

19         JEANETTE:  PJ.

20         FEMALE 2:  PJ.

21         JEANETTE:  No.

22         FEMALE 2:  Mattie, you have to calm him down. Go.

23         JEANETTE:  PJ, stop.

24         OFF. GALE:  Stop fighting me.

25         JEANETTE:  Stop.
```

**HALL vs CITY OF WEED**
**Police - Use of Force Incident on 10/12/2019**                Page 18

```
1          OFF. GALE:  Calm down.

2          MR. HALL:  Give it cover.

3          OFF. GALE:  I got you covered, man.

4          JEANETTE:  Oh, my God.

5          MR. TROY:  I got you covered.

6          OFF. GALE:  Radio for some backup.

7          JEANETTE:  It'd be here.

8          OFF. GALE:  Weed PD 449.  I need backup.

9          MR. HALL:  [talking over each other] cover.

10         OFF. GALE:  Yeah. We'll get it covered.

11         MALE 6:  [talking over each other] now.

12         OFF. GALE:  We'll get you covered.

13         MR. HALL:  Okay. That's enough.

14         MR. TROY:  No. Hey, wait.

15         MR. HALL:  Mattie. Mattie.

16         OFF. GALE:  And we understand. We're trying to

17    help you. The medics will be here in a minute.

18         MALE 6:  Did you dispatch medical?

19         MR. HALL:  That guy's taser that tased me.

20         MR. TROY:  Yes.

21         MALE 6:  And did you guys [talking over each

22    other].

23         MR. HALL:  That guy tased me and set me on fire.

24         MALE 6:  Do you mind [talking over each other].

25         OFF. GALE:  Seems clear [talking over each other]
```

**HALL vs CITY OF WEED**
**Police - Use of Force Incident on 10/12/2019**                     Page 19

```
 1   vehicle. Scene is clear.
 2        MR. HALL:  He tased me and set me on fire. He
 3   tased me.
 4        OFF. GALE:  Calm down, bud. We're here to help.
 5   All right. Hey, calm down. PJ. [talking over each
 6   other]. The ambulance needs to come and see you.
 7        OFF. GALE:  Come on. Come on. Stop fighting.
 8        MR. HALL:  You skinny little motherfucker. You
 9   tased me. Supposed to kill him.
10        OFF. GALE:  All right. I got it.
11        MR. HALL:  Kill him.
12        OFF. GALE:  Not to flight [ph] --
13        MR. HALL:  Hey --
14        OFF. GALE:  -- right now.
15        MR. HALL:  -- kill him.
16        OFF. GALE:  PJ --
17        MR. HALL:  This is [talking over each other].
18        OFF. GALE:  -- sit down PJ. Stop. You need to
19   stop moving.
20        MR. HALL:  Kill him.
21        OFF. GALE:  You need to stop moving now.
22        MR. TROY:  No. We're not killing [talking over
23   each other].
24        MR. HALL:  Kill him.
25        MR. TROY:  We're not killing anybody today.
```

 1       OFF. GALE:  [talking over each other] help us.

 2       MR. HALL:  Why is everything burnt up?

 3       OFF. GALE:  Because you lit yourself on fire

 4  right in front of me, PJ. I'm trying to [talking over

 5  each other].

 6       MR. HALL:  [talking over each other] did.

 7       MR. TROY:  You tased him when he had gas on himm

 8  you dumb fuck.

 9       OFF. GALE:  He lit the match [talking over each

10  other].

11       MR. TROY:  I watched you tase him you dumb piece

12  of shit.

13       MR. HALL:  [talking over each other]

14       MR. TROY:  [talking over each other] fucking --

15       OFF. GALE:  [talking over each other] calm down,

16  bud.

17       MR. TROY:  -- you're so fucking stupid.

18       FEMALE 2:  [talking over each other] oh, my God.

19       GROUP:  [talking over each other].

20       MR. TROY:  With a micro mini dick. [talking over

21  each other] --

22       FEMALE 2:  No.

23       OFF. GALE:  PJ.

24       MR. HALL:  [Inaudible] water.

25       OFF. GALE:  PJ, Fire is her.

```
 1   over each other] --

 2         MR. HALL:  Kill him.

 3         OFF. GALE:  -- is here.

 4         GROUP:  [talking over each other].

 5         OFF. GALE:  Come help me, please.

 6         MALE 6:  You guys could stay there.

 7         MALE 5:  You did this. PJ, PJ. [talking over each

 8   other] I know. Stop. PJ, I know.

 9         OFF. GALE:  35449 negative. We're on Main Street,

10   Main and Inez.

11         JEANETTE:  Why did you tase him?

12         OFF. GALE:  He lit the lighter in front of me,

13   ma'am.

14         JEANETTE:  No, he didn't.

15         MR. TROY:  [talking over each other]. No, he

16   didn't. I watched him.

17         JEANETTE:  No, he didn't.

18         OFF. GALE:  Yeah. I got everybody coming.

19         MALE 8:  You want to get [trash to build it that

20   way [ph] I getting you some.

21         OFF. GALE:  Yeah. I need something for my hands,

22   too.

23         MALE 8:  Well, uh, okay.

24         JEANETTE:  Stop.

25         OFF. GALE:  Weed PD 449. Fire and medical is on
```

**HALL vs CITY OF WEED**

1    scene and so was on scene.

2          FEMALE 2:  What. Is he going to die?

3          OFF. GALE:  Three, he lit himself in front of me.

4    All right. I'm returning to the traffic.

5          OFF. GALE:  Good.

6          OFF. GALE:  Go.

7          OFF. GALE:  Okay.

8          JEANETTE:  Help him. Help him.

9          MALE 9:  Hey, are you okay. You got burns?

10         OFF. GALE:  Uh, yeah. But they need to get him

11   first. I'm all right.

12         MALE 9:  Okay. We need --

13         OFF. GALE:  I'm all right.

14         MALE 9:  -- to know -- we need to get you over

15   here. Come on. Come over here and sit down.

16         OFF. GALE:  Go.

17         MALE 8:  I got the traffic. Come on. Over here.

18   We'll go over here with the officer.

19         JEANETTE:  Why would you do this, sir?

20         MALE 9:  Go.

21         OFF. GALE:  No.

22         MALE 9:  He got burns on his hands.

23         OFF. GALE:  [talking over each other]. I'm sorry.

24         MALE 8:  Let's roll. Let's go. Take it off.

25         OFF. GALE:  Yeah.

Case 2:20-cv-01789-TLN-DMC   Document 44-4   Filed 11/15/23   Page 316 of 317
**HALL vs CITY OF WEED**
Police - Use of Force Incident on 10/12/2019                                    Page 27

1         MALE 10:  You want anything for your --

2         OFF. GALE:  No, I'm good.

3         MALE 9:  Get in.

4         OFF. GALE:  I'm got to go. A man's hurt.

5         MALE 9:  Let's go. Let's go. Let's go to the

6    hospital. [inaudible] just ran over.

7         MALE 10:  ASAP. Take you out of the ditch there

8    [ph]. Got some more for that.

9         MALE 9:  I'm transporting [talking over each

10   other] with the officer in person -- got burns. You

11   all right, man, other than the burns?

12        OFF. GALE:  Uh, the burns -- I'm all right.

13        MALE 9:  We're going to get you there as soon as

14   I can.

15

16

17

18

19

20

21

22

23

24

25

**HALL vs CITY OF WEED**
Police - Use of Force Incident on 10/12/2019                        Page 28

1

2

3        I, Chris Naaden, a transcriber, hereby declare

4  under penalty of perjury that to the best of my

5  ability the above 27 pages contain a full, true and

6  correct transcription of the tape-recording that I

7  received regarding the event listed on the caption on

8  page 1.

9

10       I further declare that I have no interest in the

11  event of the action.

12

13       April 6, 2023

14       Chris Naaden

15

16

17

18  (Hall v. City of Weed, Use of Force, 10-12-19)

19

20

21

22

23

24

25